UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 03-852 (MLC) |
| v. | : | |
| | : | |
| ATLANTIC STATES CAST IRON | : | **MEMORANDUM OPINION** |
| PIPE CO., JOHN PRISQUE, | : | |
| SCOTT FAUBERT, JEFFREY MAURY, | : | |
| and CRAIG DAVIDSON, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**Outline of Opinion**

PRELIMINARY STATEMENT                                                          1

DISCUSSION

I.    DEFENDANTS' POINT I:  "THE COURT COMMITTED REVERSIBLE
      ERROR BY FAILING TO INSTRUCT THE JURY REGARDING CRIMINAL
      NEGLIGENCE AND RECKLESSNESS."                                           4

      A.    Legal standards for jury instructions

      B.    The jury instructions identifying the elements of each charged felony
            offense                                                           7

      C.    The jury instructions defining the mens rea requirements of each
             charged felony offense                                          13

      D.    The jury instructions identifying the elements and defining the
            lesser-included Clean Water Act negligence offense               21

      E.    The government's objection to the last identified element of the Clean
            Water Act and Clean Air Act felony offenses                      24

      F.    Defendants' objection to refusal of their proposed instructions on
            recklessness                                                     30

      G.    Legal analysis for the last identified element of the Clean Water Act
            and Clean Air Act felony offenses                                38

      H.    Legal analysis for refusal of defendants' proposed instructions on
            recklessness                                                     75

II.   DEFENDANTS' POINT II:  "PROSECUTORIAL MISCONDUCT."                     89

III.  DEFENDANTS' POINT III:  "THE COURT COMMITTED ERRORS
       WHICH REQUIRE A NEW TRIAL."                                          108

IV.     DEFENDANTS' POINT IV:  "JUDGMENTS OF ACQUITTAL ON
        COUNT I MUST BE GRANTED BECAUSE OBSTRUCTION OF OSHA
        IS NOT A VALID OBJECTIVE OF THE CONSPIRACY."                    112

V.      DEFENDANTS' POINT V:  "THE INCONSISTENT VERDICTS
        AGAINST DAVIDSON, PRISQUE AND ATLANTIC STATES CANNOT
        STAND."                                                         119

VI.     DEFENDANTS' POINT VI:  "THE FATAL DUPLICITY OF THE
        CONSPIRACY COUNT WARRANTS JUDGMENT OF ACQUITTAL OR
        A NEW TRIAL."                                                   127

VII.    DEFENDANTS' POINT VII:  "THE UNITED STATES FAILED TO
        PRODUCE SUFFICIENT EVIDENCE AND THE JURY'S VERDICT IS
        AGAINST THE WEIGHT OF THE EVIDENCE."                            130

        A.  Legal standards – motions for acquittal and new trial      130

        B.  Overview of manufacturing process and facilities           132

        C.  Substantive charges (Counts 2-34)                          133

        D.  Conspiracy charge (Count 1)                                257

        E.  Conclusion of Point VII                                    263

VIII.   DEFENDANTS' POINT VIII:  "RENEWAL OF MOTIONS FOR
        PURPOSES OF APPEAL."                                           265

CONCLUSION                                                             267

## PRELIMINARY STATEMENT

A jury convicted Atlantic States Cast Iron Pipe Company and four of its supervisory level employees under a superseding indictment charging them with a multi-object conspiracy and various substantive offenses.  Those defendants move for judgment of acquittal or a new trial, asserting legal points and challenging the sufficiency of the evidence.[1]

The indictment identifies the defendants and their positions during relevant times as follows.  Atlantic States manufactured cast iron pipe at its facility in Phillipsburg, New Jersey.[2] John Prisque was plant manager.  Scott Faubert held positions as human resource manager and safety director.  Jeffrey Maury was maintenance superintendent.  Craig Davidson was finishing department superintendent.   A fifth individual was acquitted.  (See n.6 infra.)

The indictment contained thirty-four counts, beginning with one conspiracy count.[3] Count 1 charged that during the period of approximately October 31, 1995 through August, 2003, the defendants entered into a conspiracy to:  (1) knowingly discharge a pollutant into U.S. waters,

---

[1]  There was no joint defense agreement among the defendants, although they have frequently submitted motions as a group when appropriate.  We will address the arguments of specific defendants wherever their positions are distinct.  Otherwise, this opinion refers to them collectively as the defendants.

[2]  Atlantic States is not a separate corporation but is a division of McWane, Inc.

[3]  Documents filed on the electronic docket in this Court are generally cited here simply by docket entry number ("dkt.").  The original 35-count indictment was filed on 12-11-03.  (Dkt. 1.)  A superseding 35-count indictment was filed on 9-14-04.  (Dkt. 95.)  By Order filed on 3-11-05, the court approved a voluntary dismissal without prejudice of count 34, which resulted in renumbering of original count 35 to be count 34.  (Dkt. 120.)  The resulting 34-count superseding indictment was prepared by the government, and received in chambers on July 21, 2005, but not filed on the docket.  We have recently caused a copy of that version to be docketed.  (Dkt. 711.) We refer to that version in this opinion as the "indictment," unless otherwise specified.  It is further to be noted that before that superseding 34-count indictment went to the jury for the deliberation phase, the Court directed redaction of some text, in consultation with the parties. (See dkt. 717 at 66 (jury instructions).)  We have not docketed that jury version of the indictment, but it is retained in the chambers file and the parties have copies.

without and in violation of a permit, in violation of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A); (2) knowingly violate a requirement and prohibition of permits under the Clean Air Act, 42 U.S.C. § 7413(c); (3) defraud the United States by obstructing the lawful functions of the Occupational Safety & Health Administration ("OSHA") and the Environmental Protection Agency ("EPA") in enforcing federal workplace safety and environmental laws and regulations; (4) make false statements in matters within the jurisdiction of OSHA, EPA and the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001; and (5) corruptly influence and obstruct the administration of law under a pending proceeding before OSHA, in violation of 18 U.S.C. §§ 1505 and 1515(b); all in violation of 18 U.S.C. § 371.  (Dkt. 711.)

The substantive counts charged Atlantic States, and specified individual defendants, with violations of 18 U.S.C. § 1001 (Counts 2-7); 18 U.S.C. § 1505 (Counts 8-10); 18 U.S.C. § 1519 (Count 11); 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A) (Counts 12-33); and 42 U.S.C. § 7413(c)(1) (Count 34).  All substantive counts also charged aiding and abetting under 18 U.S.C. § 2.  (Id.)

Defendants moved for judgment of acquittal at the close of the government's case and at the end of the evidence.  This Court reserved judgment and submitted all counts to the jury.  In addition, at the request of the defendants named in the Clean Water Act counts, we submitted to the jury the lesser-included offense (not charged in the indictment) of a negligent violation of the Clean Water Act, 18 U.S.C. § 1319(c)(1)(A).

The jury failed to reach a verdict on Count 2, which named only Atlantic States and Faubert.  It found Atlantic States guilty on all counts except Count 2 (no verdict) and Count 6 (not guilty).  It found the specified individual defendants guilty on Count 1, as to various of the alleged objectives of the conspiracy.  See n.64, infra.  It rendered mixed verdicts on the

2

substantive charges against them.  The verdicts as to those convicted are listed in the margin.[4]

The full case record is filed on the docket.[5]  As noted, one named defendant was acquitted

of the charges against him, which were contained in Counts 1, 6 and 34.[6]  The pending motions

------

[4] The verdicts as to the convicted defendants were as follows.  NOTE:  If a defendant was not charged in a count, the notation is "n.c."  If a defendant was charged under the Clean Water Act (all felony charges), but convicted of the lesser-included offense (negligent violations), the notation is "neg. only".

| Count | Atl. States | Prisque | Faubert | Maury | Davidson |
|-------|-------------|---------|---------|-------|----------|
| 1 | guilty | guilty | guilty | guilty | guilty |
| 2 | [no verdict] | n.c. | [no verdict] | n.c. | n.c. |
| 3 | guilty | n.c. | n.c. | guilty | n.c. |
| 4 | guilty | n.c. | n.c. | n.c. | guilty |
| 5 | guilty | n.c. | n.c. | not guilty | n.c. |
| 6 | not guilty | n.c. | n.c. | n.c. | n.c. |
| 7 | guilty | n.c. | guilty | n.c. | n.c. |
| 8 | guilty | guilty | n.c. | n.c. | n.c. |
| 9 | guilty | guilty | guilty | guilty | n.c. |
| 10 | guilty | not guilty | guilty | n.c. | n.c. |
| 11 | guilty | guilty | n.c. | n.c. | n.c. |
| 12-26 | guilty | n.c. | n.c. | n.c. | neg. only |
| 27 | guilty | neg. only | n.c. | neg. only | neg. only |
| 28-33 | guilty | n.c. | n.c. | guilty | n.c. |
| 34 | guilty | guilty | n.c. | n.c. | n.c. |

(See separate verdict sheets, dkt. 609; dkt. 610; dkt. 611; dkt. 612; dkt. 614.)

[5] The procedural history is set forth on the docket and is described here only as necessary.  The trial consumed almost eight months and covers approximately 20,000 pages of transcript.  Motions filed and decided before and during trial have been the subject of many briefs, oral argument transcripts, and orders.  Those are referenced in this opinion by docket entry number.  We have found it useful to prepare and file an index of the trial transcripts.  (Dkt. 718.)  The transcripts of trial and pretrial sessions cited here are referred to by docket number as  "tr.".

[6] The individual who was acquitted was Daniel Yadzinski.  (Dkt. 613.)  He was described in the indictment as engineering manager and environmental manager.  He is of course not a party to the pending motions.

are listed in the margin.[7]  This opinion follows the format of defendants' omnibus post-trial

motion brief, quoting verbatim the section headings of that brief.  (Dkt. 635.)[8]  The rulings are set

forth in the Conclusion, infra.

## DISCUSSION

## I.  DEFENDANTS' POINT I:  "THE COURT COMMITTED REVERSIBLE ERROR BY FAILING TO INSTRUCT THE JURY REGARDING CRIMINAL NEGLIGENCE AND RECKLESSNESS."

### A.      Legal standards for jury instructions

Defendants first argue that the jury instructions used in the trial were erroneous.

Specifically, they argue that in this case, "it was a constitutional error for the Court to refuse to

give any instructions to the jury on criminal/gross negligence and recklessness as defenses to the

felony charges."  (Dkt. 635 at 14.)  They argue that "the jury was presented with an improper

choice only between knowledge and civil negligence, with no understanding that evidence of

criminally/grossly negligent or reckless conduct that fell in between these two extremes

supported acquittal."  (Id. at 20.)   That omission, they contend, impermissibly lowered the

government's burden of proof on every count in the indictment and requires a new trial.  (Id. at

18.)  This is a novel argument, neither addressed in any of the case law cited by defendants nor

revealed in our careful review of the relevant authorities.

_____

[7]  The motions addressed in this opinion are docket entries 470 and 471 (filed 2-20-06); 559 (filed 3-31-06); and 617 and 618 (filed 5-5-06).  The latter two are the post-trial motions, which incorporate and expand upon the points raised in the former three motions.  The briefing on this group of motions, including supplemental briefs requested by the Court at oral argument on the post-trial motions, was completed as of 11-14-06.  (See dkt. 661.)

[8]  This opinion is structured by quoting the section headings of defendants' main post-trial brief.  (Dkt. 635.)  This is for reference only, and is not to be interpreted as any comment by the Court on the position of either side regarding the issues presented.

"The Fifth and Sixth Amendments require the government to prove each element of a criminal charge beyond a reasonable doubt whether or not the defendant presents evidence contesting the element."  United States v. Thayer, 201 F.3d 214, 222 (3d Cir. 1999) (citing United States v. Gaudin, 515 U.S. 506, 509-10 (1995); Sullivan v. Louisiana, 508 U.S. 275, 277-78 (1993)).  "When a jury instruction is ambiguous and open to an unconstitutional interpretation, the instruction is error if there is a reasonable likelihood the jury accepted the erroneous interpretation."  Id.

When instructing the jury, the district court must provide "a clear articulation of the relevant legal criteria."  United States v. Goldblatt, 813 F.2d 619, 623 (3d Cir. 1987).  The jury instructions must, therefore, be structured so as to avoid confusing or misleading the jury. United States v. Johnstone, 107 F.3d 200, 204 (3d Cir. 1997).  "The charge to the jury, taken as a whole and in light of the evidence presented, must fairly and adequately submit the issues in the case to the jury."  United States v. Schneider, 14 F.3d 876, 878 (3d Cir. 1994).  It will be presumed that the jury followed the court's instructions.  United States v. Restaino, 405 F.2d 628, 630 (3d Cir. 1968).

A defendant is entitled to an instruction on that defendant's theory of the case where the record contains evidentiary support for it.  United States v. Davis, 183 F.3d 231, 250 (3d Cir. 1999).  However, it is well settled that a trial judge has substantial discretion to select the language to be used in the jury instructions on the law, so long as the instructions are correct and do not omit essentials.  United States v. Tiller, 302 F.3d 98, 105 (3d Cir. 2002).  "Nor is a defendant entitled to a jury instruction of his own choosing."  United States v. Ellis, 156 F.3d 493, 498 n.7 (3d Cir. 1998).  A court errs in refusing a requested instruction "only when the

requested instruction was correct, not substantially covered by the instructions given, and was so consequential that the refusal to give the instruction was prejudicial to the defendant." United States v. Leahy, 445 F.3d 634, 651 (3d Cir. 2006) (quoting United States v. Phillips, 959 F.2d 1187, 1191 (3d Cir. 1992)).

Our Court of Appeals, in evaluating the adequacy of jury instructions, sometimes draws a distinction between an instruction identifying the elements of an offense, and an instruction defining those elements. See, e.g., Leahy, 445 F.3d at 643-44 & n.7 (distinguishing between identifying "intent to defraud" as an element of bank fraud offense, and defining what "intent to defraud" means). We find that distinction helpful here, because we must first point out that defendants do not object to the identification of any of the elements of the charged offenses, and then show how that informs our analysis of the objection they do raise.

This Court, from the outset of the trial, presented to the jury an identification of the essential elements of the charged Clean Water Act ("CWA") and Clean Air Act ("CAA") offenses that was as requested by defendants, over the objection of the government. We did that based upon a thorough reading of the unsettled case law in this area, and we embodied it consistently in both the preliminary jury instructions and the final jury instructions, as explained below. The parties had no disagreement on the identification of the essential elements of the other charged offenses, which we provided to the jury in both the preliminary and final jury instructions.

It was only in the detailed discussion of the definition of the mens rea requirements, late in the trial, that the issue now pressed by defendants was raised for the first time. We rejected their proffered points for instruction that would have defined the "knowing" or "willful" or

6

"corrupt" mens rea for the charged felony offenses by explaining that "recklessness," as defined in Model Penal Code Section 2.02(2)(c), would not rise to the level of the required mental state for those offenses.

Although defendants now urge that we also should have defined the statutory mens rea requirements by further explaining that criminal gross negligence would not meet the statutory standard for the charged felony offenses, they submitted no such proposed jury instruction.  See text accompanying n.56, infra.  Therefore, we will confine this discussion to the fact that we rejected defendants' requested jury instructions on the topic of criminal recklessness.

**B.**     **The jury instructions identifying the elements of each charged felony offense**

The final jury instructions were delivered to the jury orally on the record, and in a 70-page typed format.  (Dkt. 717.)[9]  The portions quoting the statutory language and listing the elements of each charged felony offense are reproduced here.[10]

_____

[9]  We have docketed the typed version of the final jury instructions, copies of which the jury and the parties had available as the instructions were delivered orally in court during the trial, and will cite to that source here.  (Dkt. 717.)  The substantive jury instructions (pages 1-64) were delivered prior to closing arguments, by consent of the parties.  (Id. at 1-64; tr. 558 at 3-75.)  After the closing arguments, the Court provided and explained on the record four replacement pages (pages 50, 53, 60 and 61), which only corrected certain numbers.  (See Dkt. 717 (replacement pages); tr. 579 at 3-7.)  At that time the Court also delivered orally, and provided typed pages, of supplemental and deliberation instructions.  (Dkt. 717 at 65-70; 579 at 7-22.)  During deliberations the jury posed certain questions in writing, which were answered by the Court in writing after consultation with counsel on the record, out of the presence of the jury.  Each of those questions and the accompanying response is docketed.  (See dkt. 594, 595, 597, 599, 602, 604, 606, 607, 608; tr. 581 at 3-29; tr. 589 at 3-6; tr. 591 at 3-12.)

[10]  The Third Circuit Model Criminal Jury Instructions, of which portions were published recently and portions remain to be completed, were not available during the trial in this case.  We consulted established sources such as O'Malley, Grenig & Lee, Federal Jury Practice & Instructions (5th ed.), model jury instructions of other circuits, and extensive case law.  We also considered all proposed jury instructions submitted by the parties, as discussed infra.

## COUNT ONE:  CONSPIRACY

The conspiracy statute charged in Count One is found in Title 18 U.S.C. § 371, which provides that:

> [i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall [be guilty of violating this law].

### Conspiracy -  Essential Elements

There are three essential elements of the crime of conspiracy charged in Count One, which must be proven by the government beyond a reasonable doubt:

First:       that the described conspiracy was formed and existed at or about the time alleged in the Indictment;

Second:   that the defendant knowingly and willfully became a member of the conspiracy; and

Third:       that at some time during the existence of the conspiracy, one of the members of the conspiracy knowingly and willfully committed an overt act, and that overt act or acts were committed to further some goal of the conspiracy.

(Dkt. 717 at 28-29.)

## COUNTS TWO THROUGH SEVEN:  FALSE STATEMENTS

Counts Two through Seven charge the named defendants with knowingly and willfully making a false statement to OSHA, the EPA, and the FBI.  The substantive crime charged in those counts is found in Title 18 U.S.C. § 1001, which provides that:

> Whoever, in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation [shall be guilty of violating this law].

<u>False Statement Counts -- Essential Elements</u>

In order for a defendant to be found guilty of a false statement offense under this law, the government must prove beyond a reasonable doubt each of the following four elements:

First:        that the defendant made a false statement or representation;

Second:     that the statement was "material;"

Third:        that the defendant acted willfully, with knowledge of the statement's falsity; and

Fourth:      that the statement was made in a matter within the jurisdiction of the executive branch of the federal government.

(<u>Id.</u> at 42-43.)

<u>COUNTS EIGHT THROUGH TEN:  OBSTRUCTION OF JUSTICE UNDER § 1505</u>

Counts Eight through Ten charge the named defendants with obstruction of justice violations for intentionally and corruptly endeavoring to obstruct or impede a proceeding of a United States agency.  The substantive statute charged in those counts is found in Title 18 U.S.C. § 1505, which provides that:

Whoever corruptly ... endeavors to ... obstruct or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States [shall be guilty of violating this law].

<u>§ 1505 Obstruction Counts -- Essential Elements</u>

In order for a defendant to be found guilty of an obstruction of justice offense under this law, the government must prove beyond a reasonable doubt each of the following three elements:

First:        that there must be a proceeding pending before a department or agency of the United States;

Second:     that the defendant must be aware of the pending proceeding; and

9

Third:        that the defendant must have intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding.

(Id. at 46.)

## COUNT ELEVEN:  OBSTRUCTION OF JUSTICE UNDER § 1519

Count Eleven charges the named defendants with an obstruction of justice violation under a different obstruction statute from that charged in Counts Eight through Ten.  The substantive statute charged in Count Eleven is found in Title 18 U.S.C. § 1519, which provides that:

Whoever knowingly alters . . . conceals, covers up . . . any . . . tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department of agency of the United States [shall be guilty of violating this law].

### § 1519 Obstruction Count -- Essential Elements

In order for a defendant to be found guilty of an obstruction of justice offense under this law, the government must prove beyond a reasonable doubt each of the following five elements:

First:        that the defendant knowingly;

Second:        altered, concealed, and covered up;

Third:        a tangible object;

Fourth:        with the intent to impede, obstruct, and influence the investigation and proper administration;

Fifth:        of a matter within the jurisdiction of an agency of the United States, that is, the Occupational Safety and Health Administration.

(Id. at 49.)

## COUNTS TWELVE THROUGH THIRTY-THREE:  CLEAN WATER ACT

Counts Twelve through Thirty-three charge the named defendants with violation of the Clean Water Act.  The substantive statute charged in those counts is found in Title 33 United States Code sections 1319(c)(2)(A) and 1311(a).

10

The first of those sections, section 1319(c)(2)(A), provides that:

> Any person who . . . knowingly violates section 1311 [shall be guilty of violating this law].[11]

The next section, section 1311(a), provides that:

> Except as in compliance with this section . . . the discharge of any pollutant by any person shall be unlawful.

Clean Water Act Counts - Overview

The Clean Water Act creates a joint federal and state permitting program for those who discharge pollutants into the waters of the United States. Permits issued under this program are called National Pollutant Discharge Elimination System (NPDES) permits. By agreement with the EPA, that water permit program is administered in New Jersey by the New Jersey Department of Environmental Protection (NJDEP).

Pursuant to that authority, NJDEP issued water permits to Atlantic States that authorized discharges of storm water run-off and discharges of water from the cooling tower to a storm sewer. The permits imposed limitations on the type and amount of pollutants that could be discharged from the facility. We will call those NPDES permits issued to Atlantic States the "water permits."

Clean Water Act Counts -- Essential Elements

These counts charge the named defendants with knowingly violating the Clean Water Act by causing petroleum-contaminated wastewater to be pumped so as to enter storm drains that led to the Delaware River, without a permit authorizing such discharges. In order for a defendant to be found guilty of an offense under these sections of the Clean Water Act, the government must prove beyond a reasonable doubt each of the following six elements:

| | |
|---|---|
| First: | that a discharge of a pollutant into a water of the United States occurred on or about the date alleged in the indictment; |
| Second: | that the discharge was made by the defendant; |
| Third: | that the defendant knew the nature of what he was discharging; that is, he knew that he was discharging petroleum-contaminated wastewater; |

---

[11]  These provisions of the CWA are quoted more fully infra, n.31 and accompanying text.

| | |
|---|---|
| Fourth: | that the discharge was from a point source; |
| Fifth: | that the discharge was in violation of the authorized limits of the water permits; and |
| Sixth: | that the defendant knew the discharge was in violation of the authorized limits of the water permits. |

(Id. at 50-52.)

## COUNT THIRTY-FOUR:  CLEAN AIR ACT

Count Thirty-four charges the named defendants with knowingly operating in violation of permit requirements under the federal Clean Air Act by causing more than 55 gallons per day of waste paint to be burned in the facility called the cupola.  The substantive statute charged in Count Thirty-four is found in Title 42 U.S.C. § 7413(c)(1), which provides that:

> Any person who knowingly violates any requirement … under … section 7661a(a) or 7661b(c) of this title (relating to permits) … shall [be guilty of violating this law].[12]

### Clean Air Act Count -  Overview

NJDEP, acting under the federal Clean Air Act, issued Atlantic States a permit called a Title V operating permit, and a series of prior permits called preconstruction permits.  We will call those permits the "air permits."  During the relevant period alleged in this count, the air permits prohibited the burning of more than 55 gallons per day of waste paint at Atlantic States, in the facility called the cupola.

### Clean Air Act Count -- Essential Elements

In order for a defendant to be found guilty of a violation of the Clean Air Act as charged in this count, the government must prove beyond a reasonable doubt each of the following three elements:

| | |
|---|---|
| First: | that the defendant was an owner or operator of a stationary facility or source subject to the air permit program; |

---

[12]  The related provisions of the CAA are quoted infra, n.44.

12

Second:      that during the time period charged in Count 34, the
             defendant knowingly caused more than 55 gallons per day
             of waste paint to be burned in the cupola; and

Third:       that the defendant knew the activity was in violation of the
             authorized limits of the air permits.

(Id. at 57-58.)

## C.     The jury instructions defining the mens rea requirements of each charged felony offense

The final jury instructions defining the mens rea requirements of each charged felony

offense are excerpted here, insofar as pertinent, as follows.[13]

Count 1:  Conspiracy, 18 U.S.C. § 371

First Element:  Existence of Agreement

[Instructions regarding formation of conspiracy and the multiple alleged objectives.][14]

Second Element:  Membership in the Conspiracy

....  If the evidence shows that the particular conspiracy charged in the Indictment
existed, then you must decide whether the defendants were members of that
conspiracy.

A person may become a member of a conspiracy without knowing all of
the particular aspects, goals and participants of the conspiracy, as long as that
person acts "knowingly and willfully" to advance an illegal goal of the conspiracy.
However, if that person has no knowledge of the conspiracy, but happens to do
something that advances an objective or purpose of the conspiracy, that person
does not, by that action alone, become a conspirator.  Rather, the evidence must
show both the existence of the conspiracy and a defendant's willful participation
in it -- that is, that the defendant intended to advance an objective of the
conspiracy.

---

[13]  These excerpts are not marked with "..." where text is omitted.  Our purpose here is to
present just the language pertinent to the points under discussion in this section of the opinion.

[14]  This topic was further explained at pages 60-62 of the jury instructions.

I will give you the legal definitions of the terms "knowingly and willfully" in the context of conspiracy before we leave the topic of Count One in these instructions, on pages 40-41 below.

You must base your conclusion as to whether a defendant was a member of the conspiracy upon the evidence that you have heard concerning that defendant's own actions, conduct, statements and declarations. You may also weigh that defendant's own statements, actions, and conduct in connection with the acts and conduct of the other alleged conspirators. You may also consider the acts or declarations of others proved to be conspirators in deciding whether a defendant was a member of the conspiracy. In short, whether a defendant was a member of a conspiracy may be based upon all of the evidence, including the reasonable conclusions which you may draw from the evidence.

A particular defendant's participation need not be shown by direct evidence. A defendant's connection may appear from such facts and circumstances in the evidence as legitimately tend to support that conclusion. Proof of a particular defendant's membership may be based upon "circumstantial evidence."

I want to caution you that a defendant's mere presence at the scene of an alleged crime, or merely working together at the same facility, or merely holding a particular job title, does not, by itself, make him a member of the conspiracy. Similarly, mere association with one or more members of the conspiracy does not automatically make the defendant a member. Mere similarity of conduct or the fact that they have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy, or membership in the conspiracy.

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient. Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further an objective of the conspiracy, does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with knowledge of at least one of the objectives of the conspiracy, and that the defendant did knowingly and willfully intend to aid in the accomplishment of those unlawful goals.

To determine the defendant's knowledge and intent you may draw reasonable inferences from all the facts in evidence. In that connection, I instruct you that to become a member of the conspiracy, the defendant need not have known the identities of each and every other member, nor need the defendant have been apprised of all of their activities. Moreover, the defendant need not have

14

been fully informed as to all of the details, or the scope, of the conspiracy in order to justify an inference of knowledge on his part. Furthermore, the defendant need not have joined in all of the conspiracy's unlawful objectives, as long as the defendant joined in at least one of those objectives.

In sum, to establish the membership of a defendant in the conspiracy, the government must prove beyond a reasonable doubt that the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering at least one of the illegal objectives. The defendant thereby becomes a knowing and willing participant in the unlawful agreement -- that is to say, a conspirator.

Third Element:  Commission of Overt Act

The third element that the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that one or more overt acts were committed in furtherance of the conspiracy by one or more persons you find to be members of the conspiracy.

An overt act is an act knowingly and willfully committed by one of the conspirators in an effort to effect, achieve, or accomplish some object or purpose of the conspiracy. The act itself need not be criminal in nature. It may be as innocent on its face as the act of attending a meeting, writing a letter, issuing or depositing a check, or talking on the telephone. However, it must be an act which tends toward the accomplishment of the plan or scheme and it must be done knowingly and willfully in furtherance of some object or purpose of the conspiracy charged in the Indictment.

(Id. at 29-37.)

Conspiracy -- Knowingly and Willfully

Conspiracy requires that a defendant have acted knowingly and willfully. You will soon hear me describe other offenses, and I will instruct you as to the state of mind requirement under each of those offenses. As used in the conspiracy count, Count One, I will define the terms "knowingly and willfully" for you now.

Under the conspiracy law charged in this case, a person acts "knowingly" if that person acts voluntarily and intentionally and not because of mistake, or accident, or other innocent reason. The purpose of adding the word "knowingly" is to ensure that no one will be convicted for an act done because of mistake or accident, or other innocent reason.

15

It is also the law that a person cannot be convicted of conspiracy if the state of mind of the defendant was in the nature of negligence.  One of the substantive laws charged in this case, which I will explain later in these instructions, may involve the concept of criminal negligence.  But I repeat that a defendant cannot be convicted of conspiracy, the offense charged in Count One, based on a state of mind that does not rise to the level of knowing and willful participation in the conspiracy.

A person acts "willfully" if that person acts voluntarily and with the specific intent or purpose to do something the law forbids or with the specific intent to omit something the law requires that person do; that is to say, with bad purpose either to disobey or disregard the law.

In determining whether the defendant has acted knowingly and willfully, it is not necessary for the government to establish that the defendant knew that he was breaking any particular law.

(Id. at 40-41.)

Knowledge and intent exist in the mind.  Because it is not possible to look into a person's mind to see what went on, the only way you have to arrive at a decision on these questions is for you to consider all of the facts and circumstances shown by the evidence and to determine from all the evidence whether the requisite knowledge and intent were present at the time in question. You may consider any statement made by the defendant, and the defendant's actions, as well as all other facts and circumstances in evidence, and the reasonable inferences from that evidence, to determine the defendant's state of mind and intent.

(Id. at 42.)

Counts 2-7:  False Statements, 18 U.S.C. § 1001

False Statement Counts -- First Element

A false statement or representation is one that is untrue when made, and which the defendant knows at that time to be untrue.  To find  that the government has proved this element, you do not need to find that the defendant had the intent to deceive a federal agency.

False Statement Counts -  Second Element

[Instructions regarding materiality.]

16

<u>False Statement Counts -- Third Element</u>

To find that a defendant acted "knowingly" in the context of the false statements statute charged in Counts Two through Seven, you must find that the defendant acted deliberately and intentionally as opposed to acting innocently, unintentionally, or even negligently.  I will define the term "negligently" when discussing the Clean Water Act counts at pages 55-57 in these instructions.  But you are instructed that in order to find that the defendant acted knowingly under this statute, you must find that the defendant knew he was making a false statement.

To find that a defendant acted "willfully," in the context of the false statements statute, you must apply the same legal definition of the term "willfully" that I gave you on pages 40-41 of these instructions.

<u>False Statement Counts -- Fourth Element</u>

The fourth essential element under the false statements statute charged in Counts Two through Seven requires that the statement was made in a matter that was in fact within the jurisdiction of the executive branch of the federal government.  You do not need to find that the defendant had actual knowledge that federal agencies were involved or that the matter was within federal jurisdiction.  In addition, for Counts Five and Six, which involve allegedly false written statements or representations, you do not need to find that the defendant had actual knowledge that the written statement he was making would be sent to a federal agency.

<u>False Statement Counts -- Good Faith Defense</u>

A person who makes a statement or representation, or causes another person to make a statement or representation, on a belief, opinion, or interpretation honestly held is not punishable under the provisions of the statute charged in Counts Two through Seven merely because the belief, opinion, or interpretation eventually turns out to be inaccurate, incorrect, or wrong.  An honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct under this statute.  In other words, a statement made with "good faith" belief in its accuracy does not amount to a false statement and is not a crime.  This is so even if the statement is, in fact, erroneous.

While the term "good faith" has no precise definition, it encompasses, among other things, a belief or opinion honestly held and an absence of malice or ill will.  In determining whether or not the government has proven beyond a reasonable doubt that the defendants acted with the specific intent to make a

17

statement that they knew to be false at the time it was made, the jury must consider all the evidence in the case bearing on the named defendant's state of mind.

The burden of proving good faith does not rest with the defendant because the defendant does not have any obligation to prove anything in this case.  It is the government's burden to prove to you, beyond a reasonable doubt, that the defendant acted with the specific intent to make a statement or representation that he knew to be false at the time the statement was made.

(Id. at 42-46.)

Counts-10:  Obstruction of Justice, 18 U.S.C. § 1505

§ 1505 Obstruction Counts -- First Element

The  term "pending proceeding" includes an administrative or criminal investigation conducted by a department or agency that has rule-making or adjudicative authority.  This term extends to an agency investigation of a particular incident or event or situation even if the investigation occurs before a formal administrative citation or criminal indictment has been issued.

§ 1505 Obstruction Counts -- Second Element

The requirement that the defendant must be aware that there is a pending proceeding means that the defendant must be aware that there is then pending an agency proceeding, such as an investigation of an incident or event that falls within the scope of responsibility of that agency.

§ 1505 Obstruction Counts -- Third Element

The term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information. In order to prove that a defendant acted "corruptly" under this statute, the government must establish that defendant acted knowingly and dishonestly, with the specific intent to subvert or undermine the integrity of the agency proceeding. This definition of the term corruptly, applicable to Counts Eight through Ten only, is found at 18 United States Code, Section 1515(b).

"Endeavor" means to knowingly and deliberately act or make any effort which has a reasonable tendency to bring about the desired result. You do not need to find that the endeavor was successful, or achieved the desired result; the

18

government must merely show that the defendant endeavored to obstruct the proceeding.

There must be, however, a connection -- or what we call a nexus -- between the defendant's act and the proceeding.  That is, the act must have a relationship in time, causation, or logic with the proceeding.  This nexus may include obstruction with regard to prospective witnesses.  The endeavor must have the natural and probable effect of interfering with the administration of justice.

\*       \*       \*

Here let me add a point that is applicable to Count One, the conspiracy count.  As you know, the Indictment charges that one of the illegal objectives of that conspiracy was to obstruct justice in violation of this obstruction statute, 18 U.S.C. § 1505.  You can see that in the Indictment, paragraph 39.E.  The "nexus" requirement and the requirement of a "pending proceeding" under this obstruction statute impose special requirements as to conspiracy.  In the case of a conspiracy, the agency proceeding does not need to be pending.  You must find beyond a reasonable doubt, however, that at the time that they conspired, the members of the conspiracy must have expected that a proceeding would be instituted and must have intended that their actions would obstruct that anticipated proceeding.

(Id. at 47-48.)

Count 11:  Obstruction of Justice, 18 U.S.C. § 1519

§ 1519 Obstruction Count -- First through Third Elements

The first through third essential elements of the obstruction of justice offense charged in Count Eleven require the government to prove beyond a reasonable doubt that the defendant knowingly altered, concealed or covered up a tangible object.  Here you should use the definition of "knowingly" provided above on pages 40-41 of these instructions.

§ 1519 Obstruction Count -- Fourth Element

This element requires a finding beyond a reasonable doubt that the defendant intended to impede, obstruct or influence the investigation and proper administration of a matter within the jurisdiction of a federal agency, in this case OSHA.  You do not need to find that the defendant was successful in impeding, obstructing or influencing the agency.

(Id. at 50.)

19

<u>Counts 12-33:  Clean Water Act, 33 U.S.C. §§ 1319(c)(2)(A) and 1311(a)</u>

<u>Clean Water Act Counts -- Third and Fifth Elements</u>

The third and fifth elements of these counts require the government to prove beyond a reasonable doubt that the defendant acted "knowingly"; that is, the defendant had knowledge of the facts of the offense.

This means that you must find that:

a.      the defendant committed the discharge intentionally and not as the result of ignorance, mistake or accident; and

b.      the defendant knew the nature of the material discharged, that is, the defendant knew the material being discharged included substances that were not pure water; and

c.      the defendant knew the discharge was in violation of the authorized limits of the water permits.

Note that there are some matters that you do not need to decide.  First, you do not need to find that the defendant knew that he was breaking the law.  Second, you do not need to find that the defendant actually read the water permits or knew all the details contained in those permits.  But you must find that the defendant had knowledge that the discharge was not permitted under the water permits.  Third, you do not need to find that the defendant knew that the waters into which he was discharging pollutants happened to be waters of the United States; it is sufficient that he knew the discharge was into a storm drain or storm sewer leading to public waters.

        *         *         *

I specifically instruct you that negligence is not sufficient to satisfy the requirement of a <u>knowing</u> violation of the Clean Water Act, as alleged in these counts.

(<u>Id.</u> at 54-55.)

<u>Count 34:  Clean Air Act, 42 U.S.C. §  7413(c)(1)</u>

<u>Clean Air Act Count -- Second Element</u>

An act is done "knowingly," as used in this statute, if the defendant is aware of the nature of his acts and does not act or fail to act through ignorance, mistake or accident.  This element requires the government to prove beyond a

reasonable doubt that the named defendant "knowingly" caused more than 55 gallons per day of waste paint to be burned in the cupola. This means that you must find that he knew that an amount of waste paint in excess of 55 gallons per day was being burned in the cupola, and he knowingly participated in causing that amount to be burned.

Clean Air Act Count -- Third Element

This element requires the government to prove beyond a reasonable doubt that the defendant knew that the burning of more than 55 gallons of waste paint per day in the cupola was in violation of the authorized limits of the air permits. Note that there are some matters that you do not need to decide. First, you do not need to find that the defendant knew that he was breaking the law. Second, you do not need to find that the defendant actually read the air permits or knew all the details contained in those permits. But you must find that the defendant had knowledge that the burning of that quantity of waste paint was not permitted under the air permits.

*　　*　　*

I specifically instruct you that negligence is not sufficient to satisfy the requirement of a knowing violation of the Clean Air Act, as alleged in this count.

(Id. at 59-60.)[15]

**D.    The jury instructions identifying the elements and defining the lesser-included Clean Water Act negligence offense**

There was only one potential lesser-included offense among all the statutes charged in this case, based on the conduct alleged. That offense is found in the Clean Water Act, 33 U.S.C. § 1319(c)(1)(A), quoted in the margin.[16] The indictment charged only felony offenses, and did

---

[15]   The jury instructions also included an aiding and abetting section under 18 U.S.C. § 2, directed to all substantive counts. (Dkt. 717 at 62-64.)

[16]   Section 1319(c)(a)(A) of the Clean Water Act provides in pertinent part:

(1)  Negligent violations
   Any person who --
      (A)  negligently violates section 1311 ... of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title ..., or any requirement imposed in a pretreatment program approved under section

21

not charge the lesser-included CWA negligence offense.  We made no mention of it in the preliminary jury instructions, which did identify the essential elements of each offense charged in the indictment.  (See dkt. 716.)

Defendants argued at trial that the evidence supported the submission to the jury of the lesser-included Clean Water Act offense.  (Dkt. 533.)  We agreed, and included that offense in the jury instructions and in the verdict sheets of the defendants named in the CWA counts.  The portion of the jury instructions identifying the elements and defining the term "negligence" for a "negligent" violation under 33 U.S.C. § 1319(c)(1)(A) stated in full:

Clean Water Act Counts -  Lesser Included Offense of Negligent Violation

If you do not find beyond a reasonable doubt that a defendant knowingly violated the Clean Water Act, however, you may still consider whether the government has proven beyond a reasonable doubt that defendant is guilty of the offense of negligently violating that Act.

The section of the Clean Water Act that makes a negligent act a criminal violation is found in Title 33 United States Code section 1319(c)(1)(A).  That section provides:

Any person who ... negligently violates section 1311 ... or any permit condition or limitation [shall be guilty of violating this law].

"Negligence" may be defined as a failure to exercise, in the given

---

1342(a)(3) or 1342(b)(8) ... or in a permit issued under section 1344 ...
...
shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than 1 year, or by both.  If a conviction of a person is for a violation committed after a first conviction of such person under this paragraph, punishment shall be by a fine of not more than $50,000 per day of violation, or by imprisonment of not more than 2 years, or by both.

33 U.S.C. § 1319(c)(1)(A).

22

circumstances, that degree of care for the safety of others which a person of ordinary prudence would exercise under similar circumstances. It may be the doing of an act which the ordinary prudent person would not have done, or the failure to do that which the ordinary prudent person would have done, under the circumstances then existing.

**Here I caution you:  The Clean Water Act is the only offense in this Indictment that can be violated negligently.  All of the other offenses require knowledge and/or willfulness as I have instructed you.**

You will be given a verdict sheet in order for you to record the verdicts you may reach on each of the counts as to each of the defendants.  For the Clean Water Act counts, Counts 12 through 33 of the Indictment, you will notice that there are separate categories for a knowing or negligent violation of the act. These are separate offenses; if you find that a defendant acted negligently, but not knowingly, you should check off only the "negligent" violation, and not the "knowing" violation.

I would like to say a few words about the concept of negligence specifically as it may apply to the Clean Water Act.  A person negligently violates the Clean Water Act by failing to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstances, and, in so doing, discharges any pollutant into United States waters without or in violation of a water permit.  In other words, for the government to prove a negligent violation of the Clean Water Act it must prove, beyond a reasonable doubt, (1) that a defendant acted negligently, and (2) that the defendant's negligence was a proximate cause of the illegal discharge.

An incident is "proximately caused" by an act or a failure to act whenever it appears from the evidence that the act or failure to act played a substantial part in bringing about or actually causing the incident, and that incident was either a direct result or a reasonably probable consequence of the act or omission.  In order to prove that a defendant caused a negligent discharge in violation of the water permits, the government must prove beyond a reasonable doubt that the named defendant's conduct had a direct and substantial connection to the discharge, and that the discharge would not have occurred but for the defendant's conduct.  For example, if a spill was a direct result or a reasonably probable consequence of a defendant's negligence, then that spill was proximately caused by such act or omission.  Conversely, if you find that the spill would have occurred even in the absence of the defendant's negligence, then you must find that the defendant did not proximately cause the spill.

23

    If you find that a defendant was negligent but that the actual discharge was the result of a superseding cause, such as the act of a second person, and that a reasonably prudent person would not have foreseen an act of the kind committed by the second person as a probable consequence of defendant's negligence, then defendant is not responsible for the action and you must find defendant not guilty of a negligent violation of that law. The foreseeability of another's actions is viewed from a reasonable person's perspective at the time, and not in hindsight.

(Dkt. 717 at 55-56 (emphasis added).)

We used the civil or ordinary negligence definition (also referred to as "simple" negligence) in this jury instruction, rather than a higher standard for negligence such as found in the Model Penal Code, Section 2.02(2)(d). This instruction was based on the Ninth Circuit's holding in United States v. Hanousek, 176 F.3d 1116 (9th Cir. 1999), cert. denied, 528 U.S. 1102 (2000), discussed infra. The fact that the Supreme Court denied certiorari adds no precedential weight to that holding. We found no contrary federal appellate decision, however, and the parties did not object to using that definition here.[17]

E.  **The government's objection to the last identified element of the Clean Water Act and Clean Air Act felony offenses**

The Clean Water Act and Clean Air Act offenses charged in this case were based upon allegations that defendants committed criminal violations of the permits issued to Atlantic States under the federal regulatory system established under those statutes. Atlantic States had water

---

[17] The statutory construction used by the Hanousek court was based on its conclusion that because the CWA uses the term "gross negligence" in another section containing civil penalties only [albeit enacted at a different time than the current version of 33 U.S.C. § 1319(c)(1)(A)], Congress must have meant not to use a Model Penal Code type of definition for the "negligent" criminal violation in Section 1319(c)(1)(A). This type of reasoning was explicitly rejected in a recent Supreme Court decision, Safeco Ins. Co. v. Burr, 127 S.Ct. 2201, 2210 (2007) ("The vocabulary of the criminal side of [the Fair Credit Reporting Act] is consequently beside the point in construing the civil side."). We believe there is good reason to scrutinize carefully that aspect of Hanousek, rather than accepting it as controlling.

permits that allowed it to discharge into the municipal storm sewer system, which emptied directly into the Delaware River, the following liquids:  (1) stormwater surface run-off, and (2) non-contact cooling water flowing from Atlantic States's cooling towers.  Thus, petroleum-contaminated wastewater was not permitted to be discharged into the public storm sewer system, no matter where it came from within the plant.  Likewise, Atlantic States had air permits that allowed it to burn up to 55 gallons per day of waste paint in the cupola, which had air emissions control processes and monitoring equipment.  The alleged conduct of the defendants named in the substantive CWA and CAA counts related to those limitations of the water and air permits.

Proposed jury instructions were submitted by both sides prior to trial, as required in a Scheduling Order issued by this Court.  (Dkt. 175.)[18]  The government's version identified the essential elements of the CWA offense as follows:

First:	that on or near the date [stated in] the indictment, the defendant discharged a pollutant into a water of the United States;

Second:	that the discharge was from a discernible, confined, and discrete point source, such as a storm sewer/storm drain; and

Third:	that the discharge occurred without a permit;

Fourth:	that the defendant acted knowingly.

(Dkt. 712 at 81.)  The government's version explained those elements as follows:

You must decide that ... the defendant acted knowingly; that is, the defendant had knowledge of the facts of the offense.  This means that you must find that:

_____

[18]  The proposed jury instructions submitted by the parties before trial, pursuant to the Scheduling Order, were received in chambers on or about August 16, 2005, but were not filed on the docket.  We have recently docketed those two documents because they are pertinent to this point of the post-trial motions.  (See dkt. 712 ("Government's Draft Requests"); and dkt. 713 ("Defendants' Draft Requests").)

25

a.      The defendant committed the discharge intentionally and not as the result of ignorance, mistake, or accident;

b.      The defendant knew the nature of the material discharged, i.e., he knew the material included substances that were not pure water.

Note that there are some matters that you do not need to decide.  First, you do not need to find that the defendant knew that he was breaking the law.  Second, you do not need to find that that defendant knew the legal requirement of having a permit, though you must find that the defendant did not have a permit allowing these types of discharges.  Third, you do not need to find that the defendant knew that the waters into which he was discharging pollutants happened to be waters of the United States.  Deciding who owns the waters in question merely allows courts to decide whether the offense belongs in a state or a federal court.

(Id. at 85.)

The government's version similarly identified the essential elements of the CAA offense

as follows:

First:        the defendant is the owner or operator of a source subject to the operating permits program;

Second:       the defendant operated the source;

Third:        in violation of a permit requirement; and

Fourth:       the defendant acted knowingly.

(Id. at 89.)  The government's version explained those elements as follows:

It is not necessary for the government to prove that the defendant knew that he was acting in violation of the law or that he knew any of the regulatory requirements.

This crime is one of general intent, that is, the defendant does not need to know that he was violating the specific terms of the permit or of the law in order to be liable for the crime.  You must, however, find that he knew the facts of what he was doing.  This means that you must find that he knew how much waste paint was being burned in the cupola.  Then, you must find that this amount of paint was in excess of that allowed under the permit.

(Id. at 93.)

The defendants' version identified the essential elements of the CWA offense as follows:

First, that on or about the dates alleged ..., the Defendant knowingly, and not accidentally or by mistake or other innocent reason, caused a discharge;

Second, that the Defendant knew he was causing the discharge of a pollutant;

Third, that the Defendant knew the content of the discharge was petroleum-contaminated wastewater;

Fourth, that the Defendant knew the method or instrumentality used to discharge the pollutants;

Fifth, that the Defendant knew that the discharge was to navigable waters of the United States; and

Sixth, that the Defendant caused the discharge knowing that such discharge was not authorized by a permit issued under the Clean Water Act.

The Government must prove that the Defendant knew of the nature of his acts and performed them intentionally.  Further, the Government must prove that the Defendant knew the nature of the material involved.  Specifically, the Government must prove that the Defendant knew that he was causing the discharge of petroleum-contaminated wastewater.  If the Defendant did not know that he was discharging petroleum-contaminated wastewater, then you must find the Defendant not guilty.  The Government is not required to establish that a Defendant knew that his conduct was unlawful.

(Dkt. 713 at 94-95.)

The defendants' version similarly identified the essential elements of the CAA offense as

follows:

First, that the Defendant owned or operated a major stationary source;

Second, that the Defendant knew that Atlantic States' Title V permit prohibited the burning of more than 55 gallons per day of waste paint; and

Three, that the Defendant knew that his actions would cause a violation of a requirement of the Title V permit; specifically that the Defendant knew his actions would result in the burning of more than 55 gallons per day of waste paint.

27

....
        Defendant Atlantic States was issued a Title V permit that prohibited the burning in the cupola of more than 55 gallons of waste paint per day.  In order to find a Defendant guilty, you must find ... that the Defendant knew that the Title V permit prohibited the burning of more than 55 gallons of waste paint per day in the cupola.

        To secure a conviction under the Clean Air Act, the Government must prove beyond a reasonable doubt a Defendant's knowledge of the facts meeting each element of the offense.

        For you to find a Defendant guilty, you must find ... that the Defendant knew that his actions would result in the burning of more than 55 gallons of waste paint in the cupola on a particular day.

(Id. at 106-09.)

The key difference between the proposed instructions of the parties, to identify the essential elements of the CWA and CAA offenses charged in the indictment in the factual context of this case, was that the defendants' version would require knowledge that the discharge or emission was in violation of water and air permits that Atlantic States did possess.  The government's version would require only knowledge of the nature of the discharge (i.e., polluted wastewater going into the storm sewer system or excess paint burned in the cupola).  The parties sharply disagreed on that issue, and the Court was required to resolve it prior to trial in order to provide the jury with preliminary jury instructions listing the essential elements of each charged offense.[19]

We ruled that where, as here, an industrial operator has a permit and its employees are

------

[19]  This Court prepared written preliminary jury instructions, after hearing argument from the parties on this issue.  That document was provided to the parties when the ruling was rendered in advance of trial, and we orally read those preliminary instructions to the jury at the outset of the trial.  We have docketed the written document (dkt. 716), and the transcript is also available.  (Tr. 234 at 19-57.)

28

charged with "knowing" criminal violations of the CWA and CAA, the defendant must know not just the nature of the discharge, but also the fact that the discharge is in violation of the authorized limits of the permits.[20]  We therefore instructed the jury, in the preliminary jury instructions, that the essential elements of the Clean Water Act offenses charged in the indictment were:

1.    That a discharge of a pollutant into a water of the United States occurred on or about the date alleged in the indictment;

2.    That the discharge was made by the defendant;

3.    That the defendant knew the nature of what he was discharging; that is, he knew that he was discharging petroleum-contaminated wastewater;

4.    That the discharge was from a point source;

5.    That the discharge was in violation of the authorized limits of the water permits; and

6.    That the defendant knew the discharge was in violation of the authorized limits of the water permits.

(Dkt. 716 at 22-23; tr. 234 at 46-47.)  We similarly instructed the jury, in the preliminary jury instructions, that the essential elements of the charged Clean Air Act offense were:

1.    That the defendant was an owner or operator of a stationary facility or source subject to the air permit program;

2.    That during the time period charged ..., the defendant knowingly caused more than 55 gallons per day of waste paint to be burned in the cupola; and

---

[20]  A distinction can perhaps be made between the employer, who is the actual permittee, and its non-officer employees, such as the individual defendants here.  Theoretically, the employer/permittee itself could be presumed to have knowledge of the terms of its permits.  However, in crafting the jury instructions we declined to draw that distinction between the knowledge requirements for Atlantic States and its individual defendant employees, even if appropriate.

     3.      That the defendant knew the activity was in violation of the authorized limits of the air permit.

(Dkt. 716 at 24; tr. 234 at 48.)  That identification of the essential elements was repeated consistently in the final jury instructions.  (Dkt. 717 at 52, 58.)  However, at the time we made that ruling in advance of the trial, we made it clear to the parties that we did not foreclose the possibility that a so-called "willful blindness" instruction could be included in the final jury instructions if appropriate.  (Tr. 234 at 5-14.)

We find that it is necessary to set forth in this opinion the legal analysis that led us to that ruling.  That legal background provides the framework for the decision that we made to reject defendants' proposed language on "recklessness" when the issue arose in drafting the final jury instructions.

## F.    Defendants' objection to refusal of their proposed instructions on recklessness

We have described above that proposed jury instructions were submitted by both sides prior to trial, as required in a Scheduling Order issued by this Court.  (See n.18, supra and accompanying text.)  The Defendants' Draft Requests, submitted at that time, contained proposed instructions defining the terms "knowingly" and "willfully," quoted here:

> A person acts knowingly if he acts intentionally and voluntarily, and not because of ignorance, mistake, accident, carelessness or other innocent reason. The terms "accident" or "accidental" mean an event that takes place without foresight or expectation; that is, an unintended, sudden and unexpected event. Whether the Defendant acted knowingly may be proven by the Defendant's conduct and by all of the facts and circumstances surrounding the case.  As I will instruct you later, the term "knowingly" has a specific meaning in connection with the Government's Clean Water Act and Clean Air Act allegations against the defendants.

(Dkt. 713 at 43.)

A "willful" act is one undertaken with a "bad purpose."  In other words, in order to establish a "willful" violation of a statute, the Government must prove ... that the defendant acted with knowledge that his conduct was unlawful and that the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids.  A willful act is done with bad purpose either to disobey or disregard the law.  The defendant's conduct is not "willful" if it was due to negligence, inadvertence, mistake or without knowledge that his conduct was unlawful.

(Id. at 44.)

Meaning of "Knowingly" under the Clean Water Act

An act is done knowingly if (1) the Defendant was aware of the act, and (2) the Defendant's actions or failure to act were not the result of ignorance, mistake, accident, negligence or carelessness.  In order for you to find a Defendant guilty of a knowing violation of the Clean Water Act, you must find ... that the Defendant acted knowingly with regard to each and every element of the offense that I described above.  In other words, if you find ... that the Defendant knowingly caused a discharge but you are unable to find ... that he caused the discharge knowing that such discharge was not authorized by a permit issued under the Clean Water Act, then you must find him not guilty of a Clean Water Act violation.  In determining whether a Defendant possessed the requisite knowledge, you should consider all of the information that you find was available to the Defendant, any information that you find was obtained by the Defendant, and any information that you find was communicated to the Defendant by any person, including public officials.  Negligence on the part of a Defendant alone is not enough to establish knowing conduct.

To find the Defendants guilty of a knowing violation of the Clean Water Act, the Government has the burden to prove ... that the Defendants acted knowingly.  If the Government proves only that the Defendant acted negligently, you must find that Defendant not guilty of a knowing violation of the Clean Water Act.

(Id. at 103.)  Definition of the "knowledge" requirements under the Clean Air Act, as proposed in Defendants' Draft Requests, are quoted supra.  (Id. at 108-09.)  Definitions of knowledge and intent pertaining to other charged offenses, as proposed in Defendants' Draft Requests, are

quoted in the margin.[21]

---

[21]  Defendants' Draft Requests contained other language on the topic of defining the required mental state, examples of which may be excerpted as follows:

<u>Conspiracy Charge -  Mere Knowledge Insufficient Evidence</u>

> I also want to caution you that mere knowledge or acquiescence, without participation, in some unlawful plan is not sufficient.  Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purpose or objectives of the conspiracy, does not make the defendant a member.  Negligent or careless conduct on the part of a defendant does not make him a conspirator.  More is required under the law....  [I]n sum, in order to become a conspirator, the defendant, with the understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised, or assisted in it for the purpose of furthering the illegal undertaking.  He thereby becomes a knowing and willing participant in the unlawful agreement – that is to say, a conspirator.

(Dkt. 713 at 71.)

<u>False Statement Charges</u> - <u>Fourth Element - Knowing and Willful Conduct</u>

> To find a defendant guilty of any of Counts 2 through 7, you must find that the defendant acted knowingly and willfully in making the alleged false statement.

> A person acts "knowingly," as that term is used in these instructions, if that person acts consciously and with awareness and comprehension and not because of ignorance, mistake or misunderstanding or some other innocent reason.  To find any of the defendants guilty of Counts 2 through 7, the Government must prove ... that the defendants had personal knowledge that the specific statement alleged was false.

> A person who makes, submits, or uses a statement or a writing which he believes to be truthful does not "knowingly" make, submit, or use a false, fictitious or fraudulent statement.  A defendant cannot be found guilty if the Government merely shows that the statement was made inadvertently.

> An act is done "willfully" if it is done with an intention to do something the law forbids, with a bad purpose to disobey the law.  A person acts "willfully," ... when that person acts deliberately, voluntarily, and intentionally.

(<u>Id.</u> at 75-76.)

There was no mention in Defendants' Draft Requests of the concepts of gross negligence or recklessness.  (See dkt. 713 at 1-115.)  The preliminary jury instructions provided by the Court employed well-recognized definitions of the mental states found in the elements of the charged offenses, without objection by defendants, as follows:

> Under the laws that are charged in this case, a person acts "knowingly" if that person acts voluntarily and intentionally and not because of mistake or accident or other innocent reason.  The purpose of adding the word "knowingly" is to ensure that no one will be convicted for an act done because of mistake or accident, negligence, or other innocent reason.
>
> A person acts "willfully" if that person acts voluntarily and with the specific intent or purpose to do something the law forbids or with the specific intent to omit something the law requires that person to do; that is to say, with bad purpose either to disobey or disregard the law.
>
> In determining whether the defendant has acted knowingly and intentionally, or willfully, it is not necessary for the government to establish that the defendant knew that he was breaking any particular law.  Ignorance of the law is no excuse and is not a defense in this case.

(Dkt. 716 at 24.)

_____

Obstruction Charges -  Elements of § 1519

> In order to find a defendant guilty of Count 11 ..., you must ... find ... that defendants Atlantic States and John Prisque knowingly altered the condition of a cement mixer by bypassing a safety device ... and that the defendants knowingly concealed that alteration from OSHA inspectors.  The term "knowingly," ... means only that one is conscious of what he or she is doing – not that the defendant knew that the conduct in question is a violation of the law....
>
> Second, the Government must prove that the defendant intended to impede, obstruct, or influence an investigation being conducted by a department or agency of the United States.  Thus, ... you must also ... find ... that the defendants altered the cement mixer and concealed that alteration with the intent to impede, obstruct or influence an investigation being conducted by OSHA.  Intent to impede, obstruct or influence implies a consciousness of wrongdoing....

(Id. at 89.)

33

This Court purposely defined the word "knowingly," in the preliminary jury instructions, by excluding "an act done because of mistake or accident, negligence, or other innocent reason." (Id.; tr. 234 at 49.)  We did that precisely because we were aware of the possibility that the final jury instructions would submit to the jury the lesser-included offense of a negligent violation of the Clean Water Act.  We therefore believed it prudent to pave the way for such an instruction by making it clear at the outset that "negligence" would not satisfy the definition of "knowingly." (See tr. 704 at 47-48.)

The trial was nearing completion when, on March 23, 2006, defendants submitted a letter brief requesting that the Court instruct the jury on the lesser-included offense under the Clean Water Act, on the grounds that the evidence supported submitting the lesser-included offense for the jury to consider.  (Dkt. 533.)  That brief also requested that the jury "be instructed very clearly that negligence is *not* a valid theory of liability (and indeed is a defense) to each of the other counts."  (Id. at 1.)  This was an argument that defendants had expressed during the pretrial motion arguments as well.  (See dkt. 157 at 4-10; dkt. 174 at 3-5; tr. 211 at 20-26.)  That letter brief was accompanied by a new document, entitled Defendants' Proposed Instructions to the Jury ("Defendants' Proposed Instructions").  (Dkt. 532.)  In the letter brief, defendants stated that they had submitted a proposed instruction using a simple negligence definition for the lesser-included CWA count, and "negligence instructions [that] are required in order to clarify for the jury that the various offenses other than the CWA have distinct mental-state requirements that cannot be satisfied by negligence."  (Dkt. 533 at 1.)  That brief summarized the mental state requirements for each of the charged felony offenses other than the CWA offense, pointing out that negligence would be a defense to each and commenting, "[t]hen the jury must sort out that

34

acting with mere negligence – an *element* of liability under CWA – is a *defense* to liability under CAA."  (Id. at 5-6.)

The Court at that point had over 300 pages of proposed jury instructions to review:  the original sets from each side that had been submitted pre-trial pursuant to the Scheduling Order (103 and 115 pages, respectively) and the 108-page new submission from the defendants.  In reviewing the new set from the defendants, we noticed that in virtually every location where the term "knowingly" was addressed, the word "recklessly" had been added to the list of what that term does not include.  Defendants' Proposed Instructions contained the following theme, repeated frequently in its pages:

> Under the laws that are charged in this case, a person acts "knowingly" if that person acts voluntarily and intentionally and not because of mistake, or accident, or negligence, or recklessness or other innocent reason.  The purpose of adding the word "knowingly" is to ensure that no one will be convicted for an act done because of mistake, accident, negligence, recklessness or other innocent reason.

(Dkt. 532 at 38; see also id. at 66-67, 83, 95.)

> A negligent or reckless act is ordinarily committed unintentionally.  Therefore, as a matter of both law and logic, a defendant cannot conspire or agree to commit a negligent or reckless act.  Accordingly, if you believe that a defendant negligently or recklessly violated the law, you cannot find that the defendant conspired to violate that law.  For example, if you find ... that a defendant negligently or recklessly (but not knowingly) violated the Clean Water Act, then you cannot find that defendant guilty of conspiring to violate that act.

(Id. at 50.)

> A false statement is one that is untrue when made, and which the defendant knows at that time to be untrue....  [A] person acts "knowingly" if that person acts voluntarily and intentionally and not because of mistake or negligence or recklessness or accident or other innocent reason.

(Id. at 66-67.)

35

The false statement at issue must have been a knowing and willful false statement instead of a mere negligent or reckless one.

"Negligence" in this context means a failure to exercise "reasonable care," that is, the care reasonably prudent persons would exercise....

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that materially exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.[22]

Accordingly, if you find that defendant was acting negligently or recklessly, as I have defined those terms, but not knowingly and wilfully, as I have defined those terms, when he made a false statement, you must acquit the defendant of that count.

(Id. at 70-71.)

To find a "knowing" violation of the Clean Water Act, you must find ... that a defendant knew that he was discharging petroleum-contaminated wastewater and knew that the discharge was in violation of the authorized limits of the water permits. Negligence or recklessness is not sufficient to satisfy the requirement of a knowing violation.

(Id. at 86.)

This Court prepared a 62-page Draft One of its final jury instructions, and commenced the jury charge conference. (Dkt. 714; tr. 556 at 3-76.) That draft did feature the lesser-included CWA offense, and did import some of the "recklessness" language that defendants had recently proposed. (Id. at 39-40, 42, 52-55, 57.)[23] That draft, however, also mis-stated the elements of

---

[22] Defendants derived this definition of "recklessness" from Model Penal Code Section 2.02(2)(c). (Dkt. 532 at 70-71.) The Model Penal Code was the only citation supplied by defendants for using the concept of recklessness in their Proposed Jury Instructions. (Id.)

[23] We have docketed the chambers copy of Jury Instructions, Draft 1. (Dkt. 714.) That copy bears the Court's inked notations corresponding to the discussion on the record during that session of the charge conference. (Id.; tr. 556 at 3-76.)

the CWA and CAA offenses that we had previously ruled upon, due to simple oversight by the Court.  (Id. at 49-50, 56; tr. 555 at 130-31.)  During that charge conference session, we stated that we would likely correct that oversight in the next draft to be prepared.  (Tr. 556 at 48-52.)  We also indicated no difficulty with the "recklessness" language that we had used as proposed by defendants, to which the government had raised no objection.  (Id. at 35-40.)

The second draft of the final jury instructions was discussed in the jury charge session the next day.  (Dkt. 715; tr. 555 at 95-152.)[24]  That draft contained the corrected listing of the elements of the CWA and CAA felony offenses, and retained the lesser-included negligent CWA offense.  (Dkt. 715 at 52-64.)  It also contained repeated admonitions that only the CWA could be violated negligently, and negligence was not sufficient to satisfy the requirement of "knowing" for any of the felony offenses.  However, it deleted the references to recklessness.  It also included a proposed instruction on willful blindness, to be added to the section defining the term "knowingly."  (Id. at 70.)  Defendants objected to addition of the willful blindness instruction, which the government strongly urged should be employed.  (Tr. 555 at 128-147.)

This Court ultimately exercised its discretion not to include a willful blindness instruction in the final jury instructions.  (Tr. 555 at 150-51; tr. 577 at 51-60.)  However, we rejected defendants' proffered language that would have defined the term "knowingly," for each felony offense in the indictment, by explaining that "recklessness" (as defined in the Model Penal Code

---

[24] Draft 2 was prepared in two formats:  "Draft 1 with changes," and "Draft 2."  The difference was that the former showed additions in bold type and deletions in italics, for ease of the reader, and the latter showed the text as it would appear if those changes were incorporated.  We have docketed the Court's hand-annotated copy of "Draft 1 with changes."  (Dkt. 715.)  Copies of "Draft 2," and successive drafts discussed with counsel on the record, are in the chambers file.

as a subjective rather than an objective state of mind) is not included in the definition of "knowing."  (Tr. 555 at 124-28.)  After two more drafts addressing minor points, those rulings were embodied in the final jury instructions.  Defendants preserved their objection, which they raise as Point 1 in their post-trial motions.  See n.50, infra.

The next section will set the framework for this issue by addressing the body of environmental criminal jurisprudence that informed our drafting of the jury instructions identifying the elements of the Clean Water Act and Clean Air Act offenses here.  The following section will then address the issue of "recklessness" in the context of this case.

**G.**     **Legal analysis for the last identified element of the Clean Water Act and Clean Air Act felony offenses**

This Court identified the last essential element for both the CWA and the CAA felony offenses, as charged in this case, to be that the government must prove that the defendant knew that the discharge or activity violated the authorized limits of the water or air permits held by Atlantic States.  (Dkt. 717 at 50-52, 57-58, quoted supra, Sec. I.B.)  This ruling agreed with the position of defendants on the point, over strong objections by the government.  (See dkt. 133-2 at 1-14; dkt. 146-1 at 26-30; dkt. 148 at 10-16; dkt. 157 at 1-4; dkt. 167-1 at 1-7; dkt. 174 at 1-3; tr. 211 at 15-24, 28-58; tr. 213 at 61; tr. 704 at 21-30, 48-49; tr. 234 at 5-14.)  It was based upon our analysis of the evolving state of the circuit appellate case law interpreting these and similar environmental criminal statutes.  Those decisions in turn refer to pertinent Supreme Court decisions, although very few of those involve environmental statutes.

None of the defendants advanced a theory of defense that they were unaware of the relevant water and air permit limitations.  (See, e.g., tr. 211 at 24-25; tr. 577 at 58-60.)

Nevertheless, they were entitled to jury instructions that correctly identified the mens rea requirements of each charged offense.  See United States v. Korey, 472 F.3d 89, 93 (3d Cir. 2007) (citations omitted); Thayer, 201 F.3d at 222.

The task of interpreting federal criminal statutes to determine the statutorily-imposed mens rea requirement is a judicial function, applying familiar principles of statutory construction. While the principles of statutory interpretation are well established, the process can be difficult. "Few areas of criminal law pose more difficulty than the proper definition of the *mens rea* required for any particular crime."  United States v. Bailey, 444 U.S. 394, 403 (1980).

The felony violations of the Clean Water Act and the Clean Air Act charged in this case each require that the defendant have acted "knowingly."  Other counts of the indictment require a mens rea of "willfully."  The Supreme Court has provided this basic summary for interpreting those terms.  "'[T]he knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law.'.... Thus, unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."  Bryan v. United States, 524 U.S. 184, 193 (1998) (internal citation omitted).  An offense requiring a "willful" state of mind will generally require proof "that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful."  Id.  Generally, however, even a requirement of willfulness does not "carve out an exception to the traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required."  Id. at 196.

The frequently vexing question, when interpreting a statutory provision requiring that defendant acted "knowingly," is "'how far down the sentence the word 'knowingly' is intended

to travel.'"  Liparota v. United States, 471 U.S. 419, 425 n.7 (1985) (quoting W. LaFave & A.

Scott, Criminal Law § 27 (1972)).  Jurisdictional elements do not generally carry a "knowing"

requirement.  See United States v. X-Citement Video, Inc., 513 U.S. 64, 72 n.3 (1994) (citing

United States v. Feola, 420 U.S. 671 (1975)).  All other elements may, but do not necessarily,

have a "knowing" requirement.  These questions are resolved by the courts in the process of

performing the necessary statutory interpretation.

Here we lay out an overview for the discussion of appellate precedent that follows.  Some

courts have invoked the so-called "public welfare doctrine" to aid in determining how far down

the elements of an environmental felony offense the knowledge requirement must travel.[25]

However, this approach has been criticized both as to the origin of such "doctrine," and its effect

when sought to be applied to complex statutory and regulatory schemes carrying serious felony

consequences.  Other courts have developed the view that determining a statutory mens rea

requirement depends not only upon the statutory provision charged, but also upon the type of

conduct charged, even when interpreting regulatory schemes aimed at protecting the public

health and welfare.  Under this approach, courts have applied a canon of statutory interpretation

demanding the mens rea requirement to include knowledge of enough facts to distinguish

conduct that is likely culpable from conduct that is entirely innocent.  We believe that Third

Circuit precedent, as well as most of the appellate precedent in other circuits, is consistent with

that approach in interpreting mens rea requirements under environmental felony provisions, even

while recognizing a legislative goal of protecting the public health and welfare.

_____

[25] See n.42, infra, for a description of the "public welfare doctrine."

The choice of statutory interpretation framework is not merely an academic exercise.  It can produce different jury instructions when the court performs its constitutional duty to determine the essential elements of an offense, including the mens rea requirements, in a given factual setting.  In our view, this District Court was confronted with just such a challenge as it drafted the jury instructions defining the essential elements of the felony violations of the Clean Water Act and the Clean Air Act charged in this case.  We can best explain the reasoning that we employed in drafting those instructions by describing the array of relevant precedent.

The key features of each of the decisions to be discussed here were:  (1) who was charged; (2) precisely what statutory provision was charged; and (3) what conduct was charged.  We have grouped the decisions by statutory provision, to show the lines of cases that have developed interpreting portions of those environmental statutes.

The only modern Supreme Court decision interpreting the mens rea requirement under a federal law aimed at protecting the environment was United States v. International Minerals & Chemical Corp., 402 U.S. 558 (1971).  There, a company was charged with a misdemeanor violation of a provision of the Interstate Commerce Act by shipping (i.e., delivering to a common carrier for shipment) chemicals including sulfuric acid and knowingly failing to show on the shipping papers the required classification of the substance as corrosive liquid, in violation of an ICC regulation.  The statute gave the ICC the power to "formulate regulations for the safe transportation" of "corrosive liquids," and stated that whoever "knowingly violates any such regulation" would be subject to fine or imprisonment of up to one year.  Id. at 559 (statutory citations omitted).  A divided Supreme Court held that the "knowing" requirement in that

situation was limited to knowledge of shipment of the dangerous materials; knowledge of the

regulation was not also required.  Id. at 563-64.

      Reviewing the statutory language in light of the legislative history, and prior Supreme

Court precedent on issues bearing on criminal mens rea, the International Minerals Court

observed that a requirement of mens rea was present in the offense language:

> The principle that ignorance of the law is no defense applies whether the law be a
> statute or a duly promulgated and published regulation.  In the context of [the
> legislative history of this provision] we decline to attribute to Congress the
> inaccurate view that the Act requires proof of knowledge of the law, as well as the
> facts, and that it intended to endorse that interpretation by retaining the word
> 'knowingly.'....
>
> So far as possession, say, of sulfuric acid is concerned the requirement of 'mens
> rea' has been made a requirement of the Act as evidenced by the use of the word
> 'knowingly.'  A person thinking in good faith that he was shipping distilled water
> when in fact he was shipping some dangerous acid would not be covered.

Id. at 564 (quoting Morissette v. United States, 342 U.S. 246, 250 (1952)).

      The Court interpreted the statutory language "knowingly violates any such regulation" as

follows:

> We ... see no reason why the word 'regulations' should not be construed as a
> shorthand designation for specific acts or omissions which violate the Act.  The
> Act, so viewed, does not signal an exception to the rule that ignorance of the law
> is no excuse and is wholly consistent with the legislative history.

Id. at 561.

The International Minerals decision ended with the following statement:

> In Balint the Court was dealing with drugs, in Freed with hand grenades, in this
> case with sulfuric and other dangerous acids.  Pencils, dental floss, paper clips
> may also be regulated.  But they may be the type of products which might raise
> substantial due process questions if Congress did not require, as in Murdock
> [interpreting "willfully" requirement in criminal tax offense statute], 'mens rea' as
> to each ingredient of the offense.  But where, as here and as in Balint and Freed,

> dangerous or deleterious devices or products or obnoxious waste materials are
> involved, the probability of regulation is so great that anyone who is aware that he
> is in possession of them or dealing with them must be presumed to be aware of
> the regulation.

Id. at 564-65 (citations omitted; bracketed material added).

We begin this survey of circuit court environmental jurisprudence with a group of consistent rulings demonstrating that even when the word "knowingly" is found only at the beginning of a statutory phrase containing multiple elements, courts will apply the "knowingly" requirement to several of those elements.  The stated basis for such a ruling, where appropriate in light of the text, structure and legislative history of the statute, is that to hold otherwise could foreclose defenses based on ignorance of facts rather than ignorance of the law, and thus criminalize otherwise innocent conduct.

The federal Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6987, creates a regulatory scheme to ensure that hazardous wastes are disposed of properly.  One of its provisions creates a felony offense for:

> [a]ny person who (1) knowingly transports, or causes to be transported, any
> hazardous waste identified or listed under this subchapter to a facility which does
> not have a permit ....

42 U.S.C. § ("Section") 6928(d)(1).

Courts have had no difficulty applying the "knowingly" requirement in Section 6928(d)(1) to extend all the way to the last factual element stated in that text, namely that defendant (who is the transporter) knows that the facility to which the hazardous waste is transported (the receiving facility) does not have a permit.  See United States v. Speach, 968 F.2d 795, 796-98 (9th Cir. 1992); United States v. Hayes Int'l Corp., 786 F.2d 1499, 1503-05 (11th

43

Cir. 1986); accord, United States v. Hansen, 262 F.3d 1217, 1253 (11th Cir. 2001), cert. denied, 535 U.S. 1111 (2002); see also United States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 46-48 (1st Cir. 1991) (noting same with approval); United States v. Goldsmith, 978 F.2d 643, 644-46 (11th Cir. 1992) (referencing jury instructions on same with apparent approval); United States v. Overholt, 307 F.3d 1231, 1250-51 (10th Cir. 2002) (assuming without deciding same in view of Hayes Int'l and Speach); United States v. Wasserson, 418 F.3d 225, 231 & n.2 (3d Cir. 2005) (noting, as explained by reference to district court opinion 2004 WL 433824, at *1-2 (E.D. Pa.), that district court properly granted new trial when correct jury instruction under Section 6928(d)(1) would have required transporter's knowledge that receiving facility lacked a permit).

The rationale for those rulings, as expressed in Hayes Int'l, was that "[r]emoving the knowing requirement from this element would criminalize innocent conduct; for example, if the defendant reasonably believed that the [disposal] site had a permit, but in fact had been misled by the people at the site." Hayes Int'l, 786 F.2d at 1504 (citing Liparota, 471 U.S. at 425-26; United States v. Freed, 401 U.S. 601 (1971)). Those courts have, however, cautioned that under Section 6928(d)(1), ignorance of the legal requirement that the receiving facility have a permit would be no defense. The Hayes Int'l court explained this point as follows:

> In this case, the congressional purpose indicates knowledge of the permit status is required. The precise wrong Congress intended to combat through section 6928(d) was transportation to an unlicensed facility.... [FN6]
>
>> Fn. 6: It may seem anomalous to hold that the government need not show that the defendant had actual knowledge that the law requires a permit, but that it must show knowledge of the permit status of the disposal site at issue. As Justice White stated, however, in discussing the hypothetical [found in Liparota, 104 S.Ct. at 2088 n.7] a seller need not know a license is required to sell a security as long as the seller knows he does not have a permit. 105 S.Ct. at 2094 (White, J., dissenting). Here, if the

44

> transporter does not know a permit is required, but knows the
> facility does not have one, or knows he has not inquired, then
> sufficient knowledge is shown.

> The government does not face an unacceptable burden of proof in proving that the
> defendant acted with knowledge of the permit status.  Knowledge does not require
> certainty; a defendant acts knowingly if he is aware "'that that result is practically
> certain to follow from his conduct, whatever his desire may be as to that result.'"
> ....  Moreover, in this regulatory context a defendant acts knowingly if he willfully
> fails to determine the permit status of the facility....

> Moreover, the government may prove guilty knowledge with circumstantial
> evidence....  In the context of the hazardous waste statutes, proving knowledge
> should not be difficult....

> ....  Knowledge does not require certainty, and the jurors may draw inferences
> from all of the circumstances, including the existence of the regulatory scheme.

Hayes Int'l, 786 F.2d at 1504-05 (citations omitted).[26]

As this discussion reveals, the courts have agreed that even when a provision of the

RCRA statute is interpreted as not requiring knowledge on the part of defendant that the law

requires a third party to have a permit, it may require knowledge of the fact that the third party

does not have a permit for the regulated activity.  This rationale was further explained in Speech

as follows:

> [S]ection 6928(d)(1) deals not with the violator's lack of a permit, but with the
> lack of a permit on the part of the person to whom the violator delivers hazardous
> waste.  The statute accordingly does not limit liability to the person in the best
> position to know the facility's permit status.  Instead, it requires transporters like
> [defendant] to ensure that other parties have storage permits.  We decline to
> impose liability on these defendants absent proof that they knew the recipient's
> permit status.

Speech, 968 F.2d at 797.

---

[26]  The Third Circuit in Wasserson did not reach the question of whether ignorance of the
legal requirement that the disposal facility have a permit would be a defense under RCRA
Section 6928(d)(1), because in that case the defendant stipulated that he knew that a facility that
receives hazardous waste must have a permit.  418 F.3d at 230-31.

RCRA also contains a provision that appears to make an express distinction between the knowledge requirement for a felony offense by a permit holder as distinguished from a non-permit holder, where the facts do not involve a third party permittee.  That provision creates a felony offense for:

> [a]ny person who -
> ...
> (2) **knowingly** treats, stores or disposes of any hazardous waste ... --
>> (A) without a  permit ... or
>> (B) in **knowing** violation of any material condition or requirement of such permit; or
>> (C) in **knowing** violation of any material condition or requirement of any applicable interim status regulations or standards....

42 U.S.C. § 6928(d)(2) (emphasis added).

The courts of appeals that have interpreted this provision in the context of a RCRA prosecution under Section 6928(d)(2)(A) have, with the exception of the Third Circuit, held that this section, dealing with the situation where a permit is required but has not been obtained, does not require knowledge that the law requires defendant's activity to have a permit, or knowledge that defendant lacks a permit.  See United States v. Kelley Technical Coatings, Inc., 157 F.3d 432, 436-40 (6th Cir. 1998); United States v. Wagner, 29 F.3d 264, 265-66 (7th Cir. 1994); United States v. Laughlin, 10 F.3d 961, 964-66 (2d Cir. 1993), cert. denied, 511 U.S. 1071 (1994); United States v. Dean, 969 F.2d 187, 190-92 (6th Cir. 1992), cert. denied, 507 U.S. 1033 (1993); United States v. Hoflin, 880 F.2d 1033, 1036–40 (9th Cir. 1989), cert. denied, 493 U.S. 1083 (1990); accord United States v. Dee, 912 F.2d 741, 745-46 (4th Cir. 1990), cert. denied, 499 U.S. 919 (1991); see also United States v. Greer, 850 F.2d 1447, 1450-51 (11th Cir. 1988) (referencing jury instructions on same with apparent approval); United States v. Goldsmith, 978

46

F.2d 643, 644-46 (11th Cir. 1992) (same); but see United States v. Johnson & Towers, 741 F.2d 662 (3d Cir. 1984), cert. denied, 469 U.S. 1208 (1985) (discussed infra, nn. 29 & 52 and accompanying text).

The Court of Appeals for the Ninth Circuit first articulated this statutory interpretation in Hoflin.  There, a municipal director of public works was convicted, inter alia, of violating Section 6928(d)(2)(A) on a felony charge of aiding and abetting disposal of hazardous paint waste without a permit.  The appeals court held that the quoted language of the RCRA statute makes a clear distinction between non-permit holders and permit holders, requiring knowledge of violation of an existing permit under subsection (B) but requiring no knowledge of lack of a permit in subsection (A).  Finding no ambiguity in the statutory language, the court held that as to a non-permit holder under Section 6928(d)(2)(A), knowledge of the absence of a permit is not an element of that offense.  Hoflin, 880 F.2d at 1036-40.  However, the court noted that under its interpretation, Section 6928(d)(2)(B), dealing with a permit holder, does require that the defendant "knowingly violate a material condition or requirement of the permit."  Id. at 1037.

This theme was repeated and amplified by the Court of Appeals for the Sixth Circuit in Dean, which agreed with the holding under Section 6928(d)(2)(A) in Hoflin, and added that this section does not require that the defendant have knowledge that a permit was required for defendant's activity.  Dean, 969 F.2d at 190-91.[27]  The Dean court then emphasized that "[a]s to

---

[27]  The RCRA-regulated activity in each of the cases we have cited involved a hazardous waste material.  As to that element, the courts have consistently held that the knowledge requirement is that defendant must know that the activity involves a material that has the potential to be harmful to persons or the environment.  In other words, the RCRA felony provisions are generally interpreted to require knowledge of the potential harmful nature of the material rather than knowledge that it is a RCRA-listed hazardous material.  See Hansen, 262 F.3d at 1251-53; Kelley Technical Coatings, 157 F.3d at 440-41; United States v. Self, 2 F.3d

subsections (B) and (C), the requirements are different.  Here, the statute clearly requires in addition that if one is to be charged under [those provisions], then one must be aware of the additional requirements of the permit or regulation."  Id. at 191.

As this discussion reveals, the courts interpreting RCRA Section 6928(d)(2)(B), in the context of a Section 6928(d)(2)(A) prosecution, have stated that knowledge of material conditions and requirements of a permit is a required element of an offense under Section 6928(d)(2)(B) where the defendant is charged with violating an existing permit under RCRA. The Court of Appeals for the Tenth Circuit has indicated agreement with this view in a prosecution arising directly under Section 6928(d)(2)(B).  In United States v. Self, 2 F.3d 1071, 1085-88, 1091 (10th Cir. 1993), the court and the parties acknowledged that the language of Section 6928(d)(2)(B) requires proof of defendant's knowledge that the storage violates the permit.  There, the court stated that "the second 'knowing' requirement of § 6928(d)(2)(B) ensures that a good faith belief that a permit allows a particular manner of treatment, storage or disposal of hazardous waste, when in fact it does not, is a defense to a criminal charge."  Id. at 1091.  Nor have any courts opined that imposing such a knowledge requirement under Section 6928(d)(2)(B) is in derogation of the rule that ignorance of the law is no defense.[28]

---

1071, 1089-92 (10th Cir. 1993); United States v. Baytank, Inc., 934 F.2d 599, 612-13 (5th Cir. 1991); Dee, 912 F.2d at 745-46; Hoflin, 880 F.2d at 1039; Hayes Int'l, 786 F.2d at 1500-01, 1505.

[28]  Arguably, by expressly imposing a knowledge requirement of the "interim status regulations or standards" in RCRA Section 6928(d)(2)(C), Congress did intend that ignorance that conduct proscribed in those regulations or standards is illegal would be a defense to criminal liability under that section.  We have found no mention of this issue in federal appellate precedent, except the above-quoted statement in Dean, 969 F.2d at 191.  Even under this view, the presumption that ignorance of the specific law or regulation is no defense would continue in force.  As the Supreme Court explained in Liparota, which applied a "knowing" requirement in a prosecution under 7 U.S.C. § 2024(b)(1) to extend to knowledge by defendant that his

This brings us to the 1984 decision of the Court of Appeals for the Third Circuit in
Johnson & Towers.  There, the government appealed from dismissal of substantive RCRA
charges under Section 6928(d)(2)(A) against individual supervisory employees of a corporate
facility that disposed of hazardous waste chemicals without a permit.[29]  The facility had no
permit.  The issue on appeal was whether the term "any person" in Section 6928(d)(2)(A) could
apply to individual employees rather than being confined to owners and operators, i.e., those
obligated under the RCRA statute to obtain a permit.  Johnson & Towers, 741 F.2d at 663-65.

The Johnson & Towers decision held "that section 6928(d)(2)(A) covers employees as
well as owners and operators of the facility who knowingly treat, store, or dispose of any
hazardous waste, but that the employees can be subject to criminal prosecution only if they knew
or should have known that there had been no compliance with the permit requirement of section
6925."  Id. at 664-65.  The court first reviewed the statutory text and structure, then consulted the
pertinent legislative history.  It "reject[ed] the district court's construction limiting the
substantive criminal provision by confining 'any person' in section 6928(d)(2)(A) to owners and
operators of facilities that store, treat or dispose of hazardous waste, as an unduly narrow view of
both the statutory language and the congressional intent."  Id. at 667.

---

acquisition or possession of food stamps was in a manner unauthorized by statute or regulations,
the government need not show that he had knowledge of specific regulations but must prove that
he knew that his conduct was unauthorized or illegal.  Liparota, 471 U.S. at 433-34.

[29]  There were other offenses charged in Johnson & Towers, against both the corporation
and the employees, which were not included in the scope of the motion to dismiss that had been
granted by the district court and appealed by the government.  Those other charges were not
discussed in the decision.

Since it had ruled that the case must be remanded because the individual employees were covered by Section 6928(d)(2)(A), and not just as potential aiders and abettors, the court in Johnson & Towers then said "it is incumbent on us to reach the question of the requisite proof as to individual defendants under that section." Id. The court construed the "knowingly" requirement under (d)(2)(A), as applied to the employees, to require knowledge that each of them knew that the employer (1) was required to have a permit, and (2) did not have a permit. Id. at 669. The court concluded "that the individual [employee] defendants are 'persons' within Section 6928(d)(2)(A), [and] that all the elements of that offense must be shown to have been knowing, but that such knowledge, including that of the permit requirement, may be inferred by the jury as to those individuals who hold the requisite responsible positions with the corporate defendant." Id. at 670. In so holding, the court referred to International Minerals for several guiding principles, including as it observed, "that under certain regulatory statutes requiring 'knowing' conduct the government need prove only knowledge of the actions taken and not of the statute forbidding them;" in other words that the statute does not require knowledge of the law, and the principle that ignorance of the law is no defense does apply in this context. Id. at 669.

There has been no criticism in other circuits of the aspects of the Johnson & Towers decision holding that employees can be liable as principals under Section 6928(d)(2)(A); that defendants must know that the materials are hazardous; that knowledge of illegality is not required; and that proof of knowledge can be established by inference. See Kelley Technical Coatings, 157 F.3d at 436-37; Wagner, 29 F.3d at 266, n.2; Self, 2 F.3d at 1087-88, 1090-93; Dean, 969 F.2d at 190-93; MacDonald & Watson, 933 F.2d at 46-55; Dee, 912 F.2d at 745-46.

However, no appeals court has expressed agreement with the Third Circuit's statutory construction of the "knowing" requirement under that section as requiring proof of the employees' knowledge of the permit requirement and the lack of a permit.  Some have characterized it as dicta and others have expressly declined to follow it.  See Wagner, 29 F.3d at 266; Laughlin, 10 F.3d at 964-66; Dean, 969 F.2d at 190-92; Baytank, 934 F.2d at 612-13; Dee, 912 F.2d at 745; Hoflin, 880 F.2d at 1036-39.

We turn next to appellate precedent under the felony provisions of the Clean Water Act, 33 U.S.C. § 1251, et seq.  This is a comprehensive statute first enacted in 1972, then amended through the years to modify some provisions and incorporate several added enactments.  The stated objective of the Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  Id. § 1251(a).  Our discussion of the CWA is focused on those provisions that have relevance in the present case, and in the cited reported appellate decisions. It is not directed to the many other provisions of the CWA that can be enforced through criminal sanctions.

Section 1311(a) of the CWA provides:

> Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.[30]

Id. § 1311(a).  The felony CWA counts charged in this case alleged violation of Section 1311(a) and Section 1319(c)(2)(A).  (See indictment, dkt. 711, Counts 12-33.)  The latter provision is

---

[30] The term "discharge of a pollutant" means, inter alia, any addition of any pollutant to navigable waters from any point source.  33 U.S.C. § 1362(12).  The term "navigable waters" means the waters of the United States, including the territorial seas.  Id. § 1362(7).  See Rapanos v. United States, 126 S.Ct. 2208 (2006), described infra, n.41.

quoted in the margin.[31]

The CWA creates a joint federal and state permitting program for those who discharge pollutants into the waters of the United States.  33 U.S.C. § 1342.  Permits issued under this program are called National Pollutant Discharge Elimination System ("NPDES") permits.  The CWA prohibits, inter alia, the discharge of any pollutant into those waters except in compliance with an NPDES permit.  33 U.S.C. §§ 1311(a) & 1342.  By agreement with the EPA, the NPDES water permit program is administered in New Jersey by the New Jersey Department of Environmental Protection ("NJDEP").  Pursuant to that authority, NJDEP issued water permits to Atlantic States that authorized discharges of surface stormwater run-off, and discharges of water

---

[31]  The CWA provides criminal penalties for various defined offenses.  The felony CWA provision charged in this case provides in pertinent part:

Any person who –

(A)  knowingly violates section 1311, 1312, 1316, 1317, 1318, 1321(b)(3), 1328, or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State, or any requirement imposed in a pretreatment program approved under section 1342(a)(3) or 1342(b)(8) of this title or in a permit issued under section 1344 of this title by the Secretary of the Army or by a State; or

(B) ...;

shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation, or by imprisonment for not more than 3 years, or by both.  If a conviction of a person is for a violation committed after a first conviction of such person under this paragraph, punishment shall be by a fine of not more than $100,000 per day of violation, or by imprisonment of not more than 6 years, or by both.

33 U.S.C. § 1319(c)(2)(A).  Other CWA felony provisions contain different mens rea language.  See, e.g., 33 U.S.C. §§ 1319(c)(2)(B) ("knowingly introduces into a sewer system or into a publicly owned treatment works ..."), (c)(3) (knowing endangerment), (c)(4) (false statements).

from a specified cooling tower, into municipal storm sewers located on the Atlantic States property. The permits imposed limitations on the type and amount of pollutants that could be discharged from the facility.[32]  The CWA counts in the indictment charged the named defendants with knowingly violating the CWA by causing petroleum-contaminated wastewater to be pumped so as to enter storm drains that led to the Delaware River during specified time periods, without a permit authorizing such discharges.  (See indictment, dkt. 711, Counts 12-33.)

Section 1319(c)(2)(A) creates a felony offense for a knowing violation of Section 1311(a), or of any conditions or limitations of an NPDES permit issued under Section 1342. However, as with the case law under analogous provisions of RCRA and other environmental statutes, the courts have struggled to determine how far down the statutory language the "knowingly" requirement travels in various factual settings.  This body of case law must be presented chronologically because it represents an evolving dialogue among the circuits, as they reflect upon emerging Supreme Court pronouncements.

The Fourth Circuit decided one of the first reported appellate cases under the felony provisions of CWA introduced by the 1987 amendments.[33]   In United States v. Ellen, 961 F.2d 462 (4th Cir.), cert. denied, 506 U.S. 875 (1992), an individual environmental consultant, who

---

[32]  The CWA defines the term "pollutant" (with exceptions not here relevant) to mean "dredged soil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).

[33]  The legislative history of the 1987 amendments to the CWA has been discussed in many of the cases cited here.  See generally United States v. Wilson, 133 F.3d 251, 262 (4th Cir. 1997) (describing amendments and collecting cases); see also United States v. Frezzo Bros., Inc., 602 F.2d 1123 (3d Cir. 1979) (quoting and interpreting pre-1987 misdemeanor version of Section 1319(c)).

had no permit, was convicted under CWA Sections 1311(a) and 1319(c)(2)(A), for filling in

wetlands without a permit.[34]  The Ellen court approved, albeit in a footnote, a jury instruction

stating that the "knowingly" requirement "applies to all four elements of the offense," adding:

> We also reject [defendant's] argument that the court failed to instruct the jury that
> an element of the offense was that he knew a permit was required by CWA.  The
> court instructed that the absence of a permit was an element ..., and
> unambiguously stated that the government had to prove that he acted knowingly
> with respect to each element.

Id. at 467, n.2.  Arguably this statement could be interpreted to require proof of knowledge that

the law required a permit for the activity, as well as knowledge that defendant did not have a

permit.  At a minimum, it expressed that this court believed the "knowingly" requirement to

extend to knowledge that the defendant himself did not have a permit for his conduct.  The

Fourth Circuit confirmed that it is of the latter view in United States v. Wilson, 133 F.3d 251,

264 (4th Cir. 1997), discussed infra.

A 1994 decision of the Ninth Circuit under the felony provisions of the CWA has set the

parameters of a debate that continues to this day.  In U.S. v. Weitzenhoff, 35 F.3d 1275 (9th Cir.

1994), cert. denied, 513 U.S. 1128 (1995), defendants who were managers at a municipal water

treatment plant in Oahu instructed employees to dispose of sewage sludge directly into the outfall

leading to the ocean (mostly at night), thus bypassing the plant's NPDES monitoring devices and

---

[34] Permits to discharge dredged or fill material, as distinguished from permits to
discharge other pollutants, are covered under separate sections of the CWA.  Compare 33 U.S.C.
§ 1344 (dredged and fill material permit) with id. § 1342 (NPDES permit).  Both types of permit
requirements are included under the general requirement language of Section 1311(a), and both
are subject to criminal liability under Section 1319(c).  That distinction has not produced separate
mens rea issues in the cases discussed here.

fouling Honolulu's beaches.  The appellate panel held that the "knowingly" requirement under

Section 1319(c)(2)(A) was knowledge that the defendants were discharging the pollutants in

question, not that they knew they were violating either the law or the terms of the facility's

NPDES permit.  Id. at 1283-86.  In so ruling, the court rejected defendants' proffered "mistake of

fact" defense that they mistakenly believed their conduct was authorized by the permit.  Id. at

1283 & n.3.  The court based its holding upon International Minerals and the "public welfare

offense" doctrine, as well as its reading of the legislative history of the 1987 CWA amendments

and its own precedent under RCRA.[35]

The Ninth Circuit rejected a request for rehearing en banc in Weitzenhoff.  Id. at 1279-81.

Circuit Judge A.J. Kleinfeld, joined by several others, assailed the reasoning of the panel

decision in a powerful dissent.  In their view, where the discharger does have an NPDES permit,

the portion of Section 1319(c)(2)(A) that makes it a felony to "knowingly violate ... any permit

condition or limitation" should be read to require knowledge that the defendants were violating

the terms of the permit.  Id. at 1293-95.  The dissenters interpreted the text and structure of the

CWA, contrasting the "knowing" and "negligent" mens rea provisions; discussed recent Supreme

Court precedents, particularly Staples v. United States, 511 U.S. 600 (1994); and pointed out the

weakness of invoking the "public welfare offense" justification for the court's ruling.  They

urged that their interpretation would avoid making "felons of a large number of innocent people

---

[35] The Weitzenhoff panel did not deal with the Ninth Circuit's own statement in Hoflin, interpreting the analogous felony provision of RCRA, 42 U.S.C. § 6928(d)(2)(B), in the situation where a permit did exist, to require that defendant "knowingly violate a material condition or requirement of the permit."  Hoflin, 880 F.2d at 1037.

doing socially valuable work." Id. at 1293.[36]  They concluded:

> All dischargers acting lawfully pursuant to a permit know that they are discharging pollutants.  The presence or absence of that knowledge, which is the only mental element determining guilt under the panel's decision, has no bearing on any conduct Congress could have meant to turn into a felony.  The only knowledge which could have mattered to Congress, the only knowledge which distinguishes good conduct from bad [in this context], is knowledge that the discharge violates the permit.  That is what the statute says, "knowingly violates [terms of a permit]," not "knowingly discharges."  There is no sensible reason to doubt that Congress meant what it said and said what it meant.

Id. at 1295 (bracketed material added).

> Congress made it a serious felony "knowingly" to violate permit limitations on discharge of pollutants.  The harsh penalty for this serious crime must be reserved for whose who know they are, in fact, violating permit limitations.

---

[36]  In this passage the Weitzenhoff dissenters argued:

The harm our mistaken decision may do is not necessarily limited to Clean Water Act cases.  Dilution of the traditional requirement of a criminal state of mind, and application of the criminal law to innocent conduct, reduces the moral authority of our system of criminal law....  We have now made felons of a large number of innocent people doing socially valuable work.  They are innocent, because the one thing which makes their conduct felonious is something they do not know.  It is we, and not Congress, who have made them felons.  The statute, read in an ordinary way, does not.  If we are fortunate, sewer plant workers around the circuit will continue to perform their vitally important work despite our decision....  We have decided that they should go to prison if, unbeknownst to them, their plant discharges exceed permit limits.  Likewise for power plant operators who discharge warm water into rivers near their plant, and for all sorts of other dischargers in public and private life.  If they know they are discharging into water, have a permit for the discharges, think they are conforming to their permits, but unknowingly violate their permit conditions, into prison they go with the violent criminals.  The statute does not say that.  The statute at issue makes it a felony ... to "knowingly violate [] ... any permit condition or limitation."  33 U.S.C. § 1319(c)(2)(A).

35 F.3d at 1293.

Id. at 1299.[37]

The author of the Weitzenhoff dissenting opinion was on the panel in a later Ninth Circuit case involving a sewage sludge disposal contractor convicted under 33 U.S.C. § 1319(c)(2)(A) for aiding and abetting in the violation of an NPDES permit held by defendant's customer, a municipality.  See United States v. Cooper, 173 F.3d 1192 (9th Cir. 1999).  There, the district court held the government to a higher mens rea standard than in Weitzenhoff, instructing the jury that in that situation the defendant must know that his conduct violates the permit.  The appeals court held that a non-permittee could be criminally liable for violation of a CWA permit.  It added that because of the higher mens rea standard applied by the district court, it did not reach the question whether under Section 1319(c)(2)(A), a non-permittee contractor must know that his conduct violates a permit held by his customer.  Id. at 1201.

The Second Circuit reached a similar result as the Weitzenhoff panel in U.S. v. Hopkins, 53 F.3d 533 (2d Cir. 1995).  There, a corporate officer who signed a Connecticut DEP consent order imposing a fine for past toxic zinc-related wastewater violations, and who had corporate responsibility for ensuring compliance with that order and with a DEP-issued water discharge

---

[37]  Briefly addressing the issue of proof of knowledge, the Weitzenhoff dissenters observed:

> [T]hese two defendants were literally "midnight dumpers." ....  Their conduct ... suggests that they must have known they were violating their NPDES permit.... But we cannot decide the case on that basis, because the jury did not.  The [district] court ... refused to instruct the jury that a mistaken belief that the discharge was authorized by the permit would be a defense.  Because of the way the jury was instructed, its verdict is consistent with the proposition that the defendants honestly and reasonably believed that their NPDES permit authorized the discharges.

35 F.3d at 1294.

permit, was convicted of felony violations under CWA Sections 1319(c)(2)(A) and (c)(4) for his

conduct relating to tampering with test results and submitting false DEP monthly discharge

monitoring reports.  On the issue of defining the elements of the offense under the cited CWA

sections, the court ruled that the term "knowingly" in those sections did not require proof that the

defendant knew his conduct violated the law or a regulatory permit.  Id. at 537-41.  Relying on

the "presumption of awareness" of regulation expressed in International Minerals, as well as its

reading of the legislative history of the 1987 amendments to the CWA, the Hopkins court

summed up its holding as follows:

> [W]e conclude ... that in a prosecution under § 1319(c)(2)(A), the government was
> required to prove that Hopkins knew the nature of his acts and performed them
> intentionally, but was not required to prove that he knew that those acts violated
> the CWA, or any particular provision of that law, or the regulatory permit issued
> to [the company].

Id. at 541 (emphasis added).

The Fifth Circuit took a different view from the Weitzenhoff approach to mens rea in

U.S. v. Ahmad, 101 F.3d 386 (5th Cir. 1996).  There, a gasoline station owner-operator was

convicted of violating CWA Section 1319(c)(2)(A) for knowingly discharging a pollutant into

navigable water without a permit in violation of Section 1311(a) (count one), and knowingly

operating a source in violation of a pretreatment standard in violation of Section 1317(d) (count

two), when he discharged gasoline from a tank and it flowed into both the city storm sewer

system (count one) and its sewage treatment plant (count two).  One of his asserted grounds of

defense was that he thought the substance being discharged was water rather than gasoline.  The

district court instructed the jury that the "knowing" requirement applied to the fact of

discharging.  It refused to instruct that the "knowing" requirement also applied to the other

58

elements of the offense, including that the substance being discharged was a pollutant.  The court

of appeals reversed, holding that with the exception of purely jurisdictional elements, the mens

rea of knowledge was a requirement in each element of the crime, including the facts that the

defendant knew he was discharging a pollutant and that he lacked a permit.  Id. at 389-91.[38]

    The Ahmad court's analysis expressly rejected reliance upon the "public welfare offense

exception" in determining the mens rea for the charged offenses, which under Section

1319(c)(2)(A) are "felonies punishable by years in federal prison."  Id. at 391.  Instead, the court

harked back to "the long-held view that 'the presumption in favor of a scienter requirement

should apply to each of the statutory elements which criminalize otherwise innocent conduct.'"

Id. at 390 (quoting X-Citement Video, 513 U.S. at 72).  It relied heavily on the analysis of the

Supreme Court in Staples, observing that there the Court "made plain that statutory crimes

carrying severe penalties are presumed to require that a defendant know the facts that make his

conduct illegal."  Id. (citing Staples, 511 U.S. at 619-20).  It attempted to distinguish Weitzenhoff

and Hopkins on the basis that those courts were "concerned almost exclusively with whether the

language of the CWA creates a mistake-of-law defense," and agreed with those decisions that

knowledge of the illegality of the defendant's actions is not an element of the charged offenses.

Id. at 390-91.

    Ahmad did not involve a prosecution of employees of a company that did have an NPDES

permit, as was the case in Weitzenhoff and Hopkins.  Therefore, the Ahmad court did not have to

decide whether, in its view, knowledge that one's conduct violates permit limitations is part of

---

[38]  Courts have also worked to define what is the jurisdictional element under Section
1319(c)(2)(A), as to which there is general agreement that no mens rea requirement is imposed.
Ahmad features in that discussion as well.  See n.44, infra.

the required mens rea where there is a permit.  Nonetheless, the analytical approach of <u>Ahmad</u> does deviate from that employed in those decisions in this respect:  <u>Ahmad</u> echoes the reasoning of the dissent in <u>Weitzenhoff</u>, in the sense that both of those opinions were grounded in the principle that the mens rea requirement for a felony offense will generally be applied to reach at least enough elements of the offense so as to avoid criminalizing otherwise innocent conduct.[39]

The next significant appellate decision in this line of CWA cases came from the Fourth Circuit in 1997.  In <u>U.S. v. Wilson</u>, 133 F.3d 251 (4th Cir. 1997), several companies and a CEO were convicted of felony violations of CWA Sections 1311(a) and 1319(c)(2)(A) for discharging fill and excavated material into wetlands without a permit.  There, as in <u>Ahmad</u>, no permit had been applied for or issued, and therefore the court was concerned with the first disjunctive phrase of Section 1319(c)(2)(A):  "Any person who knowingly violates ... section 1311 ... shall be punished."[40]

---

[39] <u>Ahmad</u> can easily be read to be consistent with <u>Weitzenhoff</u> and <u>Hopkins</u>, as later courts have observed, because even the latter two decisions would not have foreclosed a mistake of fact defense based upon a lack of knowledge that the substance discharged was a pollutant. <u>See</u> <u>United States v. Sinskey</u>, 119 F.3d 712, 716-17 (8th Cir. 1997) (discussing <u>Ahmad</u>); <u>Wilson</u>, 133 F.3d at 262 (same).  This is consistent with <u>International Minerals</u>, 402 U.S. at 563-64 ("A person thinking in good faith that he was shipping distilled water when in fact he was shipping some dangerous acid would not be covered.").  We find <u>Ahmad</u> instructive not so much for its rather unremarkable result to that effect, but for its conceptual basis as we have discussed.

[40] As we have seen, after this first substantive phrase of  CWA Section 1319(c)(2)(A), there are several successive phrases, each stated in the disjunctive "or."  Those successive phrases expressly pertain to situations where a permit does exist.  The second phrase, in its grammatical construction, provides:  "Any person who –  knowingly violates ... any permit condition or limitation ... in a permit issued under section 1342 ... shall be punished...."  The third phrase, itself containing several disjunctive sub-parts, provides:  "Any person who – knowingly violates ... any requirement imposed in a pretreatment program approved under section 1342(a)(3) or 1342(b)(8) ... or in a permit issued under section 1344 ... shall be punished...."  33 U.S.C. § 1319(c)(2)(A) (full text quoted <u>supra</u>, n.31).

60

The jury instructions in <u>Wilson</u> had required knowledge only that defendant discharged a pollutant.  All other elements had been listed in the jury instructions without a scienter requirement.  The court of appeals reversed, holding that "the instructions did not adequately impose on the government the burden of proving <u>each statutory element</u>." <u>Id.</u> at 264 (emphasis in original).  Specifically, after performing an extremely thorough statutory interpretation, the <u>Wilson</u> court held that "the Clean Water Act, 33 U.S.C. § 1319(c)(2)(A), requires the government to prove the defendant's knowledge of <u>facts</u> meeting each essential element of the substantive offense, ... but need not prove that the defendant knew his conduct to be illegal...." <u>Id.</u> at 262 (emphasis in original; citations omitted).

The <u>Wilson</u> court concluded that the elements of the charged offense that the government must prove were as follows:

> (1) that the defendant knew that he was discharging a substance, eliminating a prosecution for accidental discharges; (2) that the defendant correctly identified the substance he was discharging, not mistaking it for a different, unprohibited substance; (3) that the defendant knew the method or instrumentality used to discharge the pollutants; (4) that the defendant knew the physical characteristics of the property into which the pollutant was discharged that identify it as a wetland, such as the presence of water and water-loving vegetation; (5) that the defendant was aware of the facts establishing the required link between the wetland and waters of the U.S.;[41] and (6) that the defendant knew he did not have

---

[41] At this point in the quoted text, the <u>Wilson</u> court placed an asterisked footnote addressing the issue of excluding jurisdictional facts from the elements of the offense requiring mens rea.  <u>Id.</u> at 264, n.*.  That issue was revisited in a recent Fourth Circuit decision.  In <u>United States v. Cooper</u>, 482 F.3d 658 (4th Cir. 2007), the court expressly held that in general, knowledge that a discharge is into "water of the United States" within the meaning of the CWA "is simply a jurisdictional fact, the objective truth of which the government must establish but the defendant's knowledge of which it need not prove....  The government did, however, have to prove that [defendant] knowingly discharged the sewage into the creek."  <u>Id.</u> at 668, citing <u>Wilson</u>, 133 F.3d at 264; <u>Sinskey</u>, 119 F.3d at 715; <u>Ahmad</u>, 101 F.3d at 391; <u>Hopkins</u>, 53 F.3d at 541; <u>Weitzenhoff</u>, 35 F.3d at 1283-84.

a permit.  This last requirement does not require the government to show that the defendant knew that permits were available or required.  Rather, it, like the other requirements, preserves the availability of a mistake of fact defense if the defendant has something he mistakenly believed to be a permit to make the discharges for which he is being prosecuted.

Id. at 264.  In so holding, the Wilson court conducted a lengthy review of the "public welfare"

discussion in Supreme Court and appellate case law, neither rejecting nor endorsing it as a basis

for its decision.[42]  Instead, it concluded with the following observation:

> While a statute which in some applications is a public welfare statute may in other applications be held to require a different mens rea, see Staples, 511 U.S. at 605, 114 S.Ct. at 1796-97, even in the latter situation, the government need prove only that the defendant knew the operative facts which make his conduct illegal.  The government need not prove that the defendants understood the legal consequences of those facts or were even aware of the existence of the law granting them significance.

---

The Cooper court distinguished Wilson on this point by saying that in Wilson the government did have to prove that defendant was aware of the facts establishing the required link between the wetland in question and waters of the United States, because both the Army Corps of Engineers and Maryland law were unclear on whether those lands were within the purview of the CWA.  Id. at 667-68.  See generally Rapanos, 126 S.Ct. 2208 (2006) (plurality opinion) (holding that contrary to EPA interpretation, "waters of the United States" includes "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] ... oceans, rivers, [and] lakes.' ....  The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall.")

[42]In Wilson the Fourth Circuit described the "public welfare offense" concept as follows:

Under this somewhat amorphous exception to the general common law scienter requirements, a threat to public health and safety posed by an object or activity and the inherent dangerousness or deleterious nature of the prohibited item are considered sufficient in themselves to place the defendant on notice of the likelihood of regulation and thus to excuse the need to prove mens rea with respect to one or more elements of the offense.  Even under this public welfare doctrine, however, true or rigid strict liability does not generally follow, as ignorance of the facts usually remains a defense.

Id. at 263 (citations omitted).

62

Id. at 264 (citations omitted).  See also United States v. Hartsell, 127 F.3d 343, 350-51 (4th Cir.

1997) (felony provision of 33 U.S.C. § 1319(c)(2)(A) not unconstitutionally vague as applied to

permit-holder).

The Eighth Circuit aligned itself with the holdings in Weitzenhoff (Ninth Circuit) and

Hopkins (Second Circuit) in United States v. Sinskey, 119 F.3d 712 (8th Cir. 1997), which was

also a situation involving an employee of a permit-holder.  Defendant in Sinskey was the plant

manager at a meat-packing plant ("Morrell") that did have an NPDES water permit.  He was

convicted under Section 1319(c)(2)(A) for discharging pollutants in amounts exceeding the

permit limitations.  The appeals court affirmed, ruling that the government was not required to

prove that defendant knew his acts violated either the CWA or permits issued under that act.  Id.

at 715-16.  The Sinskey court reviewed precedent, including International Minerals, and the

legislative history of the pertinent provisions.  The Sinskey court expressed its conclusion on this

point as follows:

> In construing other statutes with similar language and structure, that is, statutes in
> which one provision punishes the "knowing violation" of another provision that
> defines the illegal conduct, we have repeatedly held that the word "knowingly"
> modifies the acts constituting the underlying conduct....
>
> We see no reason to depart from that commonly accepted construction in this
> case, and we therefore believe that in 33 U.S.C. § 1319(c)(2)(A), the word
> "knowingly" applies to the underlying conduct prohibited by the statute.
> Untangling the statutory provisions ... in order to define precisely the relevant
> underlying conduct, however, is not a little difficult.  At first glance, the conduct
> in question might appear to be violating a permit limitation, which would imply
> that § 1319(c)(2)(A) requires proof that the defendant knew of the permit
> limitation and knew that he or she was violating it.  To violate a permit limitation,
> however, one must engage in the conduct prohibited by that limitation.  The
> permit is, in essence, another layer of regulation in the nature of a law, in this
> case, a law that applies only to Morrell.  We therefore believe that the underlying
> conduct of which Sinskey must have had knowledge is the conduct that is

63

prohibited by the permit, for example, that Morrell's discharges of ammonia nitrates were higher than one part per million in the summer of 1992.  Given this interpretation of the statute, the government was not required to prove that Sinskey knew that his acts violated either the CWA or the NPDES permit, but merely that he was aware of the conduct that resulted in the permit's violation.

Sinskey, 119 F.3d at 715-16 (citations omitted).[43]  Accord United States v. Snook, 366 F.3d 439, 441-43 (7th Cir. 2004).

This completes our review of the appellate case law interpreting the mens rea requirements under pertinent "knowing" felony provisions of the Clean Water Act.  There is an important case under the Clean Water Act's negligence provisions, United States v. Hanousek, 176 F.3d 1116 (9th Cir. 1999), cert. denied, 528 U.S. 1102 (2000).  Before adding Hanousek to this discussion, we will summarize the limited body of appellate precedent on similar issues under the felony provisions of the Clean Air Act, 42 U.S.C. § 7413(c).  As we have noted, only the Clean Water Act contains both misdemeanor and felony criminal penalties; neither RCRA nor the CAA impose criminal penalties for negligent violations.

We are currently aware of four published appellate decisions interpreting the criminal mens rea requirements under the Clean Air Act.  Those are United States v. Rubenstein, 403 F.3d 93 (2d Cir. 2005); United States v. Ho, 311 F.3d 589 (5th Cir. 2002); United States v. Weintraub,

---

[43]  Sinskey and a co-defendant employee were also convicted of violating 33 U.S.C. § 1319(c)(4) for knowingly rendering inaccurate a required monitoring device or method.  The court of appeals rejected their contention that under that section the government would have to prove knowledge that their acts were illegal, stating:  "This argument has even less force with respect to § 1319(c)(4) – which penalizes a person who 'knowingly falsifies, tampers with, or renders inaccurate any monitoring device or method required to be maintained' by the CWA – than it does with respect to § 1319(c)(2)(A).  In § 1319(c)(4), the adverb 'knowingly' precedes and explicitly modifies the verbs that describe the activities that violate the act."  Id., 119 F.3d at 717.  The Weitzenhoff and Hopkins defendants were also convicted under § 1319(c)(4).  See Weitzenhoff, 35 F.3d at 1282-83 & nn.1, 3; Hopkins, 53 F.3d at 541.

273 F.3d 139 (2d Cir. 2001); and United States v. Buckley, 934 F.2d 84 (6th Cir. 1991).  All

involved convictions under various subsections of 42 U.S.C. § 7413(c), inter alia, relating to

improper handling and disposal of asbestos during renovation/demolition activities, which were

upheld over objections to jury instructions on the required mens rea for the charged offenses.  We

will concentrate our summary on the Weintraub decision because it is the most thorough on that

issue, and the holdings in the other three cases are in accord.

> The federal regulation of asbestos activity is different from that involved in this case.  See

Weintraub, 273 F.3d at 144-45 (describing CAA regulatory framework for handling asbestos in

building demolition and renovation).  We have located no appellate decisions under the Clean

Air Act involving the mens rea requirement in a situation where, as here, an emissions control

permit has been issued under the CAA for industrial manufacturing activities.

> Defendant Weintraub was the owner/operator of real estate development companies that

purchased an abandoned office building from a city for renovation.  The city provided him with a

consultant's report and an appraisal stating that the building had extensive asbestos in floor tiles

and insulation, but defendant proceeded with demolition without complying with proper asbestos

abatement and disposal procedures.  He appealed his conviction on conspiracy and various

substantive CAA violations under 42 U.S.C. § 7413, arguing chiefly that the jury instructions

were insufficient because they did require knowledge that the material was asbestos, but did not

require knowledge that the material met the threshold regulatory requirements of friability and

minimum quantities.  Id. at 141-44.[44]

---

[44]  Defendant in Weintraub was convicted of conspiracy to violate 42 U.S.C. § 7413(c) by
unlawfully removing and disposing of asbestos (ct. 1), and substantive charges as follows:
violation of § 7413(c)(2)(B) by causing renovation of a building containing asbestos (as defined

The <u>Weintraub</u> court affirmed in a carefully reasoned opinion, holding that in the charged Clean Air Act provisions, "the phrase 'knowingly violates' requires knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal." <u>Id.</u> at 147.  Applying that ruling in the context of the case, it concluded that "in a criminal prosecution under Section 7413 for a violation of the asbestos work-practice standard, the government need only prove that defendant knew that the substance involved in the alleged violations was asbestos; it need not establish the defendant's knowledge that the conduct proscribed by the statute involved the kind and quantity of asbestos sufficient to trigger the asbestos work-practice standard." <u>Id.</u> at 151.  However, the court added the following caveat:

> Our holding that the scienter component of a criminal violation of the asbestos work-practice standard is satisfied by knowledge of the presence of asbestos and not the particular type of asbestos to which the standard applies is limited to such violations.  The application of the scienter requirement to criminal violations involving other hazardous air pollutants or violations of other provisions of the CAA must await future cases.

<u>Id.</u>

---

by regulations) without notifying EPA (ct. 2); violation of § 7413(c)(1) by causing wrecking and dismantling that broke up asbestos-containing materials (ct. 3); violation of § 7413(e)(1) by causing asbestos-containing materials to be placed in containers that were not leak-tight and did not possess the required warning labels (ct. 6); and violation of § 7413(c)(1) by causing to be disposed asbestos-containing materials at one or more sites that could not legally accept asbestos for disposal (ct. 7).  The court explained the regulatory framework of the action, summarizing and quoting the key statutory provisions as follows:

> The CAA creates strict civil liability for violations of § 7412 or regulations adopted thereunder, which include the asbestos work-practice standard.  <u>See</u> 42 U.S.C. § 7413(b)(2).  The CAA also holds criminally liable "[a]ny person who *knowingly violates* any requirement or prohibition of ... section 7412 of this title ..., including a requirement of any rule, order, waiver, or permit promulgated or approved under such section [ ]." 42 U.S.C. § 7413(c)(1) (emphasis added).

<u>Weintraub</u>, 273 F.3d at 145.

The stated basis of the Weintraub decision was neither the "public welfare" doctrine, nor the principle that a "knowing" requirement should generally be applied to all elements of an offense other than purely jurisdictional elements. Rather, the court developed in considerable detail its rationale based on "a canon of statutory interpretation to read criminal statutes that are silent or ambiguous as to the required standard of mens rea, to demand knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent." Id. at 147 (citations omitted).

The Weintraub court highlighted its reasoning by comparing the Supreme Court rulings in United States v. Freed, 401 U.S. 601 (1971), and Staples v. United States, 511 U.S. 600 (1994). Those decisions applied the scienter requirement of one felony statute, 26 U.S.C. § 5861(d),[45] to two different sets of facts. Freed held, where defendant allegedly possessed hand grenades, that he could be convicted without proof that he knew the grenades were unregistered, because knowingly possessing the grenades was sufficient to distinguish his conduct from an innocent act. Freed, 401 U.S. at 609. In contrast, as the Weintraub court observed:

> Twenty-three years later, in Staples, the Court applied the same analysis to the possession of a machine gun, but reached a nearly opposite result based on the different expectations of regulation associated with guns. The Court found that the long history of substantially unregulated possession of guns in the United States meant that a possessor would not reasonably expect that possession to be closely regulated. The Court consequently decided that the government was obligated to prove that the defendant knew that his gun was, in fact, capable of being fired automatically and thus was a machine gun, unregistered possession of which violated the Act. Simple knowledge that it was a gun was inadequate to create an expectation that its possession could be criminal.

Weintraub, 273 F.3d at 148 (citing Staples, 511 U.S. at 610-12).

---

[45] The National Firearms Act proscribes, inter alia, "receiv[ing] or possess[ing] a firearm which is not registered to [defendant] in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d).

Applying that approach in its case, the Weintraub court stated that knowledge of the presence of asbestos would satisfy the required statutory scienter under each of various charged CAA subsections, because "[b]ut for the presence of asbestos, each count describes conduct that is basically innocuous and largely unregulated....  Asbestos is thus 'the crucial element separating legal innocence from wrongful conduct.'"  Id. at 149 (quoting X-Citement Video, 513 U.S. at 73).  The court added, however, that where the charged offense was knowing disposal of asbestos at sites that could not legally accept it for disposal, the district court also properly held the government to proof of defendant's knowledge that the sites were not legal asbestos disposal sites.  Id. at 151-52.[46]

We return now to the Clean Water Act, to address the mens rea issue under its criminal negligence provision, which provides in pertinent part:

---

[46]  The spectrum of views within the United States Supreme Court on statutory interpretation of mens rea requirements is well illustrated by the array of opinions in X-Citement Video, 513 U.S. 64, which held that a state felony law against knowingly shipping or receiving sexually explicit material involving minors required knowledge both that the material was sexually explicit and that it involved minors. Chief Justice Rehnquist, writing for the majority, based the decision primarily upon the canon of construction that "the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." Id. at 72.  Justice Stevens, concurring, relied upon his view that "the normal, commonsense reading of a subsection of a criminal statute introduced by the word 'knowingly' is to treat that adverb as modifying each of the elements of the offense identified in the remainder of the subsection." Id. at 79.  Justice Scalia, joined by Justice Thomas in dissent, stated that Supreme Court precedent cannot be "read to stand for the sweeping proposition that 'the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct,' ... even when the plain text of the statute says otherwise." Id. at 80-81 (italics in original).

> Any person who –
>> (A) negligently violates section 1311, ... of this title, or any permit
>> condition or limitation implementing any of such sections in a permit
>> issued under section 1342 of this title ... shall be punished ....

33 U.S.C. § 1319(c)(1)(A) (quoted in full <u>supra</u>, n.16).[47]

The appellate case law interpreting the definition of negligence under Section
1319(c)(1)(A) is currently controlled by <u>United States v. Hanousek</u>, 176 F.3d 1116 (9th Cir.
1999), <u>cert. denied</u>, 528 U.S. 1102 (2000) (with Thomas, J., joined by O'Connor, J., dissenting
from denial of certiorari).  We are aware of no contrary federal appellate rulings.  The <u>Hanousek</u>
decisions are instructive not just on the statutory definition of negligence under the CWA as
expressed by the Ninth Circuit, but perhaps more importantly for the perspective on "public
welfare legislation" expressed by Justice Thomas in his dissent from the denial of certiorari.

Hanousek was employed by a railroad company as roadmaster of a stretch of railroad in
Alaska.  Under his employment contract he was responsible for safe maintenance of the railroad,
including special projects.  One night while Hanousek was at home and off-duty, a contractor's
employee operating a backhoe in a special project on the railroad line struck a petroleum pipeline
adjacent to the tracks, causing the pipeline to rupture and spill large quantities of heating oil into
the river below.  The appeals court observed that the district court properly instructed that
defendant could be convicted only on the basis of his own negligent conduct, and not on the basis
of the negligence of others working at the site.  However, the facts supported personal liability

---

[47]  The penalties under Section 1319(c)(1)(A) include imprisonment for not more than
one year for a first conviction, and not more than two years for a violation committed after a first
conviction.  <u>Id.</u>  This section is sometimes referred to as a misdemeanor provision, but the
penalty for the repeat violation apparently raises it to a felony.

for his conduct even though he was not present at the time of the spill.  See id. at 1119, 1123.

Hanousek was convicted of negligently discharging a harmful quantity of oil into navigable

waters, under 33 U.S.C. §§ 1319(c)(1)(A) (quoted above), and 1321(b)(3).  Id. at 1118-20.

The Hanousek jury instructions defined negligence as "the failure to use due care" – a

definition commonly used for ordinary or civil negligence – over defendant's objection that the

district court should have used the Model Penal Code definition:  "a gross deviation from that

standard of care that a reasonable person would observe in the situation."  Id. at 1120.  The Ninth

Circuit affirmed, holding that the jury instruction reflected a correct statutory interpretation and

that the provision as thus interpreted did not violate defendant's right to due process.  Id. at 1120-

22.  On the due process issue the court concluded:

> In light of our holding in Weitzenhoff that the criminal provisions of the CWA
> constitute public welfare legislation, and the fact that a public welfare statute may
> impose criminal penalties for ordinary negligent conduct without offending due
> process, we conclude that section 1319(c)(1)(A) does not violate due process by
> permitting criminal penalties for ordinary negligent conduct.

Id. at 1122.

Hanousek petitioned for certiorari, stating the following issues:

> 1. Is the Clean Water Act a "public welfare" statute (as the Ninth, Eighth and
> Second Circuits have ruled, but contrary to the rulings of the Fifth Circuit and
> arguably the Fourth Circuit) so as to justify criminal conviction and
> imprisonment, without proof of mens rea, for otherwise innocent conduct?
>
> 2. Does the Due Process Clause restrict eliminating mens rea for offenses
> punishable by significant terms of imprisonment of one year or more?
>
> 3. Does the unmodified word "negligently" in § 1319(c)(1)(A) of the Clean Water
> Act, a criminal statute that provides for both misdemeanor and felony penalties,
> mean negligence in an ordinary civil tort sense or negligence in an aggravated
> criminal sense?

Hanousek, Petition for Writ of Certiorari, 1999 WL 33633013, at *i.

The Supreme Court denied certiorari.  Hanousek, 528 U.S. 1102 (2000).  However, Justice Thomas, joined by Justice O'Connor, filed a dissenting opinion stating that "[w]hatever the merits of petitioner's underlying due process claim, I think that it is erroneous to rely, even in small part, on the notion that the CWA is a public welfare statute."  Id. at 1103.  Reviewing the criminal penalties for negligent and knowing violations of the CWA, ranging up to six years of imprisonment, Justice Thomas said, "[t]he seriousness of these penalties counsels against concluding that the CWA can accurately be classified as a public welfare statute."  Id. at 1104.  He explained:

> Although provisions of the CWA regulate certain dangerous substances, this case illustrates that the CWA also imposes criminal liability for persons using standard equipment to engage in a broad range of ordinary industrial and commercial activities.  This fact strongly militates against concluding that the public welfare doctrine applies....  I think we should be hesitant to expose countless numbers of construction workers and contractors to heightened criminal liability for using ordinary devices to engage in normal industrial operations.

Id. at 1103.

Justice Thomas expressly criticized the basis of the Ninth Circuit's decision in Weitzenhoff regarding the elements of a "knowing" violation under Section 1319(c)(2)(A), stating:

> Some courts interpreting the felony provisions of the CWA have used the public welfare doctrine to determine that a person may "knowingly" violate the statute even if he is not aware that he is violating the law."  *See, e.g., United States v. Weitzenhoff*, 35 F.3d 1275, 1284-1286 (C.A.9 1993).

Id. at 1104, n.2.  His dissent in Hanousek concluded:

> [W]e have never held that any statute can be described as creating a public welfare offense so long as the statute regulates conduct that is known to be subject to extensive regulation and that may involve a risk to the community.  Indeed, such a suggestion would extend this narrow doctrine to virtually any criminal statute

71

applicable to industrial activities.  I presume that in today's heavily regulated society, any person engaged in industry is aware that his activities are the object of sweeping regulation and that an industrial accident could threaten health or safety.  To the extent that any of our prior opinions have contributed to the Courts of Appeals' overly broad interpretation of this doctrine, I would reconsider those cases.  Because I believe the Courts of Appeals invoke this narrow doctrine too readily, I would grant certiorari to further delineate its limits.

Id. at 1104-05.[48]  This Court believes that that Hanousek simple negligence test has been further undermined by Safeco Ins. Co. v. Burr, 127 S.Ct. 2210 (2007).  (See n.17, supra.)

The Supreme Court filed its Hanousek denial of certiorari and dissent in 2000.  The Second Circuit decided its Weintraub case interpreting the Clean Air Act in 2001.  There, without citing the Hanousek dissent, it nevertheless stated, "[t]he government contends that Weintraub was convicted of a so-called "public welfare offense" that demands a less onerous showing of mens rea....  We find it unnecessary to decide whether a criminal violation of the asbestos work-practice standard is such an offense."  Weintraub, 273 F.3d at 148, n.4.  In other words, the Second Circuit did not rely on the "public welfare" theory to interpret the provisions of the Clean Air Act charged there.  Instead, it preferred to rest its decision on the stated canon of interpretation that defines mens rea, for a "knowing" felony offense, to require knowledge of enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent.  Id. at 147.

---

[48]  For a fascinating and scholarly description of criminal mens rea standards as interpreted in federal and state courts, see State v. Hazelwood, 946 P.2d 875 (Alaska 1997) (holding that civil negligence standard for state crime of negligent discharge of oil satisfied state constitutional due process clause).  There the court points out that the term "public welfare offense" originated in a 1933 Columbia Law Review article.  Id. at 881, n.11.

\*      \*      \*

It was against the background of case law described above that this Court crafted its instruction defining the elements of the Clean Water Act and the Clean Air Act felony offenses under the circumstances presented in this case.  As previously stated, we carried the "knowing" requirement down to the last element of those offenses (excluding jurisdictional facts), imposing on the government the burden of proving that the individual defendant knew the fact that the discharge or conduct was in violation of the authorized limits of the water or air permits.  We also made clear that knowledge of the law, or of any particular provision of the regulations or even the permit, was not required.  (See Secs. I.B & I.C., supra (quoting the pertinent portions of the final jury instructions).)  We did this not under a view that every non-jurisdictional element must carry a "knowing" requirement.  Rather, we believe it may have been necessary in order to distinguish innocent industrial activity of employees in a regulated facility from that which could amount to "knowing" violation of a permit limitation.

This approach appears to be consistent with Third Circuit precedent interpreting criminal statutes with a "knowing" mens rea to extend to at least enough facts to distinguish conduct that is likely culpable from conduct that is entirely innocent.  See, e.g., United States v. Barbosa, 271 F.3d 438, 457-60 (3d Cir. 2001) (although drug identity and quantity is an element of 21 U.S.C. § 841(a) offense when it results in a sentence beyond the relevant statutory maximum, mens rea requirement is only that defendant knew that the substance in which he trafficked was a controlled substance); Johnson & Towers, discussed supra; United States v. Hamilton, 456 F.2d 171 (3d Cir. 1972) (mens rea requirement under 18 U.S.C. § 2423 is knowledge that defendant transported and induced the victim to engage in prostitution; knowledge that victim was under

73

age eighteen is not required although age of victim is an element), discussed with approval in

United States v. Figueroa, 165 F.3d 111, 118 (2d Cir. 1998).

We realize that the only circuits to have directly confronted the issue under the Clean

Water Act (no such decisions having yet been rendered in this context under the Clean Air Act),

have held that where a permit does exist, an employee of the permit holder is presumed to know

when his or her conduct violates the permit, and it is therefore not an element of a "knowing"

violation that the employee must know that the discharge or conduct violates the permit.  See

Weitzenhoff, Hopkins, and Sinskey, discussed supra.  However, those decisions relied at least in

part on what appears to be an eroding perception that the "public welfare doctrine" can be

invoked to justify a less-than-rigorous mens rea requirement for a felony violation of an

environmental regulatory statute.  We also note that the appeals courts have consistently

interpreted the analogous felony provision of RCRA to impose on the government the burden of

proving knowledge by employees (indeed, even an owner/operator) of the fact that their conduct

violates a permit, where the employer does have a permit.  See Self, Dean, and Hoflin, discussed

supra.[49]

The Third Circuit in Johnson & Towers, and more recently in Wasserson, interpreting

analogous provisions of RCRA, albeit in situations where there was no permit, has gone so far as

to approve requiring knowledge that the law requires a permit and the fact that the individual

does not have one.  The Fourth Circuit in Wilson, interpreting the Clean Water Act in a similar

---

[49] The holdings in Weitzenhoff, Hoflin and Sinskey are interesting in that the offense conduct in each of those cases also supported a conviction under 33 U.S.C. § 1319(c)(4) for deliberately tampering with the permit-holder's wastewater testing methods.  See supra, n.43 and accompanying text.  That type of conduct would satisfy a culpability requirement even if the discharges themselves were not shown to be violative of the emissions limits of the permits.

74

situation, has carefully delineated its reasoning that it is appropriate to require that the individual

defendant know the <u>fact</u> that he lacks a permit, even where knowledge of the legal requirement

for a permit may be presumed.  Finally, we believe that the <u>Weitzenhoff</u> dissent, in a case

involving conduct of employees of a permit-holder, is perhaps better-reasoned than the panel

decision that prevailed in that case.  We also take careful note of the criticism leveled at the

<u>Weitzenhoff</u> decision by Justice Thomas in his dissent from denial of certiorari in <u>Hanousek</u>.

We have provided a thorough explanation of the language this Court used to <u>identify the</u>

<u>elements</u> of the charged felony CWA and CAA offenses for two reasons.  First, as we have said,

it is necessary background to understand our choice of language to <u>define the term "knowing"</u> in

the jury instructions, which we discuss in the next section.  Second, as we have also noted, the

government objected to our identification of those elements, arguing that knowledge of the

nature of the discharge or conduct (for CWA:  discharging petroleum-contaminated wastewater;

for CAA:  burning more than 55 gallons per day of waste paint) was sufficient.  In view of the

unsettled case law in this area, we have considered it important to explain the reasoning

underlying the language used by this Court in the jury instructions identifying those elements.

**H.     Legal analysis for refusal of defendants' proposed instructions on recklessness**

It will be recalled that a negligent violation of the CWA was not charged in the

indictment in this case.  The jury instruction submitting that lesser-included offense to the jury

was specifically requested by defendants, and we granted that request over objection by the

government.  Defendants also requested, but this Court refused, a jury instruction that would

have introduced the concept of "recklessness," given a <u>subjective</u> definition of that concept as

found in the Model Penal Code, and would have stated that "recklessness" will not satisfy the

definition of "knowing" or "willful" conduct under any of the offenses charged in the indictment. Defendants assert that the failure to deliver such an instruction resulted in a violation of their constitutional rights.  (See Sec. I.F. supra.)[50]

Defendants do not, of course, quarrel with the fact that they ultimately succeeded in persuading the Court not to include any instruction to the effect that a finding of knowledge could be based on evidence of conscious avoidance, the so-called willful blindness or deliberate ignorance or "ostrich" instruction.  But the concepts of willful blindness and recklessness are closely related in the law, and both were in play at the same time while we crafted the jury instructions in this case, so we must include both of those concepts in this discussion.

We must observe again here that defendants have not cited, nor has our research revealed, any cases holding that it is error not to define "knowing" in a criminal case by defining and excluding the concept of "recklessness," where the offense statute does not contain the term "reckless," and there is no lesser-included offense based on recklessness.  Certainly no such rulings exist in the federal appellate environmental offense cases that we have reviewed.  What we have found is a plethora of statements, throughout those cases and in the general Third Circuit precedent, that have approved of standard definitional language for the term "knowing," such as used in the jury instructions in this case.  Many of those cases have further approved the addition of a "willful blindness" instruction in defining "knowing," when appropriate.  None mentions the argument advanced by defendants, that it is error not to define (whether by Model Penal Code or

---

[50]  It is unclear whether at trial the defendants articulated this objection as a legal argument, or an objection to a discretionary ruling.  (See tr. 555 at 125-128.)  The Court of Appeals will determine the applicable standard of review.  See United States v. Zehrbach, 47 F.3d 1252, 1260-64 (3d Cir. 1995) (the basis of the objection determines the standard of review).

other source) and exclude the concept of recklessness when defining the statutory term

"knowing" for the jury.

      The closest case to the scenario presented here was <u>United States v. Wilson</u>, 133 F.3d 251

(4th Cir. 1997), discussed <u>supra</u>.  Defendants were convicted of knowing violations of the CWA

under 33 U.S.C. § 1319(c)(2)(A).  They were also charged with misdemeanor counts for

negligent violations of the CWA under 33 U.S.C. § 1319(c)(1)(A) based on the same conduct,

but because of the felony convictions they were not convicted on those lesser-included counts.

<u>Id.</u> at 255.  The appeals court reversed based on its holding that the identification of the elements

of the offense should have included knowledge of the fact that defendant did not have a permit.

However, with apparent approval it both quoted the words used in the jury instruction to define

"knowingly,"[51] and  noted that the district court also instructed on willful blindness, stating that

such could stand in the place of actual knowledge.  <u>Id.</u> at 260.  There is no mention of the

concept of recklessness in <u>Wilson</u>, where the jury received instructions on both "knowing" and

"negligent" counts under the CWA.  Similarly, in <u>United States v. Ortiz</u>, 427 F.3d 1278 (10th

Cir. 2005), convictions on one count each of a negligent and a knowing violation of the CWA,

under 33 U.S.C. §§ 1319(c)(1)(A) and (c)(2)(A) respectively, were upheld on appeal without

challenge to jury instructions and without mention of the concept of recklessness.

---

    [51]  The uncriticized definition of an act done "knowingly," used the jury instructions in
<u>Wilson</u>, was "if it is done voluntarily and intentionally and not because of ignorance, mistake,
accident or other innocent reason."  <u>Id.</u> at 260.  <u>See also</u> <u>United States v. Hubenka</u>, 438 F.3d
1026, 1036 (10th Cir. 2006) (similar language used to define "knowing" under 33 U.S.C. §
1319(c)(2)(A)); <u>Sinskey</u>, 119 F.3d at 715 (same).

The Third Circuit expressly approved of a standard definition of the term "knowingly"

used in a CWA felony case, United States v. West Indies Transport, 127 F.3d 299 (3d Cir. 1997)

as follows:

> An act is done knowingly if done voluntarily and intentionally, and not because of
> mistake or accident or other innocent reason.  The purpose of adding the word
> "knowingly" is to insure that no one will be convicted for an act done because of
> mistake, accident, or other innocent reason.

Id. at 309-10.  There, a corporation and individual employees were convicted of felony violations

of the same CWA section charged here, 33 U.S.C. § 1319(c)(2)(A), for discharge of pollutants

from a barge into a bay.  The court of appeals rejected defendants' argument that under this

instruction the jury could convict even if it found that the discharge of pollutants was accidental,

holding that there was no error in the instruction as phrased.  Id.  See also Ellen, 96 F.2d at 467

n.2 (affirming CWA Section 1319(c)(2)(A) conviction based on similar definition of

"knowledge.").

The Second Circuit reached a similar conclusion as to defining "knowingly" under 33

U.S.C. § 1319(c)(2)(A) and (c)(4) in U.S. v. Hopkins, 53 F.3d at 536-43.  There, defendant

challenged the definition of the term in jury instructions using standard language and adding a

"conscious-avoidance" instruction.  The court of appeals affirmed on that and other grounds,

stating:

> Hopkins also contends that the jury, consistent with the trial court's instructions,
> could have convicted him for conduct that was merely negligent or innocent.  In
> light of the court's actual instructions and the evidence presented, this contention
> is meritless.  With respect to count one, for example, the court instructed, *inter*
> *alia*, that the government was required to prove that Hopkins had a high degree of
> awareness that the testing process was being tampered with, and prove that he
> "did not [falsify or tamper with that process] by mistake, accident or other
> innocent reason" ..., and that "[a] showing of negligence, mistake, or even

78

> foolishness on the part of the defendant is not enough to support an inference of knowledge"....  With respect to count two, the court similarly instructed that the government was required to prove that Hopkins had "acted voluntarily or intentionally and not by mistake, accident, ignorance of the facts, or for other innocent reason."

Id. at 541 (referring to the Section 1319(c)(4) charge as count one, and the Section 1319(c)(2)(A) charge as count two).  The Hopkins court further held that based on the evidence, a conscious-avoidance instruction under both Sections 1319(c)(2)(A) and 1319(c)(4) was appropriate even though the government contended that defendant had actual knowledge.  Id. at 541-42.  Here, as in the other CWA cases dealing with the definition of "knowing" for a felony violation, the topic of recklessness was not mentioned.  See also Buckley, 934 F.2d at 87-89 (approving use of willful blindness instruction in defining "knowing" in asbestos felony prosecution under CAA and CERCLA).

A review of the appellate decisions under RCRA reveals a consistent pattern of approving similar instructions defining the term "knowingly," with or without the addition of a conscious-avoidance or willful blindness instruction.  See, e.g., Hansen, 262 F.3d 1217, 1251-54 (11th Cir. 2001);  Self, 2 F.3d 1071, 1087 (10th Cir. 1993); Speach, 968 F.3d 795, 797-798 (9th Cir. 1992); Goldsmith, 978 F.2d 643, 645-646 (11th Cir. 1992); MacDonald & Watson, 933 F.2d 35, 50-55 (1st Cir. 1991); Hayes Int'l, 786 F.2d 1499, 1504-1505 (11th Cir. 1986).  See also Wasserson, 418 F.3d 225, 237-239 (3d Cir. 2005) (holding evidence sufficient under unchallenged willful blindness instruction); Johnson & Towers, 741 F.2d 662, 669-670 (3d Cir. 1984) (knowledge may be inferred).[52]  As with the CWA and CAA cases cited for this point above, none of these

---

[52]  The Johnson & Towers opinion stated its own holding, at the outset of the discussion, as follows:

cases, decided under RCRA and related federal environmental criminal statutes, have addressed

the concept of recklessness or how it might be invoked in defining the statutory term

"knowingly" in those offense statutes.

The Ninth Circuit squarely held in <u>Hanousek</u> that the district court properly declined to

provide the jury with an additional instruction requested by defendant, to further define the

element of causation for criminal negligence under the CWA, by explaining what it did <u>not</u>

include.  Defendant's proffered instruction, taken directly from the Model Penal Code, stated that

"the element of causation is not established if the actual result is not within the risk of which the

particular defendant was aware or should have been aware, unless...."  176 F.3d at 1124.  The

appellate court found no error, holding that the causation instruction given by the district court

---

> We hold that section 6928(d)(2)(A) covers employees as well as owners
> and operators of the facility who knowingly treat, store, or dispose of any
> hazardous waste, but that the employees can be subject to criminal prosecution
> only if they knew *or should have known* that there had been no compliance with
> the permit requirement of section 6925.

741 F.2d at 662 (*emphasis* added).  In summarizing its holding at the conclusion of the opinion,
however, the court stated:

> In summary, we conclude that the individual defendants are "persons" within
> section 6928(d)(2)(A), that all the elements of the offense must be shown to have
> been knowing, but that such knowledge, including that of the permit requirement,
> may be inferred by the jury as to those individuals who hold the requisite
> responsible positions with the corporate defendant.

<u>Id.</u> at 670.  We believe that the <u>Johnson & Towers</u> court simply misspoke when it used the
quoted phrase "or should have known," which would indeed lower the required standard of proof
to an objective test for mental state, such as negligence.  We believe that phrase was actually
referring to the principle that knowledge can be proven by circumstantial evidence.  Of course,
the Third Circuit has made it clear that the standard of willful blindness, where appropriate to
include in the jury instructions, "'is a subjective state of mind that is deemed to satisfy a scienter
requirement of knowledge.'"  <u>Wasserson</u>, 418 F.3d at 237 (quoting <u>United States v. Wert-Ruiz</u>,
228 F.3d 250, 255 (3d Cir. 2000)).

80

was adequate under current circuit precedent, and "[t]hat was sufficient." Id.  Likewise, the

Third Circuit has ruled that a district court in a criminal case did not abuse its discretion in

refusing an additional instruction requested by defendant that "[s]uspicion does not amount to

knowledge." United States v. Kapp, 781 F.2d 1008, 1012-13 (3d Cir.), cert. denied, 479 U.S.

821 (1986).

      The Model Penal Code is frequently utilized by the Supreme Court and lower courts as

one of the sources available to consult in interpreting federal statutory language.  See, e.g.,

Turner v. United States, 396 U.S. 398, 416 (1970); Leary v. United States, 395 U.S. 6, 46 n.93

(1969).  It is not unusual, however, for courts to reject the Model Penal Code formulation rather

than relying on it.  See, e.g., Dixon v. United States, 126 S.Ct. 2437, 2447 (2006).  Indeed, the

Hanousek circuit court decision, which established the prevailing interpretation of the term

"negligence" under CWA § 1319(c)(1)(A) as instructed to the jury in this case, expressly rejected

the Model Penal Code definition of  the statutory term "negligently" in favor of using a

traditional tort law definition.  Hanousek, 176 F.3d at 1120-21.  Defendants have cited no

authority suggesting that a term, and its definition, should be plucked from the Model Penal Code

and used to instruct a jury on what is not included in a statutory mens rea requirement.

      The Supreme Court, in a masterstroke of understatement, has observed that "the term

recklessness is not self-defining." Farmer v. Brennan, 511 U.S. 825, 836 (1994); see also Burr,

127 S.Ct. at 2215.  There are two general categories of definition for the term "reckless" in the

law.  As explained in Farmer, the criminal law formulation generally refers to a subjective state

of mind, while the usual tort law formulation is an objective test:

> The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.... The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware.

Id. at 836-37 (citations omitted).  There, the Court adopted a subjective recklessness standard for deliberate indifference in claims of inhumane prison conditions under the Eighth Amendment, defined as: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  But see Sacramento v. Lewis, 523 U.S. 833 (1998)  (rejecting reckless disregard as test for Fourteenth Amendment substantive due process deliberate indifference standard in police high-speed chase situation; imposing "shocks the conscience" test); Ziccardi v. City of Philadelphia, 288 F.3d 57, 64-66 (3d Cir. 2002) (adopting "more than a substantial risk – let us say a great risk" standard for Fourteenth Amendment deliberate indifference standard where plaintiff alleged his injury was aggravated by responding paramedics).

The Supreme Court opined in an early environmental criminal prosecution that a "knowing" statutory mens rea requirement could be satisfied by proof that defendant "willfully neglected" to inquire into facts that would have satisfied a regulatory duty to use an alternative safer route when transporting hazardous materials.  United States v. Boyce Motor Lines, 432 U.S. 337, 342 (1952).  This rule was incorporated into the RCRA "knowing" requirement in Hayes Int'l, 786 F.2d at 1504 ("[I]n this regulatory context a defendant acts knowingly if he willfully fails to determine the permit status of the facility." [citing Boyce]).  See also United States v. Ladish Malting Co., 135 F.3d 484, 488 (7th Cir. 1998) (stating, in OSHA criminal prosecution, "[c]riminal recklessness may be so close to actual knowledge that proof of one suffices for proof of the other").

82

Another layer of confusion is added when we observe that various case law definitions of the term "reckless," when used in the subjective sense, bear a very close resemblance to accepted definitions of the concept of "willful blindness," also known as deliberate ignorance or conscious avoidance, which is also a subjective term.  For example, in Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657 (1989), the Supreme Court defined a subjective standard for "reckless disregard" in a defamation action by a public figure as requiring that "the defendant actually had a high degree of awareness of ... probable falsity."  Id. at 688 (emphasis added). This definition is very close to the accepted formulation of the test for "willful blindness" used to satisfy a "knowing" mens rea in Third Circuit criminal case law.  That test was stated in United States v. Wert-Ruiz, 228 F.3d 250 (3d Cir. 2000) as follows:  "The instruction 'must make clear that the defendant himself was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability.'"  Id. at 255 (emphasis added) (quoting United States v. Caminos, 770 F.2d 261, 265 (3d Cir. 1985)).  The Third Circuit Model Criminal Jury Instructions, which are currently being completed and published and were not cited by the parties during trial in this case, contains a similar formulation for "willful blindness."[53]

_____

[53] The Third Circuit Model Criminal Jury Instructions define "willful blindness" in pertinent part as follows:

> [Y]ou may find that *(name)* knew *(state the fact or circumstance, knowledge of which is required for the offense charged)* based on evidence which proves that: (1) *(name)* was aware of a high probability of this *(fact) (circumstance)*, and (2) *(name)* consciously and deliberately tried to avoid learning about this *(fact) (circumstance)*.

Third Circuit Model Criminal Jury Instructions, Sec. 5.06  (emphasis added).

83

The confusion in case law precedent between the concepts of willful blindness and recklessness was summarized by then-Judge, now Justice Anthony M. Kennedy, dissenting in United States v. Jewell, 532 F.2d 697 (9th Cir. 1976), as follows:

> [T]he wilful blindness doctrine is uncertain in scope.  There is disagreement as to whether reckless disregard for the existence of a fact constitutes wilful blindness or some lesser degree of culpability.

Id. at 706 & n.8 (Kennedy, J., dissenting) (citations omitted).  See also United States v. One 1973 Rolls Royce, 43 F.3d 794, 806-09 (3d Cir. 1994) (Becker, J.) (collecting case law, Model Penal Code and treatise materials).  Indeed, an intriguing comment to the Third Circuit Model Criminal Jury Instructions states that whether the mens rea requirement under a given criminal statute is "knowingly," "intentionally," "willfully," or "recklessly," as defined in those Model Instructions, it may be appropriate to instruct on willful blindness as a means of satisfying the subjective knowledge or awareness aspect of any of those mental states.  See Third Circuit Model Criminal Jury Instructions, Sec. 5.06, Comment.

We must also recognize that as a legal matter, it appears that the scienter standard for any crime requiring a willful mens rea, and for false statement offenses such as charged in this case, would be satisfied by a state of mind meeting a subjective definition of "reckless."  In United States v. Murdock, 290 U.S. 389 (1933), a prosecution for "willfully" failing to pay a required tax, the Supreme Court stated that conduct was "willful" under the criminal statute if it was "marked by careless disregard [for] whether or not one has the right so to act."  Id. at 395.  Similar definitions of "willful," the Court has observed,  "hav[e] been applied by courts interpreting numerous other criminal and civil statutes."  Trans World Airlines v. Thurston, 469 U.S. 111, 127 n.20 (1985).

84

The Third Circuit has repeatedly included recklessness in the definitions of mens rea standards under federal criminal statutes involving fraud or "willful" offenses.  See, e.g., United States v. Johnstone, 107 F.3d 200, 207-10 (3d Cir. 1997) (prosecution for alleged excessive force during arrest; held that "'willful[ ]' in [18 U.S.C.] § 242 means either particular purpose or reckless disregard;" not reaching issue whether to define recklessness as objective or subjective); United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995) (under mail fraud statute, 18 U.S.C. § 1341, "[p]roof of specific intent is required ..., which 'may be found from a material misstatement of fact made with reckless disregard for the truth.'") (citations omitted); United States v. Boyer, 694 F.2d 58 (3d Cir. 1982) (accord, in prosecution for mail fraud and securities fraud).  See also United States v. Lange, 528 F.2d 1280, 1288 (5th Cir. 1976) (prosecution for false statements under 18 U.S.C. § 1001, "[t]he misrepresentation must have been made deliberately, ... knowingly and willfully, ... or at least with reckless disregard of the truth and with a conscious purpose to avoid learning the truth.") (citing United States v. Egenberg, 441 F.2d 441, 444 (2d Cir. 1971); United States v. Clearfield, 358 F.Supp. 564, 574 (E.D. Pa. 1973) (Becker, J.)).[54]

If this precedent is correct and applicable to the counts of the indictment charging willful or false statement offenses in this case, it would have been plain error for this Court to have

---

[54]  Defendants cite United States v. Litman, 246 F.2d 206 (3d Cir.), cert. denied, 355 U.S. 869 (1957), a prosecution for willfully failing to make federal tax returns, which found no error in a jury instruction distinguishing willfulness from "inadvertence or carelessness or negligence, even gross negligence."  Id. at 208-10.  See also United States v. Palermo, 259 F.2d 872, 880-81 (3d Cir. 1958) (citing Litman).  However, both of those decisions interpreted a statutory "willful" mens rea rather than a "knowing" mens rea, and neither mentioned the term recklessness, either in the subjective or the objective sense.  As the Third Circuit explained in United States v. Malinowski, 472 F.2d 850 (3d Cir. 1973), those decisions "examine[d] wilfulness in light of the intentional vs. negligent dichotomy."  Id. at 852-55.

instructed the jury, as requested by defendants, that "if you find that defendant was acting

negligently or recklessly, as I have defined those terms, but not knowingly and wilfully, as I have

defined those terms, when he made a false statement, you must acquit the defendant of that

count." (Dkt. 532 at 70-71, quoted in text accompanying n.22, supra.)  On the contrary, it is

likely that the charged offenses requiring a "willful" mens rea could indeed be satisfied by a

subjective "reckless" state of mind, although no party raised it and therefore we did not so

instruct the jury.[55]

      Defendants have shown no entitlement to a "reckless" or "gross negligence" instruction

based on any notion of law of the case.  Defendants are incorrect when they argue in this motion

that "[c]riminal/gross negligence and recklessness were cornerstones of the defense from the very

beginning of the case."  (Dkt. 635 at 28.)  Defendants did assert from the start that they would

rely on the defense of negligence to all counts, and seek the lesser-included negligence offense

instruction under the CWA.  (See, e.g., tr. 211 at 24-26.)  To be sure, some defense counsel

referred to a defense of negligence, or accident, or mistake, in their opening statements.  (See tr.

234 at 106:23-25, 107:1, 108:5-15, 116; tr. 238 at 26:16-18, 27:16 - 28:1, 31:9-12, 50:5-14, 52:2-

4, 84:10 - 85:12; tr. 240 at 29:4 - 30:6, 42:19 - 44:12, 46:5-8; tr. 246 at 5:21-22, 7:5-12, 8:6-7.)

However, we have searched the record in vain for any mention by them of the concepts of gross

negligence or recklessness [except to note without objection the Hanousek precedent rejecting

criminal gross negligence as the standard for the lesser-included CWA offense], until the time

---

     [55]  Defense counsel are aware of this line of cases, having cited it elsewhere in their post-trial briefing on another point, yet failed to cite or discuss it in arguing this point.  (See dkt. 635 at 185 (citing United States v. Lange, 528 F.2d 1280, 1288 (2d Cir. 1976), which relied in part on Judge Becker's opinion in Clearfield).)

they inserted the word "recklessness" in their Proposed Jury Instructions (dkt. 532), filed near the

end of the trial.  The same is true for all briefs submitted by defendants before and during the

trial, which were numerous.  Not one of those briefs stated any intention to request an instruction

defining mens rea by excluding the concepts of gross negligence or recklessness – not even the

brief filed with the very Proposed Jury Instructions containing the latter term (but not the

former).  (Compare dkt. 533 (brief filed 3-23-06) with dkt. 532 (Defendants' Proposed Jury

Instructions filed 3-23-06).)

When this Court was confronted with the challenge of evaluating such a proposed

instruction, with no citation to any case law or any model jury instructions, we erroneously

indicated on the record that we were thinking only of the objective concept of recklessness,

usually found in tort law, rather than the subjective concept as set forth in the Model Penal Code

and some offense statutes.  (See tr. 555 at 124.)  Indeed, it was only in stating their objection to

our rejection of the "recklessness" language that one defense counsel added that they would also

need an instruction on "gross negligence."  (Id. at 125-26.)  Defendants provided no precedential

support for either of those positions at any time.  Nor have they established any prejudice in this

regard, based upon the sequence of events at trial.[56]  Cf. United States v. Ienco, 92 F.3d 564, 569-

---

[56]  Both sides submitted their draft jury instructions well prior to trial, pursuant to a
Scheduling Order for that purpose.  See n.18, supra.  Jury selection commenced on September
12, 2005.  (Dkt. 219.)  The jury was sworn and preliminary jury instructions were delivered on
September 27, 2005.  (Tr. 234 at 17-57.)  Trial proceeded steadily through the ensuing months.
Defendants filed their new Proposed Jury Instructions, which first requested an instruction on
"recklessness," on Thursday, March 23, 2006.  (Dkt. 532.)  Defendants' case was almost
complete at that time; there were only three days of testimony after that date:  March 27, 28 and
29.  (See tr. 548, 550, 554.)  The jury charge conference commenced on Tuesday, March 28,
concentrating on the Jury Instructions - Draft 1 document that the Court had supplied to the
parties the previous evening.  (Tr. 556 at 3-76.)  That draft did import some of defendants'
proposed "recklessness" language from their recently-filed Proposed Jury Instructions (dkt. 714

570 (7th Cir. 1996) (prejudice to defendants when district court reversed ruling promising not to give a certain jury instruction, where ruling was made during government's case in chief and reversal was announced later, after most government witnesses had testified and had been cross-examined by defense).

*     *     *

This Court instructed the jury as to the required mental state under each of the statutes charged in this case, using classic language to define the term "knowingly" where found in each offense statute. We carefully and repeatedly cautioned the jury that a state of mind of negligence would not satisfy the definition of "knowingly" or "willfully," and that only the Clean Water Act could be violated under a mental state of negligence. We carefully weighed and ultimately

---

at 39-40, 42, 52-55, 57), and the Court expressed a willingness to use that language. (Tr. 556 at 35-40.) Numerous other topics were discussed in that session, including the Court's acknowledgment that it would need to revise the language describing the elements of the charged CWA and CAA offenses, and would correct that in the next draft. (Id. at 49-50, 56.) Trial then adjourned for the night. (Id. at 94.) The next morning, Wednesday, March 29, the Court distributed its Draft 2, docketed as Draft 1 with Changes. (Dkt. 715; see n.24, supra.) That draft corrected the CWA and CAA elements and retained the lesser-included CWA offense as requested by defendants, but eliminated the references to "recklessness," and proposed a willful blindness instruction that was ultimately not used. The jury charge conference continued at length that day, and briefly the next day, which was Thursday, March 30, but the Court did not change its position expressed on Wednesday, March 29 that it rejected the "recklessness" instruction. (Tr. 555 at 95-152; tr. 557 at 3-10.) The Court delivered the written and oral jury instructions in session with the jury on that Thursday, March 30. (Tr. 558 at 3-75.) Those instructions were delivered prior to summations by consent of all counsel, with the exception of deliberation instructions to be delivered following summations. (Id. at 3.) Trial was in recess on Friday, March 31. Closing arguments began on Monday, April 3, 2006 and were completed on Thursday, April 6, 2006. (Tr. 564, 562, 570, 572.) The verdicts were rendered on April 26, 2006. (Tr. 590.) In summary, during this 7½-month trial, defendants had the benefit of the Court's approval of a "recklessness" instruction for less than two days (Monday night, March 27 to Wednesday morning, March 29). Summations began the following week. We find no prejudice to defendants in this sequence of events.

88

decided not to instruct the jury that willful blindness could satisfy the requirement of "knowing," although there is ample support for such an instruction in environmental felony cases.

The jury instructions in this case provided the jury with the law that they were to apply in determining whether the government had proven each essential element of each offense charged against each defendant in the indictment.  We did not instruct the jury on mental states that were not charged in the indictment.  The jury instructions must "be structured in such a way as to avoid confusing or misleading the jury."  Johnstone, 107 F.3d at 204.  Where, as here, the jury instructions fairly provide the jury with a correct definition of "knowledge," "[t]he district court is not obligated to use the language the defendant proffers."  Kapp, 781 F.2d at 1013.  In our view, that obligation was satisfied by the jury instructions in this case clearly defining each mens rea requirement, and "that was sufficient."  Hanousek, 176 F.3d at 1124.

## II.  DEFENDANTS' POINT II:  "PROSECUTORIAL MISCONDUCT."

Defendants contend that they are entitled to a new trial because of enumerated instances of alleged prosecutorial misconduct which, taken as a whole, had the cumulative effect of denying them a fair trial.  (Dkt. 635 at 20-21; dkt. 646 at 11-12.)  "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."  United States v. Young, 470 U.S. 1, 11 (1985).  "Prosecutorial misconduct does not always warrant the granting of a mistrial.  The Supreme Court has acknowledged that given 'the reality of human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not

guarantee such a trial.'" Zehrbach, 47 F.3d 1252 (citing United States v. Hasting, 461 U.S. 499, 508-09 (1983)).

The standard for appellate review of the district court's ruling on any contemporaneous objection is abuse of discretion. United States v. Brennan, 326 F.3d 176, 182 (3d Cir. 2003). Under this standard, if the appellate court finds a trial court error based on prosecutorial misconduct, it must apply harmless error analysis. Id. The standard used in that analysis "depends on whether the error was of constitutional proportions." United States v. Molina-Guevara, 96 F.3d 698, 703 (3d Cir. 1996) (citation omitted). If there is a constitutional error, the reviewing court may affirm only if the error is "harmless beyond a reasonable doubt." Id. (citing Chapman v. State of California, 386 U.S. 18, 24 (1967)). If the error is non-constitutional, the court may affirm "so long as there is a 'high probability' the error did not contribute to the conviction." Id. (citing United States v. Jannotti, 729 F.2d 213, 219-20 (3d Cir. 1984)). Such an error "is deemed harmless if the court possesses 'a sure conviction that [it] did not prejudice' the defendant." Id. (citation omitted). In judging whether improper remarks are harmful, the court considers "their scope, their relation to the context of the trial, the ameliorative effect of any curative instructions and the strength of the evidence supporting the conviction." United States v. Rivas, 479 F.3d 259, 266 (3d Cir. 2007). "To find that the court abused its discretion in failing to order a mistrial for prosecutorial misconduct, we must first be convinced that the prosecution did in fact misconduct itself." Id.

The standard for appellate review of rulings on any non-contemporaneous objection is plain error review. Brennan, 326 F.3d at 182. To demonstrate prosecutorial misconduct under a plain error standard, the review must reveal "egregious error or a manifest miscarriage of

90

justice." Id.  "Failure to object at trial, absent plain error, constitutes a waiver of the issue for post-trial purposes."  United States v. Tiller, 302 F.3d 98, 105 (3d Cir. 2002).

Here we address each allegation of prosecutorial misconduct, considering it under this framework for appellate review of court error related to such matters.  The organization of this section begins with a quotation of the point heading from defendants' post-trial motion brief. (Dkt. 635.)[57]  Next we cite, but do not repeat, the arguments of the parties as set forth in their post-trial motion briefs ("the referenced briefs").  Then the ruling is provided, with citation to any relevant portions of the trial record and, where pertinent, also the pretrial record.  We specifically do not repeat here the Court's rulings on contemporaneous objections.  Those rulings are contained in the cited portions of the record, and we believe they should be read in their entirety rather than condensed here.

Defense Subsection II.A: "THE UNITED STATES FILED A PRE-TRIAL MOTION TO DISQUALIFY VINCENT NUZZI, ESQ. BASED ON NUZZI'S PRIOR REPRESENTATION OF SCOTT RODNEY AND BECAUSE THE UNITED STATES INTENDED TO CALL RODNEY AS A WITNESS, DESPITE KNOWING THAT RODNEY NEVER CONSIDER[ED] NUZZI HIS LAWYER."

Briefs: Def. Br. 635 at 21-23; Gov. Br. 641 at 8-9; Def. Br. 646 at 12-13.

**RULING:** The Court reviewed the motion papers, conducted oral argument, and held an evidentiary hearing on that pretrial motion.  We ruled that Mr. Nuzzi could continue as counsel for defendant Davidson, on certain conditions and based on an express waiver of conflict by Mr. Davidson.  (See Gov. Motion 23; tr. 29 at 6-17 (oral); Davidson Br. 40; Gov. Br. 41; Davidson

---

[57]  All citations to the record in this opinion are to the docket entry number, as previously explained.  See n.3, supra.  In this and succeeding sections of this opinion, we may refer to such docket entries by the short citation, "dkt." or "tr.," or when appropriate by a more descriptive citation such as "Def. Br." or "Gov. Motion."

Br. 44; Gov. Br. 50; tr. 46 at 59-104 (hearing and oral); id. at 104-109 (ruling).)  The Court finds

no misconduct by the prosecution in having submitted the issue to the Court as a pretrial motion,

or in naming Mr. Rodney as a prospective witness but electing not to call him to testify at trial.

Defense Subsection II.B: "THE UNITED STATES IMPROPERLY REFERENCED JOHN
O'REILLY, ESQ. DURING ITS DIRECT EXAMINATION OF DETECTIVE BARSONY."

Briefs: Def. Br. 635 at 24; Gov. Br. 641 at 9-12; Def. Br. 646 at 13-15.

        **RULING:**  The Court reiterates its trial ruling on the underlying issue.  (See tr. 392 at 10-

12 (trial); tr. 391 at 4-9 (sidebar); tr. 390 at 4-47 (sealed R. 104 hearing and oral); id. at 31-47

(ruling); tr. 392 at 12-13 (limiting instruction).)  The Court finds no prosecutorial misconduct on

this point.  Assuming arguendo that such was misconduct, the Court concludes that the limiting

instruction was effective to protect defendants' rights.

Defense Subsection II.C: "THE UNITED STATES INTENTIONALLY MISSTATED THAT
THERE WAS A PRIOR RULING REGARDING A CO-DEFENDANT."

Briefs: Def. Br. 635 at 24-25; Gov. Br. 641 at 12-14; Def. Br. 646 at 15-16.

        **RULING:**  The Court reiterates its trial ruling on the underlying issue.  (See Def. Motion

534; tr. 520 at 75-83, 87-89, 100-101; tr. 521 at 6-24; tr. 528 at 6-7; tr. 531 at 4-6; tr. 576 (sealed)

at 3-10; Order 695; see also Def. Motion 417; Gov. Br. 426; tr. 421 at 3; Order 689 (the related

prior in limine ruling).)  The Court finds no prosecutorial misconduct on this point.

Defense Subsection II.D:  "THE UNITED STATES PERMITTED ITS WITNESSES TO GIVE
FALSE TESTIMONY TO THE JURY."

        The applicable legal standards are not in dispute.  (See Def. Br. 635 at 25-27; Gov. Br.

641 at 15.)

1. "The United States Failed To Correct Rush's False Testimony Regarding Assistance Received From Special Agent Tara Donn Regarding His Outstanding Bench Warrant."

Briefs:  Def. Br. 635 at 27-32; Gov. Br. 641 at 14-16; Def. Br. 646 at 16-17.

      **RULING:** The Court reiterates its trial rulings on the underlying issue.  (See Def. Motion 285; Order 685; Def. Motion 300; Def. Br. 285; Gov. Br. 301; Order 686; tr. 290 at 4-84 (sealed R. 104 hearing and oral); tr. 295 at 51-118, 125-135 (R. 104 hearing, oral and rulings); tr. 308 at 3-10, 15-17 (oral and rulings); see also transcript citations in the referenced briefs.)  The Court finds no prosecutorial misconduct on this point.

2. "The United States Permitted Rush To Falsely Testify That He Was Working On December 4, 1999."

Briefs:  Def. Br. 635 at 32-33; Gov. Br. 641 at 16-17; Def. Br. 646 at 17.

      **RULING:** Court finds no prosecutorial misconduct on this point.  The available business records were incomplete and subject to inaccuracy, and the Court permitted extensive cross examination of the witness on this point.  (See, e.g., transcript citations in the referenced briefs; see also tr. 304 at 35-37 (sidebar); tr. 321 at 15-33 (sidebar).)

3. "The United States Failed to Timely Disclose Shepherd's Agreement Not To Be Prosecuted And Then Permitted Shepherd To Refuse To Give Complete Details Regarding This Agreement."[58]

Briefs:  Def. Br. 635 at 33-34; Gov. Br. 641 at 17-19; Def. Br. 646 at 17-18.

      **RULING:**  The Court finds no prosecutorial misconduct or Jencks or Giglio violation on this point.  (See transcript and correspondence citations in the referenced briefs.)  Although not dispositive of this issue, we have found no record of any contemporaneous objection.  In

---

[58] This point is also raised as an asserted Giglio violation.  See Sec. II.F.2, infra.

addition, the Court instructed the jury that its credibility evaluation of Mr. Shepherd could

include the fact that he was an immunized witness.  (See tr. 558 at 19.)

4.  "The United States Permitted Joe Delker To State He Had Never Been To George Vine's House."

Briefs:  Def. Br. 635 at 34; Gov. Br. 641 at 19-20; Def. Br. 646 at 18.

**RULING:** The Court finds no prosecutorial misconduct on this point.  (See transcript and

correspondence citations in the referenced briefs.)

Defense Subsection II.E:[59]  "THE UNITED STATES PURPOSEFULLY INTRODUCED HIGHLY PREJUDICIAL AND INFLAMMATORY TESTIMONY FOR THE SOLE PURPOSE OF PREJUDICING DEFENDANTS."

1.  "Rush's Testimony Regarding The Day His Father Died."

Briefs:  Def. Br. 635 at 35-36; Gov. Br. 641 at 20; Def. Br. 646 at 18-19.

**RULING:** The Court finds no prosecutorial misconduct on this point.  (See transcript

citations in the referenced briefs.)

2.  "The United States Permitted Redcay To Testify That Coxe Died At The Scene Of The Accident."

Briefs:  Def. Br. 635 at 36-37; Gov. Br. 641 at 21-22; Def. Br. 646 at 19.

**RULING:** The Court reiterates its trial rulings, which were favorable to the position of

the government on the underlying evidentiary issue.  (See tr. 368 at 153-158:2 (trial); tr. 369 at

21-22:4 (sidebar); tr. 368 at 158:3-163 (trial); tr. 369 at 22:5-29:21 (oral and rulings).)  The Court

finds no prosecutorial misconduct on this point.

---

[59]  Section II of the moving brief contains a typographical error that designates this as another Subsection "A."  (See Def. Br. 635 at 35.)  We will refer to it as Subsection E, to reflect the order in which it appears in the brief.  We have also renumbered the subsequent subsections in sequence.

3.  "The United States Improperly Injected 'Dioxins' Into Dr. Smith's Cross-Examination."

Briefs:  Def. Br. 635 at 37-39; Gov. Br. 641 at 22-25; Def. Br. 646 at 19-21.

**RULING:** The Court reiterates its trial ruling, which was favorable to the position of defendants on the underlying evidentiary issue.  (See tr. 464 at 111 (trial); tr. 466 at 34-35:14 (trial); tr. 467 at 24-58:7 (oral and ruling); id. at 58:8-59:4 (Court instruction to witness); tr. 466 at 35:25-36:24 (limiting instruction).)  The Court finds no prosecutorial misconduct on this point. Assuming arguendo that such was misconduct, the Court concludes that the limiting instruction was effective to protect defendants' rights.

4.  "The United States Permitted Rush to Call Defendants 'Hitler's Henchmen.'"

Briefs:  Def. Br. 635 at 39-40; Gov. Br. 641 at 25-27; Def. Br. 646 at 21.

**RULING:** The Court finds no prosecutorial misconduct on this point.  (See transcript citations in the referenced briefs.)

5.  "The United States Let Hirsch Imply That Atlantic States May Have Polluted The Drinking Water For Trenton."

Briefs:  Def. Br. 635 at 40-41; Gov. Br. 641 at 27-29; Def. Br. 646 at 21-22.

**RULING:** The Court reiterates its trial ruling, which was favorable to the position of the government on the underlying evidentiary issue.  (See Tr. 363 at 33-37.)  The Court finds no prosecutorial misconduct on this point.

Defense Subsection II.F:  "THE UNITED STATES CONSISTENTLY IGNORED THE TENETS OF JENCKS, BRADY, AND GIGLIO."

The applicable legal standards are not in dispute.  (See Def. Br. 635 at 47; Gov. Br. 641 at 29-30.)

95

1.  "Dillon Intentionally Failed To Have Gabriel Marchan Sign The Statement Of Understanding And File Quarterly Status Reports With Immigration and Customs Enforcement."

Briefs:  Def. Br. 635 at 41-47; Gov. Br. 641 at 30; Def. Br. 646 at 22-23.

    **RULING:** The Court, in response to requests from defense counsel, conducted an extensive Rule 104 hearing and directed production of additional documents on the Giglio issues pertaining to government witness Gabriel Marchan.  (See correspondence citations in the relevant briefs; tr. 391 at 37-46 (sidebar); tr. 395 at 37-56 (sidebar); tr. 401 at 29-48, 75-80 (sidebar); tr. 402 at 4-7 (sidebar); tr. 407 at 6-12 (sidebar), 12-68 (R. 104 hearing); tr. 406 at 4-65 (R. 104 hearing, cont.); tr. 405 at 12-38:14 (sidebar).)  The Court finds no prosecutorial misconduct on this point.  Assuming arguendo that there was any Giglio disclosure violation on this issue, the Court concludes that the supplemental document production and Rule 104 hearing, prior to the completion of direct testimony of the witness, were effective to protect defendants' rights.

2.  "Additional Violations of *Brady* and *Giglio*"

    •    United States failed to notify defense regarding discrepancies between direct testimony of witnesses and their prior statements made to agents or grand jury testimony.

        •    Robert Rush
        •    Brian Fleming
        •    Joe Delker
        •    Robert Owens
        •    Randy Lieberman

Briefs:  Def. Br. 635 at 47-49; Gov. Br. 641 at 31-32; Def. Br. 646 at 23-24.

    **RULING:** The Court reiterates its trial rulings on this issue.  (See, e.g., tr. 304 at 21-21 (oral and ruling); tr. 338 at 20-40 (oral, R. 104 hearing, rulings); tr. 360 at 4-10, 13-17 (oral and rulings).)

- United States failed to notify defense regarding any agreements not to prosecute Rush.

Briefs:  Def. Br. 635 at 49; Gov. Br. 641 at 33.

**RULING:** This matter was addressed by the Court at trial, and the government stated that there were no agreements, whether written or oral or tacit, not to prosecute Robert Rush.  No contrary information appeared.  (See tr. 308 at 10-14.)

- United States withheld information identifying initials on a diagram used during testimony of Rush.

Briefs:  Def. Br. 635 at 50; Gov. Br. 641 at 33-34; Def. Br. 646 at 23.

**RULING:** The Court reiterates its trial ruling on this issue.  (See tr. 305 at 165-171 (trial); tr. 306 at 18-28 (sidebar); tr. 308 at 32 (sidebar); tr. 307 at 98-100 (stipulation).)  The Court finds no Jencks or Giglio violation on this point.

- United States failed to disclose what documents it presented to Shepherd when agents questioned him at home regarding the Coxe accident.

Briefs:  Def. Br. 635 at 50; Gov. Br. 641 at 34; Def. Br. 646 at 23.

**RULING:** There was no Giglio obligation for the government to disclose which documents it showed to George Shepherd as a prospective witness or target during an interview session.  Defense counsel was given wide latitude to cross examine Shepherd regarding government interview sessions, and the underlying facts concerning any exchange between him and James Yukna.  (See tr. 416 at 40-44:10 (direct); tr. 415 at 4:22-7:3 (sidebar); tr. 416 at 44:12-46:3 (direct); tr. 418 at 15:2-16:21 (direct); tr. 419 at 3:1-3:18 (sidebar); tr. 418 at 16:23-23:10 (direct); id. at 27:14-32:8 (cross); tr. 419 at 3:21-22:22 (sidebar); tr. 418 at 32:10-43:12, 64:16-

70:1 (cross); tr. 419 at 22:24-24:22 (sidebar); tr. 418 at 70:3-71:1, 156:25-170:24, 177:14-187:23, 191:22-193:18 (cross); tr. 420 at 26:24-29:20 (cross); tr. 421 at 3:17-4:11 (sidebar); tr. 420 at 48:12-52:17, 154:25-163:16 (cross); tr. 422 at 77:14-79:13, 87:9-88:18,93:12-98:17, 101:21-101:23 (cross); tr. 423 at 14:29-20:10 (sidebar).)

- United States failed to notify defense in advance of Shepherd's direct testimony that he had an "unwritten" nonprosecution agreement, and that trial counsel AUSA Goldsmith was involved in that deal.

Briefs:  Def. Br. 635 at 50; Gov. Br. 641 at 33; Def. Br. 646 at 23.

**RULING:** See ruling on Sec. II.D.3 supra, which covers this point.  In addition, the movants have cited no authority to the effect that a prosecuting attorney is disqualified as trial counsel for participating in an oral nonprosecution agreement with a cooperating witness, and the Court is unaware of such a rule.  (Cf. tr. 577 at 18-22.)

Defense Subsection II.G:  "THE UNITED STATES VIOLATED *GRIFFIN V. CALIFORNIA* BY IMPROPERLY COMMENTING ON PRISQUE'S RIGHT TO SILENCE."

Briefs:  Def. Br. 635 at 50-51; Gov. Br. 641 at 34-38; Def. Br. 646 at 24.

**RULING:** The Court reiterates its trial ruling on this issue.  (See tr. 489 at 80-81 (cross); tr. 499 at 20-21 (sidebar); additional transcript citations in the referenced briefs.)  The Court concludes that the trial record in this instance reveals no violation of Griffin v. California, 380 U.S. 609 (1965) and its progeny.

Defense Subsection II.H:  "THE UNITED STATES VIOLATED THE COURT'S ORDER WHEN IT DELIBERATELY BROUGHT OUT OTHER ACCIDENTS AND INJURIES, WITHOUT NOTICE TO THE DEFENSE, IN A CALCULATED EFFORT TO PREJUDICE DEFENDANTS."

Briefs:  Def. Br. 635 at 51-60; Gov. Br. 641 at 38-44; Def. Br. 646 at 25-26.

**RULING:** The Court reiterates its numerous trial rulings on the underlying evidentiary issues, in favor of the government or defendants depending on context.  (See, e.g., transcript citations in the referenced briefs; see also Def. Motion 171; Gov. Br. 188; Gov. Supp. Ltr. Br. 9-14-05 [not docketed]; Gov. Br. 472; Order 665 and transcript citations therein.)  The Court finds no prosecutorial misconduct on this point.  Assuming arguendo that any such instances were misconduct, the Court concludes that its contemporaneous rulings and limiting instructions were effective to protect defendants' rights.

Defense Subsection II.I:  "THE UNITED STATES ASKED INAPPROPRIATE QUESTIONS OF THE INDIVIDUAL DEFENDANTS AND WITNESSES CALLED ON THEIR BEHALF."

Briefs:  Def. Br. 635 at 60-71; Gov. Br. 641 at 44-46; Def. Br. 646 at 26-27.

**RULING:** To the extent that there were contemporaneous objections, the Court reiterates its trial rulings on the points raised in this subsection.  (See, e.g., transcript citations in the referenced briefs.)  The government was not obliged to offer witnesses to establish that it had a good faith basis to ask relevant questions during cross-examination.  The Court finds no prosecutorial misconduct on this point.

Defense Subsection II.J:  "THE UNITED STATES REPEATEDLY MADE INAPPROPRIATE COMMENTS."

1.  "The United States Improperly Coined 'The D'Alessio Rule.'"

Briefs:  Def. Br. 635 at 72-74; Gov. Br. 641 at 47-51; Def. Br. 646 at 27.

**RULING:**  The Court reiterates its contemporaneous rulings on the trial management problems presented by the conduct of counsel, on both sides, at various times.  Those rulings included, but were not limited to, an immediate corrective instruction to the jury on the one occasion when the government used this term in the presence of the jury.  (See, e.g., transcript

99

citations in the referenced briefs; see also tr. 408 at 33 (sidebar).)  The Court finds no

prosecutorial misconduct on this point.

2.  "Improper References To Hiring Illegal Aliens."

Briefs:  Def. Br. 635 at 74-76; Gov. Br. 641 at 51; Def. Br. 646 at 27.

**RULING:** The Court reiterates its trial rulings on this point.  (See, e.g., tr. 404 at 115:22-

116:23 (trial); tr. 405 at 38:15-43:1 (sidebar); tr. 404 at 116:25-132:14 (trial); tr. 405 at 43:2-54:3

(sidebar); tr. 409 at 4-43, 169-201 (trial); tr. 411 at 3-13 (sidebar).)

Defense Subsection II.K: "THE UNITED STATES ALSO MADE INAPPROPRIATE
COMMENTS DURING SUMMATION."

1.  "The United States Introduced Facts Not In The Record During Its Summation."

Defendants argue that prosecutorial comments during summation that are based on

information outside the record constitute *per se* reversible error.  (Def. Br. 635 at 77.)  To the

contrary, the Third Circuit has ruled, in the context of improper vouching based on suggestion of

matters outside the record, that such would be non-constitutional error subject to case-by-case

analysis and reversal only where the defendant has suffered prejudice.  Zehrbach, 47 F.3d at

1264-67 (overruling *per se* rule of United States v. DiLoreto, 888 F.2d 996 (3d Cir. 1990)).

a.  "Comments Regarding Owens"

Briefs: Def. Br. 635 at 78-79; Gov. Br. 641 at 51-52; Def. Br. 646 at 28.

**RULING:**  The Court reiterates its trial rulings on this issue.  The Court did find that the

government in summation made reference to two facts not in evidence regarding the

circumstances of Mr. Owens's return to work after his injury.  (See tr. 349 at 3:2-9:13 (sidebar);

tr. 346 at 95:14-96:5 (trial) (the underlying redirect testimony of Robert Owens); tr. 564 at

131:15-132:12 (summation); tr. 565 at 10:20-11:4 (sidebar); Def. Motion 575 at 1-6; tr. 577 at

12:22-14:23 (sidebar); tr. 577 at 39:22-40:4 (sidebar); tr. 572 at 137:19-139:2 (summation

correction; curative instruction); Order 697.)  However, the Court concludes that the retraction by

the government, and the contemporaneous curative instruction by the Court, were effective to

prevent any resulting prejudice to defendants.

    b.  "Documents Not In Evidence"

Briefs: Def. Br. 635 at 79-86; Gov. Br. 641 at 53-57; Def. Br. 646 at 29-30.  See Gov. Appendix
643 at 13-24 (Attachment L:  Gov. Exhibit 1-118.2); id. at 25-56 (Attachment M:  Gov. Exhibit
2-293a).

    **RULING:**  The Court reiterates its trial rulings on the underlying issue, which was first

raised by defendants on April 10, 2006.  (See tr. 578 at 5-10, 18-38; Def. Motion 574; Order

696.)  That subject included reference to the trial proceedings on February 1, 2006.

    The Court has carefully studied the relevant portions of the trial and sidebar transcripts

for February 1, 2006, and has listened to the underlying electronic recordings.  The official

transcripts contain omissions and errors.  We have made an edited version of that portion of the

record, tr. 454 (trial) and tr. 453 (sidebar), and have docketed it as a Notice of Intent to Correct

Record.  (Dkt. 719.)[60]  Based on that review, the Court provides the following additional

background and discussion.  Here our citations to the transcripts refer to the proposed corrected

version.

    As of January 31, 2006, the government was preparing to rest its case in chief, and was

lining up its last few witnesses.  (See tr. 452 at 21-27.)  One of those witnesses was the Atlantic

---

[60]  We will resolve any objections to the Notice of Intent to Correct Record before making
any changes to those transcript pages.

States custodian of records, Edward O'Brien, who testified on February 1, 2006.  (See tr. 454 at 115-120.)

Mr. O'Brien had testified previously during the government's case, on January 17, 2006. Based on his testimony on that January date, the Court admitted five groups of Atlantic States documents under the business records rule, without objection by defense counsel.  Those groups were designated Groups 1, 2, 4, 5 and 6.  (See tr. 413 at 64-75.)[61]  The groups were voluminous, and the government was directed by the Court to provide the individual exhibit numbers to the Courtroom Deputy.  (See tr. 413 at 67; see also tr. 283 at 23.)

When Mr. O'Brien was re-called on February 1, 2006, the government had three additional groups of Atlantic States business records that it offered in evidence through his testimony.  Those were designated Groups 7, 8 and 9.  (Tr. 454 at 116:7-118:24.)[62]  Group 7 was two pages of a first aid log.  Group 8 consisted of correspondence files with the DEP.  (Id. at 116:16-25.)  Exhibit 1-118.2, which is at issue here, was part of Group 8.  (Tr. 578 at 19:15-22:10.)  Group 9 was a group of cupola furnace 24-hour reports.  (Tr. 454 at 117:1-12.)  Exhibit 2-293a, the other document at issue here, was part of Group 9.  (Def. Br. 641 at 53.)  The government stated that it was moving all of those documents into evidence.  (Tr. 454 at 118:22-24.)  The government had made the documents available to defense counsel for inspection, and

---

[61]  Group 3, consisting of handwritten summary sheets by mechanic James Yukna, was similarly qualified by Mr. O'Brien at that time.  (See tr. 413 at 68-70.)  However, defense counsel objected to its admission and the Court advised the parties at sidebar that it would not admit that group at that time.  (See tr. 414 at 38-53; tr. 413 at 70.)

[62]  The prosecutor stated, "... I'm going to call – like I did the last time – I'm going to call these groups, so that they'll be subject to labeling with exhibit numbers later, Your Honor."  The Court responded, "That's fine."  (Tr. 454 at 116:11-15.)

counsel for Atlantic States had reviewed them with Mr. O'Brien before he testified.  (Tr. 578 at 18:22-21:2).  Defense counsel conducted no cross-examination as to those three groups.  (Tr. 454 at 116:6-1120:14.)

There were also two individual documents that the government qualified as business records through the testimony of Mr. O'Brien, and the government offered in evidence at that time.  The first was another first aid log, marked D-1969.  (Id. at 118:15-24.)  The other was actually the reverse side of a document already in evidence, a driver's daily checksheet marked 3-074A.  (Id. at 119:3-120:6.)  The latter document was the subject of brief cross-examination by counsel for Atlantic States, and the government acknowledged that it might require discussion at side bar.  (Id.)  The Court responded, "Okay, well we have the testimony.  I can make these rulings later.  So, we can now let Mr. O'Brien leave the stand and adjourn for the day with the jury; is that correct?"  The prosecutor, Mr. Marra, responded, "Fine, Your Honor.  And I will make sure all those exhibits are labeled and give that to your deputy."  The Court responded, "Fine."  (Id. at 120:7-14.)  At that point, the witness was released and the jury was excused for the day.

The Court immediately conducted sidebar on the unfinished business of the session.  (See tr. 453 at 24:5-27:4.)  During that sidebar, the Court specifically asked defense counsel whether there were any objections to admitting "any of the group that Mr. O'Brien qualified, upon questioning by the Government."  Counsel for Atlantic States stated that there was no defense objection.  (Id. at 24:25-25:1.)  The Court then conducted separate discussion on each of the individual documents requiring rulings, and ruled that each of them was also in evidence.  (Id. at

103

24:5-22; 26:6-9; 27:2-4.)[63]

It is true that the Court did not use the phrase "Groups 7, 8 and 9 are admitted in evidence," which was its usual but not invariable means of so ruling.  However, in our view the process that the Court followed that day was sufficient to convey to all counsel that those documents were ruled in evidence, without objection, and the Courtroom Deputy was authorized to mark them as exhibits in evidence.  That was the understanding of the Court and the Courtroom Deputy and the government, as later stated on the record when the issue as to Exhibit 1-118.2 arose post-summations.  (Tr. 578 at 26:1-28:8.)  In fact, the Court so recorded in its contemporaneous trial notes on February 1, 2006, and the Courtroom Deputy, acting at the direction of the Court, individually marked all of the exhibits in Groups 7, 8 and 9 in evidence as of that date.  (Id.)  Those exhibits, bearing official evidence numbers and stickers, remained available in the courtroom for inspection by all counsel, for the duration of the trial.  (Tr. 578 at 21:9-11.)

When this issue was first raised by defense counsel on April 10, 2006, after summations and on the day that the case was submitted to the jury, only the government's use of Exhibit 1-118.2 in its rebuttal summation was identified as the subject of the defense objection.  The Court thoroughly explored that issue on the record at that time, and made its contemporaneous ruling.  (See tr. 578 at 5-10, 18-38.)  Based on the trial record as described above, the Court would have

---

[63]   There were two other individual government exhibits also discussed in that sidebar session, which are not pertinent to the present issue but which the Court did address with the parties and made rulings.  Those were exhibit 4072 already in evidence (lead sampling records admitted in evidence during the testimony of the prior witness, Joseph Czapik, but from which the Court deleted the last page, which was a chart by Mr. Surca, without objection) (tr. 453 at 25:11-26:25); and D-1967 (employment application of Phillip Berberena).  (Id. at 24:5-22.)

made the same rulings on that date had the same issue been raised as to the other exhibit now in question, Exhibit 2-293a.  We find no prosecutorial misconduct in counsel's use of those documents in its rebuttal summation.

2.  <u>"The United States Made Improper References That Craig Davidson Was Related To John Prisque During Its Summation."</u>

Briefs: Def. Br. 635 at 86-87; Gov. Br. 641 at 57-58; Def. Br. 646 at 30-31.

     **RULING:**  The Court was not requested to rule upon the relevance, or lack thereof, of the evidence of familial relationship between these two defendants, either during the evidentiary portion of the trial or during the summations.  (<u>See</u> transcript citations in the referenced briefs.)  In other instances during trial, the Court either allowed or disallowed inferences to be suggested based on familial relationship, depending on the context.  (<u>See, e.g.</u>, tr. 368 at 9-10 (trial); tr. 369 at 4-7 (sidebar); tr. 418 at 27-32 (trial); tr. 419 at 9-22 (sidebar); tr. 418 at 32-35 (trial).)  The Court does not find that the prosecutorial statements on this subject during summation constituted misconduct.

3.  <u>"The United States Improperly Referenced McWane Despite The Court's Prior Order That McWane Was Not Relevant To This Case."</u>

Briefs: Def. Br. 635 at 87-88; Gov. Br. 641 at 59-61; Def. Br. 646 at 31.

     **RULING:**  Defendant Atlantic States Cast Iron Pipe Company is a division of McWane, Inc. ("McWane").  The government moved to obtain a pretrial ruling on whether certain specified events at other facilities operated by McWane would be admissible either as intrinsic evidence or under Rule 404(b).  That motion was fully briefed and argued.  (<u>See</u> Gov. Motion 152; Def. Br. 177; Def. Br. 180; Def. Br. 182; Def. Br. 185; Def. Br. 186; Def. Br. 187; tr. 212 at 6-45; Order 659.)  The Court denied the motion without prejudice, stating that it would make such rulings in

the course of the presentation of the evidence at trial.  (See tr. 212 at 45:15-47:19.)  Included in

that ruling was the following observation:  "It may be that by the time the proofs are all in, the

government can say, see, this runs all the way up to the top of McWane.  But we're not there yet.

I want to see the evidence be built ... from the ground up rather than from the top down."  (Id. at

47:11-47:15.)  In the course of the presentation of evidence by the government and by the

defendants at trial, there was evidence of some corporate policies that were received by the

Atlantic States division from McWane, and there was certain other evidence referring to

McWane.  (See, e.g., transcript citations in the referenced briefs.)  Based upon that trial evidence,

this Court does not find that the prosecutorial references to McWane during trial and summations

constituted misconduct.

4.  "The United States Intentionally Played The Wrong Videotape During Its Summation."

Briefs: Def. Br. 635 at 88-89; Gov. Br. 641 at 61; Def. Br. 646 at 31.

**RULING:**  The Court permitted the government to retract its own error and apologize for

referring to one videotape that was in evidence while playing a different videotape that was also

in evidence.  (See tr. 563 at 6-8; transcript citations in the referenced briefs.)  The Court is

satisfied that the error was inadvertent rather than misconduct.  The Court further finds that the

corrective statement by the government was effective to prevent any prejudice to defendants.

5.  "The United States Improperly Commented Upon Defendants' Photographic Evidence."

Briefs: Def. Br. 635 at 89; Gov. Br. 641 at 61-62; Def. Br. 646 at 32.

**RULING:**  The Court finds no prosecutorial misconduct on this point.  (See transcript

citations in the referenced briefs.)

6. "The United States Improperly Commented Upon Defense Counsel, Money Awarded In A
Workers' Compensation Case, and Defense Costs."

Briefs: Def. Br. 635 at 89-92; Gov. Br. 641 at 62-65; Def. Br. 646 at 32-33.

RULING:  The Court reiterates its trial ruling, which was favorable to the position of the

government on the issue of the prosecutorial comment on expert witness fees in summation.

(See tr. 564 at 102-104, 155 (summation); tr. 563 at 5-6 (sidebar); tr. 572 at 141 (summation);

Def. Motion 575 at 6-9; tr. 577 at 39:6-21 (sidebar); Order 697.)  The Court finds no prejudice to

the individual defendants on that point, because the jury saw that Atlantic States was the only

defendant that presented expert testimony.  Further, the Court finds no misconduct in the

prosecutorial reference in rebuttal summation to the eloquence of defense counsel.  Viewed in

context, it was a reference to the objections and arguments of defense counsel in light of the jury

instruction that such are not evidence.  (See transcript citations in the referenced briefs.)

Defense Subsection II.L: "THE CUMULATIVE EFFECT OF THESE ERRORS DEPRIVED
THE DEFENDANTS OF A FAIR TRIAL."

Briefs: Def. Br. 635 at 92-94; Gov. Br. 641 at 65-66; Def. Br. 646 at 33.

RULING:  Most of the points raised in this section were the subject of contemporaneous

objections and trial rulings, as to which an abuse of discretion standard of review will apply on

appeal.  Brennan, 326 F.3d at 182.  We have not changed any of those rulings in reviewing the

issues post-trial.  Some of those rulings favored the government, and some favored defendants.

In the latter instances, the Court directed remedies and provided limiting instructions where

appropriate.  This Court finds no constitutional errors in any of these points, and no trial error in

the circumstances.

107

We conclude that the asserted instances did not rise to the level of prosecutorial misconduct, and that those instances in which prosecutors erred, or the Court made rulings adverse to the government, were addressed by the Court effectively in the context of the trial proceedings.  Assuming arguendo that any of these instances did amount to prosecutorial misconduct, we further determine that the "ameliorative effect of [the] curative instructions and the strength of the evidence supporting the conviction[s]" rendered them harmless.  Rivas, 479 F.3d at 266.  Viewing these points in the context of the trial record as a whole, the Court concludes that the record supports a sure conviction that such did not prejudice a fair trial for the defendants.  Molina-Guevara, 96 F.3d at 703.

## III.  DEFENDANTS' POINT III:  "THE COURT COMMITTED ERRORS WHICH REQUIRE A NEW TRIAL."

Defendants contend that they are entitled to a new trial because of enumerated instances of alleged error by the Court that cumulatively warrant a new trial.  (Dkt. 635 at 94-123; dkt. 646 at 33-39.)  See, e.g., United States v. Curtis, 644 F.2d 263, 264-71 (3d Cir. 1981) (reversing conviction citing harm caused by cumulative effect of errors); cf. U.S.S.E.C. v. Infinity Group Co., 212 F.3d 180, 196 (3d Cir. 2000) (recognizing without expressly adopting the "cumulative error doctrine" in criminal but not civil cases).  Here we address each allegation of alleged trial error, using the same format as in the preceding section.

Defense Subsection III.A:  "THE COURT DID NOT PERMIT DEFENDANTS TO QUESTION GEORGE SHEPHERD REGARDING HIS SECOND OFFENSE OF DESERTION."

1.  "Desertion Is A Crime Of Dishonesty And Deceit."

2.  "The Defense Should Have Been Able To Cross-Examine Shepherd That His Conviction For Desertion Motivated Him To Cooperate With The United States."

Briefs: Def. Br. 635 at 95-98; Gov. Br. 641 at 66-68; Def. Br. 646 at 34.

**RULING:**  The Court reiterates its trial ruling on this issue.  (See tr. 419 at 30-33; tr. 421 at 3; see also Def. Motion 417; Gov. Br. 426; Order 689.)

Defense Subsection III.B:  "THE COURT SHOULD NOT HAVE PERMITTED FERNICOLA TO OPINE THAT MAURY WAS LYING, THEN COMPOUNDED THIS ERROR BY RULING TOO LATE THAT THE JURY SHOULD DISREGARD THE 'OPINION' GIVEN BY FERNICOLA."

Briefs: Def. Br. 635 at 98-103; Gov. Br. 641 at 68-72; Def. Br. 646 at 35-36.

**RULING:** The Court reiterates its trial ruling on this issue.  (See tr. 555 at 151; tr. 576 at 10-21; tr. 578 at 14-16; dkt. 717 at 65 (jury instruction); see also Def. Br. 335; Gov. Br. 336.)

Defense Subsection III.C.:  "THE COURT ERRED IN REFUSING TO POLL THE JURY FOLLOWING THE PUBLICATION OF A STAR-LEDGER ARTICLE ON APRIL 10, 2006."

Briefs: Def. Br. 635 at 103-106; Gov. Br. 641 at 72-76; Def. Br. 646 at 36.

**RULING:** The Court reiterates its trial ruling on this issue.  (See tr. 578 at 3-5, 10-11; dkt. 717 at 68 (jury instruction).)

Defense Subsection III.D: "THE COURT REFUSED TO PERMIT THE DEFENSE TO RECALL BRUCE GELETA OR GIVE A LIMITING INSTRUCTION REGARDING DILLON'S ALTERCATION WITH GELETA."

Briefs: Def. Br. 635 at 106; Gov. Br. 641 at 76-77; Def. Br. 646 at 37.

**RULING:** The Court reiterates its trial ruling on this issue.  (See tr. 535 at 13-14; tr. 553 at 39-41.)

Defense Subsection III.E: "THE COURT INCORRECTLY LIMITED THE CROSS-EXAMINATION OF SHEPHERD REGARDING HIS BIAS AND MOTIVATION TO COOPERATE WITH THE UNITED STATES AND PROVIDE TESTIMONY AGAINST DEFENDANTS."

Briefs: Def. Br. 635 at 107-111; Gov. Br. 641 at 77-81; Def. Br. 646 at 37.

**RULING:** The Court reiterates its trial ruling on this issue.  (See tr. 419 at 2-22.)

<u>Defense Subsection III.F: "THE COURT FAILED TO INSTRUCT THE JURY TO ADHERE</u>
<u>TO THE QUOTED LANGUAGE OF THE INDICTMENT FOR THE FALSE STATEMENT</u>
<u>CHARGES."</u>

Briefs: Def. Br. 635 at 111-112; Gov. Br. 641 at 81-83; Def. Br. 646 at 38.

**RULING:** The Court reiterates its trial ruling on this issue.  (<u>See</u> dkt. 597 (jury question

#3 and Court's response); tr. 581 at 3-24.)

<u>Defense Subsection III.G: "THE COURT FAILED TO GIVE APPROPRIATE LIMITING</u>
<u>INSTRUCTIONS."</u>

<u>Specified examples:</u>

• During testimony of Christina Morgan, denial of request regarding limits for

   stormwater runoff that had no bearing on Atlantic States' permits.

• Regarding photographs of puddling conditions during 2-24-00 search warrant

   execution, denial of request regarding no violations notices issued.

• During testimony of Robert Rush, denial of request regarding his lack of

   knowledge if individual discussing OSHA stalling tactics was employed by

   Atlantic States; also that such testimony applied only to Atlantic States.

• Denial of requests by individual defendants for instructions that certain evidence

   pertained only to the company.

• Denial of request by Faubert for instruction that he did not work at the plant

   during time period covered by testimony of William Houston.

• Denial of request by Faubert for instruction following question about "maimed"

   employees working at Atlantic States.

- Denial of request to use defense summary chart in cross-examination of David Chase re: notebook entries; and denial of request to inform jury that defense was limited to cross-examination on only 25 of hundreds of those entries.

Briefs: Def. Br. 635 at 112-113; Gov. Br. 641 at 83-92; Def. Br. 646 at 38.

**RULING:** The Court reiterates its rulings on these points.  (See, e.g., transcript citations in the referenced briefs; tr. 361 at 10-16, 40 (oral and rulings).)

Defense Subsection III.H:  "THE COURT PERMITTED UNITED STATES WITNESSES TO TESTIFY WITHOUT PERSONAL KNOWLEDGE IN VIOLATION OF FRE 602."

Specified examples:

- Permitting Fernicola to opine that Maury was lying.  See Sec. III.B. supra.

- Providing a tutorial to the United States on how to conduct direct examination of Christina Morgan.

- Permitting Richard Hay to speculate whether two other Delaware spills were related to incidents charged to Atlantic States.

- Permitting Isabel Marchan to infer Prisque's conduct.

- Striking Donald Hirsch's testimony speculating about the behavior of Yadzinski, but refusing to declare mistrial.

- Permitting fact witness Richelle Wormley to testify to certain points, over objections to scope and expert nature of the testimony.

Briefs: Def. Br. 635 at 113-122; Gov. Br. 641 at 92-102; Def. Br. 646 at 38-39.

**RULING:**  The Court reiterates its rulings on these points.  (See transcript citations in the referenced briefs.)

Defense Subsection III.I: "THE CUMULATIVE EFFECT OF THESE ERRORS DEPRIVED THE DEFENDANTS OF A FAIR TRIAL."

Briefs: Def. Br. 635 at 122-123; Def. Br. 646 at 39.

> **RULING:**  The Court was required to exercise its discretion constantly throughout this lengthy trial and make rulings in response to motions and objections, both written and oral, by all parties.  The alleged errors asserted in this section reflect a few of those rulings.  We have reviewed the record and considered the detailed arguments submitted by the parties in their post-trial briefing materials on these points.  Based on that review, we find no reason to change those rulings or to conclude that cumulative trial error requires grant of a new trial.

## IV.  DEFENDANTS' POINT IV:  "JUDGMENTS OF ACQUITTAL ON COUNT I MUST BE GRANTED BECAUSE OBSTRUCTION OF OSHA IS NOT A VALID OBJECTIVE OF THE CONSPIRACY."

Briefs:  Dkt. 635 at 123-28; dkt. 641 at 103-10; dkt. 646 at 39-41.

> **RULING:**

Count 1 of the indictment charged that during the period of approximately October 31, 1995 through August, 2003, each of the defendants entered into a conspiracy having five unlawful objectives.  (Dkt. 711 at 1-33.)  All defendants except the acquitted individual were found guilty under Count 1, as to various of the alleged objectives of the conspiracy.  (See n.4, supra and accompanying text.)  The verdicts as to each alleged objective of the charged conspiracy are listed in the margin.[64]

---

[64]  The verdicts for the convicted defendants included the following findings as to the five alleged objectives of the conspiracy charged in Count 1:

One of the alleged objectives of the charged conspiracy was:

> E.  To corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due and proper administration of law under which a pending proceeding is being had before OSHA, an agency of the United States, in violation of 18 [U.S.C. §§] 1505 and 1515(b).

(Id. at 12.)

The indictment also contained three substantive charges of obstruction of OSHA under 18 U.S.C. § 1505 (Counts 8-10).  (Id. at 40-42.)  A fourth substantive charge of obstruction of OSHA was brought under a related section, 18 U.S.C. § 1519 (Count 11).  (Id. at 43.)  All of the acts of obstruction alleged in those substantive counts, and the overt acts alleged in Count 1, related to employee injuries that occurred at Atlantic States after the alleged date of commencement of the conspiracy, which was "beginning at a time unknown to the Grand Jury

---

| Count 1 - Alleged obj. | Atl. States | Prisque | Faubert | Maury | Davidson |
|---|---|---|---|---|---|
| A.  CWA, 1311(a) and 1319(c)(2)(A) | guilty | guilty | not guilty | guilty | guilty |
| B.  CAA, 7413(c) | guilty | guilty | not guilty | not guilty | not guilty |
| C.  Defraud the U.S., i.e., OSHA & EPA | guilty | guilty | guilty | guilty | not guilty |
| D.  False statements, 18 U.S.C. § 1001 | guilty | guilty | guilty | guilty | guilty |
| E.  Obstruct OSHA, 18 U.S.C. § 1505 | guilty | guilty | guilty | guilty | not guilty |

(See dkt. 711 at 12 (indictment); dkt. 609; dkt. 610; dkt. 611; dkt. 612; dkt 614 (separate verdict sheets).)

113

but no later than October 31, 1995."  (Id. at 11.)[65]

Defendants argue that "obstruction of OSHA was an invalid objective of the conspiracy because, as a matter of law, there was no foreseeable pending proceeding of that agency at the time [they] entered into the conspiracy charged in the indictment."  (Dkt. 635 at 124.)  They contend that the Court should have granted their pretrial motion to dismiss the conspiracy count because the indictment failed to plead that as of October 31, 1995, there was any pending OSHA proceeding, or any reasonably foreseeable future OSHA proceeding, because the injuries described in the indictment had not yet occurred.  (Id. at 125.)  They state that at trial, "the government did not offer any evidence that at the time [they] entered into the conspiracy they foresaw the OSHA inspections about which witnesses testified," (id. at 124), and argue that their renewed motions on this ground during trial and post-trial should be granted.  They further contend that striking obstruction as an objective of the conspiracy count requires judgments of acquittal on Count 1, because "[a]ny weight afforded evidence of such obstruction either by the grand jury in deciding to indict, or by the jury in deciding to convict on the conspiracy charge clearly violates the Defendants' Fifth Amendment rights."  (Id.)  In the alternative, they seek a new trial in which obstruction is stricken from Count 1 as an objective of the conspiracy, because they were substantially prejudiced by evidentiary rulings incorrectly based on obstruction of OSHA as an objective of the conspiracy.  (Id. at 124-28.)

---

[65]   The earliest OSHA-related worker injury alleged in the indictment, and reflected in the trial evidence, was during the week of February 26, 1996, when Atlantic States worker Randy Lieberman fell from a rope ladder in the cupola.  All other OSHA inspections referenced in the conspiracy count occurred between 1999 and 2002.  All four of the substantive counts alleging obstruction of OSHA involved inspections in 1999 or later.  (See dkt. 717, Count 1, Overt Acts 34-38, 50-58, 67-71; Counts 8-11.)

There is no "pending proceeding" requirement for a conspiracy to violate 18 U.S.C. §

1505, in contrast to that requirement as an element of the substantive offense under Section 1505.

In order to prove a conspiracy to obstruct justice, the government must establish that there was an

agreement whose object was to obstruct justice, that the defendant knowingly joined it, and that

at least one overt act was committed in furtherance of the object of the agreement.  United States

v. Davis, 183 F.3d 231, 243 (3d Cir. 1999).  The Third Circuit has opined on this issue in United

States v. Perlstein, 126 F.2d 789 (3d Cir. 1942).  There, the question was:

> Were the appellants properly convicted on a count charging them with conspiracy
> to obstruct the administration of justice in violation of Section 135 of the Criminal
> Code [predecessor to 18 U.S.C. §§ 1503-1505] when the conspiracy was entered
> into at a time when there was no proceeding pending in the District Court of New
> Jersey, though continued into a period when there were proceedings pending in
> that court, and acts in furtherance of the conspiracy were committed both prior to
> and after the commencement of the proceedings referred to?

Id. at 793.  The court held that "there is nothing to prevent a conspiracy to obstruct the due

administration of justice in a proceeding which becomes pending in the future from being

cognizable under Section 37."  Id. at 796 (citing predecessor to 18 U.S.C. § 371).  The Third

Circuit has commented that Perlstein "does not change the requirement that there has to be some

proof that the conspirators knew of or anticipated" a proceeding.  Davis, 183 F.3d at 243, n.3.

When this Court instructed the jury on the essential elements of the substantive Section

1505 counts (Counts 8-10), we stated and defined the substantive offense elements, including the

requirements of a "pending proceeding" and a "nexus" between the defendant's act and the

proceeding.  (Dkt. 717 at 46-48.)[66]  We distinguished those substantive counts from the

obstruction objective of the conspiracy count, stating as follows:

---

[66]  The jury instructions also explained the difference between "substantive" crimes and
the crime of conspiracy.  (Dkt. 717 at 29.)

Here let me add a point that is applicable to Count One, the conspiracy count.  As you know, the Indictment charges that one of the illegal objectives of that conspiracy was to obstruct justice in violation of this obstruction statute, 18 U.S.C. § 1505....  The "nexus" requirement and the requirement of a "pending proceeding" under this obstruction statute impose special requirements as to conspiracy.  In the case of a conspiracy, the agency proceeding does not need to be pending.  You must find beyond a reasonable doubt, however, that at the time they conspired, the members of the conspiracy must have expected that a proceeding would be instituted and must have intended that their actions would obstruct that anticipated proceeding.

(Id. at 48.)  Thus this Court recognized, and so instructed the jury, that although the agency proceeding need not be pending at the time they conspired, the conspirators would have to foresee that an OSHA proceeding would be instituted, and they would have to intend that their actions would obstruct that anticipated proceeding if it did commence in the future.  See United States v. Nelson, 852 F.2d 706, 712-15 (3d Cir.), cert. denied, 488 U.S. 909 (1988); United States v. Messerlian, 832 F.2d 778, 792-94 (3d Cir. 1987), cert. denied, 485 U.S. 988 (1988).

There is no requirement that a conspiracy start or end on any specific date.  Mercer v. United States, 61 F.2d 97, 98 (3d Cir. 1932).  This Court properly instructed the jury that "the government has sustained its burden of proof as to the existence of the conspiracy if you find that the particular conspiracy existed at any point in time reasonably near the dates set forth in the Indictment."  (Dkt. 717 at 40.)  Nor is there any requirement that a particular official proceeding be foreseeable at the outset of the conspiracy.  Where, as here, obstruction was one of several alleged objects of a conspiracy, courts have upheld convictions where the proceedings sought to be obstructed were not pending when the agreement was formed.  See United States v. Wynn, 61 F.3d 921, 925 (D.C. Cir. 1995) (money structuring conspiracy commenced in 1987; grand jury proceeding commenced in 1989; conviction upheld on multi-object conspiracy including

116

obstruction); United States v. Manton, 107 F.2d 834, 838-44 (2d Cir. 1939) (conviction upheld

on conspiracy to obstruct pending and future court proceedings, involving litigants known and

unknown); United States v. Norve, No. 04-214, 2004 WL 2984805, at *1 (E.D. La. Dec. 21,

2004) (conspiracy to defraud sheriff's department on sale of motorcycle parts began in 1998;

investigation commenced later and alleged obstruction objective included theft of witness

statements in 2001 and arson in 2002; conviction upheld on multi-object conspiracy including

obstruction).

       Basic principles of conspiracy law would be violated by the rule defendants suggest, to

the effect that the obstruction objective must have a specifically foreseeable proceeding at the

inception of the conspiracy.  A conspiracy requires proof that the co-conspirators shared a "'unity

of purpose,' intent to achieve a common goal, and an agreement to work together toward the

goal." United States v. McGlory, 968 F.2d 309, 321 (3d Cir. 1992) (quoting United States v.

Wexler, 838 F.2d 88, 90-91 (3d Cir. 1988)).  Here, the alleged common purpose of the

conspiracy was to enrich defendants and their co-conspirators "by maximizing the production of

cast iron pipe at the Phillipsburg facility, without concern to environmental pollution and worker

safety risks."  (Dkt. 711 at 13.)  The precise membership and objectives within the conspiracy

can vary over time.  For example, all conspirators do not need to have originally conceived or

participated in the conception of the conspiracy; others can join in the common effort at a later

time.  See United States v. Lester, 282 F.2d 750, 753 (3d Cir. 1960).  Nor do all conspirators

need to agree on all of the goals of the conspiracy, where they agree on the essential nature of the

plan.  See United States v. Acosta, 17 F.3d 538, 544 (2d Cir. 1994).

The government points to United States v. J.R. Watkins Co. 120 F.Supp. 154 (D. Minn. 1954), which we agree is instructive on this point.  There the alleged conspiracy began in 1928, but one of the regulations violated was not promulgated until 1942.  The court held that "the fact that the conspiracy in its existence embraced violation of various statutes or regulations, some of which were not in existence at the inception of the conspiracy, does not render the indictment fatally defective."  Id. at 163.  Likewise here, the fact that the conspiracy in its existence embraced several unlawful objectives, all bound together by a common scheme or plan, does not require that each of those unlawful objectives be fully focused on a particular regulation or official proceeding at the outset.

Atlantic States was a manufacturing facility that had long been subject to ongoing inspection and regulation by federal agencies, including OSHA, as of the inception of the period of the alleged conspiracy.  (See, e.g., tr. 359 at 7-12; tr. 449 at 40-45; tr. 394 at 186-89, 199-202; tr. 424 at 86-87).  The defendants found guilty under the OSHA obstruction conspiracy objective were supervisory employees who dealt with OSHA during its inspections and investigations at Atlantic States during the time of the conspiracy.  (See, e.g., tr. 424 at 92-94, 160-62; tr. 428 at 32-35).  Workers whose employment spanned the period of the alleged onset of the conspiracy described unsafe working conditions.  (See, e.g., tr. 280 at 4-70; tr. 332 at 5-6, 18-24, 41-42, 44:10-46:8; tr. 334 at 36-40, 98; tr. 394 at 167-72, 185-:8-192:10.)  The first OSHA-related worker safety incident described in the indictment occurred a mere four months into the almost eight-year duration of the alleged conspiracy.  (See n.65, supra.)  Assuming arguendo that the government were required to prove foreseeability of an OSHA proceeding from the inception of the conspiracy, the jury would have been justified in finding that an OSHA investigation into

118

worker safety violations was foreseeable by the conspirators as of October 31, 1995, even before

the first of the many employee injuries described in the indictment occurred four months later.

This Court has considered defendants' arguments on this point, and finds them to be

without merit.  Accordingly, we rule that defendants are not entitled to acquittal or a new trial on

Count 1 based upon the allegations and the evidence concerning the OSHA obstruction objective

of the charged conspiracy.

## V.  DEFENDANTS' POINT V:  "THE INCONSISTENT VERDICTS AGAINST DAVIDSON, PRISQUE AND ATLANTIC STATES CANNOT STAND."

Briefs:  Dkt. 635 at 128-138; dkt. 641 at 110-120; dkt. 646 at 41-50.

**RULING:**

Defendants argue that certain of the verdicts were inconsistent and require acquittal.

These are the verdicts challenged on this ground:

(1)  Atlantic States was convicted of felony CWA offenses in Counts 12-27.  However,

the individual defendants named in those counts were found guilty only of the lesser-included

negligent offense.  (See n.4, supra.)  Atlantic States argues that those verdicts are mutually

exclusive, requiring that it be acquitted on Counts 12-27.  (Dkt. 635 at 132-138; dkt. 646 at 49-

50.)

(2)  Two of the individual defendants, Prisque and Davidson, were convicted only of the

lesser-included negligent offenses under the Clean Water Act substantive counts against them –

Davidson in Counts 12-27 and Prisque in Count 27.  (See n.4, supra.)  However, the verdict

against them on the Count 1 conspiracy charge found that they knowingly and willfully

participated in the objective of violating the CWA.  (See n.64, supra.)  Prisque and Davidson

argue that the verdicts against them on Count 1 and those substantive CWA counts are mutually exclusive. They contend that this requires the Court to strike the jury's finding on Count 1 that they conspired to violate the CWA, and grant them an acquittal on that count. (Dkt. 635 at 128-132; dkt. 646 at 41-49.)[67]

It is well established that where a verdict of conviction for a defendant is inconsistent with a judgment of acquittal for that defendant on another count, judgment of acquittal on the count of conviction is not required. Dunn v. United States, 284 U.S. 390 (1932) (prohibition-era conviction on nuisance count upheld despite inconsistency with acquittals on separate counts for unlawful possession or sale of liquor based on same evidence); United States v. Powell, 469 U.S. 57 (1984) (no exception to Dunn rule where conviction on compound telephone facilitation count was inconsistent with acquittal on count charging the predicate felony, based on same evidence).

The Third Circuit, applying Dunn and its progeny, has long held that "[w]here different offenses are charged in separate counts of an indictment, an acquittal on one or more of the counts does not invalidate a verdict of guilty on another even where the same evidence is offered in support of each count." United States v. Vastine, 363 F.2d 853, 854 (3d Cir. 1966) (upholding conviction on conspiracy count despite inconsistency with acquittals on related substantive counts); United States v. Gross, 961 F.2d 1097, 1106-07 (3d Cir. 1992) (upholding convictions on insider trading and mail fraud where jury acquitted on related false statement count, even where all counts required same level of mens rea, knowingly and willfully); see also United

───────────────────────

[67] Defendants Atlantic States and Maury were convicted of felony CWA offenses in Counts 28-33. (See n.4, supra.) They were each also found guilty of participating in the charged Count 1 conspiracy objective of violating the CWA. (See n.64, supra.) Those verdicts are not arguably inconsistent, and those defendants do not raise inconsistency arguments as to their Count 1 convictions.

States v. Dolasco, 184 F.2d 746, 749 (3d Cir. 1950) (upholding conviction for stealing goods in interstate commerce despite acquittal on possession of stolen goods, stating: "Each count in the ... indictment charges a separate crime and it is enough if there is sufficient evidence to support the jury's verdict on any one."); United States v. Heavlow, 468 F.2d 842, 844 (3d Cir. 1972) (same).

The Supreme Court in Powell noted that its rule did not address a situation "where a defendant is convicted of two crimes, where a guilty verdict on one count logically excludes a finding of guilt on the other." Powell, 469 U.S. at 69, n.8. The Powell court offered no examples for this exception, noting only a "cf." reference to United States v. Daigle, 149 F.Supp. 409 (D.D.C.), aff'd per curiam, 248 F.2d 608 (1957), cert. denied, 355 U.S. 913 (1958). Id. There, the district court instructed the jury that if it found defendant guilty on an embezzlement count, it must acquit on the related larceny count. The jury convicted on both counts. The district court set aside the conviction on the larceny count, which carried the more severe penalty, and imposed judgment on the embezzlement count. It ruled on defendant's post-trial motion that the action was proper, "in execution of its jury instruction to acquit defendant under Count 2 [larceny] if he be found guilty under Count 1 [embezzlement]." The rule that it articulated was "where a guilty verdict on one count negatives some fact essential to a finding of guilty on a second count, two guilty verdicts may not stand," although it acknowledged that perhaps its instruction to the jury regarding the elements of the two offenses was unduly favorable to defendant. Id. at 414. The appeals court affirmed, stating that it found "no error affecting substantial rights of the appellant." 248 F.2d at 608.

121

We find <u>Daigle</u> inapposite to the present case because here the Court did not instruct the jury that if it found defendants guilty of the lesser-included CWA negligence offense, it could not convict on the conspiracy offense. Quite the contrary, the jury instructions and the verdict sheets set forth separately the crime of conspiracy (Count 1) and the felony and lesser-included substantive offenses under the Clean Water Act (Counts 12-27, <u>inter alia</u>), all for the jury's decision. Moreover, we did clearly instruct the jury that "a person cannot be convicted of conspiracy if the state of mind of the defendant was in the nature of negligence.... I repeat that a defendant cannot be convicted of conspiracy, the offense charged in Count One, based on a state of mind that does not rise to the level of knowing and willful participation in the conspiracy." (Dkt. 717 at 41).

The Third Circuit in <u>Gross</u> emphasized that the <u>Powell</u> exception "only operates in those situations where a jury has convicted a defendant of two crimes and those <u>convictions</u> are mutually exclusive. Such a result would be patently unjust because a defendant would be convicted of two crimes, at least one of which he could not have committed." <u>Gross</u>, 961 F.2d at 1107 (emphasis in original). The Seventh Circuit found no fatal inconsistency where a defendant was convicted on one count of robbery of federal property, but only the lesser-included offense under a separate count of assaulting or interfering with a federal officer. <u>United States v. Mathis</u>, 579 F.2d 415, 416-18 (7th Cir. 1978) (holding there was no fatal inconsistency in the verdicts, where there was sufficient evidence of force or threat of force to sustain verdict under both charged offenses.) There, the appeals court observed that "any arguable inconsistency arises not from the verdict of guilty of unarmed assault (the lesser-included offense under the assault count), but rather from the implicit verdict of not guilty of the offense of assault with a ... weapon

(the greater offense in that count)."  Id. at 418.  It relied on Dunn, adding "[m]oreover, the jury

verdict 'may have been the result of compromise,' a matter into which Dunn forecloses inquiry."

Id. (quoting Dunn, 284 U.S. at 394).  Likewise, in Evanchyk v. Stewart, 340 F.3d 933 (9th Cir.

2003), where the appeals court granted habeas relief based on improper jury instructions, but

refused to deny re-trial on double jeopardy grounds, it commented

> [A] verdict would not necessarily be "inconsistent" if a jury convicted on
> conspiracy to commit first-degree murder but acquitted on first-degree murder
> itself, choosing instead to convict for second-degree murder.  Even if the verdict
> were inconsistent, however, that would be irrelevant, so long as we could be
> confident that the verdicts were in fact premised on properly instructed crimes."

Id. at 942 (citing Powell, 469 U.S. at 65).

The Third Circuit most recently addressed the Powell exception in Buehl v. Vaughn, 166

F.3d 163, 177-81 (3d Cir. 1999), a habeas case alleging that defense counsel was ineffective for

failing to object to allegedly inconsistent verdicts on counts charging various levels of

substantive offenses.  There petitioner was charged, as to each of three victims, with first degree

murder, third degree murder, voluntary manslaughter and involuntary manslaughter, as defined

under state law.  He was found guilty on all counts except those charging voluntary

manslaughter.  The court applied, in effect, a Blockburger analysis, stating that "[a]n examination

of the statutory definitions of first degree murder, third degree murder, and involuntary

manslaughter does not reveal any apparent logical inconsistency in the verdicts."  Id. at 179.

Noting that the state criminal code under which petitioner was convicted "generally follows the

Model Penal Code rule that a lesser mens rea may be satisfied by proof of a greater one," it found

that the lesser mens rea required for involuntary manslaughter could be satisfied by proof of

intentional killing, as required under the murder counts, and counsel's failure to object on the

123

ground of inconsistent verdicts did not support relief.  Id. at 179-80.  It distinguished the

voluntary manslaughter offense, on which petitioner was acquitted, saying that the statutory

definition of that offense contained "affirmative elements [that] might be viewed as logically

inconsistent with malice, but the offense of manslaughter contains no similar elements."  Id. at

180, n.18.  It favorably noted that "courts in other jurisdictions have recognized that multiple

guilty verdicts for the same conduct that are based on varying levels of mens rea are not mutually

exclusive."  Id. at 180 (citing non-precedential Ninth Circuit decisions holding that verdicts will

not be vacated where alleged inconsistency flows from a conviction on a lesser-included

offense).

Applying these principles to the argument of defendants Prisque and Davidson that their

conviction on the lesser-included CWA offense is inconsistent with their conviction on the

conspiracy count which attributed to them participation in the unlawful objective to violate the

CWA, we find that those verdicts are not mutually exclusive and that the general rule of

upholding verdicts even if they are arguably inconsistent applies.  Those defendants were

convicted under the conspiracy count (Count 1) of knowingly and willfully participating in a

conspiracy, and of joining in the specified unlawful objective of violating the CWA.  They were

acquitted of the substantive felony CWA counts against them, while they were found guilty of

the available lesser-included substantive offense.  Those verdicts are not mutually exclusive,

even if inconsistent.  Vastine, 363 F.2d at 854.  The statutory definitions, and the essential

elements, of the conspiracy count and the substantive CWA counts differ from each other in

several respects.  (See dkt. 641 at 111-112.)  If the jury was properly instructed, and the evidence

was sufficient to support conviction on each of the counts of conviction, the fact that the jury rendered arguably inconsistent verdicts on those counts does not constitute fatal inconsistency.[68]

We hold that in this circumstance the general rule, as articulated in <u>Dunn</u> and <u>Powell</u>, controls the analysis of this issue.  We conclude that the alleged inconsistency between the verdicts against defendants Prisque and Davidson on the CWA conspiracy objective and the substantive CWA counts cannot support acquittal or a new trial on any of those counts.  The primary rationale underlying the modern jurisprudence to this effect, as expressed in <u>Powell</u>, is "the fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable."  <u>Powell</u>, 469 U.S. at 66.  A further stated rationale is that "[c]ourts have always resisted inquiring into a jury's thought processes, ... through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality."  <u>Id.</u> at 67.  Finally, the rule against overturning verdicts based on alleged inconsistency is supported by the protection the defendant has against verdicts based on insufficient evidence:

> Finally, we note that a criminal defendant is afforded protection against jury irrationality or error by the independent review of the sufficiency of the

---

[68] The Fourth Circuit found that guilty verdicts on charges of failure to keep the draft board notified of current address and failure to report for physical exam and induction were contradictory and required a new trial in <u>United States v. Bethea</u>, 483 F.2d 1024, 1029-31 (4th Cir. 1973).  However, as explained in <u>United States v. Williams</u>, 89 F.3d 165, 168 n.2 (4th Cir. 1996), the <u>Bethea</u> ruling was based on the fact that the charges in the indictment were facially inconsistent: "if the defendant had failed to notify the board of his actual address [as charged], then he could not have received his draft notice, and therefore could not be guilty of failing to report."  <u>Id.</u>  In this case, the charges that defendants Prisque and Davidson both participated in the conspiratorial objective of violating the CWA, and committed knowing substantive violations of the CWA, were not facially inconsistent.  The fact that we permitted, on defendants' request, the jury to consider the lesser-included negligent substantive CWA violation does not render the allegations in the conspiracy and substantive counts of the indictment facially inconsistent.

evidence undertaken by the trial and appellate courts.  This review should not be confused with the problems caused by inconsistent verdicts.  Sufficiency-of-the-evidence review involves assessment <u>by the courts</u> of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt....  This review should be independent of <u>the jury's</u> determination that evidence on another count was insufficient....  We do not believe that further safeguards against jury irrationality are necessary.

<u>Id.</u> (emphasis added).[69]

We find the same principles applicable to the claim by Atlantic States that because the jury only convicted the individual defendants named in Counts 12-27 of the lesser-included CWA substantive offense,  the verdict finding it guilty of the felony CWA offense on those counts must be set aside.  Atlantic States does not dispute that a corporate defendant can be convicted even if all of its charged employees are acquitted.  (<u>See</u> dkt. 641 at 118-120; dkt. 646 at 49.)  It states that "while speculation on the jury's decision-making process is inappropriate, it is the duty of this Court to determine whether the government's evidence was sufficient to support the conviction of Atlantic States for felony violations of the CWA."  (Dkt. 646 at 50.)  We agree that speculation on the jury's reason for convicting the individuals named in those counts of the lesser-included offense, while convicting Atlantic States of the felony CWA offense, is not appropriate, even as the Court is required to perform its independent duty to assess the sufficiency of the evidence as to each conviction.  <u>Powell</u>, 469 U.S. at 67.  For these reasons,

---

[69]  Defendants Prisque and Davidson also cannot benefit from an allegedly inconsistent verdict against them as to the CWA objective of Count 1, even if it is found to have been based on insufficient evidence, so long as the verdict as to that count is supported by sufficient evidence for even one of the other alleged objectives of the conspiracy that the jury found against them.  <u>Griffin v. United States</u>, 502 U.S. 46 (1991).  The verdict against Prisque on Count 1 found that he participated in all five of the alleged conspiracy objectives, and the verdict against Davidson found that he participated in the CWA and the false statement objectives.  (<u>See</u> n.64, <u>supra</u>.)

we find that the verdicts on Counts 12-27 are not mutually exclusive as between Atlantic States

and the individual defendants named in those counts.

## VI.  DEFENDANTS' POINT VI:  "THE FATAL DUPLICITY OF THE CONSPIRACY COUNT WARRANTS JUDGMENT OF ACQUITTAL OR A NEW TRIAL."

Briefs:  Dkt. 635 at 138-150; dkt. 641 at 120-126; dkt. 646 at 50-52.

**RULING:**

Defendants filed a pre-trial motion to dismiss Count 1 for duplicity, asserting that it

improperly charged in one count two separate conspiracies:  a conspiracy to defraud federal

agencies and a conspiracy to commit various specified federal offenses.  (Dkt. 131; dkt. 148 at 4-

9.)  This argument referred to the two prongs of the charged conspiracy statute, which provides in

pertinent part:

> If two or more persons conspire **either** to commit any offense against the United States ["the offense clause"], **or** to defraud the United States ["the defraud clause"], or any agency thereof ..., and one or more of such persons do any act to effect the object of the conspiracy, each shall be [punished].

18 U.S.C. § 371 (emphasis and bracketed material added).  The "defraud clause" is commonly

referred to as a Klein conspiracy.  (Dkt. 635 at 143.)  Defendants also separately argued pursuant

to Fed.R.Crim.P. 14 that due to the complexity of the conspiracy charge and the substantive

charges taken together, the Court should exercise its discretion to sever trial on the conspiracy

count from that on the substantive charges, or require the government to elect between them.

(Dkt. 157 at 4-10; dkt. 174 at 3-5; tr. 173 at 30-36; tr. 211 at 4-69.)  The Court denied that

motion to dismiss (tr. 213 at 58-59), and directed that the trial proceed on all counts.[70]

---

[70]  The defense request for election or severance was not a separate pre-trial motion, but was a contention made during briefing and oral argument on their omnibus motions.  Defendants renewed those points in their motions for judgment of acquittal made at the close of the government's case and at the close of the trial.  (See dkt. 635 at 139.)

Defendants renew those arguments in this motion, arguing further that the verdicts indicate that the jury was not able to comprehend and compartmentalize the evidence on the various counts and defendants.

Defendants do not contest that "true multiple-object conspiracies are permissible," and that a conviction will stand if there is sufficient evidence to support one of the objects. (Dkt. 646 at 51.) They contend, however, that "it is impossible to ... determine how many conspiracies the jury found existed, let alone which evidence proved which conspiracy, and which overt act they unanimously found proved each conspiracy." (Dkt. 635 at 145.) They add that "[t]he jury could have applied much of the government's evidence either to conspiracies to violate statutes or to the conspiracy to defraud government agencies, which raises the serious question of whether co-conspirator statements should have been admissible against all Defendants throughout the trial." (Id. at 145-46.) They contend that the allegedly inconsistent verdicts between the CWA negligence and CWA conspiracy objective "clearly demonstrate the jury's confusion regarding application of the government's evidence on the conspiracy count." (Id. at 149.) Based on this asserted duplicity within the conspiracy count, all defendants seek acquittal on that count, or a new trial "in which the government is made to elect which conspiracy it will prosecute in Count 1." (Id. at 150.)

Multiple-object conspiracies are not duplicitous, as defendants recognize. Braverman v. United States, 317 U.S. 49, 54 (1942); United States v. Reyes, 930 F.2d 310, 312 (3d Cir. 1991). We ruled before trial, and confirm at this time, that in our view the fact that both prongs of Section 371 are charged in a single Count 1 of the indictment is proper and not duplicitous. (Tr. 213 at 58.) Although the parties have cited no Third Circuit precedent on point, the majority of

circuits reflect that position.  See United States v. Hauck, 980 F.2d 611, 615-16 (10th Cir. 1992);

United States v. Smith, 891 F.2d 703, 711-13 (9th Cir. 1989); United States v. Treadwell, 760

F.2d 327, 336 (D.C. Cir. 1985); United States v. Williams, 705 F.2d 603, 623-24 (2d Cir. 1983).

Defendants cite United States v. Minarek, 875 F.2d 1186 (6th Cir. 1989) for a contrary

suggestion (in dicta), which we decline to follow.  (Dkt. 635 at 144.)

It is also well-established that in a multiple-object conspiracy the verdict will stand, over

Fifth Amendment due process objections, if the evidence was sufficient as to any of the alleged

objects.  Griffin v. United States, 502 U.S. 46, 58-60 (1991) (applying Turner v. United States,

396 U.S. 398, 420 (1970) to multiple-object conspiracies); United States v. Conley, 92 F.3d 157,

163 (3d Cir. 1996).  The fact that the evidence as to the multiple charged objectives may overlap

does not make the charge duplicitous.  Cf. United States v. Golb, 69 F.3d 1417, 1425 (9th Cir.

1995) (joinder of charges against multiple defendants is particularly appropriate when the

charges involve substantially overlapping evidence).

The jury was properly instructed in this case that it was not necessary for the government

to prove that the alleged conspiracy had all of the five objectives, and that it was sufficient if the

proof showed a conspiracy having one of the alleged objectives.  (Dkt. 717 at 31.)  The jury was

instructed that it could consider all of the evidence, but that it must render individual verdicts on

each count as to each named defendant.  (Id. at 9-11.)  Special verdict forms were required to be

answered by the jury, stating whether or not they found that each defendant participated in the

conspiracy and if so, as to which specific objectives of the conspiracy.  (Dkt. 609; dkt. 610; dkt.

611; dkt. 612; dkt. 614.)

The jury found all five of the convicted defendants guilty as to the objective of conspiring to make false statements to federal agencies under 18 U.S.C. § 1001. (See n.64, supra.) Under Griffin, if supported by the evidence as to that objective, this finding alone is sufficient to uphold the convictions on Count 1. Griffin, 502 U.S. at 57. The jury also made detailed findings of participation by each of those defendants in at least one of the other alleged objectives. (See n.64, supra.) This Court reiterates its ruling denying the motion to dismiss Count 1 as duplicitous, and we find no prejudicial error in declining to sever or require election as defendants requested.

## VII.  DEFENDANTS' POINT VII:  "THE UNITED STATES FAILED TO PRODUCE SUFFICIENT EVIDENCE AND THE JURY'S VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE."

Briefs:  Def. Br. 470; Davidson Br. 471; Gov. Br. 510; Davidson Br. 573; Def. Br. 559; Gov. Br. 580; Def. Br. 635 at 150-232; Gov. Br. 641 at 126-186; Def. Br. 646 at 52-66; Gov. Br. 649; Def. Br. 650; Gov. Br. 653; Def. Br. 661; Gov. Br. 673.

### A.  Legal standards – motions for acquittal and new trial

Defendants moved for acquittal at the close of the government's case and at the close of the evidence, arguing insufficiency of evidence on certain counts. (Dkt. 470; dkt. 471; dkt. 559; tr. 457 at 3-61; tr. 557 at 5.) The Court reserved decision on the acquittal motions pursuant to Rule 29(b). Defendants move post-trial, pursuant to Rule 29(c)(2) and Rule 33, for judgment of acquittal or a new trial. (Dkt. 617; dkt. 618.) We will discuss the motions as to the substantive counts (Counts 2-34), and then the conspiracy count (Count 1).

Rule 29(c)(2) provides:  "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal." A district court ruling on a motion for acquittal pursuant to Rule 29 must "'review the record in the light most favorable to the prosecution to determine whether any

rational trier of fact could have found proof beyond a reasonable doubt based on the available evidence.'" United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002) (quoting United States v. Wolfe, 245 F.3d 257, 262 (3d Cir. 2001)).  A finding of insufficiency should be "'confined to cases where the prosecution's failure is clear.'"  Smith, 294 F.3d at 477 (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984).  The Rule 29 review of sufficiency of the evidence must "credit all reasonable inferences that support the verdict[ ]."  United States v. Perez, 280 F.3d 318, 342 (3d Cir.), cert. denied, 537 U.S. 859 (2002).  "Courts must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

Defendants made their motions for acquittal at the close of the government's case, pursuant to Rule 29(a).  (Dkt. 470; dkt. 471; tr. 457 at 3-8.)  Where, as here, the district court exercised its discretion to reserve on the motions pursuant to Rule 29(b) and proceed with the trial, the court is required to determine whether acquittal was appropriate based solely on the evidence presented by the government on its case in chief.  See Fed.R.Crim.P. 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.")  When the case is in this procedural posture, the court must "examine only the evidence presented in the government's case, which includes evidence elicited on cross-examination of the government witnesses, but not evidence presented in the defense case." Brodie, 403 F.3d at 133-34.

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  When the court evaluates a Rule 33

motion it does not view the evidence favorably to the government, but instead exercises its own judgment in assessing the government's case.  The court can order a new trial on the ground that the verdict is contrary to the weight of the evidence if it "believes that 'there is a serious danger that a miscarriage of justice has occurred -- that is, that an innocent person has been convicted.'" United States v. Brennan, 326 F.3d 176, 188 (3d Cir. 2003) (quoting United States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994) and United States v. Morales, 902 F.2d 604, 606 (7th Cir. 1990)). "Motions for a new trial based on the weight of the evidence are not favored.  Such motions are to be granted sparingly and only in exceptional cases."  Id.

**B.     Overview of manufacturing process and facilities**

Here we present a brief overview of the pipe manufacturing process that forms the background of this case, as described in the evidence.  At all relevant times, the Atlantic States facility was situated on approximately 33 acres in the municipality of Phillipsburg, New Jersey, less than a mile from the Delaware River.  Residences and other industrial and commercial facilities existed in that vicinity and in Easton, Pennsylvania, across the river.

The sole business of Atlantic States during the relevant period was as a foundry, manufacturing ductile iron pipe from scrap iron and steel.  The pipes were approximately 20 feet long and ranged in diameter from 6 to 24 inches.

The basic steps in the manufacturing process were:  Raw material and accessory supplies were melted at extremely high heat in a furnace called a cupola.  The molten iron would be poured into spinning molds to cast the pipes.  The pipes were sent through an annealing oven to make them ductile (able to bend up to 20 degrees).  After cooling, grinding and pressure testing, the pipes were lined with cement and then coated with black industrial paint.

132

The physical layout of the production areas of the plant was arranged according to the steps in the manufacturing process.  The main features of the production line were:  melting, casting, annealing oven, grinding, pressure testing, cement lining and painting.  Those areas are depicted in a schematic diagram in evidence.  (Gov. Ex. 1-013A.)  The finished product was shipped on order, to be used in water supply pipelines.

**C.      Substantive charges (Counts 2-34)**

The substantive charges may be summarized as follows:

| Charge | Defendants named | Statutory offense charged |
|---|---|---|
| Count 2 | Atl. States, Faubert | 18 U.S.C. § 1001 (false statement) |
| Count 3 | Atl. States, Maury | 18 U.S.C. § 1001 (false statement) |
| Count 4 | Atl. States, Davidson | 18 U.S.C. § 1001 (false statement) |
| Count 5 | Atl. States, Maury | 18 U.S.C. § 1001 (false statement) |
| [Count 6] | [not guilty verdicts] | [N.A.] |
| Count 7 | Atl. States, Faubert | 18 U.S.C. § 1001 (false statement) |
| Count 8 | Atl. States, Prisque | 18 U.S.C. § 1505 (obstruction/OSHA) |
| Count 9 | Atl. States, Prisque, Faubert, Maury | 18 U.S.C. § 1505 (obstruction/OSHA) |
| Count 10 | Atl. States, Prisque, Faubert | 18 U.S.C. § 1505 (obstruction/OSHA) |
| Count 11 | Atl. States, Prisque | 18 U.S.C. § 1519 (altering object with intent to obstruct OSHA) |
| Counts 12-26 | Atl. States, Davidson | 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A) (CWA felony violation, months Dec. '98 through Feb. '00, re: cement pit) |

133

| | | |
|---|---|---|
| Count 27 | Atl. States, Prisque, Maury, Davidson | 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A) (CWA felony violation re: 12-4/5-99 discharge) |
| Counts 28-33 | Atl. States, Maury | 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A) (CWA felony violation, months May '99 through Oct. '99, re: pit under machine #4) |
| Count 34 | Atl. States, Prisque [and acquitted def.] | 42 U.S.C. § 7413(c)(1) (CAA violation re: burning more than 55 gal./day waste paint) |

(Dkt. 711 at 34-48). Each substantive count also charged the aiding and abetting statute, 18

U.S.C. § 2. (Id.)

The verdicts on those charges, as to each defendant, were as follows:

    (1)  Atlantic States:    No verdict on Count 2.
                                  Not guilty on Count 6.
                                  **Guilty on Counts 3-5 and 7-34**.

    (2)  Prisque:    Not charged in Counts 2-7, 12-26, 28-33.
                                    Not guilty on Count 10.
                                    **Guilty on Counts 8, 9, 11 and 34**.
                                    Not guilty of felony CWA charge on Count 27;
                                      **guilty of lesser negligent offense under Count 27**.

    (3)  Faubert:    No verdict on Count 2.
                                    Not charged in Counts 3-6, 8, 11-34.
                                    **Guilty on Counts 7, 9, 10**.

    (4)  Maury:    Not charged in Counts 2, 4, 6-8, 10-26, 34.
                                    Not guilty on Count 5.
                                    **Guilty on Counts 9 and 28-33**.
                                    Not guilty of felony CWA charge on Count 27;
                                      **guilty of lesser negligent offense under Count 27**.

    (5)  Davidson:    Not charged in Counts 2, 3, 5-11, 28-34.
                                    **Guilty on Count 4**.
                                    Not guilty of felony CWA charges on Counts 12-27;
                                      **guilty of lesser negligent offense under Counts 12-27**.

(Dkt. 609; dkt. 610; dkt. 611; dkt. 612; dkt. 614; see chart n.4, supra.)

The following count-by-count review applies the standard for acquittal under Rule 29.[71]

The conclusion of this section addresses the standard for new trial under Rule 33.

**<u>Count 2</u>**

The text of Count 2 states:

> 1.  Paragraphs 1 through 16 of Count 1 [identifying the parties and describing the OSHA regulatory program] are hereby realleged ....

> 2.  On or about August 6, 1999, ... defendants Atlantic States... and Scott Faubert, in a matter within the jurisdiction of the United States Occupational Safety and Health Administration, an agency of the executive branch of the Government of the United States, did knowingly and willfully make a false and fictitious statement and representation, that is, defendant Scott Faubert stated to the OSHA inspectors:

>> That he was unaware of a pit excavated in the casting department that had collapsed onto an employee's leg;

> When in truth and in fact, as defendant Scott Faubert then well knew and believed, a large pit had recently been excavated in the casting department.

> In violation of Title 18, United States Code, Sections 1001 and 2.

(Dkt. 711 at 34 (bracketed material added).)   This conduct is also alleged in Count 1, Overt Act 59.  (<u>Id.</u> at 59.)

---

[71]  This count-by-count discussion will address each point raised by defendants concerning the insufficiency of the evidence to establish certain essential elements of the charged offenses.  If a particular element is not challenged as to sufficiency of the evidence, that element is not addressed here.  For example, under Count 3 defendants do not challenge the sufficiency of the evidence to establish the elements of materiality and federal jurisdiction, so they are not discussed here.  However, we have considered whether all essential elements of each charged offense were established by sufficient evidence and we find that they were, unless expressly held to the contrary in this opinion.  We have applied the beyond a reasonable doubt burden of proof to all of the elements of each offense.

The jury did not reach a verdict on this count.  (Dkt. 609; dkt. 611; dkt. 708; dkt. 709.) The defendants named in this count, Atlantic States and Scott Faubert, contend that the government's evidence was insufficient to establish that Faubert was aware of the existence of the excavation, or to establish that there had been a pit collapse or injury.  (Dkt. 635 at 218-19; dkt. 646 at 64.)  The government does not counter these contentions in its post-trial brief, which does oppose the Rule 29 motion on all of the counts of conviction.  (Dkt. 641 at 126-186.)  Since this part of the motion is unopposed and we find good cause, we hold that Count 2 is not supported by sufficient evidence and must be dismissed.

## Count 3

The text of Count 3 states:

1.  Paragraphs 1 through 8 and 17 through 21 of Count 1 [identifying the parties and describing the CWA regulatory program] are hereby realleged ....

2.  On or about February 24, 2000, ... defendants ATLANTIC STATES ... and JEFFREY MAURY, in a matter within the jurisdiction of the United States Environmental Protection Agency and the FBI, agencies of the executive branch of the Government of the United States, did knowingly and willfully make a false and fictitious statement and representation, that is, defendant JEFFREY MAURY Jeffrey Maury stated to a Special Investigator from New Jersey's Department of Law and Public Safety, Division of Criminal Justice, and a Special Agent from the Federal Bureau of Investigation:

That he believed the December 4-5, 1999 spill originated from an hydraulic line on a truck;

When in truth and in fact, as defendant JEFFREY MAURY then well knew and believed, the December 4 and 5 spill originated from the cement pit.

In violation of Title 18, United States Code, Sections 1001 and 2.

(Dkt. 711 at 35 (parenthetical material added).)[72]  This conduct is also alleged in Count 1, Overt Act 11.  (Id. at 17.)

The verdict found both named defendants guilty on Count 3.  (Dkt. 609; dkt. 612.)  They contend that the government's evidence was (1) at fatal variance with the charge because it does not establish that Maury made this statement; and (2) insufficient to show that he made the alleged statement with knowledge of falsity and intent to deceive.  (Dkt. 635 at 85-88; dkt. 646 at 60-61.)

There was evidence that Maury was interviewed during execution of a search warrant at Atlantic States on February 24, 2000, and during the course of that interview he made several oral statements.  The interviewer was Special Agent Christopher Fernicola of the New Jersey Department of Law and Public Safety, Division of Criminal Justice, accompanied by FBI agent James Spence.  Fernicola testified that the purpose of the interview was to determine the origin and who was responsible for the discharge that occurred in December, 1999.  (Tr. 322 at 7-9.)  This was a reference to an incident involving an 8½ mile oil sheen on the Delaware River that appeared on Sunday, December 5, 1999 ("the 12-4/5-99 discharge"), which was responded to by

---

[72]  The offense statute provides in pertinent part:

[W]hoever, in any matter within the jurisdiction of the executive ... branch of the Government of the United States, knowingly and willfully –

...
(2)  makes any materially false, fictitious, or fraudulent statement or representation;
...
[shall be guilty of this offense].

18 U.S.C. § 1001(a).  The essential elements and mens rea requirements are described in the jury instructions quoted supra, Sec. I.B and I.C.  An additional instruction on this statute was provided to the jury in response to a question during deliberations.  (See n.77, infra.)

emergency personnel from various agencies including the New Jersey Department of

Environmental Protection ("NJDEP").  That agency administers the CWA and CAA permit

programs in New Jersey, and the search warrant execution at Atlantic States on February 24,

2000 was part of the investigation of that discharge.  (See, e.g., tr. 261 at 60-61, 68-74; tr. 265 at

14-15.)  Fernicola did the interview and took notes, which he later summarized in a written

report.[73]

Agent Fernicola testified that during that interview Maury made the following statements,

inter alia.  Maury identified himself as the superintendent of maintenance, and stated that he had

left the Atlantic States facility ("the plant") around 7:00 p.m. on Dec. 4, 1999,[74] and at that time

there was no sign of leaks or discharges in the area supervised by Davidson.  (Tr. 322 at 10-11.)

Maury stated that between 2:00 and 3:00 in the afternoon on Sunday, December 5, 1999, he was

called by John Prisque to come to the facility for cleanup; that a discharge had occurred.  (Id. at

12.)  Maury said that he and Prisque (the plant manager) spent about six or seven hours cleaning

up the discharge, which was in the area of the storm drain, and that he did not call any of his 24

workers to come in and assist with the cleanup, not wanting to bother them on their day off.

When asked by Fernicola whether Maury knew where the oil came from, Maury "stated that he

thought it came from the hydraulic line on one of the SMP trucks."  (Id. at 13.)  The reference to

---

[73]  All of the statements attributed to the individual defendants convicted in the false
statement and obstruction counts were made orally to government inspectors or investigators.
None of those statements were tape recorded or reduced to written statements signed by the
defendants.  (See, e.g., tr. 322 at 44-49, 62; tr. 319 at 99-101.)

[74]  There may be a discrepancy in the date here, discussed in cross-examination of
Fernicola, which we do not find material to the issue of sufficiency of the evidence.  (See tr. 322
at 73-75.)

SMP trucks, according to Fernicola, was that Maury explained that there are three street sweepers

at the plant that dump waste in a containment area for removal by a company called SMP.  (Id. at

73.)  Fernicola described observing the demeanor of Maury at that point as "he was fidgeting in

his chair, wringing his hands.  He didn't look either one of us in the eye when talking to us."  (Id.

at 15.)[75]

The jury had this testimony to consider, in the context of much other evidence concerning

the observations of officials who responded to the spill on the river on December 5, 1999 (taking

---

[75] On cross-examination Fernicola further testified, with reference to a portion of his
written report (D-1463) as follows:

Q     And when you asked him if he knew the origin of the oil he said he had no idea,
        remember – see that?
A     Yes.
Q     And you asked if he had any investigation in the cause of the spill, he said he just
        wanted to clean it up, you see that in your report?
A     Yes.
....
Q     He was telling you that was his primary focus, was to ... get the area cleaned up,
        correct?
A     That's correct.
....
Q     He never said ... to you, did he, ... that he believe[d] that the December 4th-5th,
        1999 spill originated from a hydraulic line on a truck, he never said that to you,
        did he?
A     Yes, he did.
Q     – you said he – he didn't believe, he assumed that's what happened, he didn't
        know is what he told you, right?
A     He said he thought that it came from a hydraulic line --
Q     It wasn't the spill that came from a hydraulic line[,] it was the oil in the water,
        correct?
A     He said that it came from – that he thought that it came from a hydraulic line on a
        truck.

(Tr. 322 at 82-83.)  We excluded Fernicola's testimony concerning his opinion that Maury was
being untruthful, but we did not exclude his testimony concerning the statement and its context.
(See Sec. III, supra.)

samples at the river and tracing the spill back through the storm sewer system to the cement pit

area of the plant), and officials who took samples from the cement pit in Davidson's area on the

day of the search warrant execution, linking both sets of samples together.  (See dkt. 641 at 164-

65, listing citations.)  They also had the testimony of Jeffrey Hill, an investigator from the

NJDEP who participated in the search warrant execution on February 24, 2000, that when he

asked Prisque about the cause of the Dec. 4-5, 1999 discharge, "Mr. Prisque told us that the

incident was caused by a hole in the middle of the hose," referring to a sump pump hose used to

pump out the cement pit.  (Tr. 314 at 34-36.)  That conduct by Prisque was alleged in Count 1,

Overt Act 13 (dkt. 711 at 17), and is relevant to Count 3, but is not the subject of a separate

substantive count.[76]

   This Court concludes that the government's evidence on Count 3 was sufficient to

establish the essential elements of the offense charged in that count.[77]  In rendering the following

---

[76]  The evidence referred to in this paragraph is also relevant to Count 4, discussed infra.

[77]  During deliberations the jury asked:

> How closely do we have to adhere to the exact words of the indictment?
> Do we have to consider exact quotes?

(Dkt. 597.)  Defendants contended that because the alleged false statements were indented in the charging language of the indictment, they should be regarded as verbatim quotes.  We considered but rejected that argument.  In so ruling, we noted that although legal writing often employs that convention [indeed, as we do in this opinion], the language used in the false statement counts, read in context, indicated that it was not a verbatim quote; and observed that the false statement offense does not require such.  (Tr. 581 at 3-30.)  We responded to the jury in writing as follows:

> When considering whether certain statements were made by the
> defendants as alleged in the indictment, in all places where the indictment does
> not attribute words to a defendant in quotation marks, you should consider
> whether the evidence shows beyond a reasonable doubt that the defendant made a
> statement having the precise meaning described.

rulings as to Count 3, we expressly incorporate by reference the discussion of evidence under Counts 4 and 12-33, infra. Mr. Maury was present for many hours doing the initial cleanup on December 5, 1999, and had the opportunity to observe first-hand the extent and direction of the spill at the plant, and its location between the cement pit and the storm drain. He was also the superintendent of maintenance, and had knowledge of how the cement pit functioned. Based on the relevant evidence, we hold that a reasonable jury could find beyond a reasonable doubt that (1) Maury made the statement alleged in Count 3; and (2) the statement was knowingly false and made with intent to deceive. The jury could reasonably find that in answer to investigators asking him specifically what he knew about the 12-4/5-99 discharge, Maury stated that he believed that spill originated from a hydraulic line on a truck, as alleged in Count 3. The jury could also infer from the evidence that Maury knew that statement was false and that in fact the discharge "originated from the cement pit." (Dkt. 711 at 35.) The jury could further reasonably conclude that his false statement was made with the intent to deceive the investigators.

## Count 4

The text of Count 4 states:

1. Paragraphs 1 though 8 and 17 through 21 of Count 1 [identifying the parties and describing the CWA regulatory program] are realleged ....

2. On or about February 24, 2000, ... defendants ATLANTIC STATES ... and CRAIG DAVIDSON, in a matter within the jurisdiction of the United States

_____

The government does not have to prove that the defendant used the exact words alleged in the indictment, unless those words are in quotation marks in the indictment. However, if you find that the defendant made a statement that could reasonably mean something different than as alleged in the indictment, you must find that the defendant did not make the statement alleged.

(Dkt. 705.)

141

Environmental Protection Agency, an agency of the executive branch of the
Government of the United States, did knowingly and willfully make a false and
fictitious statement and representation, that is, defendant CRAIG DAVIDSON
stated to a Special Investigator from New Jersey's Department of Law and Public
Safety, Division of Criminal Justice and a NJDEP emergency responder:

> That the discharge on December 4 and 5, 1999, occurred because the
> outlet hose leading from the sump pump had a hole in the middle of it;

When in truth and in fact, as defendant CRAIG DAVIDSON then well knew and
believed, the December 4 and 5 discharge occurred as a result of the end of the
hose being used to direct liquid out of the cement pit.

> In violation of Title 18, United States Code, Sections 1001 and 2.

(Dkt. 711 at 36 (bracketed material added).)  This conduct is also alleged in Count 1, Overt Act

14.  (Id. at 17.)

The verdict found both named defendants guilty on Count 4.  (Dkt. 609; dkt. 614; see

chart n.4, supra.)  They contend that the government's evidence (1) was at fatal variance with the

charge because it does not establish that Davidson made this statement; (2) was insufficient to

show that he made the alleged statement with knowledge of falsity and intent to deceive; and (3)

did not show that the statement was made in a matter within the jurisdiction of the federal

executive branch.  (Dkt. 573; dkt. 635 at 188-190; dkt. 646 at 60-61.)

There was evidence that Davidson was interviewed during the search warrant execution

at Atlantic States on February 24, 2000.  The interviewer was Special Agent Jeffrey Hill of the

New Jersey Department of Law and Public Safety, Division of Criminal Justice, Environmental

Crimes Bureau, accompanied by NJDEP investigator Bruce Doyle.  (Tr. 265 at 37-38; tr. 314 at

5, 10-12, 84-86.)  Hill's main function was to lead the field entry team, which made notes and

took samples and photographs as directed by NJDEP investigators Bruce Doyle and Donald

Hirsch, among others.  (Id. at 20-23.)

By the time Hill interviewed Davidson, Hill had already observed areas of the plant including the cement pit and the nearby storm drains, noting that the cement pit on that morning contained large amounts of water upon which Hill observed dark fluid that he believed to be floating oil, and sampled for testing.  (Id. at 23-34, 39.)  Another investigator had observed a portable sump pump on the ledge alongside the cement pit, which was seized as evidence after Hill photographed it.  (Id. at 61-62.)  A third investigator had located a portion of red rubber hose in a nearby bin.  (Id. at 73-74.)[78]  Hill had that hose photographed where found.  (Id.)  Hill also placed, and photographed, the hose alongside the cement pit, because those two items appeared to fit together and the hose was long enough to reach into the cement pit.  (Id. at 75-84.)  Hill was introduced to Davidson by Hill's supervisor, Wayne Smith, after those steps of the search warrant execution had occurred.  Hill was instructed by Smith to interview Davidson.  (Id. at 84; tr. 319 at 176-80.)  Also present throughout the interview was NJDEP investigator Doyle.  (Tr. 314 at 86; tr. 265 at 37-38.)[79]  The interview pertained to the 12-4/5-99 discharge that was the

---

[78]  Hill's incident report and underlying handwritten notes described the open container in which the hose was found as a "dumpster."  He testified that although there was a large green industrial dumpster also in the vicinity, also shown in certain photographs, the hose was found, and photographed, in the smaller black bin that looked like a parts bin.  (See, e.g., tr. 314 at 74-75.)

[79]  Hill testified that he had 18 years of experience in the Criminal Justice Division, Environmental Crimes Unit, having previously also been an investigator in the NJDEP.  (Tr. 314 at 6-9.)  On the afternoon of Monday, December 6, 1999, Hill received a telephone call from NJDEP investigator Doyle, who informed Hill of the 12-4/5-99 discharge to which Doyle had been a first responder.  Hill made a report of that phone call, which resulted in the opening of a criminal investigation case file in the Criminal Justice Division.  The search warrant execution on 2-24-00 was part of that investigation.  Persons participating in the search warrant execution included Doyle and Hirsch from NJDEP, as well as FBI agents.  (Id. at 15-20.)

subject of the search warrant execution.  (Id. at 87.)[80]

Hill testified that during that interview Davidson made the following statements, inter alia.  Davidson was the finishing pipe superintendent, and one of the functions in that area of the plant was to line the newly-cast pipes with cement.  (Id. at 85.)  The cement pit was used to recycle solids and recycle the water used in the cement lining operation, by accumulating solids at the bottom of the pit.  Every couple of weeks the cement pit would be cleaned out.  There were three stationary circulatory pumps (also referred to as recirculatory pumps), used to pump the water out of the pit which was then stored in a large cylindrical tank.  The intakes of those circulatory pumps did not extend all the way to the bottom of the pit.  So the procedure was to use an electric sump pump, moving it around to catch the remaining water in the pit.  The outlet hose of that sump pump would be directed to a trough (also referred to as a trench) in the pit that led to the intakes of the circulatory pumps.  This was a "loop" system.  (Id.; tr. 319 at 182-87.)

Hill told Davidson during that interview that Hill and the persons with him were there because of a search warrant.  Hill asked Davidson to explain what he knew about the December, 1999 discharge incident.  (Tr. 314 at 86-87.)  Davidson made the following statements to Hill.  When Davidson came in on Monday, December 6, 1999, he found out that the sump pump was still in the pit.  (Id. at 88-89.)[81]  Davidson approached Maury and asked what happened over the

_____

[80]  The interviews of Maury and Davidson that form the basis of Counts 3 and 4 were not completed; each interview was terminated abruptly when they indicated they could not continue speaking with the agents.  (See, e.g., tr. 322 at 19-20; tr. 314 at 90.)  We do not consider that evidence in determining the sufficiency of the evidence to support these counts of conviction.

[81]  Witnesses testified that Monday, December 6, 1999 was the opening day of deer season, and a plant holiday.  (See n.123, infra.)  There may be a discrepancy in the date here, discussed in cross-examination of Hill, which we do not find material to the issue of sufficiency of the evidence.  (See tr. 319 at 107-09; tr. 320 at 43-44.)

weekend.  Maury told Davidson that there was an incident over the weekend; Maury was there;

and there was oil all over the place.  Maury did not explain to Davidson what had happened, just

that there was oil all over the place, and that Maury and the plant manager were working in the

pit over the weekend.  (Id. at 87-90.)  Hill testified:

> Q    Now, at the point that you were interviewing Mr. Davidson, had you
>       already found the sump pump adjacent to the pit?
>
> A    Yes, we did.
>
> Q    Did you ask him about the use of the sump pump?
>
> A    Yes, I asked him if the pump we had was the pump that was used on the
>       day of the incident.  He stated it was a good possibility.

(Id. at 85-86.)

> Q    Tell the jury exactly what Mr. Davidson told you that he, Mr. Davidson,
>       did on Monday, December 6th, 1999.
>
> A    He told me he went to look at the hose and he discovered that there was a
>       hole in the middle of it.
>
> Q    Investigator Hill, at that point, what were you talking about, what was the
>       subject matter of the conversation?
>
> A    Well he told me he'd looked at the pump, the sump pump, when he first
>       came in.  We were discussing the pump's operation, in the normal course
>       of operation.  I believe he was talking about the sump pump.

(Id. at 90.)  At that point the interview was terminated when Davidson's pager went off and he

did not submit to further interview.  (Id. at 90-91; see n.80, supra.)

This Court concludes that the government's evidence on Count 4 was sufficient to

establish the essential elements of the offense charged in that count.  In rendering these rulings as

to Count 4, we expressly incorporate by reference the discussion of evidence under Counts 3,

supra, and 12-33, infra.  First, we find that the jurisdictional element is met, because the statement was made in the presence of NJDEP inspector Bruce Doyle, and that agency has delegated regulatory authority under the CWA.  In this connection it is significant that the search warrant execution, while based on a state warrant, was part of the state investigation initiated to discover the cause of the 12-4/5-99 discharge that was within the Clean Water Act jurisdiction of the NJDEP.  (See n.73, supra and accompanying text.)  Next, we find that the evidence was sufficient to establish that Davidson made the statement alleged.  As we instructed the jury, that element does not require a verbatim quote, but it does require that the defendant made a statement having the precise meaning described and could not reasonably mean anything different than the alleged meaning.  (See n.77, supra.)

We hold that a reasonable jury could find that when the investigator asked Davidson what he knew about the cause of the 12-4/5-99 discharge and Davidson replied as he did, his statement had the precise meaning that "the discharge on December 4 and 5, 1999, occurred because the outlet hose leading from the sump pump had a hole in the middle of it."  (Dkt. 711 at 36.)  Finally, we hold that the evidence was sufficient to support a finding that although Davidson may not have had direct personal knowledge of the cause of the discharge in the sense of having been on-site when it happened, nevertheless by the time of the interview on February 24, 2000, he did know and believe that the discharge did not occur because of a hole in a sump pump hose, but rather occurred "as a result of the end of the hose being used to direct liquid out of the cement pit," and therefore the statement he made to Hill about the cause of the discharge was knowingly false and made with intent to deceive the investigators.  (Id.)

**Count 5**

The text of Count 5 states:

1.  Paragraphs 1 though 16 of Count 1 [identifying the parties and describing the OSHA regulatory program] are realleged ....

2.  On or about March 25, 2000, ... defendants ATLANTIC STATES ... and  JEFFREY MAURY, in a matter within the jurisdiction of the United States Occupational Safety and Health Administration, an agency of the executive branch of the Government of the United States, knowingly and willfully did make a materially false, fictitious, and fraudulent statement and representation and did make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, that is, defendant JEFFREY MAURY prepared a report that indicated:

The forklift involved in the fatality the day before was inspected and found to be in "perfect operating condition;"

When in truth and in fact, as defendant JEFFREY MAURY then well knew and believed, such forklift had several defects, including faulty brakes.

In violation of Title 18 United States Code, Sections 1001 and 2.

(Dkt. 711 at 37 (bracketed material added).)  This conduct is also alleged in Count 1, Overt Act 37.  (Id. at 22.)

The verdict found Atlantic States guilty on Count 5, but found defendant Maury not guilty on that count.  (Dkt. 609; dkt. 612.)  The Rule 29 motion for acquittal filed by defendants during trial is therefore moot as to defendant Maury on Count 5.  Defendant Atlantic States provides no argument in support of acquittal on this count in its post-trial briefing, except to contend that there is no supporting evidence for this and several related overt acts.  (See dkt. 635 at 197-208; dkt. 646 at 62.)

We conclude that the government's evidence on Count 5 was sufficient to establish the essential elements of the offense charged against Atlantic States.  This count relates to the OSHA

investigation of a fatal accident that occurred at approximately 6:00 a.m. on March 24, 2000,

when a supervisor was run over by a forklift operated by an employee.  The forklift was #24; the

forklift driver was a Mr. De Los Santos; and the decedent was Al Coxe ("Coxe fatality").  OSHA

safety compliance officer Carol Tiedeman was assigned to that investigation, which is further

described in the discussion of Counts 7, 9 and 10, infra.  As pertinent to Count 5, Ms. Tiedeman

testified that when she was at the plant on March 24, 2000, Mr. Faubert was the company person

assigned to speak with her.  (Tr. 424 at 93.)  During that visit, which lasted several hours, at one

point she suggested to Faubert that he have forklift #24 completely checked out before it was put

back into service, and he said he would do that.  (Id. at 111-12.)  When Ms. Tiedeman was back

at Atlantic States on April 7, 2000, continuing the Coxe investigation, Faubert provided her with

a document dated March 25, 2000 (the day after the fatality).  (Id. at 112-15.)

 The document stated, "[a]n inspection of forklift #24 was performed on Saturday, March

25, 2000 .... by Jeffrey Maury, Maintenance Superintendent, and James Yukna, Garage

Mechanic...."  (See Gov. Appendix 644 at 32 (Attachment U:  Gov. Exhibit 3-158).)  It contained

a checklist of items and findings, including brakes, lights and horn all "OK."  It concluded:

"The forklift was found to be in perfect operating condition.  Following this inspection and it's

[sic] findings, the forklift was allowed back into service."  (Id.)

 The government presented ample evidence that forklift #24 was not in proper working

condition either before or soon after the Coxe fatality.  (See dkt. 641 at 173-75, listing citations.)

The government presented no evidence that Maury himself prepared that document or delivered

it to OSHA.  However, it is clear that Faubert provided it to the investigators on behalf of his

employer, Atlantic States.  (Faubert was not charged in Count 5; see n.4, supra.)  We hold that

148

this evidence supported the finding of the jury that the statements made by Atlantic States in that

document, Government Exhibit 3-158, were knowingly false and were made with intent to

deceive the OSHA investigators.

## Count 6

As previously stated, the verdict acquitted the named defendants of the substantive

offense charged in Count 6.  (See nn. 4 & 6, supra and accompanying text.)

## Counts 7 & 10

The text of Count 7 states:

> 1.  Paragraphs 1 through 16 of Count 1 [identifying the parties and describing the OSHA regulatory program] are hereby realleged ....

> 2.  On or about May 11, 2000, ... defendants ATLANTIC STATES ... and SCOTT FAUBERT, in a matter within the jurisdiction of the United States Occupational Safety and Health Administration, an agency of the executive branch of the Government of the United States, did knowingly and willfully make a false and fictitious statement and representation, that is, defendant SCOTT FAUBERT stated to Occupational Safety and Health Administration inspectors:

>> That the reason why there was no entry on the OSHA 200 log concerning a April 27, 1999 incident was because employee "A" did not break his leg;

> When in truth and in fact, as defendant SCOTT FAUBERT then well knew and believed, employee "A" sustained a fractured bone in his leg on April 27, 1999, after being struck by a forklift.

> In violation of Title 18, United States Code, Sections 1001 and 2.

(Dkt. 711 at 39 (bracketed material added).)  This conduct is also alleged in Count 1, Overt Act

55, as further described in Overt Acts 53, 54 and 56.  (Id. at 27.)

The verdict found both named defendants guilty on Count 7.  (Dkt. 609; dkt. 611.)  They

contend that the government's evidence was insufficient to establish that (1) Faubert made the

alleged statement; and (2) the statement was false.  (See dkt. 635 at 212-215; dkt. 646 at 63-64.)

There was evidence that Faubert was interviewed by OSHA officer Carol Tiedeman on several dates in connection with the Coxe fatality. Those interviews began on the day of the event, March 24, 2000. (Tr. 424 at 94.) On that day, in response to Tiedeman's inquiries, Faubert advised her that the driver of the forklift, De Los Santos, had not received the forklift training that Atlantic States required for its forklift drivers. (Id. at 104; see also id. at 109-11.) Tiedeman asked Faubert to gather up the OSHA 200 logs ("OSHA log") of reportable injuries for 1998, 1999 and current to 2000, and other documents pertinent to her investigation. (Id. at 104.)

Tiedeman returned to the plant on April 7, 2000, and met with Faubert and his subordinate, Joe Maddock. (Id. at 106). By that time she had become aware of news articles covering the Coxe fatality, which were not described in her testimony except to say that "[a]t this point I had to take a look at whether there were any other possible accidents that this forklift driver had been involved with." (Id. at 105-06.) On that date she received the OSHA logs for the period she had requested, and took copies of those logs to her office to review. (Id. at 108-09.)

Tiedeman made a third visit to the plant on April 27, 2000. She and a colleague inspected forklifts and spoke with drivers. (Id. at 115-16.) She also asked Faubert and Maddock how long De Los Santos had been operating forklifts at the plant, and was informed that he had been driving a forklift for quite a few years before 1999, but had never received any training. (Id. at 117.) Before leaving on that date, Tiedeman asked Faubert whether De Los Santos had been involved in an accident previously in 1999, while he was driving a forklift. This was in reference to a news article that Tiedeman had reviewed. (Id.) She testified:

150

Q   Please tell the members of the jury about that.

A   Prior to leaving I asked Mr. Faubert about an accident that had occurred in
1999 that Mr. De Los Santos – while he was driving a forklift truck.  I
asked him if he had been involved in a previous forklift accident.  Mr.
Faubert looked at me, he chuckled, and said, yes, he backed up and hit a
supervisor and broke his leg.  So I asked well, when did that occur.  And
Mr. Faubert said he thought sometime in 1998, 1999.

(Id. at 118-19.)  She requested an accident report on that incident.  (Id. at 121.)

Tiedeman and a colleague returned to the plant on May 9, 2000, informing Faubert that

they were commencing a comprehensive safety and health inspection of the facility.  (Id. at 119-

21.)  While she was at the plant that week, on May 10 or 11, 2000, she was handed a document

by Faubert that was a statement by the supervisor who was struck by the forklift in the prior

incident involving De Los Santos.  (Id. at 121-22, 135; Gov. Exhibit JGM-5.)  The name of that

supervisor was Marchan,[82] and the date of his injury was in April, 1999.  (Id. at 122-23.)  There

was no corresponding entry reporting it in the 1999 OSHA log.  (Id.)  Referring to that written

statement handed to her by Faubert on or about May 11, 2000 ("the May 11 interview"),

Tiedeman testified:

Q   Did you read it when it was handed to you by Mr. Faubert?

A   Yes, I did.

Q   And after you read it did you have a conversation with Mr. Faubert about
this piece of paper?

A   Yes.  I asked him if this was all he had regarding the accident and he stated
yes, and after reading this I also asked him, well, didn't he break his leg?
And at that time Mr. Faubert said no, he didn't break his leg, he was back
to work that day.

---

[82] The name of this individual is Gabriel Marchan.  (See tr. 404 at 58.)  It is often
transcribed in the testimony as "Marchand."

....
Q    Is there an entry on the OSHA 200 log that you were given by the company on April 7, 2000 that corresponds to the date of this occurrence April 28th 1999[83] concerning Mr. Marchand's injury?

A    It's not even on the log at all.

Q    What did you say to him?

A    Well, I asked him why it wasn't on the log and he had said – he had made that statement that he didn't break his leg, that he came back to work the next day.

(Id. at 122-23.)

Tiedeman and her colleague interviewed Mr. Marchan on July 24, 2000, in the presence of Faubert.  (Id. at 135-36.)  That interview is the topic of Count 10, discussed infra.  During that interview, according to Tiedeman, Marchan stated that the forklift struck him, it went over his foot, and he fell down and it went over his leg.  When the agents asked Marchan whether he had fractured his leg, he said no; he only had a scratch and a bruise.  (Id. at 136.)  In fact (although then unknown to Tiedeman), Marchan's forklift injuries that day were treated at the local hospital emergency room by Dr. Reid, an orthopedic surgeon.  (Tr. 400 at 92.)  Dr. Reid diagnosed soft tissue injuries to both legs, and a non-displaced fracture of the right ankle cuboid bone that went all the way through the bone.  (Id. at 93-95, 114.)  Reid treated that injury by immobilizing the right lower leg first in a splint for one week (until swelling went down) and then in a knee-high cast for four to five more weeks.  (Id. at 96-104, 118.)  At the emergency room, after the splint was applied and a narcotic pain reliever administered, Reid placed Marchan on crutches and

---

[83]  The incident involving the forklift injury of Mr. Marchan by driver De Los Santos is referred to in the testimony variously as having occurred on April 27, 1999 or April 28, 1999. (See, e.g., tr. 424 at 123, 135, 143.)  In fact it occurred on April 27, 1999.  (See tr. 400 at 92-93.) We do not find that discrepancy material.

instructed him to avoid bearing weight on the right lower extremity, to elevate the leg, and to return for an office visit the following week.  Reid's impression at that time was that Marchan was not going to be working.  (Id. at 96-104, 118.)  When the cast was removed after five weeks of immobilization, Reid recommended that Marchan be weaned off his crutches and "have approximately two weeks to learn how to walk before he had to go back to regular duty," referring to his regular job.  (Id. at 104.)

        Dr. Reid described the cuboid bone as follows:

> Q     Can you explain to the jury what is the cuboid bone?
>
> A     The cuboid bone is the bone just beyond the outer bump that you can see on your ankle.  I can show you where that is if you would like.
>
> Q     Sure, if you would like to show us your ankle.
>
> A     It's the outer bone of the ankle that I'm talking about, and the cuboid is the next bone down.

(Id. at 95.)  On cross-examination he further testified:

> Q     Whether in a medical sense you have a common everyday laymen's sense, ... you would not describe that injury as a broken leg, would you?
>
> A     I would not.
>
> Q     That's just not what's broken, obviously.  The leg stops someplace above that ankle and however that's another semantic question.
>
> A     That's correct.
>
> Q     But that cuboid bone certainly isn't even a part really of the ankle bone, it's kind of a foot bone ...?
> ....
> A     What I want to clarify is that the cuboid, it is a bone of the foot.  It's one of the major architectural bones of the foot.  But, the ligaments of the ankle on the outer aspect, that bump on the outside of the ankle, two of them are connected there.

153

> Q      Everything's sort of connected together[?]
>
> A      Everything's connected to everything.  It's certainly considered part of the foot and I think it's definitely considered part of the ankle.
>
> Q      But you would never describe that injury as a  broken leg if you were talking to a layman, would you?
>
> A      I would not use those terms.

(Id. at 119-20.)

Tiedeman further testified regarding her interview of Marchan, in the presence of

Faubert on July 24, 2000:

> Q      Ms. Tiedeman, do you recall when he told you that his leg wasn't fractured, what was the significance to you?
>
> A      Well, he's telling us that the leg wasn't fractured.  But if there is a fracture it has to be put on the OSHA log.  It's a recordable injury.
>
> Q      Now, if Mr. Marchand suffered a fractured ankle would that have to be put on the OSHA 200 log?
>
> A      Yes.
>
> Q      If he suffered a fractured foot would that have to be put on the OSHA 200 log?
>
> A      Yes.

(Tr. 424 at 137.)

Tiedeman and her colleague also conducted a lengthy interview of Faubert and his

subordinate, Joe Maddock, on July 24, 2000, after the interview with Marchan.  (Id. at 137-39.)

Maddock stated he was the person responsible for filling out the OSHA log and signing it at the

end of the year to certify the contents.  (Id. at 140).  The purpose of that interview was to

determine Maddock's knowledge of the OSHA log.  As during the interview of Marchan, Faubert

was in the room throughout that interview, and personally responded to some of the questions.

(Id. at 138-40.)  Maddock signed and certified the 1999 OSHA log, which contained no entries

for the month of April, 1999 (when the incident involving Marchan and the De Los Santos-

driven forklift occurred).  (Id. at 142-43.)  Tiedeman showed Maddock the statement by Marchan

that she had previously received from Faubert.  Maddock said he did not think he, Maddock, was

there the day of the Marchan incident.  (Id. at 143-44.)[84]  Tiedeman asked Maddock what

Marchan's injuries were, and whether he went to see a doctor.  Faubert, not Maddock, responded.

(Id. at 146.)  Faubert stated that he was there that day and he sent Marchan to the doctor just to be

on the safe side.  (Id. at 146.)  Maddock had indicated during that interview that he knew what a

lost time injury and a work restricted injury was, for OSHA log reporting purposes.[85]  (Id. at 141-

42.)  Maddock had also stated that he made the determination whether an injury should be

reported in the OSHA log based on a first aid log that the company also maintained.  (Id. at 140-

41.)  Tiedeman testified:

> Q      Now, did you ask Mr. Maddock whether the employee, namely Mr.
>        Marchan lost any time from work, either lost time or work restricted?
>
> A      Yes, I did.

---

[84]  Marchan testified that it was Maddock who took him to the hospital for treatment of his forklift injuries that day; then brought him back to the plant; then assigned him to sit in a chair and do painting from a bucket, despite his entreaties to both Maddock and Faubert to be allowed to go home because of the pain.  (Tr. 404 at 88-91.)  On the ensuing days he was brought to work by an employee who picked him up at home.  (Id. at 91-94.)

[85]  A lost time injury, for OSHA reporting purposes, is when somebody receives more than first aid and loses time from work.  (Tr. 424 at 154.)  Work restricted duty, also reportable, is also documented in company records.  (See id. at 156.)  Tiedeman later reviewed subpoenaed company records, which indicated that Marchan had been on restricted duty for 44 days following that forklift injury.  (Id. at 156.)

Q        And what response did you get?

A        Actually, it was Mr. Faubert who answered.  He said that he wasn't treated
         here so there was no entry made on the first aid log.[86]

Q        And did you ask a follow-up question to Mr. Faubert?

A        At that point ... I asked Mr. Faubert basically what gives?  You know, one
         day you tell me that the guy breaks his leg and the next day you tell me he
         doesn't break his leg.  What's the story?  Mr. Faubert gave no response.

(Id. at 146.)

Defendants contend that this evidence was not sufficient to establish that during the May

11, 2000 interview by Tiedeman, Faubert made a statement having the precise meaning set forth

in Count 7, "[t]hat the reason why there was no entry on the OSHA 200 log concerning a April

27, 1999 incident was because employee "A" did not break his leg."  (Dkt. 711 at 39; see dkt. 635

at 212-13.)  We find that the evidence was sufficient to support a finding that when Tiedeman

asked Faubert during the May 11 interview why there was no entry of the Marchan injury on the

1999 OSHA log, and he responded that Marchan did not break his leg, the statement meant that

the reason the injury was not on the log was because Marchan did not break his leg.  Therefore,

we find the evidence sufficient to establish that Faubert made the statement alleged.

Defendants also contend that the alleged statement was not false because Marchan in fact

did not break his leg; he broke the cuboid bone in his foot.  (See dkt. 635 at 213-15.)  We find that

a reasonable jury could conclude from the evidence that Faubert knew Marchan had sustained a

fracture in his right lower extremity as a result of the injuries to his legs in the forklift incident,

---

[86] This reference to the company first aid log by Faubert, during the July 24, 2000
interview, is not to be confused with the explicit reference to the required OSHA log that was the
topic of Tiedeman's questions to Faubert during the May 11 interview.  It is the May 11
interview that is the basis of the false statement allegations in Count 7.

and that the semantic distinction between "leg" and "foot" is not significant in this context.  We

further conclude that a reasonable jury could conclude that if Faubert said Marchan did not break

his "leg," and Faubert thereby meant to obscure the fact that the fracture was actually to a bone in

the foot (which is, after all, part of the leg), such a half-truth was materially false.  Under either

view, a reasonable jury could conclude that the false statement was made with the intent to

deceive the OSHA officers who were seeking facts relevant to the Coxe fatality.

*     *     *

We address Count 10 at this point because it is part of the series of events described in

Count 7, supra, and the parties address them together.  (See dkt. 635 at 212-215; dkt. 641 at 178-

80; dkt. 646 at 63-64.)  The text of Count 10 states in pertinent part:

> 1.  Paragraphs 1 through 16 of Count 1 ... are hereby realleged ....
>
> 2.  On or about July 24, 2000, ... defendants ATLANTIC STATES ...,
> JOHN PRISQUE, and SCOTT FAUBERT, did corruptly obstruct, impede, and
> endeavor to obstruct and impede, the due and proper administration of the law
> under which a pending proceeding was being had before [OSHA] ..., by
> instructing employee "A" to falsely inform the [OSHA] inspectors that his leg had
> not been broken when he had been struck by a forklift on April 27, 1999.
>
> In violation of Title 18, United States Code, Sections 1505 and 2.

(Dkt. 711 at 42.)[87]  This conduct is also alleged in Count 1, Overt Act 56, as further described in

---

[87]  The offense statute provides in pertinent part:

> Whoever corruptly, or by threats or force, or by any threatening letter or
> communication influences, obstructs, or impedes or endeavors to influence,
> obstruct, or impede the due and proper administration of the law under which any
> pending proceeding is being had before any department or agency of the United
> States, ... --
>
> [shall be guilty of this offense].

18 U.S.C. § 1505.  The essential elements are described in the jury instructions quoted supra,
Sec. I.

Overt Acts 53-55.  (<u>Id.</u> at 27.)

The verdict found defendants Atlantic States and Faubert guilty on Count 10.  (Dkt. 609; dkt. 611.)  It found defendant Prisque not guilty on Count 10.  (Dkt. 610.)  The Rule 29 motion for acquittal filed by defendants during trial is therefore moot as to defendant Prisque on Count 10.  The defendants convicted on this count, Atlantic States and Faubert, contend that the government's evidence was insufficient to establish this offense because Marchan's leg was not broken.  (Dkt. 635 at 215.)  They contend that without this evidence, the government failed to prove that they obstructed OSHA as alleged in Count 10.  (Dkt. 646 at 63-64.)

We find that the evidence is sufficient as to Count 10.  As we have concluded in the discussion of Count 7, <u>supra</u>, the distinction between "leg" and "foot" does not invalidate the evidence the government presented as to the nature of the fracture that Marchan did in fact suffer in that forklift incident.  Further, Marchan testified that before OSHA interviewed him about that incident, he was in Faubert's office.  (Tr. 404 at 94-95.)  Faubert told him not to tell the persons who were going to speak with him that his foot was broken; to say that it was only a couple of scratches.  (<u>Id.</u> at 95.)  Faubert told Marchan that he had to say that or Marchan would lose his job.  (<u>Id.</u> at 96.)  Marchan testified that he was then taken to a basement office where a male and a female asked him questions about his injury, with Faubert present.  (<u>Id.</u> at 97.)  Marchan testified that he told the visitors that nothing was wrong, and nothing was broken.  (<u>Id.</u>)  That, according to Marchan, was a lie that he told because he was afraid of losing his job.  (<u>Id.</u> at 97-

98.)[88]  We conclude that the evidence presented by the government relevant to Count 10 was

sufficient to support the verdicts of guilty on Count 10.

## Count 8

The text of Count 8 states in pertinent part:

1. Paragraphs 1 through 16 of Count 1 are hereby realleged ....

2. In or about July 1999, ... defendants ATLANTIC STATES ... and
JOHN PRISQUE did corruptly obstruct, impede, and endeavor to obstruct and
impede, the due and proper administration of the law under which a pending
proceeding was being had before [OSHA] ..., by instructing employee "B" to
falsely inform the [OSHA] inspectors that the saw safety shield had not been
changed since the June 25, 1999 incident in which an employee sustained a
fractured skull and lost an eye when a saw blade broke apart, when, in fact, a steel
wire screen had been added to the shield after the incident.

In violation of Title 8, United States Code, Sections 1505 and 2.

(Dkt. 711 at 40.)  This conduct is also alleged in Count 1, Overt Act 58.  (Id. at 28.)  Related

conduct is also alleged in Overt Act 57.  (Id. at 27.)

The verdict found both named defendants guilty on Count 8.  (Dkt. 609; dkt. 610.)  They

contend that the government's evidence was insufficient to establish that Prisque gave such an

instruction to the employee.  (Dkt. 635 at 217-18; dkt. 646 at 64.)

Count 8 relates to the OSHA investigation of an incident that occurred during production

at about noon on June 25, 1999.  An employee named Robert Owens sustained injuries including

a fractured skull, shattered nose and loss of an eye while operating "cut off saw" machinery,

---

[88]  Marchan further testified that when he and Faubert emerged from Faubert's office on
the way to the basement room where the interview took place that day, Prisque was in the hall
right outside Faubert's office.  Prisque asked Marchan if he had already talked to Faubert, and
Marchan replied yes.  According to Marchan, Prisque then told him don't say anything and if you
don't want to give too many explanations just say you don't know English.  Finally, Prisque
made a gesture to Marchan, pointing a finger vertically against his lips.  (Tr. 404 at 96-97.)

when a rotating saw blade broke off and part of it struck his head.  (Tr. 337 at 36-46, 55-58; tr. 346 at 109-10.)  At the time, Owens was functioning as "relief man" on the pipe finishing line, performing the duties at various production line stations while laborers assigned to those stations were taking their breaks.  (Tr. 326 at 148-150, 156; tr. 337 at 36.)  The cut saw operator whom Owens relieved that day was Isabel Marchand-Mendoza.  (Tr. 337 at 12, 40; tr. 332 at 32-34.)[89]

OSHA compliance officer Alex Salerno was assigned to investigate the Owens incident. (Tr. 346 at 98-102.)  His first visit to the plant on that investigation was on or about July 10, 1999.  (Id. at 104-05.)[90]  After he had been there for approximately two hours, including an opening conference in the plant office with Mr. Faubert and others, Salerno was escorted by Faubert to the area where the injury occurred.  (Id. at 105-12.)  He observed there, and photographed, an operator at the cut saw machine station, standing on a platform behind a red wooden sliding shield while he made cuts in a pipe with the saw.  (Id. at 112-17.)  Faubert explained that that shield served as a secondary guard for the operator.  (Id. at 121.)  Salerno observed that the red wooden shield appeared to be newly constructed (id. at 117), and it consisted of plexiglas in combination with a wire screen.  (Id. at 122-23.)  He asked Faubert how long the shield had been in that condition, and Faubert said 16 years.  (Id. at 123.)  Salerno then

---

[89]  Isabel Marchand-Mendoza, designated as "Employee B" in Count 8, is the brother of Gabriel Marchan, the person designated as Employee A" in Counts 7 and 10.  (Tr. 334 at 97-98.) We will refer to Isabel as "Marchand-Mendoza," although variations of his name are found in the testimony.  The identity of each brother was clear throughout the evidence.

[90]  OSHA received notification of the Owens incident on July 9, 1999, from Mrs. Owens. (Tr. 346 at 104.)  Salerno stated on cross-examination that Atlantic States was not obliged to contact OSHA when it happened, because it did not involve a fatality or a multiple-worker injury situation.  It was a reportable injury that would have to be shown in the required OSHA logs. (Tr. 351 at 6.)

spoke with the operator, in the presence of Faubert, asking how long the shield – the plexiglas and metal combination – had been in place, and he said 10 years.  (Id. at 124-25, 128; see also tr. 334 at 40-41, 208.)

Salerno testified that if the wooden shield had been changed in any way since the Owens incident three weeks previously, he would absolutely have wanted to know that information, because it would not depict what had happened on the day of the accident.  Secondarily, he would want to know if the mesh screen was in place with the plexiglas at the time.  (Tr. 346 at 129.)  The latter point related to the evaluation OSHA was making as to the adequacy of all safety features at the cut saw station, including the wooden frame shield with its wire mesh screen.  (Id. at 145-54.)

Isabel Marchand-Mendoza testified that he was the cut saw operator on the day of the Owens incident, and at that time there was no wire mesh on the sliding shield, which was also called a window.  (Tr. 332 at 15, 32-34.)  He stated that a few days later a plant carpenter placed the wire mesh on the shield, attached with staples and nails.  (Id. at 15-16, 35.)  Referring to Prisque and the metal mesh on the shield, he described a conversation Prisque initiated with him as follows:

> A      [H]e went by the saw and – and he told me that – if that then it was working right.  I said, "Yes, it's not working right, but it's there.  It was always there, and ... he told me a couple of times it was over there.  I said, "No, they just put it on, but it makes it worse because I can't see it and I can't clean it with the metal on it.  I can't clean it.  All I can do is spray water (indiscernible).  He said, "It was always there," and I say, "Yeah."  I said, "No, they just put it on.  I can't see – ."
>
> COURT:  Put what on?
>
> THE WITNESS:  The saw – the metal.

161

Q      And what did it mean to you that he kept repeating to you that the mesh had always been there?

....

A      I guess that if somebody asked me if that – the metal was there, the extended metal was there, I was supposed to say yes.

Q      Did you agree to say that?

A      Yes.

Q      And why was that?

A      I wanted to keep my job.  I've got to put food on the table.

(Id. at 36-38; see also tr. 334 at 208-09.)  Marchand-Mendoza further testified:

Q      Now after that conversation, did OSHA actually come to inspect the cutoff saw?

A      I think they did walk by, yeah.

....

Q      What did the inspector ask you?

A      They asked me about the window and if it was like that when – if it's always been like that.  I said, "Yes."

Q      What do you mean, "Always been like that?"

A      Always been like that with the metal on and the back splash on it and everything – the way you see it on the picture.

Q      And you said what to them?

A      "Yes, it was like that."

Q      Was that truthful?

A      No.

(Tr. 332 at 38-39.)

162

Robert Owens similarly testified that there was no wire mesh screen on the plexiglas shield on the day of his injury.  (Tr. 337 at 40.)[91]  Robert Rush, who was a worker on the finishing line at that time and later promoted to foreman, testified to the same effect.  (Tr. 294 at 7-11.)

We find that the evidence was sufficient for a reasonable jury to find that Prisque did instruct Marchand-Mendoza "to falsely inform the [OSHA] inspectors that the saw safety shield had not been changed since [the Owens incident], when in fact, a steel wire screen had been added to the shield after the accident."  (Dkt. 711 at 40.)  Such conduct would meet the statutory standard for the charged offense of obstruction of OSHA under 18 U.S.C. § 1505.  (See Sec. I.B., supra.)  Accordingly, we find that the verdicts of conviction on Count 8 are supported by sufficient evidence.

### Count 9

The text of Count 9 states in pertinent part:

1.  Paragraphs 1 through 16 of Count 1 are hereby realleged ....

2.  Between on or about March 24, 2000, and on or about March 25, 2000, ... defendants ATLANTIC STATES ..., JOHN PRISQUE, SCOTT FAUBERT, and JEFFREY MAURY, did corruptly obstruct, impede, and endeavor to obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before [OSHA] ..., by taking steps to conceal facts regarding the forklift fatality on March 24, 2000 from [OSHA] inspectors.

In violation of Title 18, United States Code, Sections 1505 and 2.

---

[91]  Salerno testified that his investigation determined that at the time of the Owens injury the sliding shield was not closed.  (Tr. 351 at 51-53.)  That did not affect Salerno's view of the significance of the information he was seeking concerning the safety features of the cut saw station, including the shield, at the time of the injury.  (Tr. 346 at 129, 145-54; see also tr. 334 at 205-07.)

(Dkt. 711 at 41.)  This conduct is also alleged in Count 1, Overt Act 34, which specifies that the conduct was "causing the forklift's brakes, which were known to leak brake fluid, to be repaired before the OSHA inspector inspected it."  (Id. at 22.)  Related conduct is also alleged in Count 1, Overt Acts 29-33, 35-40.  (Id. at 21-23.)

The verdict found all named defendants guilty on Count 9.  (Dkt. 609; dkt. 610; dkt. 611; dkt. 612.)  They contend that the government's evidence was insufficient to establish that anyone actually fixed or tampered with the brakes before OSHA inspected, or if so that Faubert (who was present for the OSHA inspection) knew about it.  (Dkt. 635 at 203-05; dkt. 646 at 62.)

Count 9, along with Counts 7 and 10 discussed above, relates to the OSHA investigation of the fatal incident involving day shift foreman Alfred Coxe that occurred at approximately 6:00 a.m. on March 24, 2000.  The incident involved forklift #24, driven by De Los Santos.  (Tr. 424 at 94, 100, 113.)  It was stipulated at trial that the cause of Coxe's death was injuries sustained as a result of being run over by the forklift.  (Tr. 451 at 64.)  At that time Prisque was the plant manager, Faubert was head of human resources, and Maury was maintenance superintendent. (See tr. 416 at 16-18; tr. 424 at 93, 113.)  They were among the group of managers that had "white shirt" status at the plant.  (See n.102, infra.)  All three of them were alerted and were at the scene able to see Coxe's grave condition while he was still pinned under the forklift in the moments immediately after he was run over, and when he was extricated and emergency personnel and police arrived.  (Tr. 416 at 35-38.)  Another "white shirt" immediately at the scene was George Shepherd, general electrical foreman, who had been walking along with Coxe in the roadway moments before the incident occurred, and ran back outside when he heard the driver

screaming.  (Id. at 6-9, 34-35.)  There were no eyewitnesses to the incident itself.[92]

OSHA safety compliance officer Carol Tiedeman was assigned to that investigation, discussed supra.  As pertinent to Count 9, Ms. Tiedeman testified that when she arrived at work on March 24, 2000, her supervisor handed her an accident report based on a phone call OSHA had received regarding a fatality that had occurred at Atlantic States.  This was her first visit to the facility, although she had worked for OSHA for over 20 years at that time.  She promptly gathered necessary materials and drove approximately one to one and a half hours, arriving at the plant at approximately 10:30 a.m.  (Id. at 92-93.)

Tiedeman walked into the main entrance, explained who she was and why she was there, and asked to speak with someone in charge.  Faubert was brought out to speak with her.  She spent less than 30 minutes speaking with him initially, to get general information about the company and about the incident.  She learned that the name of the person who was killed was Alfred Coxe, and that he was crossing a roadway and was struck by a forklift driven by De Los Santos, that ran over him.  (Id. at 93-94.)  After that initial conversation, she asked to be taken out to where the actual fatality occurred.

Faubert led Tiedeman to the location in the roadway between an administration building, some water towers, and a production building where the incident occurred.  She asked Faubert to describe the specific location of the incident and he pointed, telling her which direction Coxe came from and which direction the forklift was going.  (Id. at 96-98.)  She took photographs at

---

[92]  The driver, De Los Santos, was not called as a witness at trial.  His statements to police concerning the cause of the incident were inconsistent.  The fact that he was not trained or certified to drive a forklift also came to light in the OSHA investigation, and was the subject of some of Tiedeman's discussions with Faubert.  (See tr. 424 at 104, 109-11, 116-18.)

the scene, but she noticed that by the time she arrived and was taken out to the roadway, a street

sweeping machine was going up and down the roadway.  (Id. at 99.)  She asked Faubert where

the forklift was, and he told her it was down at the maintenance shop.  She asked him to bring it

up to the area of the incident so that she could inspect it.  (Id.)  At one point the medical

examiner arrived, and a detective named Barsony from the county Prosecutor's Office.  (Id.)

Tiedeman first saw the forklift after it had been brought to the area of the incident and

parked in front of the administrative building on the side of the roadway.  She did not recall who

brought it there.  (Id. at 102.)  She photographed it at that location.  (Id. at 99-101.)  Tiedeman

asked Faubert if anyone had touched the forklift, and his response was no.  (Id. at 101-02.)  She

asked Faubert to drive it and step on the brake.  She testified:

> Q    [C]an you describe ... what you observed?
>
> A    Mr. Faubert backed the forklift truck out of this area and across the
>      roadway just drove it, I don't really know how long, in a straight line and
>      stepped on the brake and the forklift stopped.
>
> Q    Did it appear to have difficulty stopping?
>
> A    No, it stopped pretty quickly.
>
> Q    Did you ask him to do anything else relative to the forklift?
>
> A    I had him check the horn and the lights, and they were working.

(Id. at 103.)

Tiedeman spent a total of about 3½ hours at the plant on that first day of the OSHA

investigation of the Coxe fatality, having conversations, taking notes, and taking photos.  Before

she left, she asked Faubert to gather documents including any inspection sheets for the forklift

trucks.  (Id. at 104.)  She also suggested to Faubert that he have the forklift completely checked

166

out before it would be put back into service.  (Id. at 111.)  The latter subject is the basis of Count

5, discussed supra.

Tiedeman visited Atlantic States again on April 7, 2000, and met with Faubert and

Maddock together, as described in the discussion of Count 7, supra.  One of the topics was the

training of forklift drivers.  Faubert and Maddock described the forklift training and certification

procedures in effect for all forklift drivers, which Faubert had previously acknowledged De Los

Santos had not received.  Tiedeman learned in that discussion that the procedures included a

written test and road test that included an obstacle course.  They told her that Maddock usually

administered the road test, but sometimes Faubert did.  (Id. at 109-11.)  It was also on that date

that Faubert handed her the document described in Count 5, stating that Maury and garage

mechanic Yukna had inspected forklift #24 on Saturday, March 25, 2000 (the day after the

fatality), and found it to be in "perfect operating condition" before it was allowed back into

service.  (Id. at 112-115.)

Tiedeman and OSHA colleagues made several more visits to the plant during the Coxe

investigation, gathering and reviewing documents and interviewing forklift drivers while

photographing defects observed in forklift #24 and other forklifts in service on those dates.  (Id.

at 115-16, 119-20, 128-35.)  She learned that drivers were supposed to fill in a drivers daily

checklist whenever they used a forklift.  She reviewed numerous checklists for forklift #24, both

before and after the date of the Coxe fatality, indicating that it had defects including horn not

working, leaks, and particularly that the brakes needed work.  (Id. at 157-60.)  The very morning

of the Coxe fatality, forklift #24 had been driven on the prior shift by David Chase the oiler, until

2:30 a.m., less than four hours before the incident.  The checklist that he filled out reported that

the headlights and warning light were not working, and the brakes were defective.  (Tr. 351 at 175.)  By Monday, March 27, 2000, three days after the incident and two days after Maury was represented to have inspected it and found it in perfect condition, Chase was again documenting serious defects including "bad brakes."  (Id. at 180.)  The repair history of forklift #24, as documented by the sole forklift mechanic, James Yukna, shows no work done on its brakes or lights during the weeks before the incident, despite numerous checklists noting the problems.  The defect and maintenance history of forklift #24, before and following the Coxe incident, is summarized in Government Exhibit 3-300 and in the underlying business records in evidence.

On July 24, 2000, after reviewing an enormous number of daily checklists for all the forklifts, all shifts, showing defects on almost every forklift, Tiedeman interviewed Maury, the maintenance superintendent, who had been identified as the inspector in the document handed to Tiedeman asserting that on the day after the Coxe fatality forklift #24 was in "perfect operating condition."  She asked Maury why the forklifts at the plant were being used with those numerous documented defects.  He replied that just because a driver filled out a checklist did not mean that the driver took that forklift and drove it.  Tiedeman then asked him where would be the checklist for the forklift that the driver did drive if he rejected the one he documented as defective, and Maury provided no response.  (Id. at 160-62.)

The government presented testimony from several workers attesting to the poor condition of the forklifts used at the plant, typically having defects including bad brakes, no headlights, no warning lights, oil leaks, and forks that fell off.  The workers were forced to drive the forklifts in that condition, on threat of being fired.  The workers would cope by methods such as bringing their own brake fluid to add to leaking brake systems, and learning how to stop a forklift by

168

dropping the load it was carrying or putting it into reverse gear.  (See dkt. 641 at 173, listing

citations.)

George Shepherd, the general electrical foreman and a "white shirt," testified that Prisque

was at the scene while Coxe was still under the forklift, directing workers to get back inside and

keep working.  That was necessary because at that point in the daily production, the molten iron

was flowing and had to be tended.  Shepherd himself, as electrical foreman, was going in and out

of the plant for that purpose as well.  Faubert and Maury were also at the scene before Coxe was

pulled out from under the forklift, even before the medics and police arrived.  (Tr. 416 at 34-39.)

Shepherd was interviewed at the scene by the police, because he was the last person with Coxe

before the incident.  He testified that after the police left, the following occurred:

> Q       After the police left what happened?
>
> A       Well, we got everybody to go back to work, all the maintenance and all
>         that.  We had to get everybody back to work.  Trying to get, you you,
>         resume production.
>
>                 The forklift was just sitting there, and it was in – next to the main –
>         that's a roadway where they take pipes back and forth, pour the molds, to
>         get back into the plant.  And John told Jeff to tell to take the forklift down
>         to the garage and have the mechanic go over it.  So, Jeff come up.  And I
>         says, "Yeah, I heard him.  I'll take it down to the garage, and I'll tell them
>         to look at the forklift."
>
> Q       Where is Mr. Prisque, where is Mr. Maury and where are you when Mr.
>         Prisque says this to Mr. Maury?
>
> A       We were all right there by the cooling towers.
>
>                 THE COURT:  Just a second.  Mr. Prisque said what to whom?
>
> A       He was telling Jeff to, you know, tell me to take the forklift down the
>         garage and just tell them to go over it, look at it, go over it.  Make sure
>         there's nothing wrong with it.

169

Q       When you say, "Mr. Prisque said to Mr. Maury, 'Go over it, take a look at it,'" what did you understand him to mean?

A       To me, I took it as, you know, I'd go over it.  If there's anything wrong with it tell them to fix it.

....

Q       Based on your understanding, why was it that Mr. Prisque had told Mr. Maury to have you tell the mechanic to go over it?

A       Wanted to make sure there was nothing wrong with it.

Q       Why was that?

A       We had to cover our bases.

Q       Based on the accident that had just happened was there anything that you expected to happen later that day?

A       Yeah, when there's an accident, I mean, at any plant, I don't care where you're at, OSHA's going to come and do an investigation, also.

Q       Now, after Mr. Prisque gave this instruction to Mr. Maury, did you have a conversation with Mr. Maury?

A       Yeah, he told me to take the forklift down the garage, so I got on the forklift, turned around –

....

        – I got on the forklift and I had to turn around, 'cause it was facing the other direction.  And I was driving it, and Jeff was just walking next to me.

        While we were walking down he asked me to try the brakes, and I tried them.  And my foot went to the ground, and I knew.  And I had to pump them to slow down, to stop.  I told him the brakes ain't working right.  They're not working.  So, we just took it down to the garage, and Jeff, he just – I didn't see him.  He just went on his way.

        I parked it.  I told Yukna to go over the forklift, make sure nothing's wrong with it, to just fix it.  And I told him the brakes weren't working.

....

        THE WITNESS:  And I told him, "Go over the forklift.  If there's anything wrong with it you're going to have to fix it."  And I told him the brakes weren't working.  I tried them.

....

> And Yukna told me pretty much – he told me to go f— myself.  He says, "I'm not doing it."  He says this is really bad that this had to happen –.

....

Q       As the maintenance mechanic on the forklifts and trucks, given your position as a white shirt, is Mr. Yukna supposed to be following orders given to him by you?

A       Yes.

....

Q       When you were driving the forklift to Mr. Yukna where was Mr. Maury?

A       He was walking right next to me.

Q       ....  Can you tell the jury what you did, what you said to Mr. Maury and what he said to you?

A       We were driving down.  He asked me to try the brakes.  So, that's what I did.  I put my foot on the pedal and it went to the ground.  And I know, so I pumped them to get them to work.  And they slowed me down.  I hold him the brakes are sluggish, they're not working right.  And that was it.  There was nothing said; just kept going.

Q       Now, when you arrived at the garage, who was with you?

A       Jeff was walking down with me, but once I pulled in I don't know where he was after that.

(Id. at 40-46.)[93]

Rush, the finishing line foreman who was promoted to that position by Prisque and reported to Davidson, was one of the workers who responded to assist Coxe at the scene.  He testified that Prisque told all the workers to get back to work (because of the cupola filled with molten iron) while Coxe was still pinned under the forklift, but some of those present got Coxe

---

[93]  Another employee, Brian Kresge, who had also experienced problems with brakes and other items while driving forklift #24, testified that he helped to extricate Coxe from under it.  He testified that after the medics and police left the scene he heard Maury tell Shepherd to take the forklift to the garage, and he watched Shepherd drive it toward the garage.  (Tr. 368 at 56-66.)

out using wooden boards as levers.  Rush was one of the people who saw Coxe's condition

before the medics arrived.  Rush then went to shower and leave, because he worked the night

shift which had ended.  Rush recounted a conversation Prisque initiated with him:

> Q     After you went in the shower what happened?
>
> A     Took a shower, got changed, and I started leaving.  On the way ... out the
>        door I met John, or John met me,  [indisc.] about personnel.
>
> Q     John who?
>
> A     John Prisque.  John asked me what I was going to tell OSHA when they
>        came to investigate.
>
> Q     What did you say?
>
> A     I told John I was going to tell the truth.  You know?  The forklift had no
>        horns, no lights, no brakes, no parking brake.  Shouldn't have been in
>        service.  He says, "No, you're going to tell OSHA that the forklift was
>        fully operational, it was safe, and the guy was driving recklessly."
>
> Q     Who said that to you?
>
> A     John Prisque.
>
> Q     What did you do?
>
> A     I told John, "There ain't no way ... I'm going to lie for you."  He looked at
>        me and he says, "You're going to tell them this because your job depends
>        on it.  It's in the best interest of your employment.  In the best interest of
>        your job somewhere down the line."

(Tr. 296 at 38-39.)

Another employee, forklift operator Robert Fretz, testified that he was in the mechanic's

garage getting a flat tire fixed by Yukna in the early morning that day, when word came that

someone had been run over by a forklift.  He was standing next to Yukna in the garage when

Shepherd brought the forklift in, and he heard Shepherd tell Yukna to make sure everything

172

worked.  Fretz saw Yukna put his hand on the brake and push it very easily right to the floor, and heard Yukna say, "I bet there's no fluid in the master cylinder."  (Tr. 368 at 96-100.)  Yukna did not testify at trial.

Deputy Chief of Detectives Robert Barsony of the county Prosecutor's Office testified that when he arrived at the scene of the incident at approximately 7:10 a.m. that morning to begin his investigation of the fatality, the forklift had already been removed from the scene and the street sweeper had already swept over the area.  He was shown to the scene by Faubert.  When Barsony asked Faubert where the forklift was, Faubert said it had been removed to the shop area. Barsony did not see the forklift until he attended the inspection of the forklift by Ms. Tiedeman from OSHA at approximately 11:30 that morning.  At that inspection those present included Faubert and his subordinate Joe Maddock, the safety officer.  Barsony believed that Faubert had driven the forklift up from the shop area to the area where the OSHA inspection was done. Barsony told them that since there was no continuity of the evidence or any chain of custody, and the forklift had not been kept where parties interested in investigating had access to it, he did not really care what was going to be demonstrated.  (Tr. 392 at 4-11.)

Shepherd testified that after he had the exchange in the maintenance garage with Yukna, he went to Maddock's office because he had to fill out an accident report since he had been at the incident.  Shepherd told Maddock about going to the cooling towers with Coxe, then walking with him across the roadway.  Shepherd testified:  "And then I told him I took the forklift down to the garage, and I told Yukna that the brakes weren't working, to go over the forklift and make sure there's no problems.  Told him to fix it."

173

Q       You told Mr. Maddock that you had said this to Mr. Yukna?

A       Yes.

(Tr. 416 at 47.)

Shepherd also testified that there was a meeting held by Prisque before OSHA arrived

that day, that included himself and Maury and Davidson and other white shirts, in which Prisque

told them to go out into the plant and make preparations for the expected OSHA visit, which they

anticipated might include a walk through the plant.  (Id. at 49-50, 52-54.)  That was standard

procedure at Prisque's direction, Shepherd said, whenever OSHA or other inspectors were

expected or arrived at the plant.  (Id. at 54-58.)

Kevin Redcay, a maintenance supervisor who reported directly to Maury and also took

orders from Prisque, testified about pervasive maintenance inadequacy throughout the plant,

including the chronic defective condition of the forklifts.  (Tr. 368 at 115-24, 152-53.)[94]  On the

morning of the Coxe incident he tried to assist at the scene and was there to see Coxe under the

forklift and after he was extricated, before medics arrived.  He, too, observed that after the

medics and police left, the forklift was taken out of sight and later reappeared outside the safety

room.  (Id. at 153-60.)  Within about two hours after the medics left with Coxe, he decided to

resign and went to give notice at Maury's office.  When he entered Maury's office he saw

gathered in there Prisque, Maury, Davidson, Shepherd, and two other individuals.  (Id. at 161-

_____

[94] There were a few well-maintained forklifts used in another area of the plant, but those
were kept separate and were generally not accessible to the drivers of the "small," 13,000 pound
forklifts such as forklift #24.  (See, e.g., tr. 296 at 39-44.)

174

62.)[95]  This meeting was not at the normal time of the daily afternoon production meetings held by Prisque with certain "white shirts" including Maury and Davidson, and others including sometimes Faubert.  (See tr. 416 at 22-26.)

Shepherd testified that later that morning, at approximately 10:30, he saw Faubert drive that forklift up and park it in front of Faubert's office in the administration building.[96]  That was the office which also housed the first aid room occupied by Faubert's subordinate, Maddock.  (Id. at 46-47.)  Shepherd also saw some of the OSHA inspection after the forklift was placed in that location.  Based on Shepherd's observation of the action of the forklift when Faubert brought the forklift up and parked it, he saw that the brakes worked fine; they were not in the same condition as when Shepherd had driven it to the garage earlier that day.   (Id. at 50-51.)  This was consistent with Tiedeman's observation when Faubert demonstrated the forklift during her inspection.

We hold that the evidence, together with reasonable inferences from the evidence, was sufficient to support a verdict based on findings that Prisque, Faubert and Maury each "did corruptly obstruct, impede, and endeavor to obstruct and impede ... a pending proceeding ...

_____

[95]  The other two individuals named by Redcay as participating in that meeting were Tom Richter and John Dittinger.  (Tr. 368 at 162.)  Richter was a "white shirt" who was the maintenance manager, senior to Maury's position as maintenance superintendent.  Richter was later succeeded in that position by Donald Harbin.  (See tr. 416 at 16-18 and n.102, infra.)  Dittinger was a supervisor who had various roles, including on at least one occasion attending a conference with OSHA (along with Faubert and other Atlantic States representatives), when Atlantic States was resisting expansion of an ongoing inspection into a comprehensive inspection.  (See, e.g., tr. 359 at 7-12.)

[96]  After the government rested, the defendants presented their evidence.  Maury testified that it was he who drove the forklift up from the garage and parked it at the location where it was inspected by OSHA on that day.  (Tr. 515 at 102-03.)  This evidence went to the credibility of Shepherd as to who drove the forklift to that location, but does not affect our analysis of the sufficiency of the government's evidence on Count 11.

before [OSHA] ..., by taking steps to conceal facts regarding the forklift fatality on March 24, 2000 from [OSHA] inspectors," as charged in Count 9, in violation of 18 U.S.C. § 1505.  (Dkt. 711 at 41.)  Specifically, the evidence supports a finding that each of them, anticipating an immediate OSHA investigation in the wake of the Coxe fatality, knowingly participated in causing the forklift to be fixed up sufficiently to pass the OSHA inspection that morning, and did so "corruptly" as defined in the statute, with the specific intent to impede and obstruct OSHA from discovering the defective condition of the forklift at the time of the incident.  We also hold that the evidence supported a reasonable finding that someone at Atlantic States did tamper with the forklift while it was out of sight for at least three hours on the morning of the Coxe fatality, with the intention to obstruct the OSHA investigation, and that each of the named defendants knowingly associated with that unlawful conduct with the intention that such persons commit the conduct, and that Prisque, Maury and Faubert each, by his individual acts, knowingly and willfully participated as an aider and abetter under 18 U.S.C. § 2, also charged in Count 9.

## Count 11

The text of Count 11 states:

1.  Paragraphs 1 through 16 of Count 1 ... are hereby realleged ....

2.  In or about December 2002, ... defendants ATLANTIC STATES and JOHN PRISQUE, did knowingly alter, conceal, and cover up a tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of [OSHA], by altering the condition of a cement mixer and concealing from the [OSHA] inspectors that they had bypassed a safety device designed to shut down the cement mixer when its doors were opened, which led to the amputation of three of an employee's fingers.

In violation of Title 18, United States Code, Sections 1519 and 2.

176

(Dkt. 711 at 43.)[97]  This conduct is also alleged in Count 1, Overt Act 68, which specifies that "[b]etween December 7, 2002, when an employee had three fingers amputated inside the cement mixer because the mixer's safety device had been bypassed, and December 18, 2002, when OSHA first inspected the mixer as a result of the amputation, defendant John Prisque and Co-Conspirator "Y" directed that the safety device be concealed from OSHA."  (Id. at 30.)  Related conduct is also alleged in Count 1, Overt Acts 67, 69-71.  (Id. at 29-30.)  Prior to trial the government identified Co-Conspirator "Y" as Donald Harbin, and the jury was so instructed during trial.  (Dkt. 717 at 38.)

The verdict found both named defendants guilty on Count 11.  (Dkt. 609; dkt. 610.)  They contend that the government's evidence was insufficient to establish that Prisque was involved in altering or concealing the condition of the machinery that OSHA was inspecting at the time.  (Dkt. 635 at 225-30; dkt. 646 at 65-66.)  We disagree, and find that the evidence is sufficient against the named defendants on this count.

Count 11 relates to the OSHA investigation of an incident that occurred during the early morning hours of December 7, 2002.  An employee named Hector Velarde was cleaning the interior of a cement mixer when his co-worker activated the mixer without alerting him, causing

---

[97]  The offense statute provides in pertinent part:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States ... [shall be guilty of this offense].

18 U.S.C. § 1519.  The essential elements are described in the jury instructions quoted supra, Sec. I.

the mixing blades to amputate three of his fingers.  (Tr. 410 at 187-201; tr. 413 at 4-9.)  The police responded and he was taken away in an ambulance.  (Tr. 410 at 201-02.)

OSHA officer Carol Tiedeman was assigned to investigate the Velarde incident on December 18, 2002, and she went to the plant that day.  (Tr. 428 at 30-32.)[98]  The persons who met with her when she arrived, and their positions at the time, were:  John Prisque (plant manager), Don Harbin (maintenance manager), and Mark Neetz (safety director).  (Id. at 32.)[99] She explained that she was there to investigate because of a complaint, and asked to be taken to the cement mixer.  She was taken there by all three individuals:  Prisque, Harbin and Neetz.  (Id. at 33.)  The mixer itself was a huge machine located on a platform reached by steps, from which cement was discharged through a door beneath the mixer, and she was taken up onto that platform.  (Id. at 34.)

Tiedeman asked where the accident occurred.  She was shown the cement mixer doors on the rear of the platform, and the interior of the mixer with blades that would rotate when the mixer was on.  (Id.)  Harbin told her what had happened in the incident.  She testified that she could not recall whether Prisque was still present during that demonstration and discussion.  (Id.) Harbin explained that the employee who was injured was assisting someone in cleaning the mixer; the mixer had been turned on momentarily while the employee's hand was still in the

---

[98]  OSHA received notification of the Velarde incident from a complaint (identity of complainant not in evidence), which was received by another OSHA compliance officer.  That complaint was communicated to the OSHA supervisor, who assigned Tiedeman to make the investigation.  (Tr. 428 at 30-32.)

[99]  Neetz was the new safety director, replacing Joe Maddock who retired.  (Tr. 428 at 32; tr. 416 at 18.)  Harbin came up from the Birmingham, Alabama plant and became maintenance manager, a separate position from the maintenance superintendent post held by Maury.  (Tr. 416 at 16, 19.)

mixer; and the moving blade caused the amputation.  (Id. at 34-35.)  Tiedeman asked whether the

mixer came with a safety switch, also called an interlock switch, on the doors of the mixer.[100]

Harbin replied that no, it did not come with such a switch.  He added that there was another

mixer at one of their Alabama plants that also did not come with that feature.  (Id. at 35.)

This led to a general discussion between Tiedeman and Harbin as to attempting to put an

interlock switch on the mixer.  Tiedeman testified that at that point Harbin spoke with an

individual, who was down on the floor area below the mixer platform, about the possibility of

installing an interlock, "and it was decided that they probably could install an interlock on this

machine."  (Id.)  Tiedeman took photographs of the cement mixer in its configuration as shown

to her during that visit on December 18, 2002.  (Id. at 35-38.)

Tiedeman returned to the plant on January 2, 2003, and met with Joseph Surca, who was

then the human resources person, to review the OSHA logs and safety procedures.[101]  During that

visit, Harbin and Surca told her that they wanted to take her to the cement mixer to show her

what they had done since her last visit on December 18.  Both Harbin and Surca took Tiedeman

to the mixer, showed her an interlock that they had installed on the mixer doors, and demonstrated

that it worked.  If the door was partially opened, the machine would shut off.  (Id. at 41.)

---

[100]  The reference to a safety switch in this context is not like a light switch.  It describes an electrical apparatus that senses when the doors to the mixer are open, and breaks the electrical current supplying power to the mixer until the doors are closed and the mixer is restarted.  (Tr. 410 at 117-23; tr. 416 at 84-86.)  It is variously referred to in the testimony as an "interlock switch", a "safety switch", or a "limit switch."  (Tr. 428 at 51.)

[101]  A safety procedure discussed extensively in this area of the evidence was "lock-out/tag out."  (See, e.g., tr. 428 at 40.)  While it was relevant to OSHA's investigations regarding causation and prevention of injuries such as sustained by Velarde, it is not essential to the focus of the present discussion.

Tiedeman continued her investigation of the Velarde incident.  She interviewed Velarde and his co-worker involved in the incident.  (Id. at 41-43.)  She went with a colleague to observe the mixer cleaning procedures during the night shift, while that same co-worker was performing the cleaning job.  She took more pictures.  (Id. at 44-47.)  On February 25, 2003, Tiedeman was again at the plant.  She asked to see the owner's manual for the mixer.  She was looking to see whether there was an interlock or other safety devices on the mixer before it was delivered to Atlantic States.  (Id. at 47-48.)  Harbin produced the manual, along with purchase documents showing that the mixer was ordered by Atlantic States from the manufacturer in May, 2002.  (Id. at 50-51.)  The manual revealed that the mixer was equipped by the manufacturer with an electrical interlock that would prevent it from starting up during cleaning, and that warnings and instructions for its installation and operation were included in the manual.  (Id. at 51-53.)  After reviewing those documents back at her office, Tiedeman called Harbin on the phone on March 20, 2003, and questioned him again as to whether the mixer had an interlock on it when Atlantic States first received it.  She testified:

> At that time Mr. Harbin changed his story and informed me that it did come with an interlock.  He commented to me that it ran one or two days, and then it would get dirty.  It was removed and his opinion was that it was removed by an employee who was no longer at the company.  I also asked him if he knew the name of this employee.  He did not know who it was.

(Id. at 53.)

A representative of the manufacturer of the cement mixer that was involved in the Velarde incident testified at trial, based on documentation maintained by that company.  He stated that it was purchased new by Atlantic States, and shipped to the plant on June 5, 2002.  (Tr. 410 at 107-13.)  He produced photographs of that actual mixer, showing its configuration as

180

it left the manufacturer for delivery to Atlantic States ("the 2002 mixer").  (Id. at 113-15.)  Those photos showed that the 2002 mixer was equipped with limit switches on both pairs of doors, located on the front and the back of the mixer.  Those switches would receive their input from a large grey control box mounted low on the front of the mixer ("interlock box").  The limit switches were connected to the interlock box by visible, external wiring that ran from the switch locations on the doors and down to the interlock box.  (Id. at 114-24.)  The function of that apparatus was when the mixer doors were open, the electrical connection in the interlock box would be broken and the mixer would stop.  When the doors were closed after that, the mixer would have to be restarted by pressing the start/stop button.  (Id. at 122-23.)

The same witness also testified that Atlantic States had purchased an identical mixer from his company in May, 2000 ("the 2000 mixer").  (Id. at 110.)  Owner's manuals and a cover letter accompanied each purchase, emphasizing the need for the purchaser to read and follow the warnings and instructions.  (Id. at 127-30.)  One of those warnings was, "Do not bypass any electrical safety interlock device."  ((Id. at 147.)  The name of the Atlantic States contact person shown in their files for the purchase of the 2002 mixer was Mike Devine.  (Id. at 107-08.)[102]

Tiedeman at trial compared the photos of the 2002 mixer in its new condition as it left the manufacturer in June, 2002, and the photos she took on December 18, 2002, when she first inspected it during the Velarde investigation.  Those photos showed that there was no limit

---

[102]  Mike Devine had been the plant manager at Atlantic States before Prisque became plant manager.  Devine became plant manager at the McWane pipe foundry in Birmingham, Alabama for a time, and by 2002 he had returned to the Atlantic States plant.  Devine was assigned to the engineering department and had "white shirt" supervisor status along with Prisque and others including Faubert, Maury, Davidson and Harbin.  The exact dates of each of their employment at Atlantic States varied, of course.  (See tr. 416 at 16-22.)

switch, and no external wiring leading from the mixer doors to the interlock box, in place on the

mixer when she inspected it at Atlantic States on December 18, 2002.  (Tr. 428 at 38-39.)

Shepherd was an experienced electrician who began working at Atlantic States in

September, 1999, and was quickly promoted to "white shirt" status as general electrical foreman.

(Tr. 416 at 6-9.)  The balance of the testimony about the cement mixers came from him.  He

stated that the 2000 cement mixer was bigger than the previous machinery and required

considerable set-up work, so it was installed during the August plant shutdown.  He did all of the

electrical work for its installation.  (Id. at 83-84.)  The 2000 mixer was equipped with limit

switches on the front and back pairs of doors, connected to the interlock box (which he called the

panel or safety box), with external wires (which he called "seal tights," referring to the flexible

conduit covering the wires).  (Id. at 84-86, 90-91.)  Shepherd performed the electrical set-up,

using the electrical diagrams supplied by the manufacturer, then tested the mixer.  The limit

switches worked, such that if a mixer door was opened the mixer would stop until the mixer was

restarted.  (Id. at 85-86.)

The morning that production started up after the August, 2000, shutdown, Shepherd was

called down to the cement line where Prisque and Davidson were standing together near the new

cement mixer.  Shepherd could see that the cement lining area was getting backed up, with pipes

coming down the production line too fast for the cement line to process.  The problem was that

the doors to the cement mixer had to be opened frequently for the operator to determine whether

the cement was the right consistency, and every time that happened the mixer shut down and had

to be restarted, resulting in backup of the whole cement line.  Davidson was finishing line

superintendent, and he stated to Prisque and Shepherd that there was no way the cement line area

182

could keep up with the rest of the plant if they had to keep opening the doors and shutting off the mixer.  (Id. at 86.)  Prisque asked Shepherd if there was anything he could do, and Shepherd replied that he could "jumper" the limit switches out, so that if the mixer doors were opened the mixer would still run.  Shepherd explained that with that modification the mixer would still have controls, but it would not automatically shut down each time the doors were opened, "and everything would be ... like the old days." (Id. at 87.)  Prisque then told Shepherd, "All right. Sounds good.  Do it."  (Id.)

Shepherd made the modification to the 2000 cement mixer, as directed by Prisque.  To do that, he consulted the wiring diagram again.  He left in place the limit switches on the mixer doors, and their external conduit wires to the interlock box.  Inside the interlock box he added a wire that would "jumper," or bypass, the interlock mechanism, so that the limit switches did not function.  (Id. at 87-88.)  In that way, the mixer appeared to have the limit switch feature but it had been disabled in a concealed location, inside the interlock box.  (See tr. 410 at 162.)

Atlantic States replaced the 2000 cement mixer with the 2002 mixer.  The two mixers were identical.  (Tr. 416 at 89; tr. 410 at 155.)  Shepherd did the electrical installation of the 2002 mixer, which was very quick because it was just a replacement.  He testified that when he was installing the replacement 2002 mixer, "I jumpered out the limits right off the bat, started it up, checked rotation of the rotors.  Everything seemed to work and turned it over."  (Id. at 90.)  In other words, Shepherd bypassed the door safety switches on the 2002 mixer by jumpering inside the interlock box, leaving the external conduit wires leading to the doors in place, exactly as he had on the 2000 mixer.  (Id. at 90-93, 101-02.)  He did that because he knew it was the same

mixer, and:  "I knew it [referring to the cement line] ain't going to run.  I would've been called

down there again doing it anyway, so I did it anyway."  (Id. at 92.)

The Velarde injury that occurred in early December, 2002 involved the 2002 cement

mixer.  (Id. at 93.)  Shepherd testified that within a few days, a meeting took place in Prisque's

office.  Those present were:  Prisque (plant manager), Harbin (maintenance manager), Shepherd

(general electrical foreman), and Mike Devine (engineering dept.; former plant manager).

Devine was specifically called to come down to Prisque's office and attend.  (Id. at 93.)  Not

present was Mark Sheetz, the new safety officer.  The topic of the meeting was the Velarde

incident.  They had learned how Velarde lost his fingers in the cement mixer.  Devine

commented that the limit switches on the mixer should have worked.  Shepherd replied that he

had jumpered them out.  (Id. at 93-94.)  At that point, Harbin and Shepherd left Prisque's office

to go down to the mixer.  (Id. at 94.)

Harbin and Shepherd continued the discussion about the mixer within the next few

minutes after they left Prisque's office.  They knew OSHA was coming, and Harbin asked

Shepherd if he could "make the limit switches disappear."  (Id. at 94.)  Shepherd said that would

be no problem.  That same day, Shepherd pulled both sets of limit switches off the mixer, with

their attached conduit wires, but did not disconnect the wires from the interlock box, instead

hiding them below the interlock box among the other wires to make it look like they belonged

there.  (Id. at 95-96.)  This made it look as if the limit switches never existed.  (Id. at 104.)

Shortly after that, Shepherd had a conversation with Harbin about what to do when OSHA

arrived.  They then planned the scenario that they later performed, as described in the testimony

of Ms. Tiedeman about her inspection on December 18, 2002.  (Compare id. at 97 with tr. 428 at

32-35.)  During that event, Shepherd was the individual down on the floor area below the mixer platform, to whom Harbin called down and inquired about the possibility of installing an interlock on the mixer, just as they had rehearsed.  (Tr. 416 at 97-100.)

Shepherd testified that before Tiedeman returned for her second visit on that investigation, Shepherd pulled the conduit wires out from their concealed location, reattached them to the mixer doors, installed new limit switches on them, and removed the jumper wire in the interlock box so that the switches would receive power.  (Id. at 102-03.)  During that second visit by OSHA [on January 2, 2003], Shepherd and Harbin demonstrated to Tiedeman that the switches had been installed on the mixer doors and they functioned to shut off the mixer when the doors were opened, or when the emergency button on the interlock box was pushed.  (Id. at 100-01, 105-06; tr. 428 at 41.)  Shepherd observed, "She was satisfied with that."  (Tr. 416 at 101.)

That same day, a couple of hours later, Shepherd and Harbin were speaking with each other and Shepherd commented that with the limit switches installed and working, the cement mixer would not be able to keep up with production at the required quick pace.  (Id. at 106.) Shepherd asked Harbin whether Shepherd should modify the mixer to be as it was before, and Harbin said to do that.  So Shepherd put a jumper wire back inside the interlock box, thus bypassing and disabling the limit switches, while leaving the limit switches and their wires in place on the mixer.  The effect of that was to bypass the limit switches again, so if the mixer doors were opened the mixer would still run.  "It was back in its original state we had it before OSHA even showed up," he testified, "so the cement [line] can just keep on running the way it was before that."  (Id. at 107.)

The verdict found the named defendants, Atlantic States and Prisque, guilty on the substantive offense charged in Count 11.  They contend that the evidence is insufficient to support a conviction under 18 U.S.C. § 1519 against Prisque, because there is no evidence that Prisque was aware of or participated in the plan that Harbin and Shepherd rehearsed and carried out in an effort to deceive OSHA about the condition of the 2002 cement mixer at the time of the Velarde incident.  (Dkt. 635 at 225-229; dkt. 646 at 65-66.)  It is true that there is no direct evidence that the Harbin/Shepherd performance was discussed in front of Prisque.  However, we find that the circumstantial evidence was sufficient for a reasonable jury to find that Prisque did indeed knowingly participate in altering the cement mixer before OSHA inspected on December 18, 2002, with intent to obstruct OSHA.

The evidence showed that Prisque ran that plant, and made it clear to all his subordinates that he was in charge of its operations.  (See, e.g., tr. 416 at 8-21, 25-34.)  Prisque was intimately knowledgeable about the workings of the plant, based on his long experience.  (Id. at 32.)  Prisque and several other "white shirts," including Maury, Davidson and Shepherd, would typically arrive at work at 4:00 a.m. and meet on the melt deck off the cupola, to get a "nice clean tap out" of molten iron from the cupola to begin the day's production of massive cast iron pipes.  (Id. at 9-11.)  Prisque ran the daily production meetings of the white shirts, held each afternoon inside the plant, where Prisque kept track of operations and demanded explanations for problems.  (Id. at 21-25.)  Workers spoke directly to Prisque about conditions on the production line.  (See, e.g., tr. 332 at 35.)  They described that the pace of production was normally very fast, except when visitors such as OSHA were on site.  Workers were pressured and threatened by foremen

and superintendents to keep up that pace.  (See, e.g., tr. 337 at 16-19, 32, 36-38, 54-55; tr. 332 at 33-34, 41-42.)

The exchange that Prisque had with Davidson and Shepherd, on the day of startup after the August 2000 shutdown when the 2000 mixer was installed, took place in that context.  A reasonable jury could consider facts in evidence, and make reasonable inferences, as we will describe.  At that time, Davidson was complaining that the cement lining process could not keep pace with the production line because the cement mixer doors had to be opened frequently to check the batch, and the new mixer with limit switches was shutting down each time the doors were opened.  Prisque told Shepherd to bypass that safety feature to keep production moving. Shepherd did.  Two years later, when the replacement mixer arrived, Shepherd followed suit and modified the new mixer in exactly the same way.

Prisque presided over a meeting in his own office right after Velarde lost his fingers in the new mixer.  The participants included only trusted "white shirts," not the new safety officer Neetz.  Prisque and the others at that meeting were well aware that OSHA would be investigating.  They discussed the condition of the mixer at the time of the injury.  Devine said the limit switches should have prevented the injury.  Shepherd told everyone at that meeting, including Prisque, that he had bypassed the limit switches on the new mixer.  Prisque knew that he had directed Shepherd to do just that to the prior mixer in 2000.  Now they all had to contemplate what would happen when OSHA arrived for its investigation.  By that time everyone in the room, including Prisque, knew that if the mixer was left in the condition it was in at the time of the Velarde incident, OSHA would likely discover that its safety interlock had been disabled.  On the other hand, if the safety switches were activated before some date in the future

187

when OSHA arrived, this would slow production in the meanwhile.  It would also probably lead OSHA to conclude that the safety switches had been fixed since the accident, since if they had been working the incident would have been prevented.

Sure enough, OSHA soon arrived.  On that day Prisque personally participated in the opening conference, which he did not usually do and was not required to do.  (See, e.g., tr. 424 at 93.)  Prisque brought along the new safety officer, Neetz, who was not in the know about the mixer.  He also brought along his trusted maintenance manager, Harbin.  Together the three of them escorted the OSHA investigator to the cement mixer.  Prisque could see that there was no visible sign of any limit switches on that mixer, whereas Prisque and Harbin both knew that the switches had been on the mixer (albeit bypassed) on the day of the Velarde incident.  It appears that Prisque did not stay around for the Harbin/Shepherd performance on that day, or the return OSHA visit when they displayed the "new" limit switches.  It was sufficient that OSHA was "satisfied," or so they all thought.

We find that this evidence, together with the reasonable inferences from it, was sufficient to support a verdict based on findings that Prisque knowingly participated in, and approved of, the decision to alter the mixer between the time of the Velarde incident and the first OSHA inspection of it, for the purpose of obstructing the OSHA investigation, in violation of 18 U.S.C. § 1519 as charged in Count 11.  The evidence also supported a reasonable finding that if Prisque did not cause this post-accident alteration to the mixer, he knowingly associated himself with the unlawful conduct of Harbin and Shepherd with the intention that they commit the conduct, and by his acts he knowingly and willfully participated as an aider and abettor in violation of 18 U.S.C. § 2, also charged in Count 11.

**Counts 12-26**

The text alleging Counts 12-26 states:

1. Paragraphs 1 through 8 and 17 through 21 of Count 1 [identifying the parties and describing the Clean Water Act regulatory program] ... are hereby realleged ....

2. In or about the months listed below, ... defendants ATLANTIC STATES ... and CRAIG DAVIDSON, ... did knowingly discharge and cause the discharge of a pollutant from a point source into the waters of the United States, by causing petroleum-contaminated wastewater to be pumped from a cement pit into a storm sewer that led to the Delaware River, without a permit issued under Title 33 of the United States Code authorizing such discharge:

| Count | Month |
|-------|-------|
| 12 | Dec. 1998 |
| 13 | Jan. 1999 |
| 14 | Feb. 1999 |
| 15 | Mar. 1999 |
| 16 | Apr. 1999 |
| 17 | May 1999 |
| 18 | June 1999 |
| 19 | July 1999 |
| 20 | Aug. 1999 |
| 21 | Sept. 1999 |
| 22 | Oct. 1999 |
| 23 | Nov. 1999 |
| 24 | Dec. 1999 |
| 25 | Jan. 2000 |
| 26 | Feb. 2000 |

In violation of Title 33, United States Code, Section 1311(a) and 1319(c)(2)(A), and [18 U.S.C.] Section 2.

(Dkt. 711 at 44-45 (bracketed material added).)[103]  This conduct is also referred to in Count 1,

alleged Overt Act 1.  (Id. at 15.)

---

[103]  The statutory language is quoted supra, n.31, and the essential elements are described in the jury instructions quoted supra, Sec. I.B.

The verdict found defendant Atlantic States guilty on each of Counts 12-26.  (Dkt. 609.) The verdict found defendant Davidson not guilty of the felony violations, but guilty of the lesser-included misdemeanor violation for each count pursuant to 33 U.S.C. § 1319(c)(1)(A).  (Dkt. 614; see chart n.4, supra.)  They contend that the evidence was insufficient to establish facts necessary to support the verdicts on Counts 12-14 and 20-21, or to establish that Davidson acted negligently.  (Dkt. 635 at 155-68; dkt. 646 at 54-55; dkt. 650 at 4-17; dkt. 661 at 4-11.)

The government presented testimony of Donald Hirsch, a supervising inspector on the water pollution regulation side of NJDEP.  His testimony summarized the features of the water permits issued to Atlantic States and some of the history with NJDEP pertaining to those permits, as relevant to the Clean Water Act counts in the indictment, Counts 12-33.[104]

The joint federal/state water permit program established under the Clean Water Act and related state laws, known as the NPDES program, is summarized supra, n.11 and accompanying text.  Hirsch testified that under the NPDES program administered in New Jersey by NJDEP, industrial facilities such as Atlantic States were required to apply for and obtain water permits. Those permits were implemented through a system that included self-reporting of  sampling data by the permittee, and annual unannounced visits by inspectors.  (Tr. 363 at 17-25.)

Atlantic States was issued its first water permit (called an NJPDES permit in New Jersey) on December 23, 1993, after a lengthy process that included a public comment period.  That permit was renewed and modified, with the latest of five permits during the relevant period being effective as of July 1, 2000 ("water permits").  Significant features of the water permits were:

---

[104]  Much of the evidence described in this subsection is also relevant to all of the CWA counts, including Count 27 (discharge from cement pit 12-4/5-99), and Counts 28-33 (discharges from pit under #4 casting machine May-Oct., 1999), discussed infra.

(1)     Atlantic States was allowed to discharge, into the public storm sewer system flowing into the Delaware River, only "wastewater" as defined in the permit.

(2)     "Wastewater" was allowed in only two categories:  (a) non-contact cooling water coming from the cooling towers, and (b) stormwater.

(3)     Water used in the production process, called "process water," was only allowed to be non-contact cooling water discharged from the cooling towers, sampled at a designated Location 1 located near the melting/casting area.

(4)     "Process water" was not allowed to be discharged from any other location in the plant.  There were approximately 40-50 locations at the plant where stormwater could enter the storm sewer system.  Four of those locations were designated in the permit for stormwater sampling.  Location 2 was in the casting area, under a storm sewer manhole cover.  Location 3 was in a high traffic area near the main gate in the middle of the plant.  Locations 4 and 5 were in the area where finished pipes were stored, at the opposite end of the plant from casting.

(5)     The permits specified that at all locations, no "visible sheen" was permitted in discharged water.  This prohibition was accompanied by testing parameters for petroleum hydrocarbons in the water.  Total suspended solids was another testing parameter for limitations in the permits.

(6)     Rain water was the only kind of water discharge allowed at all locations except Location 1.  If it was not raining, no water was to be going into any storm sewers, except non-contact cooling water from the cooling towers, sampled at Location 1.[105]

(Id. at 25-55; see Gov. Ex. 1-013A.)

---

[105]  The specific modifications to the water permits were relevant to Count 6, a count of acquittal in the verdict, but are not relevant to the present discussion.

NJDEP made its first inspection visit to Atlantic States under the water permits in June, 1994. That resulted in an unacceptable rating concerning its sampling procedures, and further inquiries by the regulators. (Tr. 363 at 57-73.) By the end of 1995, NJDEP had notified Atlantic States that it was facing penalties of $500,000 for reporting and limitation violations of the water permits, and they were in negotiations for possible settlement. (Id. at 73-90; tr. 367 at 94-97.) Another on-site compliance inspection was conducted in December, 1997, again resulting in a notice of violation. (Tr. 363 at 90-95.) The next inspection in March, 1999 produced another notice of violation, that time for reporting incomplete sampling data which, when properly reported, revealed a violation in the total suspended solids in the stormwater sampled at Location 3. (Id. at 102-14.) February 17, 2000 was the date of another annual inspection, which also produced an unacceptable rating for stormwater compliance. (Id. at 123-31.) Hirsch made all of those inspections, as well as participating in the search warrant execution on February 24, 2000. (Id.) The NJDEP letter to Atlantic States following his February 17, 2000 inspection notified Atlantic States that it was being put on a monthly stormwater sampling schedule (instead of quarterly, as before), until it could demonstrate compliance. (Id. at 125-38.)

The cement pit, also called cement pond, was an outdoor facility adjacent to the pipe finishing line that served as a repository for water being circulated through the cement lining machinery directly indoors from that location.[106] David Chase, a current Atlantic States

---

[106] Hirsch noted that he had been told, by the Atlantic States representative, during his February 17, 2000 water permit compliance inspection at the plant:

> Cement water holding pit - receives wastewater from the cement lining operation for recirculation. This is a closed loop system with no discharge per Yadzinski. Solids are scoured out 2/week and taken to the solid waste staging area.

employee who worked as the plant "oiler" during the period relevant to Counts 12-33, described

that area of the plant as it functioned at that time.  His job as oiler, on "second shift" as a

maintenance worker, was to travel throughout the production areas of the plant on a forklift,

carrying various grades of hydraulic oil, grease and other lubricants and constantly supplying

them to the machinery.  (Tr. 351 at 69-73, 76-83, 189-90.)  The complex overlay of "shifts" at

the plant is described in the margin.[107]

Part of Chase's job was to make meticulous daily notes of oil leaks and other

maintenance conditions he observed in all the production areas of the plant, including the cement

lining area, and turn those in to his foreman at the end of each workday.  (Tr. 351 at 100-02.)  It

_____

(Gov. Ex. 0-014 , Hirsch report of 2-17-00 compliance inspection, attached to NJDEP letter to Atlantic States dated March 6, 2000.)  The NJDEP did not cite Atlantic States for a permit violation at the cement pit based on that inspection, although it noted general "poor housekeeping" in the area.  It did cite the company for excessive total suspended solids in the rain event data self-reported by Atlantic States at sampling Location 3 (downgrade from the cement pit) for the period August - October, 1999.  (Id.; see n.133, infra and accompanying text.) The indictment, Counts 12-27, alleges that the named defendants were actually committing criminal violations of the CWA with respect to cement pit operations during the period spanning December, 1998 through February, 2000.

[107]  Atlantic States had three shifts, designated first, second and third shifts.  Both second and third shifts extended into the night.  The times and lengths of the shifts were not precisely defined.  In fact, they overlapped.  The start times of the individuals on the shifts varied as well, and the ending times were subject to being extended by mandatory overtime demands.  The term "first shift" related generally to production; "second shift" related to post-production mechanical maintenance; and "third shift" related to cleanup.  (See, e.g., tr. 353 at 11-13; tr. 351 at 72; tr. 362 at 170-73.)  For example, Chase the oiler, a "second shift" maintenance worker, typically worked from 11:00 p.m. to 7:30 a.m., even though the "first shift" people arrived long before 7:30 a.m., and the "third shift" cleanup crews were working during the night.  (See tr. 353 at 11; tr. 355 at 47; tr. 368 at 4.)  The finishing line, where the newly-cast pipes were lined with cement, then dried and painted, would typically continue in production mode on "second shift," during the night, and this could continue on Saturdays.  (See, e.g., tr. 280 at 75-78 (Delker); tr. 289 at 93; tr. 291 at 49-50, 68-70; tr. 303 at 17-19, 56-58, 176-78; tr. 305 at 27-28; tr. 317 at 10-12; tr. 320 at 136 (Rush); tr. 362 at 102-03 (Lieberman).)

would become the responsibility of the millwrights (mechanics), as directed by their supervisors, to repair the leaking equipment, but machinery was constantly leaking oil throughout the plant. (Id. at 107-30.)  He was familiar with the procedures for handling bulk oil and for cleaning up quantities of oil that dropped from leaky machinery or other sources in the production process.

Chase described that the major machinery in the cement lining area ("cement line" or "cement liner") had containment pits in the floor to catch water used in the process and oil leaking from the machinery, which featured hydraulic lines and cylinders pressurized with oil. For example, there was such a pit under the cement lining table, where the newly-cast pipes were actually lined with cement.  (Tr. 351 at 98-100; tr. 353 at 31, 68-69.)  A similar pit existed under the bell wash machinery (called the bell wash, "laitance," or "lake" pit).  The bell wash station washed cement debris from the bell end of the pipes before painting.  (Tr. 355 at 16-24.)[108]

When Chase would see an accumulation of oil in a production area – if it was just oil and he had time – he would scoop it up, with or without using an absorptive material called SpeediDri, and place it into 55-gallon drums that he then carried to the "oil crib," a storage shed where a contractor removed oil for disposal, or to the hazmat pit, described infra.  (Tr. 353 at 9-10; tr. 353 at 42-43.)[109]  Chase would also sometimes pump out the combination of water and oil that accumulated in the pits under the cement lining table or the bell wash into his waste oil

[108]  A dictionary definition of laitance is "an accumulation of fine particles on the surface of freshly placed concrete occurring when there is an upward movement of water through the concrete due to the presence of too much mixing water, to excessive tamping, or to vibration of the concrete."  Webster's Third New International Dictionary (1986).

[109]  The Atlantic States air permits allowed some amount of waste oil to be burned in the cupola, but the indictment does not allege violation of that limitation.  See discussion of Count 34 infra.

194

drums, using a sump pump and disposing of the drums in the same two designated areas.  (Tr. 353 at 93-94; tr. 355 at 24-28.)  However, he said that the water used in the cement lining process was carried to and from the cement lining machine and the bell wash station in trenches (also called troughs) that ran alongside that machinery and continued outside to the cement pit.  That water did collect oil and cement debris, and carried those materials along to the cement pit.  (Tr. 351 at 99-100; tr. 355 at 16-20, 158-59.)[110]  The flow in those trenches was maintained by powerful stationary pumps located inside, which directed the flow to and from the cement pit on the outside during production.  (Tr. 355 at 158-60; see also tr. 314 at 68-72; tr. 289 at 201-04.)

Once outside, the cement line water would accumulate in the cement pit where the heavy solids settled to the bottom, and any included oil would float on the surface.  (Tr. 355 at 139-40; tr. 346 at 28-29.)  That water was then recirculated for use in the cement lining process.  (Tr. 353 at 87-88.)  Water was also replenished as needed in the production process.  (Id. at 30.)

Getting the oil off the top of the water in a pit, such as the cement pit, was done sometimes using a skimmer (which was not always there and did not always work), or booms or "socks" or "pillows."  When Chase participated in servicing oil-laden skimmer barrels, booms or pillows from a pit that also contained water, he would remove them when saturated and place that material in the oil crib or in a large cement bunker called the "hazmat pit," also called waste containment area or solid waste bunker, located across the roadway from the cement pit at a distance of about 30 feet.  (See tr. 353 at 85-89, 98-99, 104, 177-80; tr. 355 at 4-14, 141-44.)

---

[110]  Chase described that the liquid accumulating in the (interior) cement lining pit and the bell wash pit could only be emptied by sump pump, and that the circulating water trenches ran alongside both areas of machinery.  (Tr. 351 at 99-100; tr. 355 at 16-20, 24-28, 158.)  Rush testified, for example, that the cement lining pit would fill up and he and his workers would pump that out approximately weekly.  (Tr. 307 at 20-28.)

However, Chase testified that not all oil was removed from the cement pit using those devices, so he would frequently observe and log the presence of oil on the surface of the water.  (Tr. 355 at 8, 139-44.)

A contractor named SMP (or SNP) would operate dump trucks to remove and dispose of the materials deposited in the hazmat pit.  (Tr. 353 at 20-22, 78-79, 150; tr. 359 at 183.)  There was evidence that during the search warrant execution on February 24, 2000, Maury stated to the agents that he and the maintenance workers reporting to him were responsible for cleaning out the cupola, and operating the street sweepers, and putting those wastes into the waste containment area (another term for the hazmat pit), from which it was removed by the SMP company.  (Tr. 322 at 10-11, 73.)

Chase identified the configuration of the cement pit as of February 24, 2000, from photographs taken by investigators during the search warrant execution that day.  (Id. at 140-45; Gov. Exs. 1-P-041; 1-P-065; 1-P-103.)  It was a large pit made of cement, with one end sloping up to grade level and the other walls vertical to grade level.  Chase identified the location of a trench in the pit that ran alongside the building at the common wall between the cement pit and the pump room, coming into the cement pit from the cement lining area inside.  (Tr. 355 at 142-45.)  He said that was where the water exited the building from the continuous water circulation within the cement line area.  He also indicated the location in the cement pit where the intake of processing water back into the cement line area originated.  (Id. at 142-45, 157-60.)  Photographs of the cement pit taken that date, during production, showed that it contained a large volume of greenish water and a petroleum substance floating on the surface.  (See tr. 265 at 35-37.)

196

Chase explained that the only way to empty the cement pit was to pump it out, and the contents could not be pumped into drums because of the volume. (Tr. 355 at 37-38, 44.) [The cement pit had no drain at the bottom, being designed to serve in part as a settling pond for cement fragments that would clog any drain.] He testified that from September, 1996, when he started as plant oiler, he and other employees participated in pumping out the cement pit (as distinguished from any of the pits inside the cement line building) as follows:

Q     And once you started working as the plant oiler, did you ever see work orders from supervisors regarding pumping out the pit?

A     Yes. It was written on a white piece of paper that was put on a clipboard at the cement liner desk.

Q     And what would the work order say?

A     "Pump the pit."

Q     And what would you and other employees do in response to the work orders?

A     I was told to bring the Honda pump out and set it by the pit.
...
Q     And can you explain what was the procedure for pumping out the pit?

A     Well, I'd drop the Honda pump off, and then I'd usually go on my own way because I had the rest of my work to be done. But the millwright in that area would set the pump up and pump the pit out.
....
Q     How would you move the Honda pump to the cement pit?

A     It was usually on a pallet, and I would move it with the lift truck.
....
Q     And when you dropped off the Honda gas pump where would you drop it off?
....
A     [Referring to photo, indicating wall of cement pit alongside roadway] In that area. Just in this whole general area here where they could get it to reach to the pit --

197

....

– So they could get – put the pump within a range so they could get the hose into the pit.  It doesn't have to be precisely right here, or there, as long as it's within the working area of the length of the hose....

Q       And what would happen after the Honda pump was placed next to the pit and the hoses went into the pit?

A       The millwright would start pumping the water out.

Q       And where would it go?

A       I seen it go out and onto the blacktop and down.

Q       Do you recall any specific time of night that you would see this happen?

A       Well, they couldn't do it until after the production shut down, because they were using this water for production, so the time varied.

....

Q       You were making a direction with the pointer, Mr. Chase, when you were talking about where the oil and water went.  Can you, on the photo ... point, for the jury, on where the oil and water would be going?

A       Once they pumped it out of the pit, it would go out here and run down this way --

...

PROSECUTOR:  Indicating for the record he's pointing from the bottom of the photo towards the top of the photo, along the road.

Q       Is that fair to say, Mr. Chase?

A       That is fair to say.

Q       And did you know ... whether there was a storm sewer in that general area?

A       Beyond – around the corner.

Q       And I'd like to now show you 1-P030.  This is also in evidence.

A       That it right there.

Q       And you just pointed to the middle of the photograph?  And when you say that's it –

198

A       That's the storm sewer that you're talking about.  The water came down
        this way and into there.

....

Q       How often did this procedure of pumping out the oil and water from the
        pit occur?

A       On average once a week.

Q       And do you recall generally what time of the week that the pit would be
        pumped out?

A       On a Friday night.

(Tr. 351 at 84-89.)

On cross-examination, Chase acknowledged that in his grand jury testimony he described

both a sump pump and a gas pump being used at times in connection with pumping out the

cement pit.  (Tr. 355 at 76-82, 85.)  Also in his grand jury testimony, which he confirmed on

cross-examination, he testified that sometimes the water being pumped from the cement pit was

sent by hose to the hazmat pit, and sometimes it was pumped onto the roadway leading to the

storm drain.  (Id. at 40-43, 60, 65-73, 82-87.)  However, he did not retract his testimony that he

saw the practice of pumping the liquid from the cement pit down the road, generally on Friday

nights, during the entire period from the time he became oiler in 1996 until the time Atlantic

States installed a row of six tall yellow holding tanks at the cement pit.  (Id. at 58-59, 80-81, 90-

99.)  Other testimony established that the six yellow tanks were not installed until June, 2001.

(See dkt. 649 at 7-8, listing citations.)

Robert Owens (see discussion of Count 8, supra and accompanying text) testified of his

experience, prior to the period covered by Counts 12-27, when he was assigned to work in a crew

cleaning out the cement pit during an August shutdown.  (Tr. 337 at 47-48.)  His best recollection

199

was that the occasion was approximately 3-4 years before his eye injury occurred on June 25, 1999, which would place it roughly in 1995 or 1996, but it could have been as early as 1992.  He described that the cement pit had water in it with a greasy substance on top.  (Id. at 48; tr. 346 at 29, 88-90.)  He and the other workers were instructed by the foreman to put two sump pumps into the pit and direct the hoses down the roadway, where the water would run down to a number of the drains in the road.  While the pumps were removing the liquid, the crew did other jobs as directed by the foreman.  (Tr. 337 at 48-52.)  When the liquid was emptied, they returned and used jackhammers and shovels to remove the contents from the bottom of the pit.  (Tr. 346 at 28-29.)[111]  That testimony from Owens placed his experience (during a summer shutdown) before the beginning of the period described by Chase for the same procedure in pumping the liquid from the cement pit for routine weekly maintenance.

The evidence established that Davidson was in charge of the finishing line, which included the cement pit and adjacent cement lining area, for the entire time covered in Counts 12-26, since in or about September, 1998.  (See dkt. 649 at 2, listing citations).  Chase testified that he knew Davidson was a white shirt on the finishing line, which included the cement line area.  (Tr. 353 at 175.)  Robert Rush testified that Davidson was finishing line superintendent during Rush's entire period of employment from March, 1999 through June, 2001.  (Tr. 289 at 188, 192.)

Numerous witnesses described the "chain of command" at Atlantic States, where laborers and millwrights took orders from foremen, who took orders from the superintendents, who took

---

[111]  Owens observed that in subsequent August shutdowns when the cement pit was being cleaned out, a front end loader was used instead of workers with shovels to remove the contents from the bottom of the cement pit.  (Tr. 346 at 29-30.)

orders from the plant manager.  (See dkt. 641 at 136-37, listing citations.)  Chase, for example,
who was part of the maintenance department, regularly took his daily orders from the
maintenance foreman on the portion of the line where he was working at any time on a given
shift, including in the finishing line.  (Tr. 351 at 159-60.)  However, from Davidson's position in
the chain of command as finishing line superintendent, Davidson would also assign duties to
Chase, through a foreman, even though Davidson and Chase worked different shifts and
Davidson never issued directions to Chase in person.  (Tr. 353 at 175-76; tr. 355 at 28-32, 58-59,
161-63.)  Likewise, the millwrights were maintenance department employees, although they
worked throughout the plant.  (Tr. 289 at 58-61; tr. 294 at 86-87; tr. 305 at 25-28; tr. 320 at 67-
68, 73-74.)  Chase was very clear that the millwrights were the ones he saw working to empty the
cement pit using the pumps.  (Tr. 351 at 84-89; tr. 355 at 58-60.)  Rush likewise testified that the
millwrights pumped the cement pit contents down the roadway, at night, at various times when
he or his foreman were not personally doing it.

    Robert Rush testified about pumping the oily liquid from the cement pit from the time he
was hired in March, 1999 through June, 2001.  He stated that when he was a laborer he would
receive orders from his foreman, Scott Rodney, on pumping out the cement pit.  (Tr. 289 at 204.)
After Rush became a foreman, about six months later, he received his instructions directly from
his superintendent, Davidson.  (Id. at 204-05; tr. 291 at 41-42.)  Chase's description of the
procedure for pumping out the pit was echoed by Rush:

> Q      Now, while you're at Atlantic States how often did you pump out the
>         cement pit with the pump and a hose?
>
> A      At first it was every night.

Q       Explain that to the jury.  When you say you pumped it out every night
        what do you mean?

A       We used to have a Honda gas pump and we would pump it out --
....
Q       Now, besides the Honda gas pump did you ever use any other type of
        pumps?

A       Yes.  We used to use electrical sump pumps.

Q       Now, back to the Honda pump for a moment.  Where would you get the
        Honda pump from when you pumped out the pit?

A       Up above casting.

Q       And where would you place the Honda pump when you pumped the pit?

A       We used to place it on the side where the pallet sits in the picture.  We
        used to place it there.

Q       Indicating for the record you're pointing at the photo that still on display.
        You're pointing at the wooden pallet in that photograph?

A       Yes.

Q       When you had placed the pump there what would happen?

A       We would throw in the sump hose into the water and we would run a blue
        hose down along the blacktop.

Q       And when you say you would run a hose down the blacktop where would
        that hose lead to?  Where would it discharge?

A       It would discharge onto the road and then go down the storm drain.
....
Q       Who directed you to pump out this pit and discharge out to the road?

A       Craig used to do that.

Q       Craig Davidson?

A       Yes.
....

202

Q      And when you pumped the pit out onto the road where would the oil and water go?

A      It would go down the storm drains.

Q      You said it would go down the storm drains.  How many storm drains are located in that area of the plant?

A      Two.

Q      And how would you describe those two storm drains?

A      One was a small concrete one, and the other one was a great big grated one.

Q      And who, if anyone, directed you to pump the oil and the water on the road that went down the storm drain?

A      Who was directing?  Craig Davidson.

(Tr. 289 at 205-209.)  As Rush also testified, when he became a foreman the chain of command ran from Davidson to Rush, then from Rush to the workers.  (Tr. 291 at 30-31.)

Rush described the intake and outlet hoses on the Honda gas pump, and how they were arranged to direct the oily water down the road when that pump was used.  He was aware that two storm drains into which the water would flow were a small drain near the cement pit, and a large drain near the front entrance of the plant.  (Id. at 33-39.)[112]  He also described the positioning of the hoses and wires of the electric sump pumps when they were used for the same

_____

[112]  There were actually two large drains in the vicinity of the main gate.  One was near the garage, closer to the scale house and guard shack; the other was near the paint room opposite the guard shack.  The latter drain was the so-called "baffle drain," designated as sampling Location 3 in the water permits.  Both of those large drains were on the downgrade from the small drain nearest the cement pit.  There was testimony that all three of those drains could receive liquid flowing on the roadway from the vicinity of the cement pit.  (See, e.g., tr. 363 at 38-40, 134-36 (Hirsch); tr. 337 at 48-52; tr. 346 at 33-34 (Owens); tr. 362 at 102, 116 (Lieberman).)

purpose.  (Id. at 44-49.)  He said the frequency of that pumping process changed twice during his time there, first to every other night and then to every Friday night once the cement lining process was improved to reduce the amount of cement waste going into the pit through the water trenches.  (Id. at 39-40.)  He confirmed that hydraulic oil from leaks in the cement line machinery would travel with the water and cement waste to the cement pit, and that oil would be in the water when it was pumped out.  (Id. at 40-41, 52-54.)

Rush said that pumping process was done at night, at the end of second shift, usually after production ended around 3:00 a.m. on Friday night, i.e., early Saturday morning, and if it was done on nights other than Fridays, the second shift would end when first shift came in.  (Id. at 49-52; see n.107, supra.)  He said that pumping was done at night, "[s]o nobody from the street could see it." (Tr. 291 at 52.)  Rush explained that the further procedure was that at some time after the liquid in the cement pit was drained down (but without necessarily emptying the pit dry), they would put the pumps away.  Then before the startup of production, usually in the early morning just before the first shift began, a worker operating a loader would come in and scoop the solids from the bottom of the cement pit, dumping them in the hazmat pit, then go on his way to loading the coke hopper [up near the cupola].  After that, the cement pit would be re-filled with water so that production could resume.  (Tr. 291 at 41; tr. 320 at 74-76, 85-87, 94-98.)  He said the same procedure was followed during summer shutdowns, with the addition of using jackhammers to remove more of the cement residue.  (Tr. 291 at 105.)[113]

---

[113]  Randy Lieberman, whose testimony relevant to the cement pit is also described infra, likewise testified that it was his understanding that the second shift workers had the responsibility to get the cement pit ready to be dug out, but the actual removal of the solids from the pit would be done by someone operating a front end loader who would scrape the solids out of the cement pit and dump that material into the hazmat pit, either late on Saturday or on Sunday

The purpose of the annual summer shutdown was to interrupt production long enough to accomplish major maintenance and upgrades.  It was generally two or three weeks long.  (Tr. 289 at 75-77; tr. 305 at 70-72; tr. 353 at 102-03.)  Rush testified that the procedure of pumping the liquid from the cement pit down the roadway continued during August, 1999, until a brown water storage tank was installed at the cement pit during that summer shutdown.[114]  The purpose of the brown tank was for storage of water from the cement pit.  (Tr. 296 at 16.)  He stated that for about six weeks after it was installed, the brown tank was used to contain the water when the cement pit was pumped for cleaning.  That approach quickly failed, however, because the interior and the valve of the tank would constantly become clogged with cement debris, and the millwrights would eventually come and work on it.  (Tr. 296 at 16-17; tr. 320 at 79-85.)  So the procedure reverted back to draining the cement pit liquid by pumping down the road into the storm drains.  (Tr. 296 at 16-17.)[115]  He said this continued until the search warrant execution on February 24, 2000, after which they started pumping the cement pit liquid over to the hazmat pit for that purpose at the end of the week at night, again at Davidson's direction.  (Tr. 291 at 119-

morning.  (Tr. 362 at 129-30; tr. 359 at 195.)  [There were various types of loaders used on-site; we do not distinguish those for purposes of this discussion.  (See, e.g., tr. 291 at 105-06.)]

[114]  This tank is sometimes referred to in the record as a blue tank, although the context makes clear which tank it is.  (See, e.g., Tr. 355 at 158-60.)  We will refer to it as the brown tank, to distinguish it from other blue tanks that may have existed elsewhere at various times.

[115]  Rush testified on direct examination:

Q      So, is it fair to say in August after the shutdown, until September, 1999, through September, you pumped the liquids into that tank?

A      Yes.

(Tr. 296 at 16.)

123; tr. 296 at 16-20.)  However, according to Rush, if it was raining Davidson would instruct him to pump it down the road rather than into the hazmat pit.  (Tr. 296 at 19-20.)

The problem with pumping that amount of liquid from the cement pit to the hazmat pit was that it was the storage place for the hazardous waste from all over the plant, and it was frequently full.  If the hazmat pit was full, Rush said, the liquid pumped into it from the cement pit would just run out of the hazmat pit and downhill on the same roadway, and into the storm drain near the cement pit.  Rush told Davidson about that, and Davidson instructed Rush to do it anyway.  (Tr. 291 at 120-25; tr. 305 at 126-29.)  Another problem with pumping out the cement pit liquid into the hazmat pit was described by Rush as follows:

> Q    [D]id you ever make any observations about after you pumped oil and
>      water into the Hazmat pit with reference to any Hazmat trucks?
>
> A    Yes.
>
> Q    Can you explain to the jury what's a Hazmat truck?
>
> A    It's a tractor trailer with a dump body on the back.
>      ....
> Q    What, if anything, would the trucks do with the Hazmat?
>
> A    They would take the hazardous material and take it somewhere outside the
>      plant.
>
> Q    And if you dumped the oil and water from the cement pit into the Hazmat
>      pit [and] the truck picked it up, what, if anything, [had] you observed?
>
> A    It'd be leaking all over the place.  All the way out the plant and up
>      Sitgreaves Street.
>
> Q    Where would it be leaking?
>
> A    The tailgate.... [o]f the trailer.
>
> Q    Did you personally observe that?

206

A    Yes.

Q    Do you recall on how many occasions?

A    Twice.

Q    Did you say anything to Craig Davidson about this?

A    I said jokingly, I said well, that makes a lot of sense.  We pump it from
     this pit into that pit and now they're spreading it all over P-burg.

Q    What was his response?

A    He just walked away.

(Tr. 291 at 125-26.)[116]

Defendants contend that the period of December, 1998 through February, 1999 (Counts

12-14), must be excluded from consideration because Rush did not arrive until March, 1999 and

Chase's testimony was not specific as to dates.  We disagree.  We find that a reasonable jury

could find, based on the background evidence supplied by Owens and the very detailed and

specific testimony by Chase, that there was a regular practice of pumping out the cement pit

during the non-production hours, to perform routine maintenance of the cement pit, by using

pumps with hoses directed onto the roadway and allowing the contents to flow into the storm

---

[116]  Rush was asked on cross-examination about the possibility of pumping cement pit
liquid through a pipeline running up to the casting department, into the pit under casting machine
#4 ("#4 pit").  That pit is the subject of Counts 28-33, discussed infra.  He said that once in a
while, at the direction of Davidson, he would start pumping in that direction, but only until the
workers up at the #4 pit complained that their pit was overflowing onto the casting floor.  (Tr.
320 at 77-79.)  Workers in that area knew that an overflow from the #4 pit could cause an
explosion.  (Tr. 355 at 173-74; tr. 357 at 67; tr. 362 at 140.)

drains, approximately weekly during the entire period covered by Counts 12-27 (December, 1998 through February, 2000.)[117]

The testimony of Rush, however, adds an exception to the pattern that we find is significant. We conclude that the month of September, 1999 must be excluded from this pattern of pumping to the roadway, because Rush testified that after the 1999 summer shutdown, the brown tank was used successfully to receive the pumped-out cement pit liquid during cleaning for approximately six weeks, through September. (See n.115, supra.) OSHA officer Silva testified that the 1999 summer shutdown included the week ending Friday, August 6, 1999. (Tr. 449 at 6-8, 75.)

We conclude that a reasonable jury could conclude from the evidence that for the purpose of removing accumulated solids from the cement pit, the liquid was removed from that pit using the procedure of pumping it down the storm drains in August, 1999, before or during the summer shutdown. However, whenever that shutdown ended after the second or even the third week of August, a six-week period of consistent use of the brown tank would likely exclude the weekly cement pit pumping in September, 1999 from the pattern of discharging to the storm drains. For a fact finder to resolve this issue in favor of conviction, we find, would invite speculation beyond

---

[117] The indictment was filed on December 11, 2003. (Dkt. 1.) The five-year statute of limitations required that the first alleged CWA substantive violation occur not earlier than December 11, 1998. The jury was so instructed with reference to Count 12, asserting a CWA violation in December, 1998. (Dkt. 717 at 53; dkt. 602; dkt. 706.) Count 24 alleged a CWA violation during the month of December, 1999, whereas Count 27 alleged a CWA violation specifically on or about December 4/5, 1999. The jury was therefore instructed that to find a CWA violation under Count 24, that would have to be a different discharge in December, 1999 than the one alleged in Count 27. (Dkt. 717 at 53, 65.)

what could be concluded beyond a reasonable doubt from the evidence.  Therefore, we will set aside the convictions of Atlantic States and Davidson on Count 21, covering September, 1999.

Defendants also contend that there is no proof that Davidson was negligent, as the verdicts on Counts 12-26 so found.  The government argues that defendants cannot prevail on this point because it was they, not the government, who successfully argued during trial for submission to the jury of the uncharged lesser-included CWA offense on the grounds that the evidence did contain support for that theory.  We need not resolve this debate because we conclude, as a matter of law, that the evidence was sufficient to support a conviction of both Atlantic States and Davidson on the felony CWA offenses.

This Court has found that the evidence supports the allegation that workers were discharging the contents of the cement pit down the storm drains during the time periods covered by Counts 12-20 and 22-26 (December, 1998 through February, 2000, excluding September, 1999).  We further find that the evidence is sufficient to support a finding that defendant Davidson knowingly caused those discharges by his actions in ordering that conduct through the established chain of command.  The fact that Rush received those orders, first as a laborer from his foreman, and then as a foreman from Davidson as his superintendent, ties those specific orders to Davidson during the time Rush was there, beginning in March, 1999.  A reasonable jury could also find, based on Chase's testimony of the orders he received and pumping to the roadway he observed, throughout the period from 1996 until the yellow tanks were installed (approximately June, 2001), that the practice was firmly in place at Atlantic States as of the Fall of 1998, with Davidson directing it when Davidson resumed his former post as finishing line superintendent at that time.

209

We also conclude that the evidence was sufficient to establish that Davidson knew that discharging into the storm sewers petroleum-contaminated process water, such as that contained in the cement pit, was a violation of the obligations imposed upon Atlantic States under its water permit restrictions.  By 1998, when Davidson returned after an absence from Atlantic States and worked his way back up to superintendent, his friend Randy Lieberman (see n.65, supra) had (literally) risen from laborer to the post of inventory clerk in the scale house, checking in the truckloads of scrap metal being delivered at the main gate.  (Tr. 359 at 125-29.)[118]  From that vantage point, Lieberman could see the end of the cement pit and the hazmat pit, as well as a storm drain in the vicinity of the main gate, near the garage.  (Tr. 362 at 49-52, 116.)  Lieberman testified that Davidson asked him to keep an eye on the cement pit and that drain, and if he saw the cement pit overflowing he should notify Davidson, because Davidson expressed concern to him about the cement pit water overflowing, which it did from time to time.  (Tr. 362 at 52-54.)  Lieberman said there were frequent occasions on his shift, such as when there was high rain volume or someone accidentally left the water on,[119] when he saw the cement pit overflowing.  He would notify Davidson, Prisque, Maury, or someone else, and "generally" someone would try to do something about it.  (Id. at 53-55, 117.)

--------

[118]  Lieberman remained a current Atlantic States employee when he testified on the government's case at trial.  (Tr. 359 at 125.)  He stated that he and Davidson were best friends, both in the 1998-99 time frame and at trial, having started at Atlantic States within a month of each other in 1994.  (Id. at 125; tr. 362 at 45-47.)

[119]  A continuous supply of water was necessary during production in the cement lining process.  Recirculating water would be replenished with additional water as needed during production.  (Tr. 315 at 88; tr. 353 at 30.)

Lieberman's impression was that Davidson's expression of concern about the cement pit overflowing was genuine. (Id.) However, this evidence, as well as the evidence discussed under Count 27, infra, all provided by witnesses called on the government's case, does support a finding that Davidson was aware of the environmental restrictions against discharging cement pit water into the storm drains.

Lieberman testified that he never saw the cement pit being intentionally pumped towards the drain, nor heard any supervisor order anyone to do that. (Tr. 359 at 181-82; tr. 362 at 125-31.) Lieberman worked on the first shift, from approximately 5:30 a.m. to mid-afternoon. (Tr. 362 at 100-01.) Lieberman knew that the cement pit had to be drained every week, for its maintenance after production, on second and third shifts when he was not typically there, because the water had to be kept circulating between the cement pit and the cement line during production. (Id. at 101-02; tr. 359 at 195.) He said his understanding at the time was that the official company procedure was to pump the cement pit water into the hazmat pit; and those times he personally saw the cement pit pumped, it was directed into the hazmat pit. (Tr. 359 at 182-83, 195-96; tr. 362 at 85-87, 98.)

Lieberman also testified, however, that frequently when he came to work after a weekend, or if he was working on a Saturday and the cement line was not in production that Saturday, he would see a lot of residue oil and a lot of puddles, which he recognized as the distinctive greenish cement pit water, with its oily appearance, "going towards the roadway to the drain," and in the vicinity of the drain (tr. 362 at 102-03), indicating that drain near the garage in the area of the scale house. (See id. at 54, 101-03, 115-17, 120-23, 128.) One of Lieberman's duties was to run the street sweeper, and when Lieberman noted oil on the ground, Davidson would order

Lieberman to use the sweeper to get it up.  (Id. at 54-55.)  This evidence, drawing all reasonable inferences in favor of the government, would further support findings that Davidson knowingly caused petroleum-contaminated wastewater to be pumped from the cement pit into the Atlantic States storm sewers (at night, to empty it for scraping the solids out), with knowledge that such conduct would violate the water permits.

The evidence clearly established that during the period covered by Counts 12-27, the problem of how to remove the liquid from the cement pit for regular pit maintenance – so that the person operating the front-end loader could come along and scrape the accumulated solids out of the cement pit – was a separate problem at Atlantic States from the daily problem of keeping the cement pit liquid from overflowing onto the roadway while the cement line was in production mode.  The overflowing problem during production could arise from a variety of causes, including:

1.      Too much new water, or recycled liquid stored in the brown tank (if the brown tank was in use), could be added to the circulating production water;

2.      Too much recycled liquid could be pumped from the inside pits (including the cement line pit and the bell wash pit), through the interior trenches and out into the cement pit;

3.      Too much cement debris could accumulate in the bottom of the cement pit, leaving insufficient capacity in the cement pit for the necessary amount of production water; and/or

4.      Any of the above could occur, singly or in combination, with or without the addition of more water from a heavy rain.

In any of those events, the level of the cement pit liquid could be reduced by pumping out just enough of it to return it to a suitable level for production to continue.  This could be accomplished, during production, by pumping just enough liquid from the cement pit to the hazmat pit to restore the cement pit liquid to the right level for production.  In theory, at least, this would not cause a discharge in violation of the water permits.

The problem of overflowing was separate, however, from the problem of what to do when the liquid contents of the cement pit had to be removed regularly, to allow the accumulated solids to be scraped from the bottom of the pit.  Those solids would build up to the point where they interfered with production because they would displace needed water in the cement pit.  The evidence from several witnesses confirmed that the "pumping of the cement pit," as workers were directed to do both orally and in writing by their superiors including Davidson, referred to the draining of the cement pit during that maintenance procedure approximately weekly, usually after the week's production had ended.  Prior to installation of the brown tank, the evidence indicated that there was no available receptacle for that volume of liquid.  The hazmat pit was the officially designated location for all that liquid, but the evidence showed that it was not a workable solution to the weekly cement pit maintenance problem.[120]  Moreover, if a pipeline

---

[120]  The significance of the evidence of pumping to the hazmat pit for purposes of the Rule 29 analysis is at least twofold.  First, pumping to that destination could be done openly during production, as needed to maintain proper water level in the cement pit for the cement lining operation, because no one believed that would get Atlantic States into trouble under its permits.  In fact, that was the "official" solution to all cement pit pumping needs, as communicated to workers such as Lieberman.  Second, the evidence concerning the hazmat pit demonstrates that pumping to that destination was not a solution to the problem of how to empty that volume of liquid from the cement pit for its routine weekly maintenance.  (See n.116, supra and accompanying text.)  The fact that the brown tank was installed in or about in August 1999, and it was later removed and replaced by six yellow holding tanks, also supports the inference that pumping to the hazmat pit was not a workable solution to the problem of what to do with the liquid in the cement pit so that the accumulated solids could be removed from the bottom and the cement pit restored to production mode.

running from the cement pit through the plant up to the pit under casting machine #4 was operational during the time period of Counts 12-27, the evidence did not indicate that it was customarily used for that purpose, or that it would provide any solution to the problem of pumping out the volume of water in the cement pit.  (See n.116, supra, and discussion under Counts 28-33, infra.)

This Court concludes that a reasonable jury could find, based on the government's evidence, that during the time period of Counts 12-27 (except Count 21 for the reasons stated), when it came to the problem of draining the liquid contents of the cement pit for its necessary maintenance (as distinguished from reducing the liquid level during production to control overflows), the routine pumping destination of those liquid contents was down the roadway into the storm drains.  We further hold that the evidence reasonably supports a finding that this was typically accomplished in the dark, by workers acting at the direction of their supervisors, generally during the late night or early morning hours after the close of cement line production, whether production ended on a Friday/Saturday shift or a Saturday/Sunday shift.

All of the government's evidence summarized under Count 27 (discussed infra), as well Counts 3 and 4 (discussed supra), pertaining to the December 4/5, 1999 discharge from the cement pit, is also relevant to Counts 12-26.  The Court finds that evidence supports and corroborates the counts of conviction upheld in this subsection.

Having found the evidence sufficient to establish each of the essential elements of the felony offenses charged in the specified counts against both Atlantic States and defendant Davidson, the Court need not summarize the evidence that would distinguish negligent from knowing conduct.  We believe that a reviewing court will apply in this setting the principle

214

recognized by the Third Circuit in <u>Buehl</u>, 166 F.3d at 177-81, that a lesser mens rea may be satisfied by proof of a greater one.  We therefore hold, as a matter of law, that the evidence was also sufficient to support the verdict against Davidson on the lesser-included CWA offenses.  For those reasons, the Court will grant a judgment of acquittal of both named defendants on Count 21, while denying the motion as to the verdicts on Counts 12-20 and 22-26.

**Count 27**

The text of Count 27 states:

1.  Paragraphs 1 through 8 and 17 through 21 of Count 1 ... are hereby realleged ....

2.  Between on or about December 4, 1999, to on or about December 5, 1999, ... defendants ATLANTIC STATES, JOHN PRISQUE, JEFFREY MAURY, and CRAIG DAVIDSON, did knowingly discharge and cause the discharge of a pollutant from a point source into the waters of the United States, by causing petroleum-contaminated wastewater to be pumped from a cement pit through a hose into a storm drain that led to the Delaware River, resulting in an 8.5 mile oil sheen on the Delaware River, without a permit issued under Title 33 of the United States Code authorizing such discharge.

In violation of Title 33, United States Code, Section 1311(a) and 1319(c)(2)(A), and [18 U.S.C.] Section 2.

(Dkt. 711 at 46.)[121]  This conduct is also referred to in Count 1, alleged Overt Act 2.  (<u>Id.</u> at 15.)

The verdict found defendant Atlantic States guilty on Count 27.  (Dkt. 609.)  The verdict found each of the named individual defendants not guilty of the felony violation, but guilty of the lesser-included misdemeanor violation pursuant to 33 U.S.C. § 1319(c)(1)(A).  (Dkt. 614; dkt. 610; dkt. 612; <u>see</u> chart n.4, <u>supra</u>.)  They contend that the government's evidence was insufficient to establish facts necessary to support the verdict, or to establish that the individual

---

[121]  The statutory language is quoted <u>supra</u>, n.31, and the essential elements are described in the jury instructions quoted <u>supra</u>, Sec. I.B.

defendants acted negligently.  (Dkt. 635 at 155-68; dkt. 646 at 57-58; dkt. 650 at 18-23; dkt. 661 at 11-13.)

A resident of Carpentersville, New Jersey, who lived in a waterfront home on the Delaware River, awoke on the morning of Sunday, December 5, 1999 and discovered a large oil sheen covering much of the river.  (Tr. 258 at 4-9.)  The prior owner of the same residence had witnessed a similar scene on the morning of Thursday, March 19, 1998.  (Tr. 246 at 40-43.) State and local authorities received 911 calls each time.  (Id. at 49-50; tr. 258 at 9; tr. 260 at 29-30, 48-49.)  Responding officials traced both discharges to an outfall pipe ("the outfall") located on a steep, rocky riverbank approximately 8½ miles upstream in Phillipsburg, New Jersey, and then to the Atlantic States plant via the municipal storm sewers.  (See, e.g.,tr. 258 at 9-25; tr. 260 at 29-54.)

The March 19, 1998 discharge was investigated by the Warren County Health Department, which sent NJDEP a copy of its June, 8, 1998 letter to Atlantic States, requesting "measures that have been taken or plan to be taken by Atlantic States to eliminate hydrocarbon products from entering the storm drains at the facility."  (Gov. Ex. 1-001; tr. 246 at 168-76.)[122] The December 4/5, 1999 discharge was responded to by agencies including NJDEP, and led to a

---

[122]  Atlantic States responded in its 6-23-98 letter to the County Health Department, stating that "we do not believe the 'large oil sheen' observed in the Delaware River which you told us about on the day of your visit ... originated from the [Atlantic States] site."  Its stated reasons were that they used a street sweeper daily to clean the paved areas during production, and they monitored their stormwater runoff for petroleum and were in compliance with those limits of their water permits.  (Gov. Ex. 1-002.)  Of course, those stormwater samples could only be collected during rain events, and they were collected at times selected by Atlantic States.  (Tr. 363 at 45-47.)  The substantive CWA counts in the indictment are directed to discharges allegedly initiated by Atlantic States intentionally to pump liquid out of certain pits, regardless of whether rainwater was going down the storm drains at the time of such pumping.

criminal investigation that included the February 24, 2000 search warrant execution at the plant, described under Counts 3 and 4, supra.  Count 27 charges that the December 4/5, 1999 discharge was a felony violation of the CWA by defendants Atlantic States, Prisque, Maury and Davidson, or alternatively that those defendants aided and abetted in that violation.  (Dkt. 711 at 46.)

NJDEP has an Emergency Response Bureau on duty at all times, staffed by a dispatch officer at the hotline and emergency response officers in the field.  (Tr. 261 at 67-68.)  Bruce Doyle, an experienced emergency response officer in the region that included Warren County, was dispatched to respond to a hotline call involving the Delaware River on the morning of December 5, 1999.  (Id. at 60-69.)  Using information provided by the dispatcher, Doyle arrived at the outfall.  There he climbed down the rocky bank, took photographs of the oil sheen on the river, and collected samples of the fluid coming from the outfall.  His impression was that the discharge had been continuing for some time, to create the amount of oil sheen observed in the river.  (Id. at 69-79.)

The Chief of the Phillipsburg Fire Department, Richard Hay, met Doyle at the outfall at approximately 11:15 a.m.  (Id. at 74-75; tr. 260 at 54.)  Chief Hay and Doyle proceeded to Atlantic States, and spoke with two guards at the main gate.  They were told that the plant was closed for deer season.  They requested the guards to call a company representative to come to the plant.  (Tr. 260 at 54-55; tr. 262 at 9-12.)[123]   Chief Hay was already familiar with the plant.

---

[123]   Monday, December 6, 1999 was the opening day of deer hunting season in Pennsylvania.  (Tr. 320 at 43-44.)  Witnesses testified that this was a standard annual holiday at Atlantic States.  (See, e.g., tr. 289 at 42-43.)  The daily manning reports, described infra n.131, indicate that the plant was not in production mode on that Monday.  (Tr. 317 at 33-36.)

(Tr. 260 at 19-21, 86-94.)  He waited for the arrival of the Atlantic States representative, and Doyle proceeded to explore.  (Tr. 262 at 12-13, 45-46; tr. 265 at 174; tr. 278 at 105.)[124]

That was Doyle's first occasion at the Atlantic States plant.  (Tr. 262 at 11.)  His job was as emergency responder to environmental calls for all types of hazardous substance problems, including in water and air, in a ten-county region.  (Tr. 261 at 61-66.)  He was not a water permit compliance inspector such as Hirsch.  (Tr. 367 at 30.)  At that time he knew only that the plant was what he then called a "metal smelting facility."  He did not know its features or how the plant functioned.  (See tr. 262 at 49-51; tr. 278 at 12-16.)

Doyle could see, from the guard booth area, large puddles on the ground with an oily sheen.  (Tr. 278 at 13.)[125]  He could also see a large drain at the end of one of the buildings, into which some of the flow was running.  He walked toward the flow, and could also see it going down a smaller drain around the corner of the building, near what he would later learn was the cement pit.  The cement pit contained solid material, and liquid in the bottom consisting of water and oil.  (Id. at 13-30.)  Inside the sloping end of the pit was a partially-submerged sump pump that was not operating at the time.  The electrical cord of the pump ran inside the building.  The outlet hose of the pump was placed outside the pit on the roadway.  (Id. at 28-36.)  Doyle could see the flow pattern from that hose leading down the roadway to the smaller drain he had just walked by, and beyond to at least two other drains, including the large drain near the main entrance.  (Id. at 27-36.)

---

[124]  Chief Hay recalled that he and Doyle stayed together until Maddock arrived, then the three of them walked to the cement pit.  (Tr. 260 at 55-56.)  We would not find that discrepancy material.

[125]  There was no trial evidence that it had rained prior to discovery of the December 4/5, 1999 spill.

Doyle photographed the scene at the cement pit when he first arrived there on December 5, 1999, before it was altered by anyone.  (Tr. 262 at 46; tr. 274 at 52; tr. 278 at 12-17.)   Those photos show the location of the sump pump at the sloping end of the cement pit, with its electrical cord running into the pump room and its outlet hose directed onto the pavement.  They also show that there was a wooden pallet propped against the railing on the lengthwise side of the cement pit.  The photos in evidence taken by Doyle on that day are described in the margin.[126]

Joseph Maddock arrived at the plant at approximately 12:45.[127]  Chief Hay introduced Doyle and Maddock, while Doyle was standing at the cement pit taking photos.  (Tr. 262 at 46.) Doyle asked Maddock whether he knew anything about the discharge and how it occurred. Doyle also asked Maddock about the sump pump, the hose and the cement pit.  Maddock stated that he had no information to give Doyle about any of those things.  (Id. at 47; tr. 278 at 18-20; tr. 278 at 113-16.)   Doyle said to Maddock that it appeared to be a deliberate discharge.  Doyle testified:  "Mr. Maddock indicated to me he had no idea what had caused the discharge and who had done it.  He had offered a suggestion that there were some contractors at the facility."  (Id. at 116.)  Doyle's understanding of that comment was that somehow the contractors were responsible for the discharge.  (Tr. 262 at 51.)  Doyle issued a written directive to Maddock that Atlantic States should clean up the spill, both at the plant and at the outfall.  Doyle then left the plant and went back to the outfall where he placed oil-absorbing booms.  (Id. at 51-55.)

---

[126]  The 12-5-99 Doyle photos in evidence (all government exhibits described in Doyle's testimony) include the following photos at the plant, which we have arranged in convenient viewing order:  1-P030; 1-P029; 1-P057; 1-P031; 1-P056; 1-P033; 1-P032; 1-P058; 1-P039; 1-P038; 1-P035; 1-P034; 1-P028; 1-P037.  They also include these photos at the outfall: 1-P025; 1-P026; 1-P027; 1-P067; 1-P068.

[127]  Maddock was the safety director, a subordinate of defendant Faubert.  (See discussion of Counts 7 and 9, supra.)

Doyle was one of the officials present for the search warrant execution at the plant on Thursday, February 24, 2000.  (Tr. 265 at 14.)  Doyle saw that the cement pit was in similar condition as on December 5, 1999, with solids and oil and greenish water in it, but the level of the liquid was much greater than on the earlier occasion, and the plant was in production mode. (Id. at 25, 35-40; tr. 274 at 54-55.)[128]

On the day of the search warrant execution a sump pump was observed lying alongside the cement pit (not attached and not in use), and a hose that appeared to fit the pump was located in a nearby bin.  Those items were taken into evidence.  (Tr. 265 at 40-68, 76-84.)  Doyle took photos that day, as did other investigators, documenting the configuration of features of the area and the sampling of the liquid in the cement pit during the search.  (Id. at 25-36, 113-23.)[129]  A dye test was also conducted in the large baffle drain near the main entrance during the search. That test confirmed that liquid entering the storm drains in that area flowed through the municipal storm sewer system and emerged at the outfall.  (Id. at 123-25.)

Doyle was present during the search on February 24, 2000 when agent Hill interviewed defendant Prisque, as described supra under Count 3.  Doyle heard Prisque state that the discharge of oil onto the roadway on December 4/5, 1999 was caused by a hole in a hose.  When

---

[128]  The appearance of the cement pit during the search warrant execution on Thursday, 2-24-00, during production, was similar to that described by County Health Department official McCormick, who investigated the oil discharge on the river on Thursday, 3-19-98.  On that date also, the cement pit was full (in fact, very full – it had been raining), and the plant was in production.  (Tr. 246 at 169-73; tr. 260 at 4-8, 38-41.)

[129]  Some of the 2-24-00 photos show the hose taken into evidence on that date positioned in the location where Doyle had seen a similar hose directed onto the roadway from the submerged sump pump on 12-5-99.  (See, e.g., Gov. Ex. 1-P064.)  That was done by the investigators for visual reference purposes, not to suggest that the hose was found in that location on 2-24-00.  (Tr. 265 at 63-68.)

Prisque walked away, Doyle turned to Hill and said, "yeah, there was a hole in the hose, at the end of the hose," referring to the end of the sump pump hose that he had photographed on December 5, 1999 directed onto the roadway.  (Tr. 265 at 137.)  The statements by defendants Maury and Davidson to investigators during the search are described supra under Counts 3 and 4, Doyle also having been present for the Davidson interview.[130]

The cement line had been in production mode on Saturday, December 4, 1999, as evidenced by workers' time sheets for that date.  (See tr. 317 at 28-33; tr. 305 at 45-46.)  David Chase, the oiler, noted in his daily log sheets on Wednesday, December 1 and Friday, December 3, 1999, that the cement line hydraulic system had a bad oil leak.  (Tr. 351 at 125.)  Robert Rush testified that there was also a bad oil leak in the bell wash machinery on Saturday, December 4, 1999.  (Tr. 291 at 64-66.)  He said that in the afternoon of December 4 the cement pit was also very oily and full, and had overflowed into the nearby small drain, but production continued under Davidson's direction.  (Id. at 57-76; tr. 307 at 38-48.)[131]

---

[130]  A business record of Atlantic States, which was not admitted into evidence until the government's cross-examination during defendants' case, was a letter dated 8-15-00 from Atlantic States to the EPA signed by Yadzinski, with a copy to Prisque, stating that on 12-4/5-99 the cement pit "experienced an overfill causing it to overflow and enter a nearby storm sewer." (Gov. Ex. 1-127.)  Clearly, according to the Doyle photos taken on 12-5-99, the discharge that he observed that day could not have gotten out of the cement pit by overflowing alone, because the liquid level in the pit on 12-5-99 was way below grade.  It would have required deliberate pumping to reach that level, whether or not an overflow had occurred earlier in the sequence of events.  Maddock, on behalf of Atlantic States, personally witnessed that obvious scene as Doyle photographed it on 12-5-99.  We exclude that letter from the Rule 29 analysis, but consider it to be further favorable government evidence under the Rule 33 analysis.

[131]  Rush was confronted on cross-examination with company records indicating that although he became a salaried foreman on 12-20-99, he was still an hourly laborer on 12-4/5-99.  (Tr. 305 at 108-15; tr. 307 at 38-58, 152-56.)  The laborer attendance records for 12-4-99 (called daily manning reports) did not note that Rush actually worked that day, although he was listed as a scheduled worker.  (Id. at 156-64; tr. 317 at 17-33; tr. 320 at 162-68, 174-75.)  Rush replied

221

Rush testified that on December 4/5, 1999, "we" were pumping out the cement pit down the drain rather than to the brown tank or the hazmat pit at the end of the shift.  It was only after the search warrant execution, in February, 2000, that the procedure changed to starting to pump into the hazmat pit for the cement pit maintenance at the end of each week (unless it was raining and the pumping would be down the drains).  (Tr. 296 at 15-20; see text accompanying n.116, supra.)  Rush stated that a few days after the 12-4/5-99 discharge, Davidson spoke to Rush about his concern.  That testimony is quoted in the margin.[132]

One of the observations made by Doyle when he was at the outfall on December 5, 1999 was that the flow of liquid contained both oil and a fine solid material suspended in the water.  He took samples at the outfall that day.  (Tr. 261 at 78-89.)  He identified similar materials in his visual observation of the contents of the cement pit at the plant on that same day.  (Tr. 262 at

---

that those records were not always completed accurately by the foremen.  (Tr. 305 at 28-31; tr. 320 at 136-53.)  He stated that he did recall the incident of the 12-4/5-99 spill (although not the exact date without assistance from the government), and he was definitely on duty that night.  (Tr. 303 at 53-74; tr. 305 at 45-46; tr. 307 at 38-48, 58; tr. 317 at 30.)

[132]  Rush testified as follows:

Q    Now, within days of December 4th 1999 do you recall Craig Davidson speaking to you about where the storm drains on Atlantic States' property lead to?

A    Yes.

Q    Please tell the jury what happened during that conversation?

A    He was worried about the oil going down the storm drain and I jokingly said to him well how can they trace the oil back to Atlantic States when all the storm drains in Phillipsburg run together and go out to the river and he said that all the storm drains just in Atlantic States go to one and then that one pipe goes to the river.  So if there was ever an oil slick in the river they can tie it back to the plant.

(Tr. 291 at 76.)

28.)[133]   Samples of the liquid in the cement pit were taken by NJDEP investigators during the

search warrant execution on February 24, 2000.  (Tr. 265 at 113-23.)  Laboratory analysis

confirmed that the lubricating oil in both sets of samples matched.  (Tr. 326 at 38-42.)

Doyle observed a similar flow from the same outfall when he again responded to an

NJDEP hotline call on the evening of Sunday, April 16, 2000.[134]  On that occasion he again went

to the outfall and saw the oil and "cement-like material" in the discharge, as well as an oil sheen

on the river.  However, the oil in that discharge appeared to be a lesser quantity than on

December 5, 1999, and the oil sheen on the river was not as extensive.  The sheen was breaking

up at a local bridge located downriver, and was not visible below that point on the river.  (Tr. 265

at 137-38, 141; tr. 275 at 65-69.)[135]

Doyle went from the outfall to the plant briefly that day, April 16, 2000, at 7:00 p.m.  It

was still daylight on that Sunday, and the plant was not in production.  He saw that although

there had been a significant rainfall, the roads in the plant did not have puddling and were dry.

He went over to the sampling Location 3 large baffle drain, and saw an oil sheen inside it in the

---

[133]   Water permit sampling Location 3, the baffle drain near the main entrance, had
recurring problems, with sample results showing excessive amounts of particulate matter ("total
suspended solids"), petroleum hydrocarbons, and other testing parameters.  For example,
rainwater testing done by Atlantic States on October 20, 1999 showed 1.5 times the limit for total
suspended solids.  (Tr. 363 at 115-23.)

[134]   This was after the time frame of the substantive CWA counts but within the period of
the alleged conspiracy, and has some relevance as discussed infra, n.141.

[135]   The samples Doyle took at the outfall on 12-5-99, when settled in the sample jars and
placed in evidence at trial, displayed layers of solids on the bottom, water in the middle, and oil
on top.  However, the sample collected directly from the outfall flow contained more solids than
the sample collected from a nearby rock pool.  Doyle stated that would be expected as the solids
began to settle out of the fluid once it exited the outfall.  (Tr. 262 at 6-9.)

middle grate.  (Tr. 265 at 137-40; tr. 277 at 11-15.)  Those observations were not documented by

samples or photos.  (Tr. 274 at 70-73; tr. 275 at 67.)  Doyle did issue a directive and another

notice of violation to Atlantic States arising from that discharge.  (Tr. 265 at 140-41.)

This Court concludes that a reasonable jury could find, based on the government's

evidence, that the December 4/5, 1999 discharge resulted from causing petroleum-contaminated

wastewater to be pumped from the cement pit through a hose into storm drains at the plant, as

alleged in Count 27.  In rendering the following rulings as to Count 27, we expressly incorporate

by reference the discussion of evidence herein under Counts 3, 4, 12-26 and 28-33.

The physical evidence clearly indicated that the cement pit was drained by pumping from

the cement pit onto the roadway during the period of December 4/5, 1999, resulting in the 8½

mile sheen observed on the river on the morning of December 5.  As documented in the Doyle

photos of that day, there was still a sump pump in place for that purpose, positioned exactly as

Rush and Owens described it in their testimony of the procedure.  (Gov. Ex. 1-P058; 1-P038; 1-

P039; Tr. 291 at 44-49.)  In addition, the wooden pallet propped against the lengthwise rail of the

cement pit shown in the 12-5-99 photos corresponded to the method and location of pumping

with the Honda gas pump described by both Chase and Rush.  (Gov. Ex. 1-P031; 1-P033; 1-

P056; tr. 289 at 205-209; tr. 291 at 33-39; tr. 351 at 84-89.)[136]  The accumulated solids were

---

[136]  Comparing the photos taken on 12-5-99 and 2-24-00 reveals another interesting detail.
The length of sidelong railing against which the wooden pallet was propped when photographed
on 12-5-99 had been removed as of 2-24-00, along with another railing nearer the pump house
that had been roughly parallel, where the sump pump was found on 12-5-99.  Only those portions
of railing were gone.  The removal of just those portions of railing resulted in no railings marking
the location of the cement pit being visible from the main gate as of 2-24-00.  (Compare [in this
order] Gov. Ex. 1-P029; 1-P057; 1-P031; 1-P056; 1-P031; 1-P032; 1-P058 (12-5-99 photos) with
1-P104; 1-P1-9;1-P103; 1-P107; 1-P110; 1-P060; 1-P046 (2-24-00 photos).)

clearly visible in the bottom of the pit, and the liquid level had been drained down.  (Gov. Ex. 1-P031; 1-P-56.)  This was consistent with the testimony of both Lieberman and Rush that a worker operating a front-end loader would come along and scoop out those materials from the drained cement pit sometime before the next production shift began.

As of December 4/5, 1999, the next production shift was not scheduled until the morning of Tuesday, December 7.  (See n.123, supra.)  The condition of the cement pit on that Sunday morning was therefore exactly as the witnesses described that it would be in the ordinary course of performing the end-of-production weekly maintenance of the pit at that time in the work week.  It would be reasonable to infer from this evidence that the heavy gas pump, which belonged up in the casting area, had been used and put away by then.  It would also follow that the small sump pump, plugged in at the pump room, was left submerged and pumping until it automatically shut down when the fluid drained to the point where the pump was only partially submerged.  That pump could be removed any time before the start of the next working day, as the loader operator came by to scoop out the solids so that the water level could be replenished and production could resume.  Owens, it will be recalled, described that pumps were left in just that configuration during a summer shutdown while crews worked elsewhere until the pumping stopped and the scooping-out tasks began.  Thus, the physical evidence discovered by NJDEP on December 5, 1999 was consistent with the pattern and practice described by the workers.

The verdict found Atlantic States guilty on the felony offense charged in Count 27, and the named individual defendants Prisque, Maury and Davidson guilty of the lesser-included negligent offense.  They contend that there was (1) no proof the individual defendants were negligent; and (2) insufficient evidence to implicate Prisque or Maury in causing the December

4/5, 1999 discharge.  We disagree, and find that the evidence was sufficient to support a conviction of Atlantic States and each of the named individual defendants on the felony CWA offense charged in Count 27.

The problems with accumulated solids and the need to drain the cement pit regularly were well known to Prisque, Maury and Davidson, according to the evidence.  Here we revert back to the evidence that Prisque as plant manager, Maury as superintendent of maintenance, and Davidson as finishing line superintendent, were key "white shirts" responsible for the steady production of the plant.  (See discussion under Count 11, supra.)  They typically arrived very early each morning and met on the "melt deck" to ensure a smooth start to the production day. They typically met each afternoon for daily production meetings, at which the primary topic of discussion was operations and maintenance problems.  They knew, as of August, 1999, that a unit such as the brown tank was needed to store cement pit water including during weekly maintenance, thus supporting the inference that the hazmat pit was not a workable destination for that purpose.

Millwrights, directed by maintenance department or finishing line foremen, regularly participated in the pumping of the cement pit for its maintenance.  The same type of millwrights would be called to repair the frequent hydraulic line leaks in cement line machinery, and they were the ones who would have to fix the brown tank when it got clogged.  Chase the oiler, a maintenance department worker, was required to take meticulous notes of his observations of broken and leaking machinery and spilled hydraulic oil throughout the plant, including concentrations of oil on the surface of the cement pit, and hand those notes daily to his

maintenance department foreman.  He also participated in servicing the booms, socks, skimmers and pillows that were used to attempt to absorb oil from the cement pit.

Keeping the cement pit up and running was essential to production.  Whenever the cement pit accumulated enough sediment to interfere with the continuous flow of sufficient water for the cement lining process, the cement pit had to be drained by pumping.  As of December 4/5, 1999, there were only two locations into which that volume of oily liquid "officially" could be pumped:  the brown tank that constantly clogged, and the hazmat pit from which the liquid would leak back onto the roadway and down the drains, or be carried off leaking the liquid from the disposal trucks.  This was a problem that involved personnel in both the finishing department supervised by Davidson, and the maintenance department supervised by Maury.  Both of them reported to Prisque, who ran the operations under a strict "chain of command" that Prisque enforced.  The evidence showed that the practice of pumping the contents of the cement pit down the storm drains at night, after production had shut down, was expressly directed by Davidson and instructed by foremen to workers of both the finishing department and the maintenance department.

The evidence was also sufficient to establish that as of December 4/5, 1999, all three of those individuals knew that discharging petroleum-contaminated wastewater down the storm drains was a violation of the company's obligations under the water permits.  Prisque was plant manager during the entire period covered by Counts 12-27, and was in charge of daily operations.  (See, e.g., tr. 291 at 4-6; tr. 416 at 16.)[137]  Yadzinski the engineering manager, who was the

---

[137]  Personnel records for Chase, for example, indicate that Prisque was plant manager before the December, 1998 onset date of the substantive CWA counts.  (See tr. 353 at 172.)

designated Atlantic States contact person with regulators on environmental issues, was routinely required to keep Prisque informed of his dealings with those officials.  (See, e.g., Gov. Ex. 1-001; 1-002.)  It would reasonably be inferred that Prisque was thus aware of the express limitations of the water permits and the ongoing regulatory struggle between the company and NJDEP over compliance.  Davidson's knowledge that this conduct was not permitted is discussed under Counts 12-26, supra.  Maury's parallel knowledge is described under Counts 28-33, infra.  Indeed, all of the government's evidence discussed under Counts 3, 4 and 12-33 would support this finding.

The evidence of the false statements of Prisque, Davidson and Maury to investigators during the search warrant execution further supports a reasonable finding that all three of them knowingly caused, and knowingly aided and abetted, the practice of pumping cement pit contents into the storm drains as of December 4/5, 1999.[138]  Maddock saw the NJDEP photographing the evidence of the discharge at the plant on December 5.  After NJDEP departed, Prisque and Maury arrived and personally did the cleanup for many hours.[139]  A reasonable jury could infer

---

[138]  When NJDEP official Doyle and agent Hill interviewed Prisque during the search warrant execution, it appears they were not made aware that Prisque was the plant manager.  (See tr. 265 at 37-38; tr. 314 at 34.)  Hill expressed concern to Prisque about the oil they saw floating in the cement pit, and Hill asked Prisque, "What do you do with the oil in the pit?"  Prisque stated, "I don't know."  Prisque then told Hill he should go see Yadzinski, head of engineering and environmental, who [curiously enough] happened not to be at the plant at the current time and for Hill to ask another question.  Prisque told Hill that Yadzinski would be back in a couple of hours.  (Tr. 314 at 35.)  A reasonable inference from this conduct by Prisque was that not only did Prisque know the answer to Hill's question, but his answer was purposely to divert the investigators from realizing that Maury, as well as Davidson, would each know that information because together they supervised those functions.  (See also tr. 454 at 22 (Harbin instructing a worker that if OSHA asked him anything while inspecting, "just tell them you don't know.").)

[139]  Chase did record occasionally cleaning up oil leaks from trucks, but those were brief cleanups according to his time sheets.  (Tr. 355 at 100-03.)

that they observed the scene and obtained the details from Maddock, then at their next opportunity they worked with Davidson to concoct similar explanations of the events.[140]  The fact that Davidson also spoke to Rush about his concern that an oil slick on the river could be traced back to Atlantic States adds further support to the inference that all three of those particular "white shirts" were preparing a suitable posture to present to the regulators when asked, because they were the ones who were involved in causing or willfully aiding the practices that led to that and similar discharges.  The evidence of personal involvement in deceptive practices after other environmental and worker safety incidents, by Prisque and the various "white shirts" responsible for those incidents, as charged in other counts in the indictment and discussed herein, is also relevant to the issue of the involvement of Prisque, Maury and Davidson in causing or aiding and abetting the December 4/5, 1999 discharge.

A reasonable jury could conclude from the evidence that the named defendants were not concerned about sending petroleum-contaminated process water down the storm drains at night, generally at the end of production each week, but rather that they did so knowingly, with the hope that most of the oil would not reach the outfall, and the cement particles would settle imperceptibly into the river, and what oil there was would dissipate quickly during the night hours so that no oil "slick" could be traced back to Atlantic States.  That expectation was not

---

[140]  Indeed, the fact that a sump pump was left by the side of the cement pit when the search warrant team was allowed to enter the plant on 2-24-00, when defendants knew that they had "visitors" and could have scuttled such evidence, can reasonably be seen as consistent with an effort to present false stories to the investigators about a sump pump with a hole in the hose on 12-4/5-99.  After all, defendants would have been aware from Maddock that a connected sump pump was photographed by NJDEP in the cement pit that day, so any false accounts to explain the events would need to include a sump pump or some other type of oil conveyance onto the roadway.

unreasonable as a practical matter, <u>if</u> the booms, pillows, skimmers or socks used by the millwrights at the cement pit did a decent job; <u>if</u> there were no major oil leaks in the machinery inside the cement line or those leaks were not pumped out of those interior pits into the trenches leading to the cement pit; <u>if</u> what oil there was on the surface of the cement pit remained mostly inside the pit when the gas and sump pump hoses went down to drain liquid from the interior of the cement pit; and especially <u>since</u> the pumping was typically done at night.  However, the act of sending petroleum-contaminated wastewater to the storm drains was a violation of the water permits, as the evidence showed those defendants knew.[141]

This Court finds the evidence sufficient to establish each of the essential elements of the felony offense charged against each of the named defendants in Count 27.  Therefore, we need not summarize the evidence that would distinguish negligent from knowing conduct.  As stated under Counts 12-26, we believe that a reviewing court will apply in this setting the principle recognized by the Third Circuit in <u>Buehl</u>, 166 F.3d at 177-81, that a lesser mens rea may be

---

[141] Each of the three oil spills described in the government's evidence that were observed at the outfall near this time period would be consistent with the government's theory of the case. The 8½ mile spill observed on the morning of Thursday, March 19, 1998 would be a night draining of a particularly oily cement pit, as required on a schedule more frequent than weekly, described by Rush in the late 1998-early 1999 period, before the cement residue accumulations were brought under better control.  The identical spill observed on the morning of Sunday, December 5, 1999 would be the end-of-production weekly draining, again of a particularly oily cement pit, as indicated by both Chase and Rush was the condition of the cement pit at that time. The breaking-up sheen observed on the evening of Sunday, April 16, 2000 [post-search warrant on 2-24-00] would be the product of passive weekend leaking onto the roadway of cement pit water pumped to the hazmat pit, enhanced by the rain event of that day, and perhaps swept from the blacktop at Atlantic States before NJDEP arrived to check.  As Doyle stated when asked on cross-examination why there were not more such sightings, he said, "If the oil was discharged at night, it's possible that nobody saw it.  The oil would dissipate."  (Tr. 278 at 96.)  The intentional discharges from the #4 pit, described under Counts 28-33 <u>infra</u>, were perhaps more frequent than weekly, but apparently less volume of fluid, and could fit the same theory of the government's case.

satisfied by proof of a greater one.  We therefore hold, as a matter of law, that the evidence was

sufficient to support the verdicts against Atlantic States on the felony CWA offense, and against

Prisque, Maury and Davidson on the lesser-included CWA offense under Count 27.

**Counts 28-33**

The text alleging Counts 28-33 states:

1.  Paragraphs 1 through 8 and 17 through 21 of Count 1 ... are hereby realleged ....

2.  In or about the months listed below, ... defendants ATLANTIC STATES ... and JEFFREY MAURY, ... did knowingly discharge and cause the discharge of a pollutant from a point source into the waters of the United States, by causing petroleum-contaminated wastewater to be pumped at night from a pit under casting machine #4 into a storm sewer that led to the Delaware River, without a permit issued under Title 33 of the United States Code authorizing such discharge:

| Count | Month |
|-------|-------|
| 28 | May 1999 |
| 29 | June 1999 |
| 30 | July 1999 |
| 31 | Aug. 1999 |
| 32 | Sept. 1999 |
| 33 | Oct. 1999 |

In violation of Title 33, United States Code, Section 1311(a) and 1319(c)(2)(A), and [18 U.S.C.] Section 2.

(Dkt. 711 at 47.)[142]  This conduct is also referred to in Count 1, alleged Overt Act 4.  (Id. at 15-

16.)

The verdict found both Atlantic States and Maury guilty of the felony offense charged in

each of Counts 28-33.  (Dkt. 609; dkt. 612.)  They contend that the government's evidence was

---

[142]  The statutory language is quoted supra, n.31, and the essential elements are described in the jury instructions quoted supra, Sec. I.B.

(1) at fatal variance with the allegations in the indictment, and (2) insufficient to establish facts necessary to support the verdicts.  (Dkt. 635 at 173-80; dkt. 646 at 58-60; dkt. 650 at 23-27; dkt. 661 at 13-15.)

The evidence established that during the period of Counts 28-33, there was a large pit located in the casting department underneath casting machine #4 ("the #4 pit").  Casting machine #4 was used to make the 24" diameter pipes, the largest made at Atlantic States.  (Tr. 368 at 25.) The dimensions of the #4 pit were approximately 20' long, 30' wide, and 16' deep.  (Tr. 355 at 170.)  That pit was covered by a steel plate, part of which could be lifted off by an overhead crane.  (Tr. 368 at 8-24.)

The casting process generated large amounts of wastewater containing lubricants including "solvac," "blacking," and hydraulic oil leaking from the casting machinery.  Those fluids were collected in the #4 pit, along with slivers of iron and other debris.  (Tr. 355 at 170-72; tr. 357 at 48-49; tr. 362 at 136-37; tr. 368 at 8, 25-26, 120-21, 128-29.)  The #4 pit was typically full.  (Tr. 362 at 138; tr. 368 at 129.)  Workers knew that the fluid level in the #4 pit had to be kept from overflowing during production, because that fluid would cause an explosion if it reached the nearby "bull ladle pit," where the red-hot molten iron came out of the cupola.  (Tr. 355 at 173-74; tr. 357 at 67; tr. 362 at 140; see also tr. 416 at 9.)

The fluid level in the #4 pit could be lowered only by pumping.  (Tr. 362 at 140-41; tr. 368 at 9-11, 26.)  If the fluid level in the #4 pit rose too high during production, workers would reduce the level by pumping it into steel deck-covered water trenches (also called troughs) that ran alongside several of the casting machines.  (Tr. 353 at 28-30, 73-77; tr. 368 at 10-11, 129-33.)  The fluid in those water trenches could be pumped to green holding tanks, also called the

large tanks or clearwell tanks ("the outside holding tanks").  (Tr. 355 at 182-84; tr. 357 at 50, 55-56.)[143]  The outside holding tanks were located adjacent to the casting area on the roadway across from the cooling towers.  (Tr. 280 at 52; tr. 289 at 9-13; tr. 357 at 4-50; tr. 362 at 149; tr. 368 at 133.)[144]  There was a storm drain in that portion of roadway.  (Tr. 280 at 67-68; tr. 368 at 33-34, 75-76.)[145]

Liquid contents were also pumped from the #4 pit at night, after production had ended, when the fluid level in that pit was too high for production to start up the next morning.  This required the effort of millwrights, crane operators and electricians, as a maintenance function.  (Tr. 355 at 174-75; tr. 357 at 57-61; tr. 362 at 138-40.)

Workers testified that they would frequently see the outside holding tanks overflow during production.  When that happened, they would see "dark, hot, muddy water" coming from those tanks and flowing into the storm drain in the roadway.  (Tr. 368 at 74-76, 133-34; tr. 280 at

---

[143]  Workers' accounts varied as to whether, during the period of Counts 28-33, there were three or four green holding tanks at that location.  That difference was not material to the testimony.  (See tr. 289 at 9-13; tr. 357 at 49-50, 72; tr. 362 at 149; tr. 368 at 73-74, 133.)

[144]  The cooling towers were a unique and separate category under the water permits. They were the only facility in the plant that was permitted to discharge "non-contact cooling water." That would be water used to cool a machine or process to keep it from overheating, and it was not supposed to come into contact with any of the material that it was cooling.  Water discharged from the cooling towers had a separate sampling Location 1 in the municipal storm sewer system.  It was regulated as a separate type of discharge than the permitted stormwater drains sampled at the other four sampling locations.  No "process water," that is, industrial wastewater, was allowed to be discharged into any of the storm drains at the plant except the "non-contact cooling water" sampled at Location 1.  Only stormwater caused by a rain event was permitted to discharge into all other storm sewer locations on the property.  (See Gov. Ex. 1-013A; tr. 363 at 27-28, 32-34, 43-45, 48-50; see generally overview of the water permits and sampling process in discussion of Counts 12-27, supra.)

[145]  This is the same portion of roadway where the Coxe forklift fatality occurred.  (See evidence cited in discussion of Count 9, supra.)

68.)  The street sweeper machines swept that and other areas of the plant roadways constantly during daytime operations, starting sometime before 7:00 a.m.  (See Gov. Ex. 1-002; 1-P046; 1-P113; tr. 314 at 64-66; tr. 389 at 4-10.)  Defendant Maury, the maintenance supervisor at the time, was also directing the work of the street sweepers through the chain of command.  He mentioned the activity of the street sweepers to the investigators while being interviewed during the search warrant execution on February 24, 2000.  (Tr. 322 at 73.)  That area of the plant roadway, unlike the roadway in the vicinity of the main gate, was not an area visible from the street.  (See Gov. Ex. 1-013A; 3-P008; tr. 424 at 93-95.)

Water was essential to production in the melting/casting area, as it was in various other areas of the plant.  (See, e.g., tr. 291 at 22-27; tr. 370 at 111-12.)  Although many workers and foremen performed functions at the direction of their supervisors relating to the maintenance and operation of the water system (or systems) in the melting/casting area, none of them were given the complete details of how it was designed or operated.  They only knew their assigned tasks and what they observed.  (See, e.g., tr. 353 at 28-30, 73-77; tr. 357 at 69-79; tr. 362 at 147-50; tr. 368 at 28-29, 38-51, 73; tr. 370 at 57-62, 110, 137.)

The rear wall of the casting building consisted of deteriorated corrugated metal with holes in it.  The outdoor area behind that wall consisted of dirt.  (Tr. 355 at 176; tr. 362 at 140, 146-48; tr. 368 at 132-33.)  That area was adjacent to the plant's rear roadway, going past the melting department to the westerly end of the plant.  (See Gov. Ex. 1-013A; tr. 355 at 176; tr. 280 at 86-87; tr. 305 at 160-61.)  The roadway in that location sloped on a downgrade away from the melting department toward the back of the plant.  (See Gov. Ex. 0-P041.)  The water permits recognized that the plant had approximately 40-50 storm drains and catch basins, and the storm

234

drains at that end of the plant were represented by sampling Location 2.  (Gov. Ex. 1-013A; Tr. 363 at 32-33.)  All of the stormwater drainage at that end of the plant flowed into the storm sewers in the vicinity of sampling Location 2, that led to the river.  (See tr. 363 at 158-63; tr. 367 at 4-7.)

Brad Schultz worked at Atlantic States as a second shift millwright during the period covered by Counts 28-33.[146]  He testified that while he worked in the casting area one of his foremen was Robert Bobinis, whose supervisor was defendant Maury.  (Tr. 362 at 138-39.)  Schultz stated that on three occasions at night, he was directed by Bobinis to pump liquid from the #4 pit.  (Id. at 138-39, 150.)  He could not recall the dates or months of those events, but said he only worked with Bobinis for a few months.  (Id. at 143, 150-51.)  He described the procedure that was followed on each occasion.  He said two types of pumps were used, namely a gas-powered pump on one occasion and a large electric sump pump the other two occasions.  He could not handle the gas pump alone, and required help from Bobinis.  The sump pump was put in place by a crane operator and hooked up by an electrician.  (Id. at 139-40, 168-69.)  On each occasion Schultz placed the outlet hose of the pump from the pit through a hole in the back wall, outside behind the building, and pumped the liquid to that location.  (Id. at 138-40, 167.)  He saw a pile of dirt in that outdoor area, but knew nothing more about that area.  (Id. at 146-48.)

Robert Bobinis worked at Atlantic States during the relevant period from approximately May 5, 1999 until he was terminated on or about October 1, 1999.  (See tr. 355 at 168-70; tr. 357

---

[146]  Schultz testified that he was employed as a millwright from January, 1998 until February 1, 2000.  He began working on third shift in the cement line area, then was moved to second shift in the casting department.  (Tr. 362 at 132-33.)

at 104.)  He started as a millwright, and was soon promoted to foreman.  Company records indicated that he was in foreman status as of no later than August 9, 1999.[147]

Bobinis testified that he pumped liquid out of the #4 pit at night, after production shut down,  approximately once or twice a week, both when he was a millwright and when he was a foreman in 1999.  (Tr. 355 at 174-75.)  He said the frequency of pumping depended on the severity of leaks from the machinery into the #4 pit and the level of fluid in the pit.  (Id. at 173.) He said that he was directed in the procedure by Maury throughout that period.  (Id. at 174-75.) He said the water system in the casting area was designed as a sealed system to recirculate the water used in the production process, but it did not function as such.  (Tr. 357 at 44-45.)

Bobinis described two of the destinations used for pumping out the #4 pit at night while he was there.  He said sometimes he would run the pump hoses outside through the back of the broken tin wall of the building, to the dirt area in the rear.  Other times he would pump the liquid into one of the several interconnected water troughs in the casting area, from which the liquid would be pumped into the outside holding tanks.  (Tr. 355 at 175-84; tr. 357 at 55-56, 65.)[148]

---

[147]  Bobinis had worked at Atlantic States in the early 1990's, then returned in May, 1999. (Tr. 355 at 168-69.)  Company personnel records indicated that Bobinis changed from an hourly worker to a salaried foreman on 7-4-99.  (Tr. 357 at 20.)  Bobinis could not confirm that date, but did say that he was invited to become a foreman just before he flunked a random drug test showing presence of marijuana.  He said he received a 30-day suspension, which was not fully served because he was called back to work as soon as he was notified by Faubert (personnel manager) or Maury that he had passed the second follow-up test.  (Id. at 5-6, 20-36, 68, 136-45.) Personnel records indicated that the suspension began on or about 7-19-99 and ended on or about 8-9-99.  (Id. at 22-25, 140-47.)

[148]  Bobinis also described an interior area of the casting department near the core floor, where bull ladles were stored, as another destination where liquid from the #4 pit could be pumped, where it would soak into the ground.  But his testimony did not indicate that this was a routine destination for the pumping at night.  (Tr. 357 at  56-67, 72-73.)

The problem with the trough approach, as he described it, was that at night when the casting area was not in production and water was being stored for the next day's operation, there was not enough capacity in the outside holding tanks for the additional liquid being pumped from the #4 pit. He described that as the liquid was pumped from the #4 pit through the troughs to go into the outside holding tanks, those tanks would overflow onto the roadway and down into the storm drain. (Tr. 355 at 184-85; tr. 357 at 48-50, 75-76.) Some of the backup of liquid would also bubble up on the floor inside the plant from the troughs "like an artesian well," and also run outside the plant. (Tr. 357 at 75-76.)

Bobinis was aware of a pit (called a sump) in the trough system from which dirty process water could be pumped to an inside area called the "wastewater treatment plant" before being recirculated in the production process. But he said that facility was inoperable the whole time he worked there in 1999, to his knowledge, and he saw that the water being pumped from the #4 pit into the troughs at night would continue to the outside holding tanks. (Tr. 355 at 183-84; tr. 357 at 54-55, 73-77.) Joseph Delker was a day shift (production time) millwright in the casting area during the period including May - October, 1999. (See tr. 280 at 5-8, 70-72.) He did maintenance on both the outside holding tanks and the water treatment plant machinery at various times. (Id. at 52-56, 67-70.) Delker stated that he saw those holding tanks overflow onto the roadway sometimes as frequently as once or twice a week, with the overflow sometimes reaching the storm drain. (Id. at 67-68.) He said that a lot of times when the water treatment plant broke down it was because of a problem in the motor or a broken belt, and then the untreated water would just go back through the water system. (Id. at 69-70.)

237

Bobinis testified that he was aware that the storm drains at the plant flowed into the

Delaware River.  He further testified as follows:

Q       Now did there come a time when you had a discussion with Mr. Maury
        about this liquid running into the storm drain?

A       One evening –  it was about three, four o'clock in the morning –
....
        It was in the evening, about three or four o'clock in the morning.  Me and
        him were sitting out in the pipes.

Q       [W]ere you a foreman then or a laborer?

A       I was a foreman.
....
        It was during lunch break.  And we were sitting out in the pipes, outside of
        – they stacked pipes right next – right across from the drain.  There's a gas
        house out there.  And they would stack the pipes up, which had – they
        called it gray pipe.  It had to go back through the oven, to make them
        ductile.  We were sitting out in the pipes and I was watching this overflow.
        The volume was so great that the drain was trying to suck air.  It was all
        going down the drains.  And it just – I looked at him and I says, "I'm not
        going to jail for this."  That's what came out.

Q       And did Mr. Maury respond to that?

A       Yeah.  He just said "ssshhh."

Q       Can you repeat that for the record?  What did he say?

A       He just put his fingers to his lips and said, "ssshhh."

(Tr. 355 at 185-86.)[149]

----

[149]  There was evidence that Prisque made an identical gesture to Gabriel Marchan as
Marchan was being escorted by Faubert to an interview by OSHA concerning the fracture caused
to him in a forklift incident involving De Los Santos, the driver in the Coxe fatality.  The
deceptive conduct concerning that Marchan injury is the topic of Counts 7 and 10.  (See n.88,
supra and accompanying text.)

238

Bobinis stated that within a few weeks after that conversation, he noticed that Maury was alienating him by assigning impossible tasks. Bobinis tried to communicate with Maury about that, but Maury would not respond. One day he came to work and discovered that two millwrights had been made foremen. They told him to contact Maury, but Maury was not there. He had been given a card with names of those in the chain of command, and he started trying to contact them to find out what was going on. Someone on that list told him to go home and get in touch with Prisque the next day. He did that, but Prisque refused to speak with him. He went to Faubert, the personnel manager, who told Bobinis he did not know what was going on. Finally, after several unreturned phone calls to Singleton, the company president, he went and sat outside Singleton's office seeking a few minutes of his time. He was allowed to see Singleton, asking why he was being terminated and mentioning that the wastewater treatment plant was not working and they had oil going down the river, and things needed to be repaired. Singleton "started mumbling," and Bobinis realized that he could do nothing about his termination. (Tr. 355 at 8-10.) Company records indicated that he was terminated as of October 1, 1999. (See tr. 357 at 104.)

Defendants argue several points as to Counts 28-33. They refer to a portion of the cross-examination of Bobinis, quoted in the margin.[150] From this exchange they argue that if Bobinis

---

[150]  Bobinis testified on cross examination as follows:

Q      The period of time we're talking about May, June, July up to August. Is this the period of time you were involved in what you testified to you dumping in the Delaware?

A      I didn't have the knowledge of it then.

Q      You said water was going down the drain you testified to yesterday, do you remember that?

did not realize until September, 1999 that the storm drain in the roadway near the outside holding

tanks led to the river, the government has not proven the charges for months prior to that.  We

reject that argument.  As the jury was instructed, the knowledge requirement on this point was

that the named defendant knew the discharge was into a storm drain or storm sewer leading to

public waters at the time of the alleged offense.  (See dkt. 717 at 54.)  Therefore, a subordinate's

knowledge or lack of it would not prevent a reasonable fact finder from concluding that based on

all the evidence, defendant Maury did know of these discharges during the relevant period, and

he knew that the storm drains led to the river.

Defendants also argue that the evidence on Counts 28-33 constituted a variance from the

indictment because at most it showed discharges to the storm drain in the roadway near the

outside holding tanks by means of overflow from those tanks, rather than by direct pumping from

the #4 pit.  We must also reject that argument.  The government's evidence was that the

overflowing of those tanks into the storm drain by the outside holding tanks at night was directly

caused by the pumping of liquid from the #4 pit, into tanks that could not hold the capacity and

immediately overflowed.

Defendants also contend that if the alleged discharges were from the outside holding

tanks rather than from the #4 pit, those tanks would not be the "point source" referred to in the

charging language of Counts 28-33.  However, as the jury was instructed, the "point source" as

charged in this case can be part of a storm drain or storm sewer that leads into United States

---

A    When I was a maintenance foreman is when the knowledge came to me of
where it was going.

(Tr. 357 at 33-34.)

waters.  (Dkt. 717 at 53.)  The evidence on those counts did support a finding that the discharges

of liquid from the #4 pit went into the storm drains in the vicinity of the casting department, and

those "point sources" led into the river.

Defendants argue, in the same vein, that at most the evidence showed only accidental or

unintentional overflows of the outside holding tanks, which would constitute both a variance

from the felony charged in those counts and an insufficiency of evidence to support the knowing

element under those counts.  We disagree.  The evidence certainly could support a finding that

some of the outside holding tank overflows, especially during production mode, were accidental

or negligent, or were the result of incompetently starting up water circulation into the holding

tanks before starting circulation flowing out of those tanks during startup of production.

However, that does not obviate the evidence of instances of intentional pumping into the same

overfilled tanks during maintenance activities at night, with the inevitable result that the fluid

would back up and overflow, thereby flowing to the nearby storm drain.  Nor does that argument

obviate the evidence of intentional pumping through holes in the rear wall of the building, to the

area adjacent to the rear roadway that also had downgrade stormwater collection drains.  That,

too, would be encompassed within the charging language of these counts that defendants "caused

wastewater to be pumped at night from [the #4 pit] into a storm sewer...."  (Dkt. 711 at 47.)

The topography of the land behind the melting and casting area sloped on a downgrade to

storm sewers at that end of the plant, which were sampled under the water permits at sampling

Location 2.  We conclude that a reasonable fact finder could infer knowledge on the part of

Maury, the maintenance superintendent for the entire plant, that he did know that there were

storm sewers in the area behind the melting/casting department, and that those flowed to the

river.  The evidence was also sufficient to support a finding that Maury knew during the relevant period that discharging petroleum-contaminated wastewater down any of the storm drains in the plant would violate the water permits.

Defendants submit that there is no evidence of knowing discharges of liquid from the #4 pit by pumping into the storm drains at night after Bobinis was terminated, so their convictions on Count 33, alleging such discharges in October, 1999, cannot stand.  On this point the Court does agree.

Only Schultz and Bobinis testified to intentional pumping of that nature during the time period alleged in Counts 28-33, and Schultz said he did that only at the direction of Bobinis.  The company personnel records indicate that Bobinis was terminated as of October 1, 1999.  Bobinis could not recall the date of his termination, but said the period after his fateful conversation with Maury and his termination was marked by alienation and lasted only a few weeks.  A reasonable jury could conclude from the evidence that Bobinis was terminated, as he believed, because of what he said in that conversation.  The jury could infer that such was Maury's reaction to the conversation, that he would not trust Bobinis to continue the practice under his direction after that, and he would take steps to separate Bobinis from employment as soon as possible.  The evidence would further support an inference that Maury did set about to constructively terminate Bobinis, and when that failed the company did so officially, without expressing a cause.[151]   Such

---

[151]  It is true that Bobinis was under a "Last Chance Agreement" when he returned from suspension as of 8-9-99.  (See testimony cited n.147, supra.)  However, at that same time the company promoted him to foreman and placed him in the chain of command between Maury and the second shift maintenance workers.  (Tr. 355 at 174, tr. 357 at 5, 145-48.)  Bobinis did indeed serve jail time, both before and after his termination from Atlantic States in 1999, for diverse offenses including several 20-year old burglary convictions and more recent convictions for simple assault and resisting arrest.  He also had several convictions (and pending charges) for

findings would place that exchange between Maury and Bobinis in early to mid-September, 1999, and the last such discharge attributable to Maury at or about that time.  For these reasons, we hold that acquittal should be granted on Count 33, because to hold otherwise would require a fact finder to speculate on what practices were in place for pumping out the #4 pit at night after September, 1999.

We do hold that the evidence was sufficient to establish each of the essential elements of the offenses charged against the named defendants in Counts 28 through 32, covering the months of May through September, 1999.  The evidence for that period, as summarized above, was sufficient to support a reasonable finding that the named defendants did knowingly cause, and/or willfully aided and abetted, discharges at least monthly of petroleum-contaminated wastewater, by pumping at night from the #4 pit into one or more storm drains leading to the Delaware River. For these reasons, the Court will grant a judgment of acquittal of both named defendants on Count 33, while denying the motion as to the verdicts on Counts 28-32.

## Count 34

The text of Count 34 states in pertinent part:

1.  Paragraphs 1 through 8 and 22 through 38 of Count 1 [identifying the parties and describing the Clean Air Act regulatory program] ... are hereby realleged ....

2.  From in or about February 2003 to in or about August 2003, ... defendants ATLANTIC STATES ... [and] JOHN PRISQUE, ... owners and operators of a major stationary source, knowingly operated such major stationary source in violation of its Title V permit requirements by causing more than 55 gallons per day of waste paint to be burned in the cupola.

---

driving under the influence.  (Tr. 357 at 6-7.)  Defendants presented evidence that he had expressed strong bias against Maury after his termination.  (Tr. 508 at 23-25.)  He was thoroughly cross-examined on those and all other issues at trial.  (See tr. 357, passim.)

       In violation of Title 42, United States Code, Section 7413(c)(1), and [18 U.S.C.] Section 2.

(Dkt. 711 at 48 (bracketed material added).)[152]  This conduct is also referred to in Count 1, alleged Overt Acts 16 and 21-22.  (Id. at 18-19.)  Additional conduct related to the air permits is alleged in Count 1, Overt Acts 15, 17-20, 23 and 47.  (Id. at 18-19, 25.)

       The verdict found defendants Atlantic States and Prisque guilty on Count 34.  (Dkt. 609; dkt. 610.)[153]  They contend that the government's evidence was insufficient to establish that the aggregate amount of waste paint burned in the cupola on any given day exceeded 55 gallons, which was the permitted limit.  (Dkt. 635 at 196-97; dkt. 646 at 61-62.)

       The government presented testimony of two senior officials on the air pollution regulation side of NJDEP, Robert Heil and Richelle Wormley.  Their testimony summarized the features of the air permits issued to Atlantic States, and some of the history with NJDEP pertaining to those permits, insofar as relevant to Count 34.

       The federal Clean Air Act is the basic air pollution law, administered by the EPA.  The CAA requires each state to have an approved State Implementation Plan.  That plan establishes how the state will come into compliance with federal air standards and how the state will enforce them.  The permitting process is part of that regulatory structure.  Industrial facilities such as Atlantic States are required to apply for and obtain air permits issued under that federal program, administered by NJDEP in New Jersey.  To administer the CAA and related state law, NJDEP is

---

[152]  The statutory language and the essential elements are described in the jury instructions quoted supra, Sec. I.B.

[153]  The other individual named in Count 34 was the defendant who was acquitted.  (See n.6, supra.)

organized basically into a permit unit and an enforcement unit.  The permit unit reviews and makes decisions leading to permit approvals, in consultation with the enforcement unit and with the applicant.  The enforcement unit generally handles the field inspections.  (Tr. 400 at 129-34; tr. 449 at 225-26.)

The cupola was the area of the plant where fuel was used to produce temperatures high enough to melt scrap metal to make the cast iron pipes.  It was like a huge furnace, approximately 70 to 80 feet high.  (Tr. 260 at 95.)  Atlantic States had air permits throughout the period relevant to this case.  (Tr. 400 at 138-41.)  Those permits and related regulatory requirements addressed four basic topics:  (1) what was allowed to be sent into the cupola during operations; (2) how the air coming from the cupola was to be treated before being released up a chimney, called a "stack," into the environment; (3) what were the allowable amounts of pollutant emissions from the stack; and (4) how those emission amounts were to be measured and reported to NJDEP. (See tr. 449 at 226-30.)

Congress amended the CAA in 1990 to create what is called the "Title V permit" program.  Permits issued under the pre-1990 system were called by various names, primarily "preconstruction permits."  (See generally dkt. 711 at 8-11.)[154]  Actually, the pre-1990 system endured well into the year 2000 and beyond, because of the time it took to get the Title V permit program established and then implemented as to individual permittees.  The preconstruction permit program would typically have the permittee holding several simultaneous air permits

---

[154]  The name "preconstruction permit" is not a particularly descriptive term, at least as applied to existing facilities such as Atlantic States.  Nevertheless, that was a name commonly used for permits issued prior to implementation of the Title V permit program.  (Tr. 400 at 138-39; tr. 449 at 227-28.)

aimed at various features of its operations; the Title V program consolidated all air permits held by a facility into a single permit. Atlantic States had a series of preconstruction permits, and was issued its first Title V permit in February, 2003. (Tr. 400 at 138-40; tr. 449 at 218-19, 225-29.)

The primary feature of those air permits, as relevant to Count 34, was the specification of what substances were allowed to be sent into the cupola. That evolved over the early years, but it remained constant from mid-2001 to the end of the indictment period in August, 2003. A brief summary of that topic is as follows.

There were five cupola air permits, or amendments thereto, covering the relevant period. Four were preconstruction permits, which we will label simply with sequential numbers. The last was the Title V permit. Their effective dates were:

| Description | Effective date | (Gov. exh. no.; testimony citation) |
|---|---|---|
| Permit 1 | 6-29-94 | (G-2-255; tr. 400 at 143-44.) |
| Permit 2 | 5-30-96 | (G-2-263; tr. 400 at 157-58.) |
| Permit 3 | 12-24-98 | (G-2-069; tr. 403 at 15-18.) |
| Permit 4 | 5-18-01 | (G-2-283; tr. 403 at 28-29.) |
| Title V permit | 2-20-03 | (G-2-225; tr. 449 at 226-30.) |

Those permits specified the ingredients that could be sent into the cupola during operations, which was commonly called "charging" the cupola. Those ingredients included scrap metal and "fuel." (See tr. 400 at 149.) In the category of fuel, the primary ingredient was coke.[155] In fact, Permit 1 allowed only coke to be used as fuel. (Id. at 149, 157.) Permits 2 and 3

---

[155] A dictionary definition of coke is "the infusible cellular coherent residue from carbonized coal that consists mainly of carbon, is hard, porous, and gray with a submetallic luster, and is used as a fuel (as in blast furnaces and domestic furnaces)." Webster's Third New International Dictionary (1986).

added non-hazardous waste paint ("waste paint") in limited quantities as a permitted secondary fuel.  (Id. at 158-60; tr. 403 at 21.)  NJDEP air pollution inspector Heil testified that non-hazardous paint was not a usual combustible.  He explained that the fuel to be used was carefully designed by permit engineers, and paint was not a typical fuel in an air permit.  (Tr. 400 at 149-50.)

The allowable amount of waste paint changed in 2001.  (Tr. 403 at 29.)  Permits 2 and 3 allowed Atlantic States to charge the cupola with up to 55 gallons of waste paint per hour of operations.  (Tr. 400 at 158-60; tr. 403 at 21.)  Permit 4 and its successor, the Title V permit, reduced that allowable amount to a maximum of 55 gallons of waste paint per day.  (Tr. 403 at 29; tr. 449 at 226-30, 323-33.)  In sum, from May 18, 2001 through August, 2003, the end of the relevant period, the allowable amount of waste paint to be burned in the cupola was limited to 55 gallons per day.

None of the permits allowed "hazardous waste paint" to go into the cupola.  (Tr. 400 at 160-61; tr. 403 at 27; tr. 449 at 233-34.)  The regulatory definition of "hazardous waste paint" depended on viscosity and volatility.  Basically, hazardous waste paint would be fresh, liquid paint.  (Tr. 400 at 160-61; tr.403 at 25-27.)  It would be hazardous in the air because of the increased volatile organic chemicals ("voc's") released when it burned.  (Tr. 404 at 38-39.)[156]

---

[156]  The charging paragraphs of the indictment did not allege violation of the air permit prohibition against burning of hazardous waste paint.  (See dkt. 711 at 18-19, 48.)  The government's evidence did not include expert analysis of any waste paint sent to be burned in the cupola.  Therefore, for purposes of this case the Court ruled that it would not instruct the jury to distinguish between hazardous and non-hazardous waste paint in making its factual findings.  (See tr. 555 at 15-18, 36, 103-120; tr. 165 at 41-44.)  The jury was thus allowed to consider any waste paint described in the evidence in determining whether in the aggregate it exceeded the 55-gallon per day permit limit as alleged in Count 34.

There was evidence that described, but did not raise issues concerning, the second main feature of the air permits. That feature was approval of the air treatment facilities (which also evolved over time) that were constructed to treat the air coming from the cupola before it was ready to be released from the stack. Those were generally referred to as the "afterburner" and "scrubber" components of the system. (Tr. 400 at 140-41; tr. 449 at 228-30.)[157]

The third main feature of the air permits consisted of limitations on the allowable pollutant emissions from the stack. Various types and amounts of emissions were regulated under those permits. The evidence on Count 34 concerned the limitations for control of carbon monoxide ("CO") emissions from the cupola. (See tr. 400 at 144-46.) Carbon monoxide is produced from incomplete combustion of fuel and air, which is affected by what fuel is being used. (Id. at 146-50.) The limitations in the Atlantic States permits on CO emissions per day were:

| Description | CO Limit (in parts per million) | (Citation) |
|---|---|---|
| Permit 1 | 2500/hr., but not to exceed 4-hr. average of 1835 ppm | (Tr. 400 at 144-46, 155-57.) |
| Permit 2 | 2500/hr., averaged over the day | (Id. at 158-59.) |
| Permit 3 | 2500/hr., averaged over the day, except up to 4000/hr., 3x per qtr. | (Tr. 403 at 18-20.) |
| Permit 4 | Same as Permit 3 | (Id. at 29-30.) |
| Title V permit | Same as Permit 4 | (Tr. 449 at 233.) |

---

[157] This discussion addresses only the aspect of the Atlantic States air permits dealing with the cupola air treatment system, because that is the topic of Count 34. The evidence also described a separate air treatment system that captured fumes coming from the molten metal after it left the cupola and was being formed into pipes in the casting area. That system was called the "melt center bag house," referring to a system of filters called bags, and it had a separate stack for emission of its treated air. (Tr. 400 at 140-42.)

Any amount in excess of those limits was called an "exceedance," which the permittee was required to report to NJDEP as described below.

The fourth main feature of the air permits related to the methods by which the amounts of emissions were measured at the plant and reported to NJDEP. The required measurement equipment at the plant was called a continuous emission monitor ("CEM"). It consisted of a probe or probes up in the stack that sensed the type and quantity of emissions and transmitted the information to an analytical instrument recording it as continuous data. (Tr. 400 at 150-51.)[158]

The permittee was required to install and maintain the CEM equipment, and have both the equipment and its data available for inspection by NJDEP.[159] However, the permittee was not required to file CEM printouts with NJDEP. Instead, the permittee was required to prepare and submit to NJDEP quarterly reports of all exceedances, called Excess Emission Reports ("EER"). (Id. at 151-53; tr. 403 at 32-34.) The permittee was also subject to unannounced inspections by the NJDEP enforcement officers, and elaborate scheduled tests of emissions called stack tests. (See tr. 400 at 134-37.)

---

[158] NJDEP has a policy that although the CEM is required to be a continuous monitoring system, the permittee is given 10% leeway to allow for maintenance problems with the system. Thus, there may be up to 10% of all operating hours when the CEM is reported as nonfunctional, but the permittee must report those hours on its NJDEP exceedance reports, and explain what the technical problems were. Any down time over the 10% was an exceedance. (Tr. 400 at 153-54; tr. 404 at 32-33.)

[159] Periodic calibration testing of the accuracy of the CEM equipment was also required under the permit. That type of testing was called a relative accuracy test assessment ("RATA" test), which was typically performed by a contractor paid by the permittee. The RATA test consisted of placing in the stack, near the CEM probe, another probe supplied by the contractor that was certified to be accurate, and comparing the results of the two probes as they simultaneously sensed the flow of emissions. (See tr. 403 at 108-112.)

Every exceedance constituted a violation of the permit, according to NJDEP.  (Tr. 400 at 153-55; tr. 403 at 37-39.)  A fine was the usual penalty for each violation, unless the NJDEP agreed not to impose a fine after the permittee submitted an "affirmative defense."  (Tr. 400 at 153-55; tr. 403 at 40-47.)

Heil testified, from NJDEP records and his own experience, that Atlantic States had a long history of air permit enforcement problems.  (Tr. 400 at 164-65.)  In 1998 it requested a relaxation of the CO permit standards, which was only partially granted in the approval of Permit 3 as of December 24, 1998.  (Tr. 403 at 4-20.)  As of late 2000, Atlantic States was facing fines of approximately $600,000 for its documented exceedances.  (Id. at 40-47, 149-50.)[160]  In summer, 2001, Atlantic States installed a multimillion-dollar new cupola emissions system.  However, the emissions problems continued.  (Id. at 48-51; tr. 416 at 120-26.)

Prisque, as plant manager, signed and certified each EER as the highest ranking official with direct knowledge of the contents of the report.  (Tr. 403 at 32-37.)  He was also typically copied on each written communication from Atlantic States to NJDEP submitting the quarterly EERs and any other communications to NJDEP, such as requests to relax the permit limitations.  (Id. at 4-10, 35.)  Heil testified that the concept of the continuous monitoring system, and its quarterly reporting requirement, was for the permittee to self-monitor and self-report, telling NJDEP what the emissions were and whether or not the company was operating within its permit limits.  (Id. at 37.)

---

[160]  A negotiated settlement of fines for exceedances attributable to 1999-2001 was later reached, which Atlantic States paid.  (Tr. 403 at 149-50.)

When NJDEP and law enforcement officials executed the search warrant on February 24, 2000, they observed and photographed numerous 55-gallon drums, sitting in a large open area of the plant adjacent to the cupola, called the scrapyard. Some of the drums had lids sealed with duct tape; others were full and open, with the contents exposed. The visible contents included a black tarry substance, as depicted in photographs in evidence. (Tr. 265 at 91-109; tr. 363 at 131-35.) Atlantic States workers who testified at trial described the process by which those drums would be filled and taken to the scrapyard, and then lifted into the cupola for burning.

Robert Rush was employed at the plant from early 1999 through June, 2001. During that period he learned all tasks on the cement line and paint line, and was promoted to foreman in or about late 1999. (Tr. 289 at 187-88, 192-93; tr. 291 at 5-7.) He described the paint line and the procedure for its nightly cleanup, which he supervised during the time he was night shift foreman there through June, 2001. George Shepherd described observing similar procedures into mid-2003.

The paint line was located adjacent to the cement line in the finishing area. (Tr. 289 at 194-95.) After the pipes were lined with cement and debris removed from the ends by washing, the pipes were dried and then painted inside and/or outside. (Tr. 291 at 22-27; tr. 416 at 13.) The paint was delivered to the plant in bulk and stored in another area. (Tr. 418 at 106.) The paint to be used each day was contained in large "day tanks" kept in the paint room adjacent to the paint line, where it was heated to the right consistency for spraying. (Tr. 317 at 6-8; tr. 305 at 131-33.) The pipes ranged up to 24 inches in diameter, and were typically 18 to 20 feet long. (Tr. 291 at 21; see also tr. 353 at 78; tr. 394 at 87.) The paint machine was a large automatic apparatus that could paint three pipes at a time, spraying the paint from two carriages each

equipped with six wands.  (Tr. 291 at 27-28.)  The waste paint would collect on the floor

underneath the paint machine.  The consistency of the cooled waste paint at that point would be

fairly thick.  (Tr. 294 at 39-43; tr. 303 at 178-80.)

Rush testified that while he was foreman, every night during cleanup the laborers under

his direction would use flat shovels to scoop the waste paint into 55-gallon drums, filling them to

2-3" from the top.  They would generally put "chills" (small pieces of iron) into each drum, so

the magnet of the crane in the scrapyard could lift them to send to the cupola.  They understood

that if the chills were omitted, the crane could not lift the drums magnetically and they would be

smashed in the scrapyard.  The workers would seal the drums with a lid and lock ring, and put

duct tape on top.  They would then transport the drums to the scrapyard using a hand truck or

forklift.  (Tr. 294 at 40-52.)

The workers would fill approximately 7-10 drums in this manner and take them to the

scrapyard each night, Rush said, generally placing them in the beginning of the yard on the right

side (the same location where the search warrant team photographed similar drums on February

24, 2000).  (Id. at 42-47, 55.)  This procedure was instructed to Rush by his superintendent

Davidson, and Rush followed it in directing the night crew until the end of his time at the plant in

June, 2001.  (Id. at 42, 49, 51-52.)[161]  Shepherd described 4 to 8 drums per night in his testimony

extending into 2003.  (Tr. 416 at 59.)

_____

[161]  Rush testified that plastic drop cloths were not used to collect waste paint under the
paint machine during his time at the plant.  (Tr. 303 at 181-82.)  The scrapyard crane operators
and Shepherd, who testified about conditions into the 2003 period, said some of the drums
contained both liquid paint and paint drippings on plastic.  (See, e.g., tr. 394 at 97; tr. 418 at
108.)  The air permits specified each type of substance allowed as inputs to the cupola.  Items
such as plastic and rubber were not permitted to be burned in the cupola.  (See tr. 449 at 433-34.)

The scrapyard was the location where scrap metal was collected to be fed into the cupola. It was a very large open enclosure, and two overhead cranes used magnets to lift the scrap up to the area where it was sent to the cupola in skip cars mounted on tracks.  (Tr. 280 at 19-23, 81-84.)

Mark Johnson was one of the crane operators during the period covering 2001 to July, 2005.  (Tr. 394 at 186.)  He testified that during that entire period, he put at least four 55-gallon drums, full to the top with waste paint, into the cupola charge, periodically on a daily basis.  He knew they were full because, although they had lids on and were covered with duct tape, sometimes when he tried to pick them up with the crane magnet they would break open and the paint would fall onto the scrap or the ground.  (Id. at 192-93; tr. 400 at 74-77.)  Joe Delker, another crane operator, testified to similar experiences during the same period.  (Tr. 280 at 21-24, 70-71.)

Johnson recounted that one day while he was walking to the crane sometime during the period of approximately 2001-2004, Davidson stopped him and told him the paint barrels were backing up in the scrapyard, and he should get rid of them – which Johnson understood to mean to put them in the cupola.  He replied that he would do his best to do that.  (Tr. 394 at 194-96.)  Also Johnson's supervisor, a "white shirt" named Tom Dalrymple who reported to Prisque, told him to burn the drums containing paint in the cupola.  (Id. at 194.)

Craig Kolbe was a foreman in the melting and casting area, which included the cupola. His employment spanned the period 1997-2005.  (Tr. 449 at 129-30.)  One of his responsibilities was to monitor the cupola emissions data.  (Id. at 130-32, 135.)  Dalrymple was his immediate supervisor, but he also had direct interaction with Prisque as his supervisor.  (See id. at 131,

135.)  Prisque told him that the permit allowed the burning of two drums of paint a day, and he did not question Prisque's word on that.  (Id. at 135.)  But Kolbe testified that when he was monitoring emissions and saw them go wrong, he knew what was happening.  From his working knowledge he testified that iron is not an accelerant but paint is, and when he saw emissions spike he concluded it was due to paint (and/or tires) in the cupola.  (Id. at 135-36.)  Mark Johnson, the crane operator, testified that he was told by his supervisors, including Prisque and Dalrymple and Kolbe, that if he put more than four drums of paint a day in the cupola, emissions would go up.  (Tr. 394 at 193-94.)

　　　　Neal Zettlemoyer worked at the plant from 1999 forward, including at the time of trial. (Id. at 81-82.)  He testified that he, too, was assigned to operate the overhead cranes in the scrapyard.  (Id. at 82-87.)  He stated that between 1999 and 2003, an average of four drums a day went into the cupola, of which at least two would be full with paint to the top and two would have plastic with paint waste on them.  (Id. at 94-95.)  He recalled at one point in approximately 2003, while Zettlemoyer was up in the crane, his supervisor Tom Dalrymple called him on the phone in the crane and told him to put in one drum per hour into the cupola, and he did that.  He recalled that some were filled with paint and some had a combination of plastic and paint drippings.  (Id. at 97.)  He stated that at about that same time NJDEP was expected at the plant, and Harbin and Shepherd came to the scrapyard and told him to pick up the extra drums containing paint and put them in the cupola, but the crane could not pick them all up.  He picked up those he could, and the ones he could not pick up he covered with fine shredded scrap so they were not visible.  (Id. at 95-97.)

254

George Shepherd testified that the episode to which Zettlemoyer referred occurred approximately one month before Shepherd left his employment (which was in May, 2003), when NJDEP officials were coming for an inspection.  (Tr. 418 at 4-7.)  Shepherd explained that each time "visitors" came, the standard procedure was that Prisque or Harbin would alert supervisors on the radio, or Prisque or Harbin would tell them personally, either individually or in meetings.  Prisque would instruct them to "make sure there's nothing out in the plant they could find."  Shepherd would then start at one end and walk the whole plant, trying to fix up anything that looked unsafe.  (Tr. 416 at 54-55.)

On that occasion, Shepherd and Harbin were called into Prisque's office, and Prisque told them that someone from the State was coming.  Prisque told them to each start at opposite ends of the plant and walk the plant.  When Shepherd reached the scrapyard he saw a lot of drums, both standing drums and smashed drums lying around with paint and other contents leaking out of them.  (Id. at 189-93.)  Shepherd called Harbin, so together they could try to get the crane operator to pick them up and send them to the cupola.  (Id. at 193.)  Harbin was directing the charging crane operator, Zettlemoyer, to start charging them to the cupola, but the crane magnet would not pick up the smashed drums.  So Harbin then directed the yard crane operator, Johnson, to bury the smashed drums with shredded metal, leaving the upright sealed drums visible.[162]  Shepherd and Harbin did that so the State would not see the messy and unsafe situation.  (Id. at 194-95; see also id. at 52-58; tr. 418 at 5-7.)

_____

[162]  Johnson also recalled on one occasion being instructed directly by Prisque (in the presence of Maury and Harbin), who waved to Johnson in the overhead crane, ordering Johnson to bury more than ten drums containing paint by piling scrap metal on the drums until they were no longer visible.  Johnson could not recall the date of that event, except that it was during his employment period spanning 2001-2005.  He did recall that later that same day, he saw visitors walking back and forth through the scrapyard looking at everything.  (Tr. 400 at 8-10, 49-53.)

One day shortly after that State inspection, Prisque directed Shepherd to get Dittinger and his crew together and get rid of those drums by charging them into the cupola.  That day they burned approximately 20 drums.  Immediately Dalrymple and Kolbe called Shepherd up to the cupola deck because the CO readings had spiked while that quantity was being consumed in the cupola.  The next day the same procedure was repeated with the remaining 15-20 drums, and the same thing happened – the CO readings spiked.  Shepherd testified that he and Dalrymple discussed that they realized that the contents of the drums had caused the high readings. Shepherd told Dalrymple that he would call Prisque with those results, and he did.[163]  Prisque replied that it was fine; that the paint and all had nothing to do with it; and "don't go there."  (Tr. 416 at 195; tr. 418 at 7-8.)

We hold that the evidence was sufficient to establish that defendant Prisque, as the plant manager who was acutely aware of the air permit emissions limits and the consequences of exceedances, did know of the waste paint limitation of 55 gallons per day that was in the 2001 permit and carried forward into the air permits in effect in 2003.  A reasonable jury could further find from the evidence that Prisque knowingly participated in causing a volume of more than 55 gallons of waste paint (exclusive of plastic and any other substances) per day to be burned in the cupola, on one or more days during the period February to August, 2003, as charged in Count 34. We conclude that the evidence was sufficient to support a verdict based on findings that each of

---

[163]  Shepherd testified to statements and actions by Prisque, and orders directly from Prisque to Shepherd, involving Prisque's constant monitoring of the emissions readings and deliberate efforts to manipulate the reportable cupola emissions.  (See dkt. 641 at 166-73, listing citations.)  Kolbe testified to similar orders, received by him from both Prisque and Dalrymple. (Tr. 449 at 144-48.)

the essential elements of the Clean Air Act violation alleged in Count 34 was established as to defendants Atlantic States and Prisque.

## D.      Conspiracy charge (Count 1)

The five-objective conspiracy alleged in Count 1 is described in the Preliminary Statement, supra.  That count charged that during the period of approximately October 31, 1995 through August, 2003, the defendants entered into a conspiracy to: (A) violate the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A); (B) violate the Clean Air Act, 42 U.S.C. § 7413(c); (C) defraud the United States by obstructing OSHA and the EPA; (D) make false statements in matters within the jurisdiction of OSHA, EPA and the FBI, 18 U.S.C. §1001; and (E) corruptly obstruct a pending proceeding before OSHA, 18 U.S.C. §§ 1505 and 1515(b); all in violation of 18 U.S.C. § 371.  (Dkt. 711 at 1-33.)  The jury was fully instructed on the conspiracy statute, its essential elements, and the legal definitions of each of the alleged objectives.  (See, e.g., dkt. 717 at 28-42, 60-62.)

The verdicts for the convicted defendants found each of them guilty under Count 1.  The verdict sheets included special interrogatories for each alleged objective.  Those verdicts were as follows:

(1)  Atlantic States:  guilty on all five objectives.

(2)  Prisque:  guilty on all five objectives.

(3)  Faubert:  not guilty on objectives (A) and (B); guilty on (C), (D) and (E).

(4)  Maury:  not guilty on objective (B); guilty on (A), (C), (D) and (E).

(5)  Davidson:  not guilty on objectives (B), (C) and (E); guilty on (A) and (D).

(See separate verdict sheets, dkt. 609; dkt. 610; dkt. 611; dkt. 612; dkt. 614; see chart n.64, supra.)

Each of those defendants was thus found guilty on at least two of the alleged objectives, and all of them were found guilty on objective (D), the false statements objective.  They contend that the evidence was insufficient to establish facts necessary to support the verdicts on Count 1. They also contend that the Court should dismiss some of the 81 overt acts alleged in Count 1, as either surplusage or unsupported by the evidence.  (See dkt. 635 at 150-232; dkt. 646 at 52-66; dkt. 650 at 2-4; dkt. 661 at 2-4 (post-trial briefs); see also dkt. 470; dkt. 471; dkt. 573; dkt. 559 (trial briefs).)

A criminal conspiracy, in violation of 18 U.S.C. § 371, is established by proof that "two or more persons conspire[d] ... to commit any offense against the United States ... and [that] one or more of such persons d[id] any act to effect the object of the conspiracy."  United States v. Cartwright, 359 F.3d 281, 287-88 (3d Cir. 2004).  The Third Circuit interprets § 371 to encompass three elements:  (1) an agreement between two or more persons to commit a federal crime, (2) knowledge of the purpose of the conspiracy and a deliberate decision to join in that purpose, and (3) commission of an "overt act" by one of the participants in furtherance of the conspiracy.  United States v. Conley, 37 F.3d 970, 976-77 (3d Cir. 1994).

A court reviewing the sufficiency of the evidence on a conspiracy charge must closely scrutinize that evidence, because "[s]light evidence of a defendant's connection with a conspiracy is insufficient to support a guilty verdict."  United States v. Brodie, 403 F.3d 123, 134 (3d Cir. 2005) (quoting United States v. Samuels, 741 F.2d 570, 575 (3d Cir. 1984)).  "In conducting the sufficiency inquiry, we do not view the government's evidence in isolation, but rather, in conjunction and as a whole."  Brodie, 403 F.3d at 134.  "The court must determine 'whether all the pieces of evidence, taken together, make a strong enough case to let a jury find

[the defendant] guilty beyond a reasonable doubt.'"  United States v. Coleman, 811 F.2d 804,

807 (3d Cir. 1987) (quoting United States v. Allard, 240 F.2d 840, 841 (3d Cir. 1957)).

Defendants argue that the government cannot prove a conspiracy based on the facts that

the defendants worked together; were supervisory "white shirts" in the chain of command; and

met regularly to discuss production matters.  "If anything," they contend, "the United States only

proved a conspiracy to run a foundry."  (Dkt. 635 at 154.)  They say that even if the jury found an

individual defendant guilty of a relevant overt act, or even a substantive count of the indictment,

that cannot support the conspiracy conviction without evidence of an agreement.  (Id.)

It is well settled in the Third Circuit that the elements of conspiracy can be proven

entirely by circumstantial evidence.  Kapp, 781 F.2d at 1010.  "Indeed, the very nature of the

crime of conspiracy is such that it often may be established only by indirect and circumstantial

evidence."  Brodie, 403 F.3d at 134.  "The existence of a conspiracy can be inferred from

evidence of related facts and circumstances from which it appears as a reasonable and logical

inference, that the activities of the participants ... could not have been carried on except as the

result of a preconceived scheme or common understanding."  United States v. Smith, 294 F.3d

473, 477 (3d Cir. 2002) (quotes and cites omitted).  The jury was so instructed in this case.  (Dkt.

717 at 30-34.)  The jury instructions pointed out that members can join a conspiracy at different

times, and have different roles, and join in some but not all of the unlawful objectives, as long as

the defendant joined in at least one of the objectives.  (Id. at 34-36.)

The jury was carefully instructed that if a "person has no knowledge of the conspiracy,

but happens to do something that advances an objective or purpose of the conspiracy, that person

does not, by that action alone, become a conspirator.  Rather, the evidence must show both the

existence of the conspiracy and a defendant's willful participation in it – that is, that the defendant intended to advance an objective of the conspiracy." (<u>Id.</u> at 33.) The instructions also cautioned that "a defendant's mere presence at the scene of an alleged crime, or merely working together at the same facility, or merely holding a particular job title, does not, by itself, make him a member of the conspiracy.... Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further an objective of the conspiracy, does not make the defendant a member.... What is necessary is that the defendant must have participated with knowledge of at least one of the objectives of the conspiracy, and that the defendant did knowingly and willfully intend to aid in the accomplishment of those unlawful goals." (<u>Id.</u> at 34.)

This Court finds that the verdicts on the conspiracy count were supported by sufficient evidence to establish each of the essential elements against each convicted defendant. We further find that the evidence was sufficient to support the findings as to the participation of the individual defendants in the alleged objectives upon which they were found guilty. In making this ruling, we incorporate the foregoing discussion of the evidence supporting each of the substantive counts of conviction. We further rule that the government's evidence at trial – taken as a whole and not confined just to the evidence discussed above – was fully sufficient to find that the named defendants knowingly and willfully participated in the conspiracy alleged in Count 1, as to each of the objectives for which they were individually found guilty. (<u>See, e.g.</u>, evidence discussed in Gov. Br. 641 at 130-186.) "To sustain a conspiracy conviction, the 'contention that the evidence also permits a less sinister conclusion is immaterial.... [T]he evidence need not be inconsistent with every conclusion save that of guilt.'" <u>Smith</u>, 294 F.3d at 478 (quoting <u>United States v. Dent</u>, 149 F.3d 180, 188 (3d Cir. 1998)).

Defendants also argue that many of the overt acts alleged in the indictment should be stricken or dismissed for insufficiency of evidence. (See, e.g., Def. Br. 635 at 155-232 (discussing evidence on specified overt acts).)[164] This Court requested supplemental briefing on the issue of whether the Court can dismiss an alleged overt act, rather than a count in the indictment, for insufficiency of evidence. (Tr. 662 at 7-8.) Having reviewed those materials and the cited case law, we remain unconvinced that upon a defendant's motion the court must dismiss a particular alleged overt act, as distinguished from a count, for lack of evidence.[165]

Federal Rule of Criminal Procedure 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment." Defendants included a motion under Rule 7(d) in their omnibus pretrial motions, seeking to strike (1) portions of the introductory language of the indictment as surplusage because it purported to explain the regulatory structure under OSHA, the CWA and the CAA, and (2) phrases such as "and others," "among other things," and "elsewhere." (Dkt. 126.) The Court denied that motion without prejudice, with leave to renew during trial. (Dkt. 201.) In so ruling, we indicated that the latter phrases would probably not be stricken, and some of the introductory language would probably be redacted in favor of the Court instructing the jury on the applicable law. (Tr. 213 at 56-57.)

---

[164] Defendants Atlantic States and Prisque also moved, at the close of all the evidence at trial, to dismiss overt acts 15, 18, 19 and 20 for lack of evidence. (Dkt. 559.)

[165] The jury instructions explained the third essential element of the conspiracy, which requires "that just one overt act, whether specifically enumerated under Count One or not, was knowingly committed by any conspirator while the conspiracy was in existence and in furtherance of the conspiracy." (Dkt. 717 at 37.) The instructions stated that the overt act need not be criminal in nature, but that the jury must be unanimous as to the specific overt act that it finds. (Id.)

That is exactly what we did at trial, even without renewal of the pretrial motion to strike. We left those quoted phrases in the indictment, and redacted the legal discussion.  When we did redact portions from the version of the indictment provided to the jury during deliberations, we so informed them in the jury instructions.  (See dkt. 717 at 66.)  The Court also informed the jury that the government had voluntarily withdrawn alleged overt acts 10, 12, 31, 39, 40, 44 and 74 from jury consideration, and the indictment had been thus redacted.  (Id.)  We declined to strike or dismiss any overt acts as requested by defendants in their Rule 29 motions filed during trial. (See dkt. 470; dkt. 471; dkt. 510; dkt. 559; dkt. 573 (letter motions and briefs).)

Federal Rule of Criminal Procedure 29 provides in pertinent part that "[a]fter the government closes its evidence or after the close of all the evidence, the court on defendant's motion must enter a **judgment of acquittal of any offense for which the evidence is insufficient** to sustain a conviction."  Fed.R.Crim.P. 29(a) (emphasis added).  It is apparent that Rule 29, which is triggered by insufficiency of the government's evidence at trial, provides only for the relief of entering judgment of acquittal of an offense.  An offense, in turn, is charged in a count of an indictment.  See Fed.R.Crim.P. 7(c) ("The indictment ... must be a plain, concise, and definite written statement of the essential facts constituting the offense").

The case law cited by defendants in their supplemental briefing does not, in our view, support the proposition that a unit of the indictment smaller than an entire offense – a count – should be dismissed under Rule 29 for insufficiency of evidence.  (See dkt. 650; dkt. 653; dkt. 661 (supplemental briefing, with citations).)  If that were so, we would be required under Rule 29 to grant a judgment of acquittal on an overt act – a result not countenanced by that Rule.  We therefore have considered defendants' arguments concerning the evidence, or lack thereof,

relating to various alleged overt acts, but we have viewed it in the context of their motion seeking a judgment of acquittal on Count 1.

We continue to decline to strike individual overt acts, upon motion of defendants, on grounds of insufficiency of evidence.  To the extent that defendants' Rule 29 motions at trial may have sought to strike any of the challenged overt acts as surplusage under Rule 7(d), this Court impliedly denied that relief by submitting to the jury the indictment in unredacted form, with the exceptions noted above.  In our view that was a proper ruling,  because all of the alleged overt acts were relevant to the conspiracy charged in Count 1 and were not unnecessarily prejudicial.

It may be that in the sentencing process, the evidence underlying certain alleged overt acts will be in issue in determining the offense conduct for guideline calculations, or in determining additional relevant facts for purposes of the Court's obligation to impose a sentence pursuant to 18 U.S.C. § 3553(a).  At that time the Court will make factual rulings as necessary to determine the sentence, and the parties may argue from the trial evidence and other information as appropriate.  However, in the present procedural posture of the case we find the issue of striking any additional language from the indictment to be moot.

**E.    Conclusion of Point VII**

The Court has considered each conviction challenged under Rule 29 for insufficiency of the evidence.  We will grant judgment of acquittal, pursuant to Rule 29(c), on the following counts:

(1)    Count 2, in favor of Atlantic States and Scott Faubert;

(2)    Count 21, in favor of Atlantic States and Craig Davidson; and

(3)    Count 33, in favor of Atlantic States and Jeffrey Maury.

The motion under Rule 29 is denied as to all other counts of conviction.

Rule 29 distinguishes between counts on which the jury has returned a guilty verdict, and counts on which the jury has failed to return a verdict, as follows:

> If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal.  If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

Fed.R.Crim.P. 29(c)(2).  We have both circumstances here:  The jury returned guilty verdicts, inter alia, on Counts 21 and 33.  The jury did not return a verdict on Count 2.

Rule 29 further provides that if the court grants a judgment of acquittal after a guilty verdict (which is the situation with Counts 21 and 33), the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed, and the court must specify the reasons for that determination. Fed.R.Crim.P. 29(d)(1).

This Court hereby determines that as to Counts 21 and 33, upon which the jury did return guilty verdicts, if the judgment of acquittal that we enter is later vacated or reversed, a motion for a new trial should be granted.  The reason for dismissing those counts was insufficiency of the evidence, and the parties should not be foreclosed from having those counts again tested in a jury trial if they elect to do so.  However, we cannot predict at this stage whether defendants would have grounds to oppose a new trial on those counts if it were sought by the government.  For example, those defendants may argue that because the evidence on Count 21 is so intertwined with Counts 12-20 and 22-27, and the evidence on Count 33 is so intertwined with Counts 28-32 (upon which the named defendants stand convicted), they would have double jeopardy or other grounds to oppose a retrial if it were limited to Counts 21 and 33.

The Court has also reviewed the evidence under Rule 33, as requested in defendants' pending motion for new trial.  That rule permits a court to grant a new trial on defendant's motion, "if the interest of justice so requires."  Fed.R.Crim.P. 33(a).  The Rule 33 motion, unlike a Rule 29 motion, requires the court to exercise its own judgment in assessing the government's case.  A district court is permitted to order a new trial on the ground that the verdict is contrary to the weight of the evidence, if the court believes there is a serious danger that a miscarriage of justice has occurred.  However, motions for new trial based on the weight of the evidence are not favored, and are to be granted only in exceptional cases.  <u>Brennan</u>, 326 F.3d at 188.

We have evaluated the weight of the evidence in this case, including challenges to the credibility of the government witnesses, and we do not find that this is an exceptional case requiring a new trial.  The government's evidence was strong on all of the counts of conviction, with the exception of the counts noted above representing certain months of alleged CWA violations not established by the testimony.  The Court has carefully reviewed the evidence under the standard of Rule 33, but we conclude that a new trial is not warranted on those grounds.

## VIII.   DEFENDANTS' POINT VIII:  "RENEWAL OF MOTIONS FOR PURPOSES OF APPEAL."

Defendants renew all motions filed during the pendency of this matter, whether filed before or during trial, including but not limited to the following.  Here we provide the identifying docket number of the entries filing and adjudicating the motions.  Much briefing and oral argument typically accompanied motions, all of which is reflected in the Court's docket.  The orders identify the dates and/or transcript references of oral rulings.

265

1.      Motion to strike surplusage (Dkt. 126; Order 201);

2.      Motion to dismiss Counts 3 and 4 for failure to allege essential elements
(Dkt. 128; Order 202);

3.      Motion to dismiss Overt Acts 1, 3 and 6-14 and Counts 3-4 and 24-27 as barred
by July 2002 settlement agreement (Dkt. 129; Mem. Op. 196; Order 197);

4.      Motion to dismiss Overt Act 9 (Dkt. 130; Order 203);

5.      Motion to dismiss Count 1 for fatal duplicity (Dkt. 131; Order 720);

6.      Motion to dismiss Counts 12-26 and 28-34 for failing to allege essential elements
(Dkt. 132; Order 205);

7.      Motion to dismiss Counts 12-34 for failing to state an offense under the CWA and
CAA – no allegation of criminal intent (Dkt. 133; Order 206);

8.      Motion to dismiss Counts 1, 8, 9 and 10 for failing to plead the essential elements
of obstruction charges (Dkt. 134; Order 207);

9.      Motion to suppress evidence seized during the 2-24-00 search warrant execution
and to dismiss Overt Acts 10-14 and Counts 3 and 4 (Dkt. 135; tr. 216 (ev. h'g);
  Order 656);

10.     Motion for a *James* hearing and pretrial determination regarding admission of
statements by unindicted co-conspirators (Dkt. 136; Order 198);

11.     Motion to compel pretrial production of Jencks material because the Jencks Act
violates defendants' constitutional rights (Dkt. 137; Order 158);

12.     Motion to consolidate Counts 24 and 27, Counts 12-26, and Counts 28-33 to
avoid multiplicative charges (Dkt. 138; Order 208); and

13.     Consolidated Motions in Limine (Dkt. 171; Order 665).

The Court hereby reiterates its prior rulings on all motions renewed for purposes of appeal.

## CONCLUSION

Defendants Atlantic States Cast Iron Pipe Company, John Prisque, Scott Faubert, Jeffrey Maury, and Craig Davidson, having each been convicted in a jury trial, move for judgment of acquittal pursuant to Rule 29.  Each defendant also moves, in the alternative, for grant of a new trial pursuant to Rule 33(a).  This Memorandum Opinion sets forth the rulings of the Court on the pending motions.[166]

For the reasons stated, the Court will grant judgment of acquittal, pursuant to Rule 29(c), on the following counts:

    (1)      Count 2, in favor of Atlantic States and Scott Faubert;

    (2)      Count 21, in favor of Atlantic States and Craig Davidson; and

    (3)      Count 33, in favor of Atlantic States and Jeffrey Maury.

Defendants' motion for judgment of acquittal as to all other counts of conviction will be denied.

The motion for new trial pursuant to Rule 33 will be denied.  However, Rule  29(d)(1) requires the Court to make a conditional determination whether any motion for a new trial should be granted if a judgment of acquittal setting aside a guilty verdict is later reversed or vacated.  That provision applies to Counts 21 and 33 here.  It does not apply to Count 2, on which the jury did not return a verdict.  We have determined conditionally that a motion for a new trial should

---

[166]  Defendants did not have a joint defense agreement.  (Tr. 283 at 44.)  However, they filed and briefed their post-trial motions collectively.  Those motions are:  (1) Motion for a Judgment of Acquittal pursuant to Rule 29 (Dkt. 617); and (2) Motion for a New Trial pursuant to Rule 33 (Dkt. 618).  Also pending are three motions for acquittal or related relief filed during trial pursuant to Rule 29(a).  Those motions are:  (1) Motion by all defendants to dismiss certain counts and overt acts (Dkt. 470); (2)  Motion by Davidson to dismiss certain counts and overt acts (Dkt. 471); and (3) Motion by Atlantic States and Prisque to strike certain overt acts (Dkt. 559).

be granted on Counts 21 and 33 if the judgment of acquittal on those counts is reversed or

vacated.

Orders on the pending motions are filed herewith.


   s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

268